## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| CHARLES KUX-KARDOS, Individually and on Behalf of All Others Similarly Situated, | **Civil Action No.:** |
| Plaintiff(s), | **CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS** |
| v. | |
| VIMPELCOM, LTD., JEAN-YVES CHARLIER, JO LUNDER, ALEXANDER IZOSIMOV, ANDREW DAVIES, and CORNELIS HENDRIK VAN DALEN, | **JURY TRIAL DEMANDED** |
| Defendants. | |

Plaintiff Charles Kux-Kardos ("Plaintiff"), individually and on behalf of all other persons similarly situated, by his undersigned attorneys, for his complaint against defendants, alleges the following based upon personal knowledge as to himself and his own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through his attorneys, which included, among other things, a review of the defendants' public documents, conference calls and announcements made by defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding VimpelCom, Ltd. ("VimpelCom" or the "Company"), analysts' reports and advisories about the Company, and information readily obtainable on the Internet.  Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

**NATURE OF THE ACTION**

1.     This is a class action on behalf of purchasers of VimpelCom securities between June 30, 2011 and November 2, 2015, inclusive (the "Class Period"), seeking to pursue remedies under the Securities Exchange Act of 1934 (the "Exchange Act").

2.     VimpelCom provides telecommunications services under various brand names in Italy, Russia, Ukraine, Kazakhstan, Uzbekistan, Tajikistan, Armenia, Georgia, Kyrgyzstan, Laos, Algeria, Bangladesh, and Pakistan.  The Company offers voice and data services through a range of traditional and broadband mobile and fixed line technologies.  The Company offers mobile telecommunications services under contract and prepaid plans for both corporate and consumer segments; value-added and call completion services; national and international roaming services; wireless Internet access; mobile financial services; and mobile bundles. It also provides fixed-line telecommunication services, such as voice, data, and Internet services to corporations, operators, and consumers.  As of December 31, 2014, the company claimed to have served approximately 222 million mobile customers in 14 countries.

3.     VimpelCom was founded in 1992 and is headquartered in Amsterdam, the Netherlands.  The Company's American Depositary Receipts ("ADRs") trade on the NASDAQ under the ticker symbol "VIP."

4.     Throughout the Class Period, Defendants made false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operations, and prospects.  Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) VimpelCom had paid tens of millions of dollars to a company controlled by Gulnara Karimova ("Karimova"), daughter of the president of Uzbekistan; (ii) the payments to Karimova were unlawful bribes intended to secure VimpelCom's access to

Uzbekistan's telecommunications market; and (iii) as a result of the foregoing, Defendants' statements about VimpelCom's business, operations, and prospects were false and misleading and/or lacked a reasonable basis.

5.     On March 12, 2014, VimpelCom announced that it was facing investigations by both the SEC and Dutch authorities related to its operations in Uzbekistan.

6.     On March 18, 2014, VimpelCom reported that the Company was the focus of an investigation by the U.S. Department of Justice related to the Company's operations in Uzbekistan.

7.     On August 13, 2015, post-market, it was reported that U.S. authorities had asked their European counterparts to seize roughly $1 billion in assets in a wide-ranging criminal probe of alleged corruption by VimpelCom and two other companies, Mobile TeleSystems PJSC ("MTS") and TeliaSonera AB ("TeliaSonera"), for paying hundreds of millions of dollars to businesses controlled by Karimova to secure wireless spectrum in Uzbekistan.

8.     Finally, on November 3, 2015, pre-market, VimpelCom announced that it had set aside $900 million for litigation costs in connection with U.S. and Dutch investigations into the Company's operations in Uzbekistan.

9.     On this news, VimpelCom's ADRs fell $0.17, or 4.63%, to close at $3.50 on November 3, 2015.

10.    As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other class members have suffered significant losses and damages.

**JURISDICTION AND VENUE**

11.     The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

12.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and Section 27 of the Exchange Act (15 U.S.C. §78aa).

13.     Venue is proper in this Judicial District pursuant to 28 U.S.C. §1391(b) and Section 27 of the Exchange Act (15 U.S.C. §78aa(c)).   Substantial acts in furtherance of the alleged fraud or the effects of the fraud have occurred in this Judicial District.   Many of the acts charged herein, including the preparation and dissemination of materially false and/or misleading information, occurred in substantial part in this Judicial District.

14.     In connection with the acts, transactions, and conduct alleged herein, Defendants directly and indirectly used the means and instrumentalities of interstate commerce, including the United States mail, interstate telephone communications, and the facilities of a national securities exchange.

**PARTIES**

15.     Plaintiff, as set forth in the accompanying certification, incorporated by reference herein, purchased VimpelCom common stock during the Class Period, and suffered damages as a result of the federal securities law violations and false and/or misleading statements and/or material omissions alleged herein.

16.     Defendant VimpelCom, Ltd., is a Bermuda corporation with its principal executive offices located at Calude Debussylaan 88, Amsterdam 1082 MD, Netherlands. VimpelCom's ADRs trade on the NASDAQ under the ticker symbol "VIP".

17.     Defendant Jean-Yves Charlier ("Charlier") has served as the Company's Chief Executive Officer ("CEO") since April 2015.

18.     Defendant Jo Lunder ("Lunder") served as the Company's CEO from July 2011 to April 2015.

19.     Defendant Alexander Izosimov ("Izosimov") served as the Company's CEO from October 2003 to June 2011.

20.     Defendant Andrew Mark Davies ("Davies") has served as the Company's Chief Financial Officer ("CFO") since November 2013.

21.     Defendant Cornelis Hendrik van Dalen served as the Company's CFO from September 2010 to November 2013.

22.     The defendants referenced above in ¶¶ 16-21 are sometimes collectively referred to herein as the "Individual Defendants."

## SUBSTANTIVE ALLEGATIONS

### Background

23.     VimpelCom provides telecommunications services under various brand names in Italy, Russia, Ukraine, Kazakhstan, Uzbekistan, Tajikistan, Armenia, Georgia, Kyrgyzstan, Laos, Algeria, Bangladesh, and Pakistan.  The Company offers voice and data services through a range of traditional and broadband mobile and fixed line technologies.  The Company offers mobile telecommunications services under contract and prepaid plans for both corporate and consumer segments; value-added and call completion services; national and international roaming services; wireless Internet access; mobile financial services; and mobile bundles. It also provides fixed-line telecommunication services, such as voice, data, and Internet services to corporations,

operators, and consumers.  As of December 31, 2014, the company served approximately 222 million mobile customers in 14 countries.

24.     The Company was founded in 1992 and is headquartered in Amsterdam, the Netherlands.  Its shares trade on the NASDAQ under the ticker symbol "VIP."

25.     In January 2006, VimpelCom announced the Company's acquisition of Bakrie Uzbekistan Telecom LLC ("Buztel"), the fourth largest GSM[1] operator in Uzbekistan, and Unitel LLC ("Unitel"), the second largest cellular operator in Uzbekistan.  The Company stated, in part:

> As soon as practicable following the completion of the acquisitions, VimpelCom plans to merge Buztel into Unitel, thus creating a single, combined company in Uzbekistan. Unitel currently serves approximately 364,000 subscribers, representing, according to the company's estimates, a 31% market share in Uzbekistan. The acquisition of Buztel will provide VimpelCom with access to the widest GSM frequency spectrum available to any GSM operator in Uzbekistan, which, in addition to the frequency resource of Unitel, should provide for significant savings on capital expenditures for the combined company. Also, the planned merger of the two companies should result in a market consolidation in Uzbekistan and an improved competitive position for the combined company.

Shortly thereafter, VimpelCom merged Buztel into Unitel, leaving Unitel as the surviving entity.

26.     In or around June 2007, VimpelCom, through subsidiaries, sold a 7 percent stake in Unitel to Takilant Ltd. ("Takilant"), a Gibraltar-incorporated company, for $20 million (the "Unitel Deal").

27.     Takilant was at all relevant times owned by Gayane Avakyan, an individual with close ties to Karimova, and, upon information and belief, Takilant was in fact controlled by Karimova herself.  Karimova is the oldest daughter of Islam Karimov, president of Uzbekistan since 1990.

---

[1] GSM (Global System for Mobile Communications or *Groupe Spécial Mobile*), has been the default global standard for mobile communications since 2014.

28.     The Unitel Deal included an option that enabled Takilant to force the sale of the 7 percent stake in Unitel back to VimpelCom, for an amount not less than $57.5 million.  In or around September 2009, Takilant duly exercised the option and sold its stake in Unitel back to VimpelCom for $57.5 million, netting a profit of $37.5 million.

29.     In VimpelCom's Annual Report for the year ended December 31, 2009, the Company reported, in relevant part, that "[t]he transaction was accounted for as a repayment of debt."  VimpelCom did not provide a business explanation for granting an option to Takilant that allowed Takilant to nearly triple its investment, at no risk to Takilant and at VimpelCom's expense, in just over two years.

### Materially False and Misleading
### Statements Issued During the Class Period

30.     The Class Period begins on June 30, 2011, when VimpelCom filed an annual report on Form 20-F with the SEC announcing the Company's financial and operating results for the quarter and fiscal year ended December 31, 2010 (the "2010 20-F").  For the quarter, the Company reported net income of $461.22 million, or $0.34 per diluted share, on revenue of $2.82 billion.  For 2010, the Company reported net income of $1.81 billion, or $1.50 per diluted share, on revenue of $10.52 billion.

31.     In the 2010 20-F, VimpelCom stated, in part, that the Company had 4.8 million customers in Uzbekistan through its Unitel subsidiary as of December 31, 2010.

32.     With respect to regulation of the telecommunications industry in Uzbekistan, VimpelCom stated, in part:

> The government authorities responsible for supervising the telecommunications industry in the Republic of Uzbekistan are the Republic of Uzbekistan Cabinet and a specially authorized telecommunications agency. In accordance with the Law on Telecommunications, dated August 20, 1999, businesses offering communications services in the Republic of Uzbekistan may be privately or

publicly held by Uzbek or foreign national individuals or legal entities. All owners of telecommunications networks have equal rights and enjoy equal protection guaranteed by the law and the legislation imposes no restrictions on foreign investors.

33.     The 2010 20-F contained signed certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") by defendants Izosimov and van Dalen, stating that the financial information contained in the 2010 20-F was accurate and disclosed any material changes to the Company's internal control over financial reporting.

34.     On September 7, 2011, VimpelCom filed a report on Form 6-K with the SEC announcing the Company's financial and operating results for the quarter ended June 30, 2011 (the "Q2 2011 6-K").  For the quarter, the Company reported net income of $235 million, or $0.15 per diluted share, on revenue of $5.54 billion, compared to net income of $334.74 million, or $0.28 per diluted share, on revenue of $2.64 billion for the same period in the prior year.

35.     On November 14, 2011, VimpelCom filed a report on Form 6-K with the SEC announcing the Company's financial and operating results for the quarter ended September 30, 2011 (the "Q3 2011 6-K").  For the quarter, the Company reported net income of $189 million, or $0.12 per diluted share, on revenue of $6.1 billion, compared to a net income of $495.9 million, or $0.39 per diluted share, on revenue of $2.82 billion for the same period in the prior year.

36.     On March 13, 2012, VimpelCom filed a report on Form 6-K with the SEC announcing the Company's financial and operating results for the quarter and fiscal year ended December 31, 2011 (the "Q4 2011 6-K").  For the quarter, the Company reported a net loss of $381 million or $0.24 per diluted share, on revenue of $5.89 billion, compared to net income of $461.22 million, or $0.34 per diluted share, on revenue of $2.82 billion for the same period in the prior year.  For 2011, the Company reported net income of $543 million, or $0.36 per diluted

share, on revenue of $20.26 billion, compared to net income of $1.81 billion, or $1.50 per diluted share, on revenue of $10.52 billion for 2010.

37.     On April 30, 2012, VimpelCom filed an annual report on Form 20-F with the SEC reiterating the financial and operating results previously announced in the Company's Q4 2011 6-K (the "2011 20-F").

38.     In the 2011 20-F, VimpelCom stated, in part, that the Company had 6.4 million customers in Uzbekistan through its Unitel subsidiary as of December 31, 2011.

39.     With respect to regulation of the telecommunications industry in Uzbekistan, VimpelCom stated, in part:

> The government authorities responsible for supervising the telecommunications industry in the Republic of Uzbekistan are the Republic of Uzbekistan Cabinet and a specially authorized telecommunications agency. In accordance with the Law on Telecommunications, dated August 20, 1999, businesses offering communications services in the Republic of Uzbekistan may be privately or publicly held by Uzbek or foreign national individuals or legal entities. All owners of telecommunications networks have equal rights and enjoy equal protection guaranteed by the law and the legislation imposes no restrictions on foreign investors.

40.     The 2011 20-F contained signed certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") by defendants Lunder and van Dalen, stating that the financial information contained in the 2011 20-F was accurate and disclosed any material changes to the Company's internal control over financial reporting.

41.     On May 15, 2012, VimpelCom filed a report on Form 6-K with the SEC announcing the Company's financial and operating results for the quarter ended March 31, 2012 (the "Q1 2012 6-K").  For the quarter, the Company reported net income of $318 million, or $0.20 per diluted share, on revenue of $5.62 billion, compared to  net income of $500 million, or $0.39 per diluted share, on revenue of $2.74 million for the same period in the prior year.

42.     On August 15, 2012, VimpelCom filed a report on Form 6-K with the SEC announcing the Company's financial and operating results for the quarter ended June 30, 2012 (the "Q2 2012 6-K").  For the quarter, the Company reported net income of $488 million, or $0.30 per diluted share, on revenue of $5.75 billion, compared to net income of $235 million, or $0.15 per diluted share, on revenue of $5.54 billion for the same period in the prior year.

43.     On November 14, 2012, VimpelCom filed a report on Form 6-K with the SEC announcing the Company's financial and operating results for the quarter ended September 30, 2012 (the "Q3 2012 6-K").  For the quarter, the Company reported net income of $538 million, or $0.33 per diluted share, on revenue of $5.75 billion, compared to net income of $189 million, or $0.12 per diluted share, on revenue of $6.1 billion for the same period in the prior year.

44.     On March 6, 2013, VimpelCom filed a report on Form 6-K with the SEC announcing the Company's financial and operating results for the quarter and fiscal year ended December 31, 2012 (the "Q4 2012 6-K").  For the quarter, the Company reported net income of $195 million, or $0.12 per diluted share, on revenue of $5.95 billion, compared to a net loss of $381 million, or $0.24 per diluted share, on revenue of $5.89 billion for the same period in the prior year.  For 2012, the Company reported net income of $1.54 billion, or $0.95 per diluted share, on revenue of $23.06 billion, compared to net income of $543 million, or $0.36 per diluted share, on revenue of $20.27 billion for 2011.

45.     On March 22, 2013, VimpelCom filed an annual report on Form 20-F with the SEC reiterating the financial and operating results previously announced in the Company's Q4 2012 6-K (the "2012 20-F").

46.     In the 2012 20-F, VimpelCom stated, in part, that the Company had 10.2 million customers in Uzbekistan through its Unitel subsidiary as of December 31, 2012.

47.     With respect to regulation of the telecommunications industry in Uzbekistan, VimpelCom stated, in part:

> The government authorities responsible for supervising the telecommunications industry in the Republic of Uzbekistan are the Republic of Uzbekistan Cabinet and a specially authorized telecommunications agency. In accordance with the Law on Telecommunications, dated August 20, 1999, businesses offering communications services in the Republic of Uzbekistan may be privately or publicly held by Uzbek or foreign national individuals or legal entities. All owners of telecommunications networks have equal rights and enjoy equal protection guaranteed by the law and the legislation imposes no restrictions on foreign investors.

48.     The 2012 20-F contained signed certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") by defendants Lunder and van Dalen, stating that the financial information contained in the 2012 20-F was accurate and disclosed any material changes to the Company's internal control over financial reporting

49.     On May 15, 2013, VimpelCom filed a report on Form 6-K with the SEC announcing the Company's financial and operating results for the quarter ended March 31, 2013 (the "Q1 2013 6-K").  For the quarter, the Company reported net income of $408 million, or $0.25 per diluted share, on revenue of $5.59 million, compared to net income of $318 million, or $0.20 per diluted share, on revenue of $5.62 billion for the same period in the prior year.

50.     On August 7, 2013, VimpelCom filed a report on Form 6-K with the SEC announcing the Company's financial and operating results for the quarter ended June 30, 2013 (the "Q2 2013 6-K").  For the quarter, the Company reported net income of $573 million, or $0.33 per diluted share, on revenue of $5.72 billion, compared to net income of $488 million, or $0.30 per diluted share, on revenue of $5.75 billion for the same period in the prior year.

51.     On November 6, 2013, VimpelCom filed a report on Form 6-K with the SEC announcing the Company's financial and operating results for the quarter ended September 30,

2013 (the "Q3 2013 6-K").  For the quarter, the Company reported net income of $255 million, or $0.15 per diluted share, on revenue of $5.69 billion, compared to net income of $538 million, or $0.33 per diluted share, on revenue of $5.75 billion for the same period in the prior year.

52.     On March 6, 2014, VimpelCom filed a report on Form 6-K with the SEC announcing the Company's financial and operating results for the quarter and fiscal year ended December 31, 2013 (the "Q4 2013 6-K").  For the quarter, the Company reported a net loss of $3.86 billion, or $2.21 per diluted share, on revenue of $5.55 billion, compared to net income of $195 million, or $0.12 per diluted share, on revenue of $5.95 billion for the same period in the prior year.  For 2013, the Company reported a net loss of $2.63 billion, or $1.53 per diluted share, on revenue of $22.55 billion, compared to net income of $1.54 billion, or $0.95 per diluted share, on revenue of $23.06 billion for 2012.

53.     The statements referenced in ¶¶ 30-52 were materially false and misleading because defendants made false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operations, and prospects. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) VimpelCom had paid tens of millions of dollars to a company controlled by Karimova; (ii) the payments to Karimova were unlawful bribes intended to secure VimpelCom's access to Uzbekistan's telecommunications market; and (iii) as a result of the foregoing, Defendants' statements about VimpelCom's business, operations, and prospects were false and misleading and/or lacked a reasonable basis.

12

**The Truth Emerges**

54.     On March 12, 2014, VimpelCom filed a report on Form 6-K with the SEC announcing that the Company was facing investigations by both the SEC and Dutch authorities related to its operations in Uzbekistan.  VimpelCom stated, in part:

> [O]n March 11, 2014, the Company received from the staff of the United States Securities and Exchange Commission a letter stating that they are conducting an investigation related to VimpelCom and requesting documents. Also, on March 11, 2014, the Company's headquarter in Amsterdam was visited by representatives of the Dutch authorities, including the Dutch public prosecutor office, who obtained documents and informed the Company that it was the focus of a criminal investigation in the Netherlands. The investigations appear to be concerned with the Company's operations in Uzbekistan. The Company intends to fully cooperate with these investigations.

55.     Then, on March 18, 2014, VimpelCom filed another report on Form 6-K with the SEC.  VimpelCom stated, in part:

> [I]n addition to the previously disclosed investigations by the U.S. Securities and Exchange Commission and Dutch public prosecutor's office, the Company has been notified that it is also the focus of an investigation by the United States Department of Justice.  This investigation also appears to be concerned with the Company's operations in Uzbekistan.  The Company intends to continue to fully cooperate with these investigations.

56.     On May 14, 2014, VimpelCom filed a report on Form 6-K with the SEC announcing the Company's financial and operating results for the quarter ended March 31, 2014 (the "Q1 2014 6-K").  For the quarter, the Company reported net income of $39 million, or $0.02 per diluted share, on revenue of $5.02 billion, compared to net income of $408 million, or $0.25 per diluted share, on revenue of $5.59 billion for the same period in the prior year.

57.     On May 15, 2014, VimpelCom filed an annual report on Form 20-F with the SEC reiterating the financial and operating results previously announced in the Company's Q4 2013 6-K (the "2013 20-F").

58.     In the 2013 20-F, VimpelCom stated, in part:

**We are subject to investigations by the SEC, DOJ and the Dutch public prosecutor, and are conducting an internal investigation, and we are unable to predict the duration, scope or results of these investigations or their impact on us.**

As we previously disclosed, the SEC, DOJ and Dutch public prosecutor's office are conducting investigations related to VimpelCom; these investigations appear to be concerned with our operations in Uzbekistan, including relations with Takilant Ltd. ("Takilant"). In June 2007, Takilant purchased from us a 7% interest in our business in Uzbekistan for US$20.0 million and entered into a shareholders agreement with us. In September 2009, Takilant exercised its option to put its 7% interest to us for US$57.5 million, an amount specified in the shareholders agreement. In addition, we had agreements with Takilant relating to the acquisition of frequency spectrum (including with respect to 3G and LTE) and channels in Uzbekistan pursuant to which we paid Takilant an aggregate of US$57.0 million.

It has been reported in the press that Takilant is currently being investigated in Sweden and Switzerland on allegations that it and certain persons associated with it have committed acts of bribery and money-laundering connected with their activities in Uzbekistan, and also that Takilant is being investigated in the Netherlands and perhaps other jurisdictions. These investigations may, in part, involve us.

As a result of concerns arising from press reports regarding Takilant, we commenced a review with respect to our operations in Uzbekistan, including our relations with Takilant, and in 2013 we retained external counsel with expertise relating to the U.S. Foreign Corrupt Practices Act ("FCPA") and other anti-corruption laws and regulations to conduct such review.

Following notice of the investigations by the SEC, the DOJ and the Dutch public prosecutor's office, we established a special committee of the supervisory board in March 2014, consisting of all outside directors, to oversee the internal investigation being conducted by the Company's external counsel and our response to the inquiries by various authorities. While the initial focus of the investigation being conducted by the Company's external counsel has been related to our Uzbek operations, including our relations with Takilant, and whether there was any conduct in our operations in Uzbekistan that may have violated the anti-bribery provisions of the FCPA, the FCPA's books and records and internal controls provisions, applicable local laws and/or our own internal policies, the investigation is also reviewing our operations in additional countries.

We expect to incur costs in responding to requests for information, testimony and other information in connection with the investigations and in conducting the internal investigation, and we cannot predict at this time the ultimate amount of all such costs. These matters may require the involvement of certain members of

14

our senior management that could impinge on the time they have available to devote to other matters relating to the business. We may also see ongoing media and governmental interest in these matters that could impact the perception of us.

The SEC, DOJ and Dutch investigations, as well as our own investigations, are continuing, and we are presently unable to predict the duration, scope or results of these investigations or how the results of these investigations may impact our internal controls, business, and the results of operations or financial condition. Further, there can be no assurance that such investigations will not be broader in scope than they currently appear, or that new investigations will not be commenced in these or other jurisdictions, or that there will not be litigation commenced against us.

One or more enforcement actions could be instituted in respect of the matters that are the subject of some or all of the investigations. The DOJ and SEC have a broad range of civil and criminal sanctions under the FCPA and other laws and regulations including, but not limited to, judgments, settlements, injunctive relief, debarment or other relief, disgorgement, fines, penalties, modifications to business practices, including the termination or modification of existing business relationships, the imposition of compliance programs and the retention of a monitor to oversee compliance with the FCPA, and criminal convictions and/or penalties. The Dutch public prosecutor's office and enforcement authorities in other jurisdictions also have a range of sanctions under the relevant laws and regulations. There can be no assurance that any investigation will not conclude that a violation of applicable law has occurred. The imposition of any of these sanctions or remedial measures could have a material adverse effect on our business or financial condition.

59.     The 2013 20-F contained signed certifications pursuant to SOX by defendants Lunder and Davies, stating that the financial information contained in the 2013 20-F was accurate and disclosed any material changes to the Company's internal control over financial reporting.

60.     On August 6, 2014, VimpelCom filed a report on Form 6-K with the SEC announcing the Company's financial and operating results for the quarter ended June 30, 2014 (the "Q2 2014 6-K").  For the quarter, the Company reported net income of $100 million, or $0.06 per diluted share, on revenue of $5.07 billion, compared to net income of $573 million, or $0.33 per diluted share, on revenue of $5.72 bilion for the same period in the prior year.

61.     On November 12, 2014, VimpelCom filed a report on Form 6-K with the SEC announcing the Company's financial and operating results for the quarter ended September 30, 2014 (the "Q3 2014 6-K").  For the quarter, the Company reported net income of $104 million, or $0.06 per diluted share, on revenue of $5.15 billion, compared to net income of $255 million, or $0.15 per diluted share, on revenue of $5.69 billion for the same period in the prior year.

62.     On February 26, 2015, VimpelCom filed a report on Form 6-K with the SEC announcing the Company's financial and operating results for the quarter and year ended December 31, 2014 (the "Q4 2014 6-K").  For the quarter, the Company reported a net loss of $935 million, or $0.53 per diluted share, on revenue of $4.39 billion, compared to a net loss of $3.86 billion, or $2.21 per diluted share, on revenue of $5.55 billion for the same period in the prior year.  For 2014, the Company reported a net loss of $647 million, or $0.37 per diluted share, on revenue of $19.63 billion, compared to a net loss of $2.63 billion, or $1.53 per diluted share, on revenue of $22.55 billion for 2013.

63.     On March 21, 2015, the Organized Crime and Corruption Reporting Project ("OCCRP"), a not-for-profit joint program of several non-profit investigative centers and for-profit independent media, published a report entitled "Uzbekistan: How The President's Daughter Controlled The Telecom Industry" (the "OCCRP Report").  The OCCRP Report described in well-sourced detail how Karimova had extracted more than $1 billion in bribes and various corruption schemes from various companies doing business in Uzbekistan throughout the 1990s and 2000s.

64.     Focusing on Karimova's activities in the telecommunications industry, "which in terms of money, dwarf all of her current alleged crimes," the OCCRP Report stated, in part:

16

- "While the international companies involved claim to have been innocent or unwilling dupes of her maneuvers, *the blatant means by which Karimova allegedly operated made it virtually impossible for those involved not to realize they were giving in to extortion and bribery.*"

- "[Karimova] demonstrated a ruthless ability to acquire a share of ownership . . . of lucrative telecom-related companies—without actually putting up any money for doing so. *Language was inserted into contracts forcing companies to buy back her shares at a future date at an exorbitant profit.*"

- "Scandinavian prosecutors now say *Karimova owns [Takilant],* although on paper it is owned and run by her aide, Gayane Avakyan.  Takilant has served as a holding company for other Karimova deals including those involving duty-free shops, clothing businesses, and pharmaceuticals."

- "[T]he terms of the [Unitel Deal] made little financial sense for VimpelCom and it's not clear why the firm would sign a deal so beneficial to Karimova.

- "Recently a whistleblower told Norwegian officials that *VimpelCom paid at least US$100 million more to Karimova.*  OCCRP confirmed at least one of the additional payments—VimpelCom said at least US$43 million was paid for a license in Uzbekistan in their 2007 filings with the US Securities and Exchange Commission.  This makes little sense since the actual cost of a license in Uzbekistan is quite small."

65.     On March 24, 2015, VimpelCom filed an annual report on Form 20-F with the

SEC reiterating the financial and operating results previously announced in the Company's Q4

2014 6-K (the "2014 20-F").

66.     In the 2014 20-F, VimpelCom stated, in part:

**We are subject to investigations by the SEC, DOJ and OM, and are conducting an internal investigation. We are unable to predict the duration, scope or results of these investigations or their impact on us.**

As previously disclosed, the SEC, DOJ and OM are conducting investigations related to VimpelCom, which have been focused primarily on our prior dealings with Takilant Ltd. ("Takilant").

In June 2007, Takilant purchased from us a 7% interest in our business in Uzbekistan for US$20.0 million and entered into a shareholders agreement with us. In September 2009, Takilant exercised its option to put its 7% interest to us for US$57.5 million, an amount specified in the shareholders agreement. In addition, we had agreements with Takilant relating to the acquisition of frequency spectrum

(including with respect to 3G and LTE) and channels in Uzbekistan pursuant to which we paid Takilant an aggregate of US$57.0 million.

It has also been reported in the press that Takilant is currently being investigated in Sweden and Switzerland on allegations that it and certain persons associated with it have committed acts of bribery and money-laundering connected with their activities in Uzbekistan, and also that Takilant is being investigated in the Netherlands and perhaps other jurisdictions. These investigations may, in part, involve us.

As a result of concerns arising from press reports regarding Takilant, we commenced a review with respect to our operations in Uzbekistan, including our relations with Takilant, and in 2013 we retained external counsel with expertise relating to the U.S. Foreign Corrupt Practices Act ("FCPA") and other anti-corruption laws and regulations to conduct such review.

Following notice of the investigations by the SEC, DOJ and OM, we established a Special Committee of the Supervisory Board in March 2014 to oversee the internal investigation being conducted by the company's external counsel and our response to the inquiries by various authorities. The Special Committee consists of directors who qualify as independent for purposes of Rule 10A-3 under the Exchange Act. The investigation being conducted by the company's external counsel has been focused primarily on our Uzbekistan operations, including our relations with Takilant, and whether there was any conduct in our operations in Uzbekistan that may have violated the anti-bribery provisions of the FCPA, the FCPA's books and records and internal controls provisions, applicable local laws and/or our own internal policies. The investigation is also reviewing our operations in additional countries.

We expect to continue incurring costs related to the investigations, primarily professional fees and expenses, which may be significant. These costs relate to responding to requests for information, testimony and other information in connection with the investigations and in conducting the internal investigation, and we cannot predict at this time the ultimate amount of all such costs. These matters may require the involvement of certain members of our senior management that could impinge on the time they have available to devote to other matters relating to the business. We may also see ongoing media and governmental interest in these matters that could impact the perception of us and result in reputational harm to our company. The investigations have received media attention in a number of jurisdictions, and parliamentary hearings held by the Norwegian Government have addressed the investigations.

The SEC, DOJ and Dutch investigations, as well as our own investigations, are continuing, and we have cooperated, and continue to cooperate, with the authorities in these investigations. We are also exploring the prospect of resolving the company's potential liabilities arising from the facts established in the investigations. We are unable to predict the duration, scope or results of the ongoing investigations or how the results of these investigations or any

resolutions may impact our business, results of operations, financial condition, or the assessment of our internal controls. Further, there can be no assurance that such investigations will not be broader in scope than they currently appear, or that new investigations will not be commenced in these or other jurisdictions, or that there will not be litigation commenced against us.

One or more enforcement actions could be instituted in respect of the matters that are the subject of some or all of the investigations. The DOJ and SEC have a broad range of civil and criminal sanctions under the FCPA and other laws and regulations including, but not limited to, judgments, settlements, injunctive relief, debarment or other relief, disgorgement, fines, penalties, modifications to business practices, including the termination or modification of existing business relationships, the imposition of compliance programs and the retention of a monitor to oversee compliance with the FCPA, and criminal convictions and/or penalties. The OM and enforcement authorities in other jurisdictions also have a range of sanctions under the relevant laws and regulations. There can be no assurance that any investigation will not conclude that a violation of applicable law has occurred. The imposition of any of these sanctions or remedial measures could have a material adverse effect on our business or financial condition.

67.     The 2014 20-F contained signed certifications pursuant to SOX by defendants Lunder and Davies, stating that the financial information contained in the 2014 20-F was accurate and disclosed any material changes to the Company's internal control over financial reporting.

68.     On May 14, 2015, VimpelCom filed a report on Form 6-K with the SEC announcing the Company's financial and operating results for the quarter ended March 31, 2015 (the "Q1 2015 6-K").  For the quarter, the Company reported net income of $184 million, or $0.11 per diluted share, on revenue of $3.52 billion, compared to net income of $39 million, or $0.02 per diluted share, on revenue of $5.02 billion for the same period in the prior year.

69.     On August 6, 2015, VimpelCom filed a report on Form 6-K with the SEC announcing the Company's financial and operating results for the quarter ended June 30, 2015 (the "Q2 2015 6-K").  For the quarter, the Company reported net income of $108 million, or

$0.06 per diluted share, on revenue of $3.76 billion, compared to net income of $100 million, or $0.06 per diluted share, on revenue of $5.07 billion for the same period in the prior year.

70.     On August 13, 2015, post-market, it was reported that U.S. authorities asked European counterparts to seize roughly $1 billion in assets related to a wide-ranging criminal probe of alleged corruption by VimpelCom, MTS, and TeliaSonera, for paying hundreds of millions of dollars to businesses controlled by Karimova to secure wireless spectrum in Uzbekistan.

71.     On this adverse news, VimpelCom's ADRs fell $0.13, or 2.3%, to close at $5.43 on August 14, 2015.

72.     Finally, on November 3, 2015, pre-market, VimpelCom announced that it had set aside $900 million for litigation costs in connection with U.S. and Dutch investigations into the Company's operations in Uzbekistan.

73.     On this adverse news, VimpelCom's ADRs fell $0.17, or 4.63%, to close at $3.50 on November 3, 2015.

74.     As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other class members have suffered significant losses and damages.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

75.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired VimpelCom securities during the Class Period (the "Class"); and were damaged upon the revelation of the alleged corrective disclosures.  Excluded from the Class are defendants herein, the officers and directors of the Company, at all relevant times, members of

their immediate families and their legal representatives, heirs, successors or assigns and any entity in which defendants have or had a controlling interest.

76.     The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, VimpelCom securities were actively traded on the NASDAQ.  While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by VimpelCom or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

77.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by defendants' wrongful conduct in violation of federal law that is complained of herein.

78.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

79.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

- whether the federal securities laws were violated by defendants' acts as alleged herein;

- whether statements made by defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of VimpelCom;

- whether the Individual Defendants caused VimpelCom to issue false and misleading financial statements during the Class Period;

- whether defendants acted knowingly or recklessly in issuing false and misleading financial statements;

- whether the prices of VimpelCom securities during the Class Period were artificially inflated because of the defendants' conduct complained of herein; and

- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

80.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

81.     Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- defendants made public misrepresentations or failed to disclose material facts during the Class Period;

- the omissions and misrepresentations were material;

- VimpelCom securities are traded in an efficient market;

- the Company's shares were liquid and traded with moderate to heavy volume during the Class Period;

- the Company traded on the NASDAQ and was covered by multiple analysts;

- the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and

- Plaintiff and members of the Class purchased, acquired and/or sold VimpelCom securities between the time the defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

82.     Based upon the foregoing, Plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

83.     Alternatively, Plaintiff and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128, 92 S. Ct. 2430 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

## COUNT I

### (Against All Defendants For Violations of Section 10(b) And Rule 10b-5 Promulgated Thereunder)

84.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

85.     This Count is asserted against defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

86.     During the Class Period, defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon Plaintiff and the other members of the Class; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities.  Such scheme was intended to, and, throughout the Class Period, did:  (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of VimpelCom securities; and (iii) cause Plaintiff and other members of the Class to purchase or

otherwise acquire VimpelCom securities and options at artificially inflated prices.  In furtherance of this unlawful scheme, plan and course of conduct, defendants, and each of them, took the actions set forth herein.

87.    Pursuant to the above plan, scheme, conspiracy and course of conduct, each of the defendants participated directly or indirectly in the preparation and/or issuance of the quarterly and annual reports, SEC filings, press releases and other statements and documents described above, including statements made to securities analysts and the media that were designed to influence the market for VimpelCom securities.  Such reports, filings, releases and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about VimpelCom's finances and business prospects.

88.    By virtue of their positions at VimpelCom, defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiff and the other members of the Class, or, in the alternative, defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to defendants.  Said acts and omissions of defendants were committed willfully or with reckless disregard for the truth.  In addition, each defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

89.    Defendants were personally motivated to make false statements and omit material information necessary to make the statements not misleading in order to personally benefit from the sale of VimpelCom securities from their personal portfolios.

90.     Information showing that defendants acted knowingly or with reckless disregard for the truth is peculiarly within defendants' knowledge and control.  As the senior managers and/or directors of VimpelCom, the Individual Defendants had knowledge of the details of VimpelCom's internal affairs.

91.     The Individual Defendants are liable both directly and indirectly for the wrongs complained of herein.  Because of their positions of control and authority, the Individual Defendants were able to and did, directly or indirectly, control the content of the statements of VimpelCom.  As officers and/or directors of a publicly-held company, the Individual Defendants had a duty to disseminate timely, accurate, and truthful information with respect to VimpelCom's businesses, operations, future financial condition and future prospects.  As a result of the dissemination of the aforementioned false and misleading reports, releases and public statements, the market price of VimpelCom securities was artificially inflated throughout the Class Period.  In ignorance of the adverse facts concerning VimpelCom's business and financial condition which were concealed by defendants, Plaintiff and the other members of the Class purchased or otherwise acquired VimpelCom securities at artificially inflated prices and relied upon the price of the securities, the integrity of the market for the securities and/or upon statements disseminated by defendants, and were damaged thereby.

92.     During the Class Period, VimpelCom securities were traded on an active and efficient market.  Plaintiff and the other members of the Class, relying on the materially false and misleading statements described herein, which the defendants made, issued or caused to be disseminated, or relying upon the integrity of the market, purchased or otherwise acquired shares of VimpelCom securities at prices artificially inflated by defendants' wrongful conduct.  Had Plaintiff and the other members of the Class known the truth, they would not have purchased or

otherwise acquired said securities, or would not have purchased or otherwise acquired them at the inflated prices that were paid.  At the time of the purchases and/or acquisitions by Plaintiff and the Class, the true value of VimpelCom securities was substantially lower than the prices paid by Plaintiff and the other members of the Class.  The market price of VimpelCom securities declined sharply upon public disclosure of the facts alleged herein to the injury of Plaintiff and Class members.

93.     By reason of the conduct alleged herein, defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

94.     As a direct and proximate result of defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases, acquisitions and sales of the Company's securities during the Class Period, upon the disclosure that the Company had been disseminating misrepresented financial statements to the investing public.

## COUNT II

### (Violations of Section 20(a) of the
### Exchange Act Against The Individual Defendants)

95.     Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

96.     During the Class Period, the Individual Defendants participated in the operation and management of VimpelCom, and conducted and participated, directly and indirectly, in the conduct of VimpelCom's business affairs.  Because of their senior positions, they knew the adverse non-public information about VimpelCom's misstatement of income and expenses and false financial statements.

97.     As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to VimpelCom's financial condition and results of operations, and to correct promptly any public statements issued by VimpelCom which had become materially false or misleading.

98.     Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which VimpelCom disseminated in the marketplace during the Class Period concerning VimpelCom's results of operations.   Throughout the Class Period, the Individual Defendants exercised their power and authority to cause VimpelCom to engage in the wrongful acts complained of herein. The Individual Defendants therefore, were "controlling persons" of VimpelCom within the meaning of Section 20(a) of the Exchange Act.   In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of VimpelCom securities.

99.     Each of the Individual Defendants, therefore, acted as a controlling person of VimpelCom.   By reason of their senior management positions and/or being directors of VimpelCom, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause, VimpelCom to engage in the unlawful acts and conduct complained of herein.  Each of the Individual Defendants exercised control over the general operations of VimpelCom and possessed the power to control the specific activities which comprise the primary violations about which Plaintiff and the other members of the Class complain.

100.    By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by VimpelCom.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff demands judgment against defendants as follows:

A.       Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiff as the Class representative;

B.       Requiring defendants to pay damages sustained by Plaintiff and the Class by reason of the acts and transactions alleged herein;

C.       Awarding Plaintiff and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D.       Awarding such other and further relief as this Court may deem just and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiff hereby demands a trial by jury.

Dated:  November 4, 2015

Respectfully submitted,

**POMERANTZ LLP**

*/s/ Jeremy A. Lieberman*
Jeremy A. Lieberman
J. Alexander Hood II
Marc C. Gorrie
600 Third Avenue, 20th Floor
New York, New York 10016
Telephone:  (212) 661-1100
Facsimile:   (212) 661-8665
Email:  jalieberman@pomlaw.com
        ahood@pomlaw.com
        mgorrie@pomlaw.com

**POMERANTZ LLP**
Patrick V. Dahlstrom
10 South La Salle Street, Suite 3505
Chicago, Illinois 60603
Telephone:  (312) 377-1181
Facsimile:  (312) 377-1184
Email:  pdahlstrom@pomlaw.com

**BRONSTEIN, GEWIRTZ
& GROSSMAN, LLC**
Peretz Bronstein
60 East 42nd Street, Suite 4600
New York, NY 10165
Telephone: (212) 697-6484
Facsimile (212) 697-7296
Email:  peretz@bgandg.com

*Attorneys for Plaintiff*