**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re VimpelCom, Ltd. Securities Litigation | **Case 1:15-cv-08672-ALC** |

# AMENDED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS

Lead Plaintiff Westway Alliance Corp. ("Plaintiff") alleges the following based upon the investigation by Plaintiff's counsel, which includes, among other things: a review of Defendants' (defined below) public documents, media interviews and reports, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding VimpelCom, Ltd. ("VimpelCom" or the "Company") securities analysts' reports and advisories about the Company, the deferred prosecution agreement entered into by VimpelCom, and information readily available on the Internet. Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## I. NATURE OF THE ACTION

1. This is a securities class action on behalf of all persons or entities that purchased VimpelCom securities between December 4, 2010 and November 3, 2015 inclusive (the "Class Period"), seeking to pursue violations of the Securities Exchange Act of 1934 (the "1934 Act") and Rule 10b-5 promulgated thereunder.

### A. VimpelCom's Deferred Prosecution Agreement

2. On February 10, 2016, VimpelCom, pursuant to authority granted by the Company's Supervisory Board (the "Board"), and the United States Department of Justice,

Criminal Division, Fraud Section and the United States Attorney's Office for the Southern District of New York ("Offices"), enter into a deferred prosecution agreement (the "Deferred Prosecution Agreement" or the "Agreement").

3. The Company acknowledged and agreed that the Offices file a two-count criminal information in the United States District Court for the Southern District of New York charging the Company with one count of conspiracy to commit offenses against the United States in violation of Title 15, United States Code, Section 371, that is, to violate the anti-bribery and books and records provisions of the Foreign Corrupt Practices Act of 1977 ("FCPA"), as amended, Title 15, United States Code, Sections 78dd-l, 78m(b)(2)(A), 78m(b)(5), and 78ff(a), and one count of violation of the internal controls provisions of the of the FCPA, Title 15, United States Code, Sections 78m(b)(2)(B), 78m(b)(5), and 78ff(a). In so doing, the Company: (a) knowingly waived its right to indictment on this charge, as well as all rights to a speedy trial pursuant to the Sixth Amendment to the United States Constitution, Title 15, United States Code, Section 3161, and Federal Rule of Criminal Procedure 48(b); and (b) knowingly waived for purposes of the Agreement and any charges by the United States arising out of the conduct described in the attached statement of facts, any objection with respect to venue, and consented to the filing of the information, as provided under the terms of the Agreement, in the United States District Court for the Southern District of New York.

4. The Company also admitted, accepted, and acknowledged that it is responsible under United States law for the acts of its officers, directors, employees, and agents as charged in the information, and as set forth in the statement of facts, and that the allegations described in the information are true and accurate. Should the Offices pursue the prosecution that is deferred by the Agreement, the Company stipulates to the admissibility of the statement of facts in any

proceeding by the Offices, including any trial, guilty plea, or sentencing proceeding, and will not contradict anything in the Statement of Facts at any such proceeding.

5. The Company agreed to pay total monetary penalties in the amount of $460,326,398.40 (the "Total Criminal Penalty"), $40,000,000 of which was paid as forfeiture. The Company also paid $190,163,199.20 of the Total Criminal Penalty to the United States Treasury within ten (10) business days of the sentencing by the Court of VimpelCom's subsidiary Unitel LLC ("Unitel") in connection with its guilty plea and plea agreement entered into, except that the parties agreed that any criminal penalties that might be imposed by the Court on VimpelCom's subsidiary Unitel in connection with its guilty plea and plea agreement will be deducted from the $190,163,199.20. The Total Criminal Penalty was offset by up to $230,163,199.20 for any criminal penalties paid to the Organization of the Public Prosecution Service of the Netherlands ("Dutch Prosecution Service") in connection with the settlement of the Company's potential prosecution in the Netherlands. *See* Deferred Prosecution Agreement attached hereto as Exhibit A.

## II. <u>JURISDICTION AND VENUE</u>

6. The claims asserted herein arise under and pursuant to §§ 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a) and Rule 10b-5 promulgated thereunder by the SEC) (17 C.F.R. § 240.10b-5).

7. This Court has jurisdiction over the subject matter of this action pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa), and 28 U.S.C. § 1331.

8. Venue is proper in this Judicial District pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa and 28 U.S.C. § 1391(b). Many of the acts and transactions alleged herein,

including the preparation and dissemination of materially false and misleading information, occurred in substantial part in this Judicial District.

9. In connection with the acts, conduct and other wrongs alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mails, interstate telephone communications and the facilities of the national securities exchange.

## III. THE PARTIES

### A. Plaintiff

10. Lead Plaintiff Westway Alliance Corp., as set forth in the certification attached to its first filed complaint, purchased the Company securities at artificially inflated prices during the Class Period and has been damaged as a result of the revelation of the Company's fraud.

### B. Defendants

11. ***Defendant VimpelCom*** is a multinational telecommunications company headquartered in the Netherlands and incorporated in Bermuda. During the period of 1996 to 2013, VimpelCom maintained a class of publicly traded securities registered pursuant to Section 12(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78*l*, and was required to file periodic reports with the SEC under Section 15(d) of the Securities Exchange Act, 15 U.S.C. § 78o(d). Accordingly, VimpelCom was an "issuer" as that term is used in the FCPA, Title 15, United States Code, Section 78dd-1(a). VimpelCom had direct and indirect subsidiaries in various countries around the world through which it conducted telecommunications business. Regional heads of VimpelCom's businesses have been members of VimpelCom's senior management group. VimpelCom has employed over 58,000 employees worldwide.

12. ***Defendant Jean-Yves Charlier*** ("Charlier") has served as the Company's Chief Executive Officer ("CEO") since April 2015.

13. ***Defendant Jo Lunder*** ("Lunder") served as the Company's CEO from July 2011 to April 2015. Lunder also served a member of Management Board. In or around November 2015, Norwegian prosecutors detained and questioned Lunder on suspicions of corruption related to VimpelCom's operations in Uzbekistan.

14. ***Defendant Alexander Izosimov*** ("Izosimov") served as the Company's CEO from October 2003 to June 2011.

15. ***Defendant Andrew Mark Davies*** ("Davies") has served as the Company's Chief Financial Officer ("CFO") since November 2013.

16. ***Defendant Cornelis Hendrik van Dalen*** ("van Dalen") served as the Company's CFO from September 2010 to November 2013.

17. Defendants referenced above in ¶¶ 12-16 are sometimes collectively referred to herein as the "Individual Defendants."

### C. Other Relevant Entities and Individuals

18. ***Bekhzod Akhmedov*** ("Akhmedov") was Ms. Karimova's associate and telecommunications representative, who also headed MTS' Uzbek subsidiary, Uzdunrobita.

19. ***Buzton JV Ltd*** ("Buzton") is VimpelCom's majority-owned subsidiary and provides fixed-line telecommunications services in Uzbekistan. Buzton was formed in Uzbekistan and a majority interest was purchased by VimpelCom in 2008. Buzton is part of the CIS business unit and, like Unitel, is managed by local managers and a supervisory committee largely comprised of senior members of the CIS business unit management.

20. ***Freevale Enterprises*** ("Freevale") is VimpelCom's wholly-owned subsidiary and acts as one of two holding companies of Unitel. Freevale was formed in the British Virgin Islands and was purchased by VimpelCom in 2006 as part of its acquisition of ***Bakrie Uzbekistan Telecom*** ("Buztel"), a separate mobile telecommunications operator in Uzbekistan that was merged into Unitel following its acquisition. Freevale has no operations and no holdings other than Unitel.

21. ***Gayane Avakyan*** ("Avakyan") was Ms. Karimova's close associate. Ms. Avakyan served as the sole director and sole shareholder of Takilant during the relevant time period. According to media reports, in or around February 2014, Ms. Avakyan was arrested in Ms. Karimova's apartment by the Uzbek police and charged with forgery, illegal business activities, money laundering, tax evasion, and illegal export of hard currency in large amounts. According to media reports, Ms. Avakyan was subsequently convicted and sentenced to six years in Uzbek jail.

22. ***Gulnara Karimova*** ("Karimova") is Uzbekistan's President's eldest daughter. From at least 2005 until July 2013, Ms. Karimova also held several positions in the Uzbek government.

23. ***Rustam Madumarov*** ("Madumarov") was Ms. Karimova's associate and, at times, her boyfriend. Mr. Madumarov held various roles in connection with Swisdorn and Expoline. According to media reports, in or around February 2014, Madumarov was arrested in Ms. Karimova's apartment by the Uzbek police and charged with forgery, illegal business activities, money laundering, tax evasion, and illegal export of hard currency in large amounts. According to media reports, Mr. Madumarov was subsequently convicted and sentenced to six and a half years in Uzbek jail.

24. ***Silkway Holding BV*** ("Silkway") is VimpelCom's wholly-owned subsidiary and acts as one of two holding companies of Unitel. Silkway was formed in the Netherlands and was purchased by VimpelCom in connection with its 2006 acquisition of Unitel. Silkway has no operations and no holdings other than Unitel.

25. ***Takilant Limited*** ("Takilant"), ***Swisdorn Limited*** ("Swisdorn) and ***Expoline Limited*** ("Expoline") are beneficially owned by Ms. Gulnara Karmova (the eldest daughter of Uzbekistan's President), and were used to carry out and conceal her involvement in a series of corrupt contracts and payments with VimpelCom and its affiliates. The corruption proceeds were laundered through a complex series of monetary transactions, including through bank accounts in Switzerland and the transfer of funds into and out of correspondent banking accounts at financial institutions in the United States. Takilant is herein referred to as the "Shell Company." The "Shell Company" (Takilant) was a company incorporated in Gibraltar that was beneficially owned by Ms. Karimova.

26. ***Telenor Group***: Telenor Group holds a minority position of 33% and voting rights of 43% of VimpelCom. Jon Fredrik Baksaas, the President and Chief Executive Officer of Telenor Group, was a member of the Board of VimpelCom.

27. ***Unitel LLC*** ("Unitel") is VimpelCom's wholly-owned subsidiary and provides mobile telecommunications services in Uzbekistan. Unitel was formed in Uzbekistan, and it was purchased by VimpelCom in 2006. Unitel is part of VimpelCom's Commonwealth of Independent States ("CIS") business unit and is managed by local managers as well as a supervisory committee, which includes senior members of the CIS business unit management.

28. ***Uzbek Agency for Communications and Information*** ("UzACI") is an Uzbek governmental entity authorized to regulate operations and formulate state policy in the sphere of

communication, information, and the use of the radio spectrum in Uzbekistan. As such, UzACI was a "department," "agency," and "instrumentality" of a foreign government, as those terms are used in the FCPA, Title 15, United States Code, Section 78dd-1(f)(l).

29. ***VimpelCom Executive 1***: According to the United States Department of Justice criminal complaint entitled *United States of America v. VimpelCom, Ltd.*, Case 1:16-cr-00137-ER (S.D.N.Y.) ("DOJ Criminal Complaint"), from 2002 to January 2014, "Executive 1" -- an individual whose identity is known to the United States -- worked for various VimpelCom related entities. From in or around December 2009 to January 2014, Executive 1 was a high-ranking VimpelCom executive with responsibilities in the Commonwealth of Independent States ("CIS") region, including oversight of Unitel in Uzbekistan.

30. ***VimpelCom Executive 2***: According to the DOJ Criminal Complaint, from 2003 to February 2013, "Executive 2" -- an individual whose identity is known to the United States -- worked for various VimpelCom related entities. From February 2010 to February 2013, Executive 2 worked with Executive 1 relating to VimpelCom's business in the CIS region, including oversight of Unitel in Uzbekistan.

## IV. THE CORRUPTION AT VIMPELCOM

### A. VimpelCom Corruptly Entered the Uzbek Market in 2005 and 2006

31. In 2005, as part of a plan of expansion into the CIS region, VimpelCom sought to acquire an Uzbek telecommunications company. Two companies under consideration for acquisition were Unitel (the second largest operator in Uzbekistan with approximately 300,000 subscribers) and Buztel, which was a much smaller operator with only 2,500 subscribers. Although there was a sound business case for purchasing Unitel alone, VimpelCom ultimately purchased Buztel, as well. VimpelCom management knew that Ms. Karimova, Uzbekistan's

President's eldest daughter, held an indirect interest in Buztel and that purchasing Buztel would ensure Ms. Karimova's support for VimpelCom's entry into the Uzbek telecommunications market.

32. From the beginning of VimpelCom's deliberations concerning its entry into Uzbekistan, there was an acknowledgment of the serious FCPA risks associated with any recommendation by VimpelCom's management to purchase Buztel in addition to Unitel. For example, on or about December 13, 2005, according to the DOJ Criminal Complaint, VimpelCom's Finance Committee of the Board met and considered management's recommendation to acquire both companies. Documents prepared for the December 13, 2005 Finance Committee meeting explained that Buztel was owned by a Russian company "and a partner" without further detailing the identity of the "partner." The materials documented that "[t]hrough a local partner, [VimpelCom was] is in a preferred position to purchase both assets . . . ."

33. According to the DOJ's Criminal Complaint, although minutes from the Finance Committee meeting similarly failed to identify the local partner's identity, the participants at the meeting identified the likelihood of corruption and expressed concerns. As reflected in the minutes of the Board, VimpelCom management explained that "due to certain political reasons (and this message should be taken by us as is), Buztel should be considered as an entry ticket into [the] Uzbekistan market and the buyer of Buztel would be considered a preferred buyer of Unitel." VimpelCom management stated that it was "more important to follow the political requirements suggested for entry into the market versus [the] questionable risk of acquisition of Unitel as [a] standalone" and VimpelCom would be "in opposition to a very powerful opponent and bring [the] threat of revocation of licenses after the acquisition of Unitel [as a] stand-alone."

34. According to the DOJ's Criminal Complaint, a VimpelCom Finance Committee member questioned the wisdom of purchasing Buztel when Unitel was of a size sufficient for nationwide coverage and when the $60 million purchase price for Buztel could be better spent developing Unitel's network. The minutes of the meeting, according to the DOJ's Criminal Complaint, reflect that this same member also "expressed concern on the structure of the deal and FCPA issues" and noted "that if [VimpelCom] goes into this deal under this structure and if the structure violates the FCPA picture, [Vimpel's] name could be damaged."

35. The Finance Committee voted to move forward with the acquisition process with the understanding that VimpelCom's Board should consider whether to "enter Uzbekistan through acquisitions of both Buztel (as a condition of entry into the market) and Unitel, . . . provided, however, that all issues related to FCPA should be resolved" or "to bid for Unitel only with understanding that potentially it may be more expensive and is connected with risks of business development without [the] local partner."

36. According to the DOJ's Criminal Complaint, during a December 14, 2005 VimpelCom Board meeting, the likelihood of corruption was further discussed. For example, VimpelCom management explained that Ms. Karimova was actively influencing and interfering with Buztel's operations because of Ms. Karimova's ownership interest in the company. VimpelCom management added that Ms. Karimova appeared to have control and influence over the purchase price for Unitel. VimpelCom management also warned that there could be a falling out with the local partner if VimpelCom only purchased Unitel that would make it difficult, if not impossible, to operate in Uzbekistan. Concerns were raised about doing business with Ms. Karimova and the dangers associated with the Buztel transaction, and there was a recognition that a thorough analysis was needed to ensure that the Buztel payment was not merely a corrupt pretext

for other services and favors. There were also numerous requests to ensure that the deal complied with the FCPA. Ultimately, VimpelCom's Board approved the Buztel and Unitel acquisitions, with a condition that an FCPA analysis from an international law firm be provided to VimpelCom.

37. According to the DOJ's Criminal Complaint, VimpelCom's management then sought FCPA advice that could be used to satisfy the Board's requirement while allowing VimpelCom to proceed with a knowingly corrupt deal. Despite the known risks of Ms. Karimova's involvement in Buztel, VimpelCom management obtained FCPA legal opinions from an international law firm supporting the acquisition of Unitel and Buztel; however, VimpelCom management did not disclose to the law firm Ms. Karimova's known association with Buztel. As a result, the legal opinion did not address the critical issue identified by the VimpelCom Board as a prerequisite to the acquisition. Management limited the law firm's FCPA review of the transaction to ensure that the legal opinion would be favorable.

38. Having obtained a limited FCPA legal opinion designed to ostensibly satisfy the Board's requirement, VimpelCom management then proceeded with the Buztel acquisition and corrupt entry into the Uzbek market. VimpelCom, through subsidiaries, purchased Buztel for approximately $60 million on or about January 18, 2006 and Unitel for approximately $200 million on or about February 10, 2006, along with the assumption of some debt.

### B. <u>VimpelCom Corruptly Entered into a Local Partnership in 2006 and 2007</u>

39. The Company admits in the Deferred Prosecution Agreement, as VimpelCom entered the Uzbek market through the acquisitions of Unitel and Buztel, VimpelCom management learned that VimpelCom would be required to enter into a partnership with the Shell Company in order to conceal corrupt payments to Ms. Karimova in exchange for her support to allow VimpelCom and Unitel to do business in Uzbekistan.

40. The Company admits in the Deferred Prosecution Agreement that in internal VimpelCom documents, Ms. Karimova frequently was identified only as "partner" or "local partner" rather than by name. For example, documents prepared for an April 7, 2006 Board meeting concerning the proposed partnership agreement with the Shell Company referred only to a "Local Partner" who was the 100% owner of Shell Company.

41. The Company admits in the Deferred Prosecution Agreement that VimpelCom structured the partnership agreement to hide the bribe payments to Ms. Karimova. Under the deal, the Shell Company obtained an indirect interest of approximately 7% in Unitel for $20 million, and the Shell Company received an option to sell its shares back to Unitel in 2009 for between $57.5 million and $60 million for a guaranteed net profit of at least $37.5 million. In proposing the partnership, VimpelCom justified it in part by explaining that the partner would provide the "[r]evision of the licensing agreement for the major licenses" and "transfer of frequencies," while also noting that the direct transfer of frequencies was not allowed in Uzbekistan.

42. The Company admits in the Deferred Prosecution Agreement that VimpelCom's Board approved the partnership on or about April 7, 2006, but its approval again was conditioned on "FCPA analysis by an international law firm" and required that the "the identity of the Partner . . . [be] presented to and approved by the Finance Committee." VimpelCom received an FCPA opinion on the sale of the indirect interest in Unitel to the Shell Company on or about August 30, 2006. The FCPA advice VimpelCom received was not based on important details that were known to VimpelCom management and that VimpelCom management failed to provide to outside counsel, including Ms. Karimova's control of Shell Company. In addition, documents, including minutes from the Finance Committee's meeting on August 28, 2006, failed to disclose the true identity of the local partner by name while noting the "extremely sensitive" nature of the issue.

43. The Company admits in the Deferred Prosecution Agreement that on or about March 28, 2007, VimpelCom's Board unanimously approved the partnership agreement with the Shell Company, and the deal progressed as planned. Ms. Gayane Avakyan[1] signed the agreement on behalf of the Shell Company as the "Director" and on or about June 12, 2007, the Shell Company transferred $20 million from its Latvian bank account to VimpelCom's bank account. Less than three years later, in or around September 2009, Shell Company exercised its guaranteed option to have VimpelCom's subsidiary repurchase the Shell Company's shares, and VimpelCom transferred $57,500,000 from its bank account to the Shell Company's bank account in Hong Kong. Both transfers were executed through transactions into and out of correspondent bank accounts at financial institutions in New York, New York.

44. The Company admits in the Deferred Prosecution Agreement that as a result of VimpelCom's partnership agreement and transfer of funds to the Shell Company, Ms. Karimova made a net profit of approximately $37.5 million and VimpelCom and Unitel were able to continue to conduct business in Uzbekistan.

### C. <u>$25 Million Corrupt Payment for 3G Frequencies in 2007</u>

45. The Company admits in the Deferred Prosecution Agreement that in 2007, VimpelCom arranged to pay Ms. Karimova, through the Shell Company, an additional $25 million bribe to obtain 3G frequencies for Unitel in Uzbekistan. VimpelCom made this bribe payment in order to secure Ms. Karimova's continued support and to ensure that the Shell Company's subsidiary waived its right to certain 3G frequencies with the expectation, and pursuant to a success

---

[1] Ms. Avakyan was Ms. Karimova's close associate, and was twenty years old when Takilant (the Shell Company) was incorporated in 2004 and had no significant experience in the telecommunications industry. Ms. Avakyan served as the sole director and sole shareholder of Takilant during the relevant time period.

fee, that UzACI would reissue the 3G frequencies to Unitel. VimpelCom management negotiated the transfer of the 3G frequencies with Mr. Bekhzod Akhmedov[2], whom they knew was Ms. Karimova's representative for the Shell Company. VimpelCom management also knew that Mr. Akhmedov was the head of one of Unitel's primary competitors in Uzbekistan.

46. The Company admits in the Deferred Prosecution Agreement that materials prepared for an October 12, 2007 Board meeting document that VimpelCom had "been offered to acquire" 3G frequencies held by a wholly owned subsidiary of Shell Company. The documents explained that, "[a]s the rights to frequencies are not transferable in Uzbekistan and cannot be sold, [the Shell Company]'s subsidiary has agreed to waive its rights to the frequencies and we expect the frequencies to be reissued to Unitel." The first $10 million would be "payable to [the Shell Company] upon waiver of the frequencies," and the final $15 million would be "payable to [the Shell Company] upon receipt of the frequencies by Unitel." On or about October 12, 2007, VimpelCom's Board unanimously approved the 3G transaction.

47. The Company admits in the Deferred Prosecution Agreement that VimpelCom management communicated with Mr. Akhmedov to arrange for the transfer of the 3G licenses through a sham contract with the Shell Company to conceal the corrupt payment to Ms. Karimova. For example, on or about October 15, 2007, Mr. Akhmedov emailed VimpelCom management from his personal email address. Using a pseudonym, Mr. Akhmedov wrote, "Enclosed you may find the docs that you have requested." Attached to the email were several documents, including a draft contract between a VimpelCom subsidiary and the Shell Company and a copy of the Shell Company's subsidiary's telecommunications license, which would be repudiated as part of the

---

[2] Mr. Akhmedov was Ms. Karimova's associate and telecommunications representative, who also headed MTS' Uzbek subsidiary, Uzdunrobita.

agreement. According to the Shell Company's subsidiary's license, the subsidiary only obtained the license weeks earlier, on September 27, 2007.

48. The Company admits in the Deferred Prosecution Agreement that in return for the $25 million bribe payment, VimpelCom and Unitel obtained an amended license within a matter of days, which permitted Unitel to use 30 frequencies previously held by the Shell Company's subsidiary. During this time, VimpelCom management negotiated directly with Mr. Akhmedov, and a Unitel executive who worked with Mr. Akhmedov and exchanged documents with government regulators, including a high-ranking official at UzACI, to help close the deal. On or about November 7, 2007, a VimpelCom subsidiary transferred $10 million from its Netherlands bank account to the Shell Company's Latvian bank account. The following day, a VimpelCom employee emailed confirmation of the payment to Mr. Akhmedov at his personal email account using Mr. Akhmedov's pseudonym, and explained: "We are ready to start 30 frequency allocation to Unitel." Later that day, Mr. Akhmedov emailed VimpelCom management, and explained that the Uzbek telecom regulator had assigned the frequencies to Unitel and that the "[o]riginal will be given to your Local Representative." Mr. Akhmedov attached a scanned copy of Unitel's amended license dated that day. The next day, on or about November 9, 2007, a VimpelCom subsidiary transferred the remaining $15 million from its Netherlands bank account to the Shell Company's Latvian bank account, completing VimpelCom's corrupt payment to Ms. Karimova for the acquisition of the necessary 30 frequencies for Unitel. The corrupt payments from the VimpelCom subsidiary to the Shell Company's Latvian bank account totaled $25 million and were executed through transactions into and out of correspondent bank accounts at financial institutions in New York, New York.

### D. VimpelCom's Corrupt Consulting Contract Payments to Shell Company in 2008 and 2011

49. The Company admits in the Deferred Prosecution Agreement that in 2008 and again in 2011, VimpelCom, directly or through a subsidiary, knowingly entered into contracts for fake consulting services with the Shell Company in order to provide Ms. Karimova with approximately $32 million in exchange for valuable telecommunications assets and to allow Unitel to continue to conduct business in Uzbekistan.

50. The Company admits in the Deferred Prosecution Agreement that in 2008 VimpelCom management, Mr. Akhmedov, and others conspired to pay an additional $2 million bribe to Ms. Karimova that had originally been contemplated in 2006. VimpelCom management justified the payment as a "consulting" fee to the Shell Company and created false, backdated documents to conceal the corrupt payment.

51. The Company admits in the Deferred Prosecution Agreement that on or about February 13, 2008, a VimpelCom executive emailed VimpelCom management to explain that "the partner, citing the earlier verbal agreements, is returning to the issue [of $2 million] and is asking us to recognize the obligations and make payments." In response, on or about February 14, 2008, a VimpelCom in-house attorney indicated that a presentation to VimpelCom's Board in April 2006 included a $2 million payment for "the partner's services" in approximately nine potential areas, however, the "payout term of the amount was not specified" and the in-house attorney did "not know if all the services listed in the presentation [had] to be fulfilled as a condition for the payment." Shortly thereafter, a VimpelCom employee with knowledge of the deal replied to confirm that the amount owed to the local partner was $2 million and that "[t]he obligations were incurred from the moment of payment for the acquisition of Unitel."

52. The Company admits in the Deferred Prosecution Agreement that VimpelCom management then endeavored to find a way to pay the Shell Company $2 million to satisfy Ms.

Karimova's demand. They proceeded to draft paperwork, in consultation with Mr. Akhmedov, in order to create false documents that would contain plausible services the Shell Company could purport to perform under a consulting agreement. Drafts of the consulting agreements included varying limited services until the final agreement only required the Shell Company to provide services related to "documentation packages required to assign channels" to Unitel.

53. The Company admits in the Deferred Prosecution Agreement that VimpelCom management also considered ways to ensure that the contractual payments avoided unwanted scrutiny. For example, on or about July 1, 2008, VimpelCom management emailed about a phone call from Mr. Akhmedov and his statement that "they have a strong desire to receive these funds from an offshore [company]." In response, one VimpelCom executive wrote, "[t]his complicates our objective as it requires organization of financing (we do not keep spare money in offshores). […] Will we be able to make a payment of 2 million the same way as the payment for 3G." On or about July 2, 2008, another VimpelCom executive responded, "we do not have approved loans in the jurisdictions where they do not closely look at the documents (we paid for 30 for Uzbekistan from BVI). There is undrawn limit for 4 million in [a Dutch entity], but they have strict compliance -- it will be necessary to prove with the documents that consulting services are provided . . . ."

54. The Company admits in the Deferred Prosecution Agreement that several other aspects of the consultancy arrangement demonstrated its sham nature. For example, at Mr. Akhmedov's request, VimpelCom, not the Shell Company, drafted the Shell Company's invoice for the work that the Shell Company purportedly performed, and VimpelCom drafted the Shell Company's service acceptance act. In addition, both documents were backdated to July 18, 2008, and the final, executed version of the consulting agreement between VimpelCom and the Shell Company was backdated to June 30, 2008. The final documents thus made it appear that the Shell

Company conducted $2 million of consulting work for VimpelCom in only 18 days. In fact, the Shell Company did no legitimate work to justify the $2 million payment.

55. The Company admits in the Deferred Prosecution Agreement that on or about August 8, 2008, VimpelCom transferred $2 million from its bank account to the Shell Company's bank account in Latvia, which was executed through transactions into and out of correspondent bank accounts at financial institutions in New York, New York.

56. The Company admits in the Deferred Prosecution Agreement that it did not conduct any FCPA analysis concerning this purported consulting services agreement with the Shell Company. This was despite the fact that VimpelCom management had received a prior FCPA opinion concerning the Shell Company, which explicitly excluded any FCPA analysis associated with consulting services provided by the Shell Company. Moreover, during the earlier due diligence process, the Shell Company had represented that "[Shell Company] does not contemplate entering into consultancy or similar agreement with VimpelCom . . . ."

57. The Company admits in the Deferred Prosecution Agreement that in 2011, Executive 1 conspired with Executive 2 and others to direct an additional $30 million payment to Ms. Karimova through the Shell Company. This $30 million bribe payment was made specifically to acquire 4G mobile communication frequencies for Unitel, but was also part of the broader effort to enable Unitel to continue to operate in the Uzbek telecommunications market without interference by Ms. Karimova. Executive 1, Executive 2 and others modeled the 2011 4G agreement on the 2007 3G agreement, except that the 2011 4G agreement purportedly was for consulting services and full payment was not contingent on obtaining the 4G frequencies. At the time, Unitel had no need for 4G frequencies, because Unitel lacked the ability to employ 4G frequencies in Uzbekistan in 2011 or the near future. VimpelCom management knew that the 4G

consulting agreement was a sham and that Shell Company would not be required to provide any actual services in return for the $30 million fee.

58. The Company admits in the Deferred Prosecution Agreement that several aspects of the 4G consulting agreement with the Shell Company caused substantial internal criticism by some VimpelCom executives, including those who were charged with approving the transaction. "Witness," a consultant functioning as a senior VimpelCom executive and whose identity is known to the DOJ, was among the chief critics of the 4G consulting agreement with the Shell Company, repeatedly voicing serious anticorruption concerns about the deal at the highest level of VimpelCom management. For example, on or about August 20, 2011, Witness emailed several senior VimpelCom executives explaining that Witness was "very uncomfortable" and could "see no rationale" why "we are solely paying to the agent working for getting the license for us, and nothing to the [Uzbek] Government[.]" Witness compared the proposed deal to another "corruption case," which resulted in "heavy fines . . . plus criminal charges against the company and individual employees." Witness cautioned, "[u]nless there is absolute transparency of our consultants' Gibraltar company, its ownership structure and the further cash flows from this, I cannot see how I can be able to sign off on this . . . unless the legal FCPA analysis can clarify this and settle my concerns."

59. The Company admits in the Deferred Prosecution Agreement that VimpelCom management again sought an FCPA opinion from outside counsel to provide a plausible cover to go forward with the transaction. VimpelCom management then failed to provide outside counsel with important information, most notably that the Shell Company was known to be owned by Ms. Karimova, because VimpelCom management were willing to accept an opinion that focused on

the Shell Company as an unrelated third party without analyzing or addressing the nature of the transaction itself or its high dollar value.

60. The Company admits in the Deferred Prosecution Agreement that the purported FCPA due diligence on the Shell Company was flawed in design and execution. No in-house or outside lawyer ever directly contacted the Shell Company's purported owner, Ms. Karimova, and instead, the FCPA questionnaires purportedly designed to uncover beneficial owners and potential corruption risks were sent to intermediaries to respond. For example, on or about August 5, 2011, a VimpelCom in-house lawyer emailed FCPA questionnaires to Executive 1 to pass along "to the [Shell Company] representative to fill out." On or about August 6, 2011, Executive 1 forwarded the FCPA questionnaires both to Executive 1's personal email account and the personal email account of Mr. Akhmedov. Executive 1 also forwarded the email with the FCPA questionnaires to Executive 2 who replied: "Hardcore, of course . . . . But in my opinion with the exception of the first and last names they can answer everything else."

61. The Company admits in the Deferred Prosecution Agreement that in or around August and September 2011, Witness continued to raise concerns. On or about September 2, 2011, Witness emailed a then in-house VimpelCom attorney to explain that Witness was "very concerned about this way of structuring the payment," and Witness asked whether VimpelCom had received "any official 'ok' from US Governmental body/SEC . . . ." On or about September 5, 2011, Witness received a response from VimpelCom's then in-house counsel that acknowledged that, "[t]his transaction deserves caution but on the legal side the question boils down to whether there is a reasonable basis to believe that our counter-party will make illegal payments. We cannot establish conclusively that there will not be any illegal payments . . . ." VimpelCom's then in-house counsel added, ". . . our due diligence is our defense in the event that there is a claim against

us so we have to ask ourselves whether the situation warrants additional due diligence. [We are] comfortable that additional due diligence is not warranted. We are going to monitor the process and ensure that real work is being done by the counter-party." However, VimpelCom, including its in-house attorneys, did not thoroughly monitor the process to ensure that the Shell Company performed any services. Once the FCPA opinion was obtained, VimpelCom proceeded with the deal.

62. The Company admits in the Deferred Prosecution Agreement that the 4G consulting agreement required approvals from senior VimpelCom executives reviewing the transaction from their areas of expertise. After receiving repeated assurances from VimpelCom's then in-house lawyers, in or around mid-September 2011, Witness eventually provided the sign-off for Witness's expert area for the proposed 4G consulting agreement with the Shell Company. However, Witness handwrote an unusual caveat below Witness's signature: "This sign off is solely related to [my expert area]. My sign off confirm[s] that I have reviewed the technical [] position and approved with it." Notably, other VimpelCom executives specifically limited their approval or expressed reservations before signing off on their expert areas. Executive 2 expressed no reservations before providing the necessary approval on behalf of the business unit.

63. The Company admits in the Deferred Prosecution Agreement that soon after providing the limited sign-off on the deal, Witness escalated the matter to the highest levels within VimpelCom management, with whom Witness met on or about September 30, 2011. However, VimpelCom management failed to act on Witness's concerns and the 4G deal remained in place after the meeting.

64. The Company admits in the Deferred Prosecution Agreement that Executive 1 and Executive 2 closely monitored the approval process and ensured that the Shell Company was paid

quickly. On or about September 19, 2011, Executive 2 received an email showing that all approvals had been received for the 4G consulting agreement. That same day, the agreement was executed with Executive 2 signing as the director of a VimpelCom subsidiary, and Ms. Avakyan signing as the director of the Shell Company. Two days later, on or about September 21, 2011, the VimpelCom subsidiary transferred $20 million as an advance payment under the 4G consulting agreement to the Shell Company's Swiss bank account. On or about October 18, 2011, UzACI issued a decision amending Unitel's license to allow it to use 4G frequencies. That same day, on or about October 18, 2011, Ms. Avakyan also sent a letter on the Shell Company letterhead to Executive 1 referencing the consulting agreement and enclosing "reports and presentations based on the work that we have done in the course of providing services to your Company." The following day, on or about October 19, 2011, the VimpelCom subsidiary sent the final $10 million payment in recognition of its full performance under the deal to the Shell Company's Swiss bank account. The corrupt payments from the VimpelCom subsidiary to the Shell Company's Swiss bank account totaled $30 million and were executed through transactions into and out of correspondent bank accounts at financial institutions in New York, New York.

65. The Company admits in the Deferred Prosecution Agreement that the Shell Company never provided any legitimate consulting services to Unitel to justify its $30 million fee. In fact, the Shell Company's consulting reports and presentations, which were prepared in supposed satisfaction of its obligations under the consulting agreement, were not needed by VimpelCom or Unitel, and the reports were almost entirely plagiarized from Wikipedia entries, other internet sources, and internal VimpelCom documents.

**E. <u>Corrupt Payments Through "Reseller" Companies in 2011 and 2012</u>**

66. The Company admits in the Deferred Prosecution Agreement that because of significant currency conversion restrictions in Uzbekistan and the inability to use Uzbek som (the Uzbek unit of currency) to obtain necessary foreign goods, Unitel frequently entered into non-transparent transactions with purported "reseller" companies to pay foreign vendors in hard currency for the provision of goods in Uzbekistan. Typically, Unitel would contract with a local Uzbek company in Uzbek som, and that Uzbek company's related companies located outside of Uzbekistan would agree to pay an end supplier using the hard currency (usually, U.S. dollars).

67. The Company admits in the Deferred Prosecution Agreement that in February and March 2011, Executive 1 conspired with Executive 2 and others to take advantage of the murky reseller process to conceal a $10 million bribe to Ms. Karimova via the Shell Company through various purported reseller transactions to Shell Company. To effectuate the corrupt payment, Unitel entered into contracts with an Uzbek entity for services that were unnecessary and/or were made at highly inflated prices. These transactions were approved without sufficient justification and bypassed the normal competitive tender processes. Unitel then made payments in Uzbek som to the Uzbek company. Thereafter, in or around February and March 2011, an offshore company affiliated with the Uzbek company sent approximately 14 payments totaling $10.5 million to another intermediary, which in turn sent approximately 14 wire payments, each under $1 million and totaling approximately $10,000,023 to the Shell Company's Swiss bank account, which was executed through transactions into and out of correspondent bank accounts at financial institutions in New York, New York.

68. The Company admits in the Deferred Prosecution Agreement that the $10 million payment to Ms. Karimova in 2011 was achieved through a series of sham agreements whose only

purpose was to justify associated payments using a number of reseller companies based in Uzbekistan or elsewhere. The reseller companies used in these transactions were fungible, as no real work from the end recipient of the funds was expected as the payment was, in fact, a bribe. For example, on or about December 15, 2010, Executive 2 received an email with only the words, "The companies," which included a forwarded email with two names of purported reseller companies and the message, "Choose any . . ." Attached to the email was banking information for the Cypriot bank account one of the companies. The following day, Executive 2 forwarded the email to two Unitel executives, and wrote, "below are the companies with which we must work on the question of the 10 mill . . . . Keep me informed pls how you will be doing it."

69. The Company admits in the Deferred Prosecution Agreement that it and Unitel, through Executive 1, Executive 2, and others, used these transactions with reseller companies to make and conceal the $10 million bribe to Ms. Karimova through the Shell Company. The Shell Company performed no legitimate services to justify a $10 million payment, and there was no need for VimpelCom or Unitel to make any payments for the specific contracted services in U.S. dollars. By using the reseller scheme, VimpelCom and Unitel executives avoided additional scrutiny, including FCPA analysis, of the transactions and payments.

70. The Company admits in the Deferred Prosecution Agreement that in 2012, Executive 1 again conspired with Executive 2 and others to make and conceal another $10 million bribe payment to Ms. Karimova via the Shell Company through purported transactions with reseller companies. As in 2011, Executive 1 and Executive 2 knew that the true purpose of these transactions was to funnel $10 million to the Shell Company, and they took efforts to ensure that the transactions were approved without unwanted scrutiny.

71. The Company admits in the Deferred Prosecution Agreement that between February and May 2012, Unitel entered into contracts, this time with multiple Uzbek entities for services that were unnecessary and/or were made at highly inflated prices. These transactions were approved without sufficient justification and bypassed the normal competitive tender processes. Unitel then made payments in Uzbek som to those Uzbek companies. Thereafter, in or around April and May 2012, a company affiliated with the subcontractor sent approximately 12 payments totaling over $10.5 million to a designated reseller company, and then that designated reseller company sent approximately 13 wire payments, each under $1 million and totaling approximately $10 million, to Shell Company's Swiss bank account, which was executed through transactions into and out of correspondent bank accounts at financial institutions in New York, New York.

72. The Company admits in the Deferred Prosecution Agreement that Unitel entered into these transactions even after Executive 1 was alerted to serious concerns about one of the reseller companies that was used in the corrupt scheme. On or about February 10, 2012, a Unitel employee emailed Executive 1 and another executive to complain that the employee had been "forced to sign a notice of voluntary [resignation]" after reporting problems after the employee's visit to the reseller company's office related to another tender. Specifically, the employee found, among other things, that the office was "located in an old rundown house [building], without any signage" and "[t]here were no specialists [or technicians] there." The employee recommended against using the reseller company as a contractor for Unitel, as it was "not qualified and there are big risks . . . ." The employee noted in the email to Executive 1 that, in response to the information the employee provided, the employee was warned by Unitel personnel "not to interfere," and,

when the employee persisted, "they began to put pressure on me to resign." This complaint did not deter Executive 1 from moving forward with the scheme.

73. The Company admits in the Deferred Prosecution Agreement that Executive 2 and others also took steps to ensure that the 2012 payments to the reseller companies would not be scrutinized during a May 2012 in-house audit of Unitel. The audit included a review of certain contracts with reseller companies, including the February 2012 agreement between Unitel and a certain reselling company. However, a Unitel executive who worked closely with Executive 2 refused to cooperate with the audit, claiming to in-house auditors that the matter was "confidential" and that no materials or information could be shared with them. When the dispute was escalated, Executive 2 intervened on or about May 22, 2012, and claimed that the transaction was "not a reselling operation," which resulted in the purported reseller company contract being removed from the audit.

74. The Company admits in the Deferred Prosecution Agreement that just as in 2011, VimpelCom and Unitel, through Executive 1, Executive 2, and others, used these transactions with reseller companies to make and conceal the $10 million bribe to Ms. Karimova through the Shell Company. The Shell Company performed no legitimate services to justify a $10 million payment, and there was no need for VimpelCom or Unitel to make payments for the contracted services in U.S. dollars. By again using the non-transparent reseller scheme, VimpelCom and Unitel executives were able to avoid additional scrutiny, including FCPA analysis, of the transactions and payments.

### F. Other Corrupt Payments in December 2012 and January 2013

75. The Company admits in the Deferred Prosecution Agreement that in the summer of 2012, a primary competitor of Unitel's was forced into bankruptcy and exited the Uzbek

marketplace. Later that summer, international news reports linked the Shell Company with Ms. Karimova

76. The Company admits in the Deferred Prosecution Agreement that VinpelCom and Unitel management discussed how to continue participating in the corrupt scheme involving Ms. Karimova and her associates. On December 3, 2012, a Unitel executive emailed Executive 1 with a draft letter for further dissemination which included an explanation of "the situation that has currently arisen in . . . Uzbekistan." The Unitel executive explained that as Unitel's business expanded significantly in 2012, Unitel began to receive all kinds of inquiries from local "partners," and that "a critical situation ha[d] arisen" concerning Unitel's failure to obtain various government permits and approvals for Unitel's on-going telecom business, and the "[l]ocal 'partners' claim that the solution to our problems directly depends on the assistance to them. The sooner we can help, the faster our requests will be addressed."

77. The Company admits in the Deferred Prosecution Agreement that on or about January 30, 2013, Executive 2 sent multiple emails to Executive 1 concerning a plan being contemplated to pay additional bribes totaling $16 million in exchange for, among other things, the "[o]pportunity to conduct future operations without hurdles from the 'partner' and regulatory agencies." Executive 2 proposed concealing the bribe payments by structuring them through "local reseller companies," noting that "[o]ffshore companies provided by the 'partner' will be final beneficiaries of these payments." Executive 2 evaluated the risks associated with "non-payment" of the bribes to involve a number of negative governmental reactions, including "disconnecting of existing base stations," "refusing to issue building permits," "refusing to issue additional numbering capacity," "possible challenges from the tax authority," and even "[r]ecall of the license." Executive 2 ultimately valued the "cumulative amount of possible risks" for "non-

payment" at approximately $61.2 million, and Executive 2 noted that if they made the decision to pay, it would also be necessary to address the "FCPA" and "[i]nternal and external audit."

**G. VimpelCom's Failure to Implement and Enforce Internal Accounting Controls**

78. The Company admits in the Deferred Prosecution Agreement that throughout the time period of VimpelCom's bribery of Ms. Karimova, VimpelCom failed to implement adequate internal accounting controls and failed to enforce the internal accounting controls it did have in place, which permitted the above-referenced bribe payments to occur without detection or remediation.

79. The Company admits in the Deferred Prosecution Agreement that it failed to implement a system for conducting, recording, and verifying due diligence on third parties, including joint venture partners, consultants, reseller companies, and suppliers to uncover their true nature, beneficial ownership, and possible corruption risks. Time and again, Board members, executives, and employees of VimpelCom identified serious concerns with third parties, and VimpelCom still failed to undertake adequate due diligence.

80. The Company admits in the Deferred Prosecution Agreement that it knowingly failed to require that all consulting agreements be for *bona fide* services, that agreed-upon payments were commensurate with the services to be performed, and that services paid for were, in fact, performed. VimpelCom knowingly failed to conduct meaningful auditing or testing of its consultant agreements, invoices, and payments, including those with the Shell Company and, as demonstrated above, failed to conduct adequate investigations of corruption complaints. VimpelCom also had no policy regarding payments to bank accounts located in places where the contractual partner neither performed work nor had operations.

81. The Company admits in the Deferred Prosecution Agreement that in 2011 and 2012, VimpelCom paid $20 million in bribes through single source decisions with reseller companies that allowed executives to structure nontransparent transactions. VimpelCom knowingly failed to implement and maintain adequate controls for approving and transacting with reseller companies and intermediaries to ensure that reseller companies were scrutinized and that single-source contracting decisions were justified. VimpelCom and Unitel executives took advantage of these control failures to engage in transactions designed to obfuscate the actual purpose of the payments, which was to corruptly influence Ms. Karimova.

82. The Company admits in the Deferred Prosecution Agreement that as a result of the facts described herein and the failures of VimpelCom's management, VimpelCom also knowingly lacked a sufficient internal audit function to provide reasonable assurances that corporate assets were not used to make bribery payments to foreign officials and failed to enforce audit protocols or conduct adequate internal audits to detect and prevent criminal activity. As discussed above, VimeplCom knowingly failed to implement and enforce internal controls to keep a 2012 reseller transaction within a regularly conducted audit after Executive 2 intervened to cause its removal, thereby allowing a bribe payment to Ms. Karimova, through the Shell Company, to go undetected.

83. The Company admits in the Deferred Prosecution Agreement that VimpelCom management also knowingly failed to implement and maintain adequate controls governing processes concerning conflicts of interest. For example, VimpelCom management knew of a conflict with Akhmedov's representation of the Shell Company, because at the time Akhmedov was a chief executive of one of Unitel's primary competitors in Uzbekistan. Moreover, Akhmedov requested to be contacted about work matters on a personal email account and through a pseudonym. VimpelCom failed to implement or enforce any meaningful policy to adequately

scrutinize business deals with representatives who had such conflicts of interest or otherwise engaged in non-transparent activities.

84. The Company admits in the Deferred Prosecution Agreement that other failures that contributed to VimpelCom's lax control environment were its failure to enforce price thresholds that determined the required level of approval authority, failure to retain documentation of deliverables for contracts, and failure to adequately classify and obtain approvals for purported charitable contributions that were made in exchange for state-provided assets.

85. The Company admits in the Deferred Prosecution Agreement that VimpelCom's failures to implement and enforce adequate internal controls contributed to an environment where it was possible for VimpelCom and Unitel executives to pay Ms. Karimova through the Shell Company over $114 million in bribes.

86. The Company admits in the Deferred Prosecution Agreement that it also had particularly severe deficiencies in its general compliance function and its anticorruption compliance policies and procedures. When VimpelCom entered the Uzbek market, it had no Chief Compliance Officer ("CCO"). To the extent that compliance was considered by VimpelCom, it was the responsibility of the legal department and was thought of as a "completeness check" that legal formalities were followed. When VimpelCom later did designate a CCO, whose formal title was the Head of Department of Compliance with Obligations and Disclosure of Information and Corporate Law, the junior executive selected had no background in compliance and was given no staff or support. Furthermore, all of VimpelCom's compliance duties were expected to take a small fraction of the executive's time. In fact, there was no dedicated compliance function at VimpelCom until 2013, and CCO was not a senior management group position until 2014.

87. The Company admits in the Deferred Prosecution Agreement that during the duration of the conspiracy, high-level VimpelCom management knew of the FCPA, yet VimpelCom had little to no anticorruption compliance program, much less a program that was regularly and appropriately evaluated for effectiveness and provided appropriate incentives. VimpelCom's only anticorruption policy was encapsulated in two, high-level paragraphs in VimeplCom's code of conduct, which required consultation with the legal department "before providing anything of value to a government official." In fact, VimpelCom's legal department did no internal FCPA review of transactions. When corruption issues were identified in the above-mentioned cases, the subsequent "FCPA review" was seen as a "check list and a confirmation from [outside counsel]." As demonstrated above, VimpelCom management withheld crucial information in such situations in Uzbekistan from outside counsel and overly restricted the scope of FCPA opinions such that the advice given was of no value. Training on the FCPA during the course of the corruption conspiracy, to the extent it existed at all, was inadequate and *ad hoc*. In short, rather than implement and enforce a strong anticorruption ethic, VimpelCom sought ways to give itself plausible deniability of illegality while proceeding with business transactions known to be corrupt.

## H. <u>VimpelCom's Scheme to Falsify Books and Records</u>

88. The Company admits in the Deferred Prosecution Agreement that due to VimpelCom's failure to implement effective internal accounting controls, VimpelCom, acting through its executives, disguised on its books and records over $114 million in bribe payments made for the benefit of Ms. Karimova in exchange for VimpelCom and Unitel's ability to enter and conduct business in the Uzbek telecommunications market.

89. The Company admits in the Deferred Prosecution Agreement that although all of VimpelCom's and Unitel's bribes to Ms. Karimova were funneled through the Shell Company, it was part of the scheme that VimpelCom management and others used a variety of non-transparent transactions with different purported business purposes so that the payments would be inaccurately recorded as legitimate transactions. In the Deferred Prosecution Agreement, the Company admitted to the following:

(a) The bribe related to the partnership agreement in which the Shell Company first purchased and then sold an indirect equity interest in Unitel was falsely recorded in VimpelCom's consolidated books and records as the receipt of loan proceeds in 2007 to be repaid in 2009 and secured by shares in a VimpelCom subsidiary.

(b) The bribe related to the acquisition of 3G frequencies in 2007 was falsely recorded in VimpelCom's consolidated books and records as the acquisition of an intangible asset, namely 3G frequencies, and as consulting expenses.

(c) The bribe in 2008 was falsely recorded in VimpelCom's consolidated books and records as "submission and support documentation packages seeking assignment of 24 channels to Unitel" and treated as an acquisition of an intangible asset and consulting services.

(d) The bribe related to consultancy services associated with the acquisition of 4G frequencies in 2011 was falsely recorded in VimpelCom's consolidated books and records as "consulting services" and treated as consulting services and as an acquisition of an intangible asset, namely 4G frequencies.

(e) The bribes made through purported reseller transactions in 2011 and 2012 were falsely recorded in VimpelCom's consolidated books and records as "professional

services" expenses. VimpelCom also created, and caused to be created, false and backdated records to further conceal these improper payments. For example, each bribe payment was concealed by false contracts that were intended to create the appearance of legitimacy. Some of these contracts included provisions prohibiting unlawful payments, including payments that would violate the FCPA, even though VimpelCom and Unitel executives knew that the payments called for by the contracts were, in fact, bribes to Ms. Karimova in violation of the FCPA. At times, VimpelCom and Unitel executives also created false service acceptance acts, invoices, and other back-up documentation to justify supposedly legitimate business services when, in truth and in fact, those executives knew that no such work was performed to justify the generous payments made to the Shell Company. VimpelCom and Unitel executives also accepted plagiarized work product to falsely substantiate consulting work that was never performed.

## I. Details of the Corrupt Payments Made to Takilant (the "Shell Company")

90. The following corrupt payments, described in the preceding sections, were made by or on behalf of VimpelCom, a subsidiary of a VimpelCom shareholder, AQUTE, or a reseller company to Takilant. At least $134,500,023 of these payments were executed through transactions that were transferred into and out of correspondent bank accounts at financial institutions in New York, New York, including through J.P. Morgan Chase, Standard Chartered Bank, Citibank, and Wells Fargo:

| Date (On or about) | Originating Party | Originating Bank | Beneficial Party | Beneficial Bank | Amount |
|---|---|---|---|---|---|
| 01/20/06 | AQUTE (the seller of Buztel and a subsidiary of a VimpelCom shareholder) | Amsterdam Trade Bank, Netherlands | Takilant | Aizkraukles Lativa | $19,000,000 |

| Date (On or about) | Originating Party | Originating Bank | Beneficial Party | Beneficial Bank | Amount |
|---|---|---|---|---|---|
| 11/07/07 | Watertrail (a VimpelCom subsidiary) | ING Bank, Netherlands | Takilant | Parex, Lativa | $10,000,000 |
| 11/09/07 | Watertrail (a VimpelCom subsidiary) | ING Bank, Netherlands | Takilant | Parex, Lativa | $15,000,000 |
| 08/08/08 | VimpelCom | Citibank, Russia | Takilant | Parex, Lativa | $2,000,000 |
| 09/23/09 | VimpelCom | Citibank, Russia | Takilant | Standard Chartered, Hong Kong | $57,500,000 |
| 03/03/11 | Reseller Company 1 | Hellenic Bank, Cyrpus | Takilant | Lombard Odier, Switzerland | $780,000 |
| 03/04/11 | Reseller Company 1 | Hellenic Bank, Cyrpus | Takilant | Lombard Odier, Switzerland | $740,000 |
| 03/04/11 | Reseller Company 1 | Hellenic Bank, Cyrpus | Takilant | Lombard Odier, Switzerland | $889,644 |
| 03/08/11 | Reseller Company 1 | Hellenic Bank, Cyrpus | Takilant | Lombard Odier, Switzerland | $840,000 |
| 03/08/11 | Reseller Company 1 | Hellenic Bank, Cyrpus | Takilant | Lombard Odier, Switzerland | $590,000 |
| 03/09/11 | Reseller Company 1 | Hellenic Bank, Cyrpus | Takilant | Lombard Odier, Switzerland | $910,00 |
| 03/11/11 | Reseller Company 1 | Hellenic Bank, Cyrpus | Takilant | Lombard Odier, Switzerland | $940,000 |
| 03/11/11 | Reseller Company 1 | Hellenic Bank, Cyrpus | Takilant | Lombard Odier, Switzerland | $980,000 |
| 03//14/11 | Reseller Company 1 | Hellenic Bank, Cyrpus | Takilant | Lombard Odier, Switzerland | $284,997 |
| 03/14/11 | Reseller Company 1 | Hellenic Bank, Cyrpus | Takilant | Lombard Odier, Switzerland | $740,000 |
| 03/17/11 | Reseller Company 1 | Hellenic Bank, Cyrpus | Takilant | Lombard Odier, Switzerland | $854,994 |
| 03/21/11 | Reseller Company 1 | Hellenic Bank, Cyrpus | Takilant | Lombard Odier, Switzerland | $980,000 |
| 03/21/11 | Reseller Company 1 | Hellenic Bank, Cyrpus | Takilant | Lombard Odier, Switzerland | $444,988 |
| 03/24/11 | Reseller Company 1 | Hellenic Bank, Cyrpus | Takilant | Lombard Odier, Switzerland | $25,080 |
| 09/21/11 | Watertrail (a VimpelCom subsidiairy) | ING Bank, Netherlands | Takilant | Lombard Odier, Switzerland | $20,000,000 |
| 10/19/11 | Watertrail (a VimpelCom subsidiairy) | ING Bank, Netherlands | Takilant | Lombard Odier, Switzerland | $10,000,000 |
| 04/13/12 | Reseller Company 2 | Marfin Popular Bank, Cyprus | Takilant | Lombard Odier, Switzerland | $854,985 |

| Date (On or about) | Originating Party | Originating Bank | Beneficial Party | Beneficial Bank | Amount |
|---|---|---|---|---|---|
| 04/20/12 | Reseller Company 2 | Marfin Popular Bank, Cyprus | Takilant | Lombard Odier, Switzerland | $854,985 |
| 04/24/12 | Reseller Company 2 | Marfin Popular Bank, Cyprus | Takilant | Lombard Odier, Switzerland | $892,702 |
| 04/24/12 | Reseller Company 2 | Marfin Popular Bank, Cyprus | Takilant | Lombard Odier, Switzerland | $854,985 |
| 04/24/12 | Reseller Company 2 | Marfin Popular Bank, Cyprus | Takilant | Lombard Odier, Switzerland | $854,985 |
| 04/25/12 | Reseller Company 2 | Marfin Popular Bank, Cyprus | Takilant | Lombard Odier, Switzerland | $799,027 |
| 04/25/12 | Reseller Company 2 | Marfin Popular Bank, Cyprus | Takilant | Lombard Odier, Switzerland | $892,702 |
| 04/25/12 | Reseller Company 2 | Marfin Popular Bank, Cyprus | Takilant | Lombard Odier, Switzerland | $854,985 |
| 04/25/12 | Reseller Company 2 | Marfin Popular Bank, Cyprus | Takilant | Lombard Odier, Switzerland | $854,985 |
| 04/25/12 | Reseller Company 2 | Marfin Popular Bank, Cyprus | Takilant | Lombard Odier, Switzerland | $854,985 |
| 05/26/12 | Reseller Company 2 | Marfin Popular Bank, Cyprus | Takilant | Lombard Odier, Switzerland | $854,985 |
| 05/04/12 | Reseller Company 2 | Marfin Popular Bank, Cyprus | Takilant | Lombard Odier, Switzerland | $575,689 |
| 05/17/12 | Reseller Company 2 | Marfin Popular Bank, Cyprus | Takilant | Lombard Odier, Switzerland | $9,000 |
| | | | | **TOTAL** | **$153,500,023** |

## J. <u>The Company's Testimony Before The Honorable Edgardo Ramos</u>

91. In a proceeding entitled *U.S. v. VimpelCom, Ltd, and Unitel, LLC*, 16 Cr. 137 (ER) (S.D.N.Y.) before the Honorable Edgardo Ramos on arraignment, plea, and possible sentencing, the Company admitted to the following:

> THE COURT: Sir, can you tell me what it was that the company did that makes it guilty of the crime to which it wishes to plead guilty?
>
> MR. ROCHON: I just want to make sure, you are addressing this to me or to the company representative?
>
> THE COURT: To the company representative.
>
> MR. DRESSER: Thank you. Before I respond, I would like to make one comment. The company deeply regrets its actions here, and we will make sure it never happens again. I would like to first state that the statement of facts I believe to be true and accurate, and they

establish a factual basis for Unitel's guilt. I have been through them with counsel, and I am comfortable with simply having the Court rely on them as the factual basis.

THE COURT: Will the government please indicate the jurisdictional basis for having the case in the Southern District of New York?

MS. MRAZEK: Yes, your Honor. All of the bribe payments at issue passed into and out of correspondent banks in this district.

THE COURT: Mr. Rochon, do you believe that there is an adequate factual basis to support the plea of guilty?

MR. ROCHON: I do.

THE COURT: Ms. Mrazek, is there an adequate factual basis to support the plea of guilty?

MS. MRAZEK: There is.

THE COURT: Mr. Dresser, how does the company now plead to the charge in Count One of the information, guilty or not guilty?

MR. DRESSER: Guilty, your Honor.

THE COURT: Is the company in fact guilty of that charge?

MR. DRESSER: Yes, your Honor.

THE COURT: After consultation with counsel, is the company pleading guilty voluntarily and of its own free will?

MR. DRESSER: Yes, your Honor.

THE COURT: Very well. Is there any further question that you wish me to ask, Ms. Mrazek?

MS. MRAZEK: No, there is not.

THE COURT: Mr. Rochon.

MR. ROCHON: No, sir.

THE COURT: Thank you. Because the company acknowledges that it is in fact guilty as charged in Count One of the information,

because I find that it knows its rights and is waiving them knowingly and voluntarily, with an understanding of the consequences of the plea, including the potential sentences that may be imposed, I accept the plea of guilty and find Unitel guilty on the charge in the information.

I understand that this was an agreement with the government pursuant to Rule 11(c)(1)(C) of the Federal Rules of Criminal Procedure. So the parties have agreed to the punishment and have also agreed to waive the presentence report and proceed immediately to sentencing.

Ms. Mrazek, why should I proceed immediately to
sentencing today?

MS. MRAZEK: Your Honor, because this is a (c)(1)(C) plea, the parties have agreed to what the appropriate penalty is. And there are two major reasons why this has been structured as a (c)(1)(C) plea.

The first is that we are talking about a very large penalty here and a very complex and sensitive negotiation, and the board members of VimpelCom have a fiduciary duty to their shareholders to make sure that they understand what kind of agreement they are entering into, and the certainty that a (c)(1)(C) plea gives is vital to effectuating that interest. In addition, as I discussed earlier, there is a very complicated set of other resolutions that are dependent upon this one and that are triggered by the sentencing of VimpelCom and so we would like to have that sentencing today, or as soon as possible.

THE COURT: Mr. Rochon, why should I sentence the company today?

MR. ROCHON: Your Honor, I agree, first of all, with what counsel for the government has said. As you know, the plea is on Unitel, but it reflects, of course, the agreement with VimpelCom and the amount that is paid pursuant to that agreement that we have reached with the United States through a deferred prosecution agreement. It is not only a complex situation with the Dutch, and just to be clear to the Court, the amounts that are owed in this case depend on that resolution as well, in the sense that the Dutch have financial penalties, and the Department of Justice needs to assess those penalties in terms of this case, and if this case doesn't move forward, it would unwind potentially the Dutch case.

THE COURT: Are the Dutch seeking sums over and above the 460-odd-million dollars that's being negotiated here?

MR. ROCHON: No. There is a combined amount that is reflecting what is negotiated with the three. And the total combined amount that will be paid by the company, as a result of all of the agreements, is $795 million. Some of it, obviously, not pursuant to the agreements before you today.

There is a real interplay between the various agreements, and it's very important to the company and its shareholders to get that done. The company has cooperated, obviously, with the Department of Justice throughout these proceedings. We would cooperate further in that regard as well as part of the agreement.

For purposes of today, your Honor, and the closure that it gives this agreement, and the ability for certainty to the shareholders who have invested in the company and expect it to go forward and appropriate, and given the global nature of the agreements, the company would strongly ask you to enter into the agreed sentencing today and to waive a PSR.

THE COURT: Thank you. I did review the guideline calculations that the parties agreed to, and given the amount of money that was involved, it’s quite literally off the charts in terms of what the total offense level is, but I do have one question that may be important, Ms. Mrazek.

To the extent that you’re able to say, what was the extent of the knowledge of the corruption within the company? How many high-level executives, again, if you’re in a position to say?

MS. MRAZEK: Your Honor, I am not really in a position to say. We have a very robust ongoing investigation into individuals that is sensitive for a whole host of reasons, and so, at this time, we haven’t concluded that investigation. ***There certainly was high-level knowledge of the bribery at VimpelCom, and that is in part why it’s such a significant resolution that we are seeking today, but I can’t give you a number of individuals***.

THE COURT: Speak, if you will, then to the fact of their cooperation, or characterize it if you will. I asked earlier whether they self-reported and you indicated that they did not. What did they do when they were confronted?

MS. MRAZEK: Yes, your Honor. VimpelCom’s cooperation in this case has been substantial, significant and full, both with respect to

> its own liability and with respect to various individuals at all levels who had involvement in the crimes at issue.
>
> The company, when they first were notified by the Department of Justice of its investigation, immediately began that cooperation and ***promptly acknowledged the company's wrongdoing*** and began to cooperate in a best-of-show manner.
>
> ***They provided copious amounts of evidence, both evidence that they had collected during their own internal investigation of the matters at issue here, but also in response to various inquiries and requests made by the Department of Justice and our colleagues at the SEC and Dutch prosecution authority. Some of that evidence was actually very hard to obtain***. As is clear from the statement of facts, this conduct is not mostly in the United States. It largely happened abroad, including in places like Russia and Uzbekistan, that are very difficult to investigate and have significant foreign data privacy and state secrecy laws that needed to be overcome.
>
> The company did do that investigation. It acted proactively and it voluntarily made its employees available for interviews. It assisted in helping us interview former employees of the company, and it collected, analyzed and translated a huge volume of evidence for the government. So this very full cooperation was an extremely significant factor for the government in coming to the resolution today.
>
> ***As I mentioned, the company also promptly acknowledged its wrongdoing, and it very promptly acknowledged its willingness to resolve its criminal liability***, which saved the government significant resources.

*See U.S. v. VimpelCom, Ltd, and Unitel, LLC*, 16 Cr. 137 (ER) Transcript, dated February 18, 2016, at pp. 27 through 33, attached hereto as Exhibit B. (Emphasis added).

## V. SUBSTANTIVE ALLEGATIONS

92. The Foreign Corrupt Practices Act of 1977, as amended, Title 15, United States Code, Sections 78dd-l, *et seq.*, was enacted by Congress for the purpose of, among other things, making it unlawful to act corruptly in furtherance of an offer, promise, authorization, or payment

of money or anything of value, directly or indirectly, to a foreign official for the purpose of obtaining or retaining business for, or directing business to, any person.

93. In relevant part, the FCPA's anti-bribery provisions prohibit any issuer of publicly traded securities registered pursuant to Section 12(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78*l*, or required to file periodic reports with the United States Securities and Exchange Commission ("SEC") under Section 15(d) of the Securities Exchange Act, 15 U.S.C. § 780(d) (hereinafter "issuer"), or affiliated persons, from making use of the mails or any means or instrumentality of interstate commerce corruptly in furtherance of an offer, payment, promise to pay, or authorization of the payment of money or anything of value to any person while knowing that all or a portion of such money or thing of value would be offered, given, or promised, directly or indirectly, to a foreign official for the purpose of assisting in obtaining or retaining business for or with, or directing business to, any person. 15 U.S.C. § 78dd-l(a)(3).

94. The FCPA's accounting provisions require that issuers, among other things, make and keep books, records, and accounts that accurately and fairly reflect the transactions and disposition of the company's assets and prohibit the knowing and willful falsification of an issuer's books, records, or accounts. 15 U.S.C. §§ 78m(b)(2)(A), 78m(b)(5), and 78ff(a).

95. Additionally, the FCPA's accounting provisions require that issuers maintain a system of internal accounting controls sufficient to provide reasonable assurances that: (i) transactions are executed in accordance with management's general or specific authorization; (ii) transactions are recorded as necessary to (A) permit preparation of financial statements in conformity with generally accepted accounting principles or any other criteria applicable to such statements, and (B) maintain accountability for assets; (iii) access to assets is permitted only in accordance with management's general or specific authorization; and (iv) the recorded

accountability for assets is compared with the existing assets at reasonable intervals, and appropriate action is taken with respect to any differences. The FCPA also prohibits the knowing and willful failure to implement such a system of internal accounting controls. 15 U.S.C. §§ 78m(b)(5) and 78ff(a).

### A. VimpelCom's False and Misleading Statements

96. On December 2, 2010, the Company filed a report on Form 6-K with the SEC announcing its third quarter operating and financial results. The Company stated in relevant part: "Total number of broadband subscriptions increased 178.7% year-on-year ("YoY") and 15.0% quarter-on-quarter ("QoQ") as we continue to develop our broadband projects in Kazakhstan, Uzbekistan and Armenia."

97. The above statements in paragraph 96 were false and misleading as the increase in total number of broadband subscriptions and broadband projects was made possible by the bribery described above. Because Defendants put the topic of the cause of its financial success at issue, then Defendants were obligated to disclose information concerning the source of the Company's success, since reasonable investors would find that such information would materially alter the mix of available information.

98. On March 29, 2011, the Company filed a report on Form 6-K with the SEC announcing its fourth quarter and full year 2010 operating and financial results. In this March 29, 2011 filing, the Company reported a net operating revenue increase in Uzbekistan.

99. On June 1, 2011, the Company filed a report on Form 6-K with the SEC announcing its first quarter 2011 results. It was in this June 1, 2011 press release that the Company reported a net operating revenue increase in Uzbekistan.

100. The above statements in paragraphs 98 and 99 were false and misleading as the net operating revenue increase in Uzbekistan was made possible by the bribery described above. Because Defendants put the topic of the cause of its financial success at issue, then Defendants were obligated to disclose information concerning the source of the Company's success, since reasonable investors would find that such information would materially alter the mix of available information.

101. On June 30, 2011, the Company filed an annual report on Form 20-F with the SEC announcing the Company's financial and operating results for the quarter and fiscal year ended December 31, 2010 (the "2010 Form 20-F").

102. In the 2010 Form 20-F, the Company stated that it had 4.8 million customers in Uzbekistan through its Unitel subsidiary as of December 31, 2010.

103. The above statement in paragraph 102 was false and misleading as the 4.8 million customers in Uzbekistan through the Company's Unitel subsidiary was made possible by the bribery described above. Because Defendants put the topic of the cause of its financial success at issue, then Defendants were obligated to disclose information concerning the source of the Company's success, since reasonable investors would find that such information would materially alter the mix of available information.

104. With respect to regulation of the telecommunications industry in Uzbekistan, the Company stated in relevant part:

> The ***government authorities responsible*** for supervising the telecommunications industry in the Republic of Uzbekistan are the Republic of Uzbekistan Cabinet and a specially authorized telecommunications agency. In accordance with the Law on Telecommunications, dated August 20, 1999, businesses offering communications services in the Republic of Uzbekistan may be privately or publicly held by Uzbek or foreign national individuals or legal entities. ***All owners of telecommunications networks have***

> ***equal rights and enjoy equal protection guaranteed by the law*** and the legislation imposes no restrictions on foreign investors. [Emphasis added].

105. The above statements in paragraph 104 were false and misleading as the government authorities responsible for supervising the telecommunications industry in the Republic of Uzbekistan was not the Republic of Uzbekistan Cabinet and a specially authorized telecommunications agency but rather the President of Uzbekistan's eldest daughter Ms. Karimova. According to the DOJ's Criminal Complaint, VimpelCom management explained that it was "more important to follow the political requirements suggested for entry into the [Uzbek] market versus [the] questionable risk of acquisition of Unitel as [a] standalone" and VimpelCom would be "in opposition to a very powerful opponent and bring [the] threat of revocation of licenses after the acquisition of Unitel [as a] stand-alone." Because Defendants put the topic of its interactions with the authorities responsible for supervising the telecommunications industry in Uzbekistan at issue, then Defendants were obligated to disclose information concerning the reality of the Company's interactions with the real authorities, since reasonable investors would find that such information would materially alter the mix of available information. Further, the following statement was false and misleading ("[a]ll owners of telecommunications networks have equal rights and enjoy equal protection guaranteed by the law") as the Company admitted in the Deferred Prosecution Agreement that to enter the Uzbek telecommunications market they had to engage in bribery and continue to bribe to remain in the market.

106. In the 2010 Form 20-F, the Company stated that its internal controls were effective and in place. The Company's 2010 Form 20-F states in relevant part:

> Our management has assessed the effectiveness of our company's internal control over financial reporting as of December 31, 2010. In making its assessment, our management has utilized the criteria set forth by the Committee of Sponsoring Organizations, or COSO,

> of the Treadway Commission in Internal Control—Integrated Framework, and Securities and Exchange Commission's Guidance Regarding Management's Report on Internal Control Over Financial Reporting Under Section 13(a) or 15(d) of the Exchange Act. ***Based on the assessment, our management believes our company maintained effective internal control over financial reporting as of December 31, 2010***. [Emphasis added].

107. The above statements regarding the Company's internal controls were false and misleading as the Company admitted in the Deferred Prosecution Agreement that it (a) failed to implement adequate internal accounting controls; (b) failed to enforce the internal accounting controls it did have in place, which permitted the above-referenced bribe payments to occur without detection or remediation; (c) failed to implement a system for conducting, recording, and verifying due diligence on third parties, including joint venture partners, consultants, reseller companies, and suppliers to uncover their true nature, beneficial ownership, and possible corruption risks; and (d) failed to require that all consulting agreements be for *bona fide* services, that agreed-upon payments were commensurate with the services to be performed, and that services paid for were, in fact, performed. Further, the Company admits that it knowingly failed to conduct meaningful auditing or testing of its consultant agreements, invoices, and payments, including those with the Shell Company and failed to conduct adequate investigations of corruption complaints. The Company admits that it also had no policy regarding payments to bank accounts located in places where the contractual partner neither performed work nor had operations. *See also* ¶¶ 78-87.

108. The 2010 Form 20-F contained signed certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") by Defendants Izosimov and van Dalen, stating that the financial information contained in the 2010 Form 20-F was accurate and disclosed any material changes to the Company's internal control over financial reporting.

109. On September 7, 2011, the Company filed a report on Form 6-K with the SEC announcing the Company's financial and operating results for the quarter ended June 30, 2011 (the "Q2 2011 6-K"). The Q2 2011 6-K stated in relevant part: "In Uzbekistan, our sales and marketing efforts resulted in a ***34% increase in the number of mobile subscribers*** as compared with the second quarter of 2010. ***Our revenues have increased by 28% YoY*** with ***strong EBITDA margin of 42.9%*** demonstrating the ***underlying strength of our core***." (Emphasis added).

110. The above statements were false and misleading as the 34% increase in mobile subscribers and revenue increase with strong EBITDA margin of 42.9% in Uzbekistan was made possible by the bribery described above. Because Defendants put the topic of the cause of its financial success at issue, then Defendants were obligated to disclose information concerning the source of the Company's success, since reasonable investors would find that such information would materially alter the mix of available information.

111. On November 14, 2011, the Company filed a report on Form 6-K with the SEC announcing the Company's financial and operating results for the quarter ended September 30, 2011 (the "Q3 2011 6-K"). The Q3 2011 6-K stated in relevant part: "***Revenues were up 36% YoY and EBITDA increased by 58% YoY*** due to our sales and marketing activities, regional 3G network roll-out and data development." (Emphasis added).

112. The above statements were false and misleading as the 36% increase in revenue and 58% increase in EBITDA in Uzbekistan was made possible by the bribery described above. Because Defendants put the topic of the cause of its financial success at issue, then Defendants were obligated to disclose information concerning the source of the Company's success, since reasonable investors would find that such information would materially alter the mix of available information.

113. On March 13, 2012, the Company filed a report on Form 6-K with the SEC announcing the Company's financial and operating results for the quarter and fiscal year ended December 31, 2011 (the "Q4 2011 6-K"). The Q4 2011 6-K stated in relevant part: "In Uzbekistan, the positive trend in subscriber base growth, coupled with positive dynamics in all KPIs, resulted in ***revenue growth of 35% YoY in 4Q11***. ***EBITDA was 54% higher YoY as a result of revenue growth and efficient SG&A spending***." (Emphasis added).

114. The above statements were false and misleading as the positive trend in subscriber base growth, the 35% increase in revenue and 54% increase in EBITDA in Uzbekistan was made possible by the bribery described above. Because Defendants put the topic of the cause of its financial success at issue, then Defendants were obligated to disclose information concerning the source of the Company's success, since reasonable investors would find that such information would materially alter the mix of available information.

115. On April 30, 2012, the Company filed an annual report on Form 20-F with the SEC reiterating the financial and operating results previously announced in the Company's Q4 2011 6-K (the "2011 Form 20-F").

116. In the 2011 Form 20-F, the Company stated, in relevant part, that it had 6.4 million customers in Uzbekistan through its Unitel subsidiary as of December 31, 2011.

117. The above statement in paragraph 116 was false and misleading as the 6.4 million customers in Uzbekistan through the Company's Unitel subsidiary was made possible by the bribery described above. Because Defendants put the topic of the cause of its financial success at issue, then Defendants were obligated to disclose information concerning the source of the Company's success, since reasonable investors would find that such information would materially alter the mix of available information.

118. With respect to regulation of the telecommunications industry in Uzbekistan, the Company stated in part:

> The ***government authorities responsible for supervising*** the telecommunications industry in the Republic of Uzbekistan are the Republic of Uzbekistan Cabinet and a specially authorized telecommunications agency. In accordance with the Law on Telecommunications, dated August 20, 1999, businesses offering communications services in the Republic of Uzbekistan may be privately or publicly held by Uzbek or foreign national individuals or legal entities. ***All owners of telecommunications networks have equal rights and enjoy equal protection guaranteed by the law*** and the legislation imposes no restrictions on foreign investors. [Emphasis added].

119. The above statements in paragraph 118 were false and misleading as the government authorities responsible for supervising the telecommunications industry in the Republic of Uzbekistan was not the Republic of Uzbekistan Cabinet and a specially authorized telecommunications agency but rather the President of Uzbekistan's eldest daughter Ms. Karimova. According to the DOJ's Criminal Complaint, VimpelCom management explained that it was "more important to follow the political requirements suggested for entry into the [Uzbek] market versus [the] questionable risk of acquisition of Unitel as [a] standalone" and VimpelCom would be "in opposition to a very powerful opponent and bring [the] threat of revocation of licenses after the acquisition of Unitel [as a] stand-alone." Further, the following statement was false and misleading ("[a]ll owners of telecommunications networks have equal rights and enjoy equal protection guaranteed by the law") as the Company admitted in the Deferred Prosecution Agreement that to enter the Uzbek telecommunications market they had to engage in bribery and continue to bribe to remain in the market.

120. In the 2011 Form 20-F, the Company also stated that its internal controls were effective and in place. The Company's 2011 Form 20-F states in relevant part:

> Our management is responsible for establishing and maintaining adequate internal control over financial reporting as defined in Rules 13a-15(f) and 15d-15(f) under the Exchange Act. ***Our internal control system was designed to provide reasonable assurance regarding the reliability of financial reporting*** and the preparation and fair presentation of our company's published consolidated financial statements under generally accepted accounting principles. [Emphasis added].

121. The above statements regarding the Company's internal controls were false and misleading as the Company admitted in the Deferred Prosecution Agreement that it (a) failed to implement adequate internal accounting controls; (b) failed to enforce the internal accounting controls it did have in place, which permitted the above-referenced bribe payments to occur without detection or remediation; (c) failed to implement a system for conducting, recording, and verifying due diligence on third parties, including joint venture partners, consultants, reseller companies, and suppliers to uncover their true nature, beneficial ownership, and possible corruption risks; and (d) failed to require that all consulting agreements be for *bona fide* services, that agreed-upon payments were commensurate with the services to be performed, and that services paid for were, in fact, performed. Further, the Company admits that it knowingly failed to conduct meaningful auditing or testing of its consultant agreements, invoices, and payments, including those with the Shell Company and failed to conduct adequate investigations of corruption complaints. The Company admits that it also had no policy regarding payments to bank accounts located in places where the contractual partner neither performed work nor had operations. *See also* ¶¶ 78-87.

122. The 2011 Form 20-F contained signed certifications pursuant to SOX by Defendants Lunder and van Dalen, stating that the financial information contained in the 2011 Form 20-F was accurate and disclosed any material changes to the Company's internal control over financial reporting.

123. On May 15, 2012, the Company filed a report on Form 6-K with the SEC announcing the Company's financial and operating results for the quarter ended March 31, 2012 (the "Q1 2012 6-K"). The Q1 2012 6-K stated in relevant part: "In Uzbekistan, the subscriber base ***continued to grow in all segments and revenue was up 33%*** YoY in 1Q12. The EBITDA margin was 44.6%, a slight decline YoY, as a result of increased competition and higher Opex due to a newly introduced tax on customer base. ***EBITDA increased 30% YoY***." (Emphasis added)

124. The above statements were false and misleading as the subscriber increase, the 33% increase in revenue and 30% increase in EBITDA in Uzbekistan was made possible by the bribery described above. Because Defendants put the topic of the cause of its financial success at issue, then Defendants were obligated to disclose information concerning the source of the Company's success, since reasonable investors would find that such information would materially alter the mix of available information.

125. On August 15, 2012, the Company filed a report on Form 6-K with the SEC announcing the Company's financial and operating results for the quarter ended June 30, 2012 (the "Q2 2012 6-K"). The Q2 2012 6-K stated in relevant part: "In Uzbekistan, the subscriber base ***continued to grow strongly***, ***up 31% YoY***, with record mobile internet user growth of 53% YoY. ***Revenue was up 35% YoY in 2Q12*** . . . ." (Emphasis added).

126. The above statements were false and misleading as the subscriber increase and the 35% increase in revenue in Uzbekistan was made possible by the bribery described above. Because Defendants put the topic of the cause of its financial success at issue, then Defendants were obligated to disclose information concerning the source of the Company's success, since reasonable investors would find that such information would materially alter the mix of available information.

127. On November 14, 2012, the Company filed a report on Form 6-K with the SEC announcing the Company's financial and operating results for the quarter ended September 30, 2012 (the "Q3 2012 6-K"). The Q3 2012 6-K stated in relevant part: "***Revenue was up 88% organically YoY in 3Q12***, ***supported by a 62% YoY increase in the subscriber base as well as 26% ARPU growth***. If this were adjusted to the growth level of 1H12, the underlying revenue growth would have been approximately 35% YoY. ***EBITDA grew 123% and EBITDA margin was 56.2%, a sharp increase from 47.3% in 3Q11***, supported by interconnect cost reduction and control of structural OPEX." (Emphasis added).

128. The above statements were false and misleading as the 88% increase in revenue, 62% increase in the subscriber base, the 26% ARPU growth, the 123% EBITDA growth in Uzbekistan was made possible by the bribery described above. Because Defendants put the topic of the cause of its financial success at issue, then Defendants were obligated to disclose information concerning the source of the Company's success, since reasonable investors would find that such information would materially alter the mix of available information.

129. On March 6, 2013, the Company filed a report on Form 6-K with the SEC announcing the Company's financial and operating results for the quarter and fiscal year ended December 31, 2012 (the "Q4 2012 6-K"). The Q4 2012 6-K stated in relevant part: "***Revenue was up 99% YoY in local currency, supported by a 60% YoY increase of the subscriber base as well as 26% YoY ARPU increase as a result of the growth of high value subscribers and increasing mobile data revenues. EBITDA grew 192% YoY and EBITDA margin was 60.3%, a sharp increase from 41.0% in 4Q11***." (Emphasis added).

130. The above statements were false and misleading as the 99% increase in revenue, the 60% YoY increase of the subscriber base, as well as 26% YoY ARPU increase as a result of

the growth of high value subscribers and increasing mobile data revenues, the 192% increase in EBITDA in Uzbekistan was made possible by the bribery described above. Because Defendants put the topic of the cause of its financial success at issue, then Defendants were obligated to disclose information concerning the source of the Company's success, since reasonable investors would find that such information would materially alter the mix of available information.

131. On March 22, 2013, the Company filed an annual report on Form 20-F with the SEC reiterating its financial and operating results previously announced in the Company's Q4 2012 6-K (the "2012 Form 20-F").

132. In the 2012 Form 20-F, the Company stated that it had 10.2 million customers in Uzbekistan through its Unitel subsidiary as of December 31, 2012.

133. The above statement in paragraph 132 was false and misleading as the 10.2 million customers in Uzbekistan through the Company's Unitel subsidiary was made possible by the bribery described above. Because Defendants put the topic of the cause of its financial success at issue, then Defendants were obligated to disclose information concerning the source of the Company's success, since reasonable investors would find that such information would materially alter the mix of available information.

134. With respect to regulation of the telecommunications industry in Uzbekistan, the Company stated in relevant part:

> ***The government authorities responsible for supervising the telecommunications industry in the Republic of Uzbekistan are the Republic of Uzbekistan Cabinet and a specially authorized telecommunications agency***. In accordance with the Law on Telecommunications, dated August 20, 1999, businesses offering communications services in the Republic of Uzbekistan may be privately or publicly held by Uzbek or foreign national individuals or legal entities. ***All owners of telecommunications networks have equal rights and enjoy equal protection guaranteed by the law*** and

> the legislation imposes no restrictions on foreign investors. [Emphasis added].

135. The above statements in paragraph 134 were false and misleading as the government authorities responsible for supervising the telecommunications industry in the Republic of Uzbekistan was not the Republic of Uzbekistan Cabinet and a specially authorized telecommunications agency but rather the President of Uzbekistan's eldest daughter Ms. Karimova. According to the DOJ's Criminal Complaint, VimpelCom management explained that it was "more important to follow the political requirements suggested for entry into the [Uzbek] market versus [the] questionable risk of acquisition of Unitel as [a] standalone" and VimpelCom would be "in opposition to a very powerful opponent and bring [the] threat of revocation of licenses after the acquisition of Unitel [as a] stand-alone." Further, the following statement was false and misleading ("[a]ll owners of telecommunications networks have equal rights and enjoy equal protection guaranteed by the law") as the Company admitted in the Deferred Prosecution Agreement that to enter the Uzbek telecommunications market they had to engage in bribery and continue to bribe to remain in the market.

136. In the 2012 Form 20-F, the Company stated that its internal controls were effective and in place. The Company's 2012 Form 20-F states in relevant part:

> Our management has assessed the effectiveness of our company's internal control over financial reporting as of December 31, 2012. In making its assessment, our management has utilized the criteria set forth by the Committee of Sponsoring Organizations, or "COSO," of the Treadway Commission in Internal Control—Integrated Framework, and Securities and Exchange Commission's Guidance Regarding Management's Report on Internal Control Over Financial Reporting Under Section 13(a) or 15(d) of the Exchange Act. ***Based on the assessment, our management believes our company maintained effective internal control over financial reporting as of December 31, 2012***. [Emphasis added].

137. The above statements regarding the Company's internal controls were false and misleading as the Company admitted in the Deferred Prosecution Agreement that it (a) failed to implement adequate internal accounting controls; (b) failed to enforce the internal accounting controls it did have in place, which permitted the above-referenced bribe payments to occur without detection or remediation; (c) failed to implement a system for conducting, recording, and verifying due diligence on third parties, including joint venture partners, consultants, reseller companies, and suppliers to uncover their true nature, beneficial ownership, and possible corruption risks; and (d) failed to require that all consulting agreements be for *bona fide* services, that agreed-upon payments were commensurate with the services to be performed, and that services paid for were, in fact, performed. Further, the Company admits that it knowingly failed to conduct meaningful auditing or testing of its consultant agreements, invoices, and payments, including those with the Shell Company and failed to conduct adequate investigations of corruption complaints. The Company admits that it also had no policy regarding payments to bank accounts located in places where the contractual partner neither performed work nor had operations. *See also* ¶¶ 78-87.

138. The 2012 Form 20-F contained signed certifications pursuant SOX by Defendants Lunder and van Dalen, stating that the financial information contained in the 2012 20-F was accurate and disclosed any material changes to the Company's internal control over financial reporting.

139. On May 15, 2013, the Company filed a report on Form 6-K with the SEC announcing the Company's financial and operating results for the quarter ended March 31, 2013 (the "Q1 2013 6-K"). The Q1 2013 6-K stated in relevant part: "***Revenue was up 100% YoY, driven by a 40% YoY increase in the subscriber base and a 43% YoY increase in ARPU due to***

***growth of high value subscribers and increasing mobile data revenues. EBITDA grew 192% YoY and EBITDA margin was 65.2%, a strong increase from 44.6% in 1Q12***." (Emphasis added).

140. The above statements were false and misleading as the 100% increase in revenue, the 40% increase in subscriber base, 43% increase in ARPU in Uzbekistan, and 192% EBITDA growth was made possible by the bribery described above. Because Defendants put the topic of the cause of its financial success at issue, then Defendants were obligated to disclose information concerning the source of the Company's success, since reasonable investors would find that such information would materially alter the mix of available information.

141. On August 7, 2013, the Company filed a report on Form 6-K with the SEC announcing the Company's financial and operating results for the quarter ended June 30, 2013 (the "Q2 2013 6-K"). The Q2 2013 6-K states in relevant part: "***Revenue increased 86% YoY, driven by 45% YoY growth in the subscriber base and a 31% YoY improvement in ARPU due to growth in high value subscribers and increasing mobile data revenues. EBITDA grew 140% YoY and EBITDA margin was 64.7%, a strong increase from 50.6% in 2Q12***." (Emphasis added).

142. The above statements were false and misleading as the 86% increase in revenue, the 45% increase in subscriber base, 31% increase in ARPU, and the 140% EBITDA growth in Uzbekistan was made possible by the bribery described above. Because Defendants put the topic of the cause of its financial success at issue, then Defendants were obligated to disclose information concerning the source of the Company's success, since reasonable investors would find that such information would materially alter the mix of available information.

143. On November 6, 2013, the Company filed a report on Form 6-K with the SEC announcing the Company's financial and operating results for the quarter ended September 30,

2013 (the "Q3 2013 6-K"). The Q3 2013 6-K stated in relevant part: "In Uzbekistan, VimpelCom continued to deliver strong YoY results in 3Q13. ***Revenue increased 29% YoY, driven by 12% YoY growth in the subscriber base and a 12% YoY improvement in ARPU due to growth in high value subscribers and increasing mobile data revenues. EBITDA grew 51% YoY and EBITDA margin was 66.0%, a strong increase from 56.2% in 3Q12***." (Emphasis added).

144. The above statements were false and misleading as the 29% increase in revenue, the 12% increase in subscriber base, 12% increase in ARPU, and the 51% EBITDA growth in Uzbekistan was made possible by the bribery described above. Because Defendants put the topic of the cause of its financial success at issue, then Defendants were obligated to disclose information concerning the source of the Company's success, since reasonable investors would find that such information would materially alter the mix of available information.

145. On March 6, 2014, the Company filed a report on Form 6-K with the SEC announcing the Company's financial and operating results for the quarter and fiscal year ended December 31, 2013 (the "Q4 2013 6-K"). The Q4 2013 6-K stated in relevant part: "***Service revenue increased 11% YoY to USD 175 million driven by a 3% YoY growth in the customer base to 10.5 million, a 3% YoY improvement in ARPU to USD 5 due to growth in high value customers and a 61% YoY increase in mobile data revenue to USD 27 million. EBITDA grew 18% YoY to USD 112 as a result of growing revenue and EBITDA margin was 63.8%, a 3.5 percentage points YoY increase, supported by increased on-net traffic and cost control***." (Emphasis added).

146. The above statements were false and misleading as the 11% increase in service revenue, the 3% growth in customer base, 3% increase in ARPU, and an increase of 18% in EBITDA in Uzbekistan was made possible by the bribery described above. Because Defendants

put the topic of the cause of its financial success at issue, then Defendants were obligated to disclose information concerning the source of the Company's success, since reasonable investors would find that such information would materially alter the mix of available information.

147. On the Company's website, anti-bribery and anti-corruption are discussed:

> In 2014, ***we continued to strengthen our system of governance, policies and procedures focused on anti-bribery and anti-corruption, with a particular emphasis on extensive training across all of the Company's businesses***.
>
> We recognize that a strong and comprehensive approach to compliance is needed to protect our business, and our stakeholders. We have put in place a risk management, compliance, and governance structure that includes a focus on anti-bribery and anti-corruption risks and issues. We have continued to make progress in establishing a more coordinated and strengthened framework, adding resources, training and awareness initiatives to the program. This will remain a key focus as we regard it as a critical part of our future development and a particular focus of our senior management team.
>
> Our comprehensive Group Compliance Charter sets out the organization, operation and governance of compliance management for the Group, including the role and responsibilities of our global Risk Assurance Committee, the Group Compliance Program and Group Compliance Function.
>
> In August 2013, the company appointed a new senior Group Chief Compliance Officer with the responsibility to update and enhance the Compliance program and to continue to develop a strong ethical culture globally. The Group Compliance Officer reports to the Audit Committee of the Supervisory Board of Directors to which he has direct access, as well as directly to the Group Chief Executive Officer. Our Group Compliance Officer is a member of VimpelCom's Management Board. In recent years, we have enhanced our compliance team at our headquarters in Amsterdam and throughout the group. We have compliance officers and coordinators at all of our business units and covering all our operations.
>
> Our compliance roadmap covers: risk analysis; policies and procedures related to key risk areas; organization and commitment; training and awareness; screening; record-keeping and controls;

reporting; internal audit and monitoring; remedial and corrective actions; and program leadership.

***In December 2012, we launched an updated Code of Conduct for the group that provides group-wide standards designed primarily to deter wrongdoing and promote honest and ethical conduct, compliance with applicable governmental laws, rules and regulations, prompt internal reporting of violations and accountability for adherence to the Code*. *The Code of Conduct reinforces the company's requirements for compliance with all applicable laws, including the US Foreign Corrupt Practices Act (FCPA) and other anti-corruption laws and regulations, as well as adherence to all company accounting policies and controls. This Code states that, in addition to applying to its employees, officers and directors, VimpelCom expects 'anyone doing business on the company's behalf' – a category that includes agents and other third parties – to also comply with anti-bribery and anti-corruption laws***.

***In early 2013, we adopted a new Group Anti-Bribery and Anti-Corruption Policy, which is supported by a range of policies and procedures, in place or under development, which address issues such as third-party due diligence, conflicts of interest, gifts and hospitality, and incident management and investigation***.

In June 2013, we introduced our new Group Incident Management Policy relating to whistleblower processes that allows employees to contact a third-party service provider to raise concerns, anonymously if desired. All cases reported are duly assessed and, if appropriate, investigated by internal or external teams. We continue to take measures to ensure these policies are adhered to and the procedures are followed in each of the countries in which we operate.

During 2014, we placed a great deal of emphasis on compliance training programs both at our headquarters and throughout the Business Units. For instance, during 2014, more than 7,300 employees worldwide have attended face to face Code of Conduct training sessions, or completed e-learning modules. Furthermore, in 2014, the company conducted an anti-corruption train-the-trainer session in Amsterdam where all compliance officers throughout the Group received additional training on FCPA and other applicable anti-bribery regulations, including advice on best practices for training other employees on these issues. Since that time, more than 800 employees (almost all of them managers) have received additional training on the FCPA and other applicable anti-bribery

> regulations as well as updated company policies. The Supervisory Board also received tailored compliance training. [Emphasis added].

148. The above statements regarding anti-bribery and anti-corruption on the Company's website were false and misleading as the Company admitted in the Deferred Prosecution Agreement that it (a) failed to implement adequate internal accounting controls; (b) failed to enforce the internal accounting controls it did have in place, which permitted the above-referenced bribe payments to occur without detection or remediation; (c) failed to implement a system for conducting, recording, and verifying due diligence on third parties, including joint venture partners, consultants, reseller companies, and suppliers to uncover their true nature, beneficial ownership, and possible corruption risks; and (d) failed to require that all consulting agreements be for *bona fide* services, that agreed-upon payments were commensurate with the services to be performed, and that services paid for were, in fact, performed. Further, the Company admits that it knowingly failed to conduct meaningful auditing or testing of its consultant agreements, invoices, and payments, including those with the Shell Company and failed to conduct adequate investigations of corruption complaints. The Company admits that it also had no policy regarding payments to bank accounts located in places where the contractual partner neither performed work nor had operations. *See also* ¶¶ 78-87.

**<u>THE TRUTH EMERGES</u>**

149. On March 12, 2014, the Company filed a report on Form 6-K with the SEC announcing that the Company was facing investigations by both the SEC and Dutch authorities related to its operations in Uzbekistan. The Company reported:

> [O]n March 11, 2014, the Company received from the staff of the United States Securities and Exchange Commission a letter stating that they are conducting an investigation related to VimpelCom and requesting documents. Also, on March 11, 2014, the Company's

> headquarter in Amsterdam was visited by representatives of the Dutch authorities, including the Dutch public prosecutor office, who obtained documents and informed the Company that it was the focus of a criminal investigation in the Netherlands. The investigations appear to be concerned with the Company's operations in Uzbekistan. The Company intends to fully cooperate with these investigations.

150. On this date, the Company American Depositary Receipts ("ADRs") dropped from $8.85 (the closing price on March 11, 2012) to an intraday low of $8.29 on March 12, 2014 ($0.56 or a 6.3% decline).

151. On March 18, 2014, the Company filed another report on Form 6-K with the SEC. The Company reported:

> [I]n addition to the previously disclosed investigations by the U.S. Securities and Exchange Commission and Dutch public prosecutor's office, the Company has been notified that it is also the focus of an investigation by the United States Department of Justice. This investigation also appears to be concerned with the Company's operations in Uzbekistan. The Company intends to continue to fully cooperate with these investigations.

152. At around 10:56 a.m. Eastern Standard time news of the investigation was disseminated to the market, and the Company ADRs dropped in intraday trading from a high of $9.07 to a low of $8.57 ($0.50 or a 5.6% decline).

153. On May 15, 2014, the Company filed an annual report on Form 20-F with the SEC reiterating the financial and operating results previously announced in the Company's Q4 2013 6-K (the "2013 Form 20-F").

154. In the 2013 Form 20-F, the Company stated in part:

> **We are subject to investigations by the SEC, DOJ and the Dutch public prosecutor, and are conducting an internal investigation, and we are unable to predict the duration, scope or results of these investigations or their impact on us.**

As we previously disclosed, the SEC, DOJ and Dutch public prosecutor's office are conducting investigations related to VimpelCom; these investigations appear to be concerned with our operations in Uzbekistan, including relations with Takilant Ltd. ("Takilant"). In June 2007, Takilant purchased from us a 7% interest in our business in Uzbekistan for US$20.0 million and entered into a shareholders agreement with us. In September 2009, Takilant exercised its option to put its 7% interest to us for US$57.5 million, an amount specified in the shareholders agreement. In addition, we had agreements with Takilant relating to the acquisition of frequency spectrum (including with respect to 3G and LTE) and channels in Uzbekistan pursuant to which we paid Takilant an aggregate of US$57.0 million.

It has been reported in the press that Takilant is currently being investigated in Sweden and Switzerland on allegations that it and certain persons associated with it have committed acts of bribery and money-laundering connected with their activities in Uzbekistan, and also that Takilant is being investigated in the Netherlands and perhaps other jurisdictions. These investigations may, in part, involve us.

As a result of concerns arising from press reports regarding Takilant, we commenced a review with respect to our operations in Uzbekistan, including our relations with Takilant, and in 2013 we retained external counsel with expertise relating to the U.S. Foreign Corrupt Practices Act ("FCPA") and other anticorruption laws and regulations to conduct such review.

Following notice of the investigations by the SEC, the DOJ and the Dutch public prosecutor's office, we established a special committee of the supervisory board in March 2014, consisting of all outside directors, to oversee the internal investigation being conducted by the Company's external counsel and our response to the inquiries by various authorities. While the initial focus of the investigation being conducted by the Company's external counsel has been related to our Uzbek operations, including our relations with Takilant, and whether there was any conduct in our operations in Uzbekistan that may have violated the anti-bribery provisions of the FCPA, the FCPA's books and records and internal controls provisions, applicable local laws and/or our own internal policies, the investigation is also reviewing our operations in additional countries.

We expect to incur costs in responding to requests for information, testimony and other information in connection with the

> investigations and in conducting the internal investigation, and we cannot predict at this time the ultimate amount of all such costs. These matters may require the involvement of certain members of our senior management that could impinge on the time they have available to devote to other matters relating to the business. We may also see ongoing media and governmental interest in these matters that could impact the perception of us.
>
> The SEC, DOJ and Dutch investigations, as well as our own investigations, are continuing, and we are presently unable to predict the duration, scope or results of these investigations or how the results of these investigations may impact our internal controls, business, and the results of operations or financial condition. Further, there can be no assurance that such investigations will not be broader in scope than they currently appear, or that new investigations will not be commenced in these or other jurisdictions, or that there will not be litigation commenced against us.
>
> One or more enforcement actions could be instituted in respect of the matters that are the subject of some or all of the investigations. The DOJ and SEC have a broad range of civil and criminal sanctions under the FCPA and other laws and regulations including, but not limited to, judgments, settlements, injunctive relief, debarment or other relief, disgorgement, fines, penalties, modifications to business practices, including the termination or modification of existing business relationships, the imposition of compliance programs and the retention of a monitor to oversee compliance with the FCPA, and criminal convictions and/or penalties. The Dutch public prosecutor's office and enforcement authorities in other jurisdictions also have a range of sanctions under the relevant laws and regulations. There can be no assurance that any investigation will not conclude that a violation of applicable law has occurred. The imposition of any of these sanctions or remedial measures could have a material adverse effect on our business or financial condition.

155. The 2013 Form 20-F contained signed certifications pursuant to SOX by Defendants Lunder and Davies, stating that the financial information contained in the 2013 Form 20-F was accurate and disclosed any material changes to the Company's internal control over financial reporting.

156. On August 6, 2014, the Company filed a report on Form 6-K with the SEC announcing the Company's financial and operating results for the quarter ended June 30, 2014 (the "Q2 2014 6-K"). The Q2 2014 6-K also stated in relevant part:

> UZBEKISTAN
>
> […] ***Mobile service revenue increased 7% YoY to USD 176 million driven by a 2% YoY growth in the customer base to 10.4 million and a 6% YoY improvement in ARPU to USD 6***. […] [Emphasis added].

157. The above statements were false and misleading as the mobile service revenue increase of 7%, the 2% year over year growth in the customer base to 10.4 million and the 6% improvement in ARPU was made possible by the bribery described above. Because Defendants put the topic of the cause of its financial success at issue, then Defendants were obligated to disclose information concerning the source of the Company's success, since reasonable investors would find that such information would materially alter the mix of available information.

158. On November 12, 2014, the Company filed a report on Form 6-K with the SEC announcing the Company's financial and operating results for the quarter ended September 30, 2014 (the "Q3 2014 6-K"). The Q3 2014 6-K also stated in relevant part:

> UZBEKISTAN
>
> […] ***Mobile service revenue increased 8% YoY to USD 189 million driven by a 7% YoY improvement in ARPU to USD 6 and a 2% YoY increase in the customer base to 10.5 million.*** […] [Emphasis added].

159. The above statements were false and misleading as the mobile service revenue increase of 8%, the 2% year over year growth in the customer base to 10.5 million and the 7% improvement in ARPU was made possible by the bribery described above. Because Defendants put the topic of the cause of its financial success at issue, then Defendants were obligated to

disclose information concerning the source of the Company's success, since reasonable investors would find that such information would materially alter the mix of available information.

160. On December 8, 2014, the President and Chief Executive Officer of Telenor Group, Jon Fredrik Baksaas, informed VimpelCom (and the market) that he was stepping down from the Board of the VimpelCom with immediate effect. Telenor holds a minority position of 33% and voting rights of 43% of VimpelCom. Jon Fredrik Baksaas, President and CEO of Telenor Group, stated in the press release: "***I am stepping down from the VimpelCom [B]oard to solely focus on protecting Telenor's position***. ***Telenor has zero tolerance for corruption***. As an owner in VimpelCom we will assist the ongoing investigations[.]" (Emphasis added). VimpelCom stock dropped from $4.63 (the closing price on December 5, 2014 (Friday)) to an intraday low of $4.26 on December 8, 2014 (Monday) ($0.37 or an 8% decline).

161. On February 26, 2015, the Company filed a report on Form 6-K with the SEC announcing the Company's financial and operating results for the quarter and year ended December 31, 2014 (the "Q4 2014 6-K"). The Q4 2014 6-K also stated in relevant part:

> UZBEKISTAN
>
> […] ***Mobile service revenue increased 8% YoY to USD 184 million driven by a 6% YoY improvement in ARPU to USD 6 and a 1% YoY increase in the customer base to 10.6 million. The ARPU increase was mainly driven by a strong 31% YoY increase in mobile data revenue to USD 36 million. EBITDA in 4Q14 stood at USD 115 million, leading to an EBITDA margin of 61.6%.*** […] [Emphasis added].

162. The above statements were false and misleading as the mobile service revenue increase of 8%, the 1% year over year growth in the customer base to 10.6 million and the 6% improvement in ARPU was made possible by the bribery described above. Because Defendants put the topic of the cause of its financial success at issue, then Defendants were obligated to

disclose information concerning the source of the Company's success, since reasonable investors would find that such information would materially alter the mix of available information.

163. On March 24, 2015, the Company filed an annual report on Form 20-F with the SEC reiterating the financial and operating results previously announced in the Company's Q4 2014 6-K (the "2014 Form 20-F"). In the 2014 Form 20-F, the Company stated in part:

> **We are subject to investigations by the SEC, DOJ and OM, and are conducting an internal investigation. We are unable to predict the duration, scope or results of these investigations or their impact on us**.
>
> As previously disclosed, the SEC, DOJ and OM are conducting investigations related to VimpelCom, which have been focused primarily on our prior dealings with Takilant Ltd. ("Takilant").
>
> In June 2007, Takilant purchased from us a 7% interest in our business in Uzbekistan for US$20.0 million and entered into a shareholders agreement with us. In September 2009, Takilant exercised its option to put its 7% interest to us for US$57.5 million, an amount specified in the shareholders agreement. In addition, we had agreements with Takilant relating to the acquisition of frequency spectrum (including with respect to 3G and LTE) and channels in Uzbekistan pursuant to which we paid Takilant an aggregate of US$57.0 million.
>
> It has also been reported in the press that Takilant is currently being investigated in Sweden and Switzerland on allegations that it and certain persons associated with it have committed acts of bribery and money-laundering connected with their activities in Uzbekistan, and also that Takilant is being investigated in the Netherlands and perhaps other jurisdictions. These investigations may, in part, involve us.
>
> As a result of concerns arising from press reports regarding Takilant, we commenced a review with respect to our operations in Uzbekistan, including our relations with Takilant, and in 2013 we retained external counsel with expertise relating to the U.S. Foreign Corrupt Practices Act ("FCPA") and other anticorruption laws and regulations to conduct such review.
>
> Following notice of the investigations by the SEC, DOJ and OM, we established a Special Committee of the Supervisory Board in

March 2014 to oversee the internal investigation being conducted by the company's external counsel and our response to the inquiries by various authorities. The Special Committee consists of directors who qualify as independent for purposes of Rule 10A-3 under the Exchange Act. The investigation being conducted by the company's external counsel has been focused primarily on our Uzbekistan operations, including our relations with Takilant, and whether there was any conduct in our operations in Uzbekistan that may have violated the anti-bribery provisions of the FCPA, the FCPA's books and records and internal controls provisions, applicable local laws and/or our own internal policies. The investigation is also reviewing our operations in additional countries.

We expect to continue incurring costs related to the investigations, primarily professional fees and expenses, which may be significant. These costs relate to responding to requests for information, testimony and other information in connection with the investigations and in conducting the internal investigation, and we cannot predict at this time the ultimate amount of all such costs. These matters may require the involvement of certain members of our senior management that could impinge on the time they have available to devote to other matters relating to the business. We may also see ongoing media and governmental interest in these matters that could impact the perception of us and result in reputational harm to our company. The investigations have received media attention in a number of jurisdictions, and parliamentary hearings held by the Norwegian Government have addressed the investigations.

The SEC, DOJ and Dutch investigations, as well as our own investigations, are continuing, and we have cooperated, and continue to cooperate, with the authorities in these investigations. We are also exploring the prospect of resolving the company's potential liabilities arising from the facts established in the investigations. We are unable to predict the duration, scope or results of the ongoing investigations or how the results of these investigations or any resolutions may impact our business, results of operations, financial condition, or the assessment of our internal controls. Further, there can be no assurance that such investigations will not be broader in scope than they currently appear, or that new investigations will not be commenced in these or other jurisdictions, or that there will not be litigation commenced against us.

One or more enforcement actions could be instituted in respect of the matters that are the subject of some or all of the investigations. The DOJ and SEC have a broad range of civil and criminal sanctions under the FCPA and other laws and regulations including, but not

limited to, judgments, settlements, injunctive relief, debarment or other relief, disgorgement, fines, penalties, modifications to business practices, including the termination or modification of existing business relationships, the imposition of compliance programs and the retention of a monitor to oversee compliance with the FCPA, and criminal convictions and/or penalties. The OM and enforcement authorities in other jurisdictions also have a range of sanctions under the relevant laws and regulations. There can be no assurance that any investigation will not conclude that a violation of applicable law has occurred. The imposition of any of these sanctions or remedial measures could have a material adverse effect on our business or financial condition.

164. The 2014 Form 20-F also sated in relevant part:

**(b) Management's Annual Report on Internal Control Over Financial Reporting**

Our management is responsible for establishing and maintaining adequate internal control over financial reporting as defined in Rules 13a-15(f) and 15d-15(f) under the Exchange Act. Our internal control system was designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation and fair presentation of our company's published consolidated financial statements under generally accepted accounting principles.

There are inherent limitations to the effectiveness of any system of controls and procedures, including the possibility of human error and the circumvention or overriding of the controls and procedures. Because of its inherent limitations, internal control over financial reporting may not prevent or detect misstatements. Also, projections of any evaluation of effectiveness to future periods are subject to risk that controls may become inadequate because of changes in conditions, or that the degree of compliance with the company's policies and procedures may deteriorate.

Our management has assessed the effectiveness of our company's internal control over financial reporting as of December 31, 2014. In making its assessment, our management has utilized the criteria set forth in the Internal Control – Integrated Framework (2013) issued by the Committee of Sponsoring Organizations of the Treadway Commission and the Securities and Exchange Commission's Guidance Regarding Management's Report on Internal Control Over Financial Reporting Under Section 13(a) or 15(d) of the Exchange Act.

> ***As a result of management's assessment of our internal control over financial reporting as of December 31, 2014, management concluded that our internal control over financial reporting was effective***. [Emphasis added].

165. The 2014 Form 20-F contained signed certifications pursuant to SOX by Defendants Lunder and Davies, stating that the financial information contained in the 2014 20-F was accurate and disclosed any material changes to the Company's internal control over financial reporting.

166. The above statements regarding the Company's internal controls were false and misleading as the Company admitted in the Deferred Prosecution Agreement that it (a) failed to implement adequate internal accounting controls; (b) failed to enforce the internal accounting controls it did have in place, which permitted the above-referenced bribe payments to occur without detection or remediation; (c) failed to implement a system for conducting, recording, and verifying due diligence on third parties, including joint venture partners, consultants, reseller companies, and suppliers to uncover their true nature, beneficial ownership, and possible corruption risks; and (d) failed to require that all consulting agreements be for *bona fide* services, that agreed-upon payments were commensurate with the services to be performed, and that services paid for were, in fact, performed. Further, the Company admits that it knowingly failed to conduct meaningful auditing or testing of its consultant agreements, invoices, and payments, including those with the Shell Company and failed to conduct adequate investigations of corruption complaints. The Company admits that it also had no policy regarding payments to bank accounts located in places where the contractual partner neither performed work nor had operations. *See also* ¶¶ 78-87.

167. On May 14, 2015, the Company filed a report on Form 6-K with the SEC announcing the Company's financial and operating results for the quarter ended March 31, 2015 (the "Q1 2015 6-K"). The Q1 2015 6-K also stated in relevant part:

> UZBEKISTAN
>
> […] ***Mobile service revenue increased by 13% YoY to UZS 405.5 billion driven by a 14% YoY improvement in ARPU to UZS 12,819, while the customer base decreased by 1% YoY to 10.4 million.*** […] [Emphasis added].

168. The above statements were false and misleading as the mobile service revenue increase of 13%, the 1% year over year growth in the customer base to 10.4 million and the 14% improvement in ARPU was made possible by the bribery described above. Because Defendants put the topic of the cause of its financial success at issue, then Defendants were obligated to disclose information concerning the source of the Company's success, since reasonable investors would find that such information would materially alter the mix of available information.

169. On August 6, 2015, the Company filed a report on Form 6-K with the SEC announcing the Company's financial and operating results for the quarter ended June 30, 2015 (the "Q2 2015 6-K"). The Q2 2015 6-K also stated in relevant part:

> UZBEKISTAN
>
> […] ***Mobile service revenue increased by 9% YoY to UZS 439 billion as a result of a 10% YoY increase in ARPU, driven by 19% YoY growth in mobile data revenue***. […] [Emphasis added].

170. The above statements were false and misleading as the mobile service revenue increase of 9%, the 10% improvement in ARPU, and the 19% year over year growth in mobile data revenue was made possible by the bribery described above. Because Defendants put the topic of the cause of its financial success at issue, then Defendants were obligated to disclose information

concerning the source of the Company's success, since reasonable investors would find that such information would materially alter the mix of available information.

171. On August 13, 2015, post-market, it was reported that U.S. authorities asked European counterparts to seize roughly $1 billion in assets related to a wide-ranging criminal probe of alleged corruption by VimpelCom, MTS, and TeliaSonera, for paying hundreds of millions of dollars to businesses controlled by Ms. Karimova to secure wireless spectrum in Uzbekistan.

172. On this adverse news, the Company's ADRs fell from a closing price of $5.56 on August 13, 2015 to an intraday low of $5.305 on August 14, 2015 ($0.255 or a 4.6% decline).

173. Finally, on November 3, 2015, pre-market, the Company announced that it had set aside $900 million for litigation costs in connection with U.S. and Dutch investigations into the Company's operations in Uzbekistan.

174. On this adverse news, the Company's ADRs dropped from $3.665 (the trading high of the day) to an intraday low of $3.48 ($0.19 or a 5.0% decline).

175. As a result of Defendants' wrongful acts and omissions, Plaintiff and other class members have suffered significant losses and damages.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

176. Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired VimpelCom securities between December 2, 2010 and November 3, 2015, inclusive, seeking to pursue remedies under the Securities Act and the Exchange Act.

177. The members of the Class are so numerous that joinder of all members is impracticable. While the exact number of Class members is unknown to Plaintiff and can only be ascertained through appropriate discovery, Plaintiff believes that there are hundreds or thousands

of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by VimpelCom or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice that customarily used in securities class actions.

178. Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

179. Plaintiff will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation.

180. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a) whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b) whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of the Company; and

(c) whether the members of the Class have sustained damages and, if so, the proper measure of damages.

181. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden

of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

**APPLICABILITY OF PRESUMPTION OF RELIANCE:**
**FRAUD-ON-THE-MARKET DOCTRINE**

182. At all relevant times, the market for VimpelCom ADRs was an efficient market for the following reasons, among others:

(a) The Company's ADRs met the requirements for listing, and was listed and actively traded on the NASDAQ, a highly efficient and automated market;

(b) During the Class Period, on average, over several hundreds of thousands of shares of VimpelCom ADRs were traded on a weekly basis, demonstrating a very active and broad market for the Company's stock and permitting a very strong presumption of an efficient market;

(c) VimpelCom regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services;

(d) VimpelCom was followed by several securities analysts who wrote reports that were distributed to the sales force and certain customers of their respective brokerage firms during the Class Period. Each of these reports was publicly available and entered the public marketplace; and

(e) Unexpected material news about VimpelCom was rapidly reflected and incorporated into the Company's stock price during the Class Period.

183. As a result of the foregoing, the market for the Company's common stock promptly digested current information regarding VimpelCom from all publicly available sources and reflected such information in VimpelCom's ADR price. Under these circumstances, all purchasers of the Company's common stock during the Class Period suffered similar injury through their purchase of VimpelCom's ADRs at artificially inflated prices, and a presumption of reliance applies.

## COUNT I

### (Against All Defendants For Violations of Section 10(b) And Rule 10b-5 Promulgated Thereunder)

184. Plaintiff incorporates the above referenced paragraphs.

185. During the Class Period, Defendants disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

186. Defendants violated § 10(b) of the 1934 Act and Rule 10b-5 in that they:

(a) employed devices, schemes and artifices to defraud;

(b) made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

(c) engaged in acts, practices, and a course of business that operated as a fraud or deceit upon plaintiff and others similarly situated in connection with their purchases of VimpelCom securities during the Class Period.

187. Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for VimpelCom securities. Plaintiff and the Class

would not have purchased VimpelCom securities at the prices they paid, or at all, if they had been aware that the market price had been artificially and falsely inflated by defendants' misleading statements.

**COUNT II**

**(Violations of Section 20(a) of the**
**Exchange Act Against the Individual Defendants)**

188. Plaintiff incorporates the above referenced paragraphs.

189. The Individual Defendants acted as controlling persons of VimpelCom within the meaning of § 20(a) of the 1934 Act. By virtue of their positions with the Company, and ownership of VimpelCom securities, the Individual Defendants had the power and authority to cause VimpelCom to engage in the wrongful conduct complained of herein. VimpelCom controlled the Individual Defendants and all of its employees. By reason of such conduct, Defendants are liable pursuant to § 20(a) of the 1934 Act.

**WHEREFORE**, Plaintiff prays for relief and judgment, as follows:

(A) Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

(B) Awarding damages in favor of Plaintiff and the other Class members against all Defendants for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(C) Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(D) Such other and further relief as the Court may deem just and proper.

**JURY TRIAL DEMANDED**

Plaintiff hereby demands a trial by jury.

Dated: December 7, 2016

**GAINEY McKENNA & EGLESTON**

By: */s/ Thomas J. McKenna*
Thomas J. McKenna
Gregory M. Egleston
440 Park Avenue South, 5th Floor
New York, NY 10016
Telephone: (212) 983-1300
Facsimile: (212) 983-0383
Email: tjmckenna@gme-law.com
Email: gegleston@gme-law.com

***Attorneys for Lead Plaintiff***