**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

In re VEON Ltd. Securities Litigation

**15-cv-08672 (ALC)**

**OPINION AND ORDER**

**ANDREW L. CARTER, JR., United States District Judge:**

Lead Plaintiff Westway Alliance Corp. brings this putative class action on behalf of all

those who purchased the securities of Defendant VEON Ltd. between December 2, 2010 and

November 3, 2015, against VEON and a number of its executives. Plaintiffs allege violations of

Sections 10(b) and 20(a) of the Securities Exchange Act of 1934, arising out of VEON's

admitted bribery in Uzbekistan. Defendant VEON moves to dismiss the Amended Complaint in

its entirety pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. For the reasons

that follow, the Court denies VEON's motion to dismiss in large part.

## BACKGROUND

### I.    Factual Background

The following facts are taken from the allegations contained in the Amended Complaint,

which are presumed to be true for purposes of this motion to dismiss. ECF No. 45 (Amended

Complaint ("Am. Compl.")). The Court also takes judicial notice of VEON's public filings,

many of which Plaintiffs quote from at length in the Amended Complaint. *ATSI Comm'ns, Inc.*

*v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007).

Defendant VEON is a "multinational telecommunications company headquartered in the

Netherlands and incorporated in Bermuda." Am. Compl. at ¶ 11.[1] Its securities are publicly

---

[1] During the course of this litigation, Defendant VimpelCom, Ltd. changed its name to VEON Ltd. *See* ECF
No. 51. For clarity, the Court will refer to the company by its new name throughout.

traded in the United States. *Id.* Plaintiffs also named as Defendants certain of VEON's current and former executives. *Id.* ¶¶ 12-16.

On February 10, 2016, VEON entered into a deferred prosecution agreement ("DPA") with the United States Department of Justice, pursuant to which VEON pleaded guilty to a two-count criminal information charging the company with conspiracy to violate the anti-bribery and books and records provisions of the Foreign Corrupt Practices Act of 1977 ("FCPA") and a violation of the internal controls provision of the FCPA. *Id.* ¶¶ 2-3; *see also* Am. Compl., Ex. A (DPA). Pursuant to the DPA, VEON also agreed to pay more than $460 million in penalties and subject itself to outside compliance monitoring. Am. Compl. ¶ 5; DPA ¶¶ 7, 13-15.

In the Amended Complaint, Plaintiffs describe in detail the facts alleged in the criminal information against VEON and admitted by VEON in the DPA's Statement of Facts. *See* Am. Compl. ¶¶ 31-90. For present purposes, it suffices to say that, beginning in 2005, as VEON first looked to enter the Uzbek telecommunications market, through 2012, VEON made, or attempted to make, millions of dollars in improper payments to Gulnara Karimova, the eldest daughter of Uzbekistan's President, in an effort to achieve favorable treatment in Uzbekistan. Executives disguised these payments in VEON's books and records as legitimate transactions. *Id.* ¶¶ 88-90. One of the ways in which these payments were made was through a partnership between VEON and Takilant Limited, a company owned by Karimova. *Id.* ¶¶ 25, 39-41. This included a $25 million bribe paid in 2007 to secure certain 3G frequencies for VEON's wholly-owned subsidiary in Uzbekistan. *Id.* ¶¶ 45-48. VEON also entered into sham consulting agreements with Takilant in 2008 and 2011, through which it funneled $32 million to Karimova in exchange for certain telecommunications assets and continued access to the Uzbek market. *Id.* ¶¶ 49-65. VEON made an additional $10 million in payments to Karimova in 2011 and 2012, using a

variety of sham transactions. *Id.* ¶¶ 66-74. Plaintiffs also describe contemplated bribes in 2012 and 2013 that apparently were not completed. *Id.* ¶¶ 75-77.

In addition to admitting much of the underlying conduct just described, in the DPA, VEON admitted that the company "failed to implement adequate internal accounting controls and failed to enforce the internal accounting controls it did have in place," thereby allowing the bribes to Karimova. *Id.* ¶ 78. It also identified problems with its internal audit function, including a knowing failure to have adequate processes for reviewing contracts and conflicts of interest. *Id.* ¶¶ 79-84. The company did not have a designated full-time compliance function until 2013, and compliance was treated as a mere formality prior to that time. *Id.* ¶ 86. Accordingly, VEON admitted that it had "little to no anticorruption compliance program." *Id.* ¶ 87. Consistent with these admissions, at VEON's plea proceeding, a Government attorney asserted that there was "high-level knowledge of the bribery" at VEON. *Id.* ¶ 91.

Plaintiffs allege that VEON's conduct that formed the basis of its FCPA violations led to material misstatements and omissions in its SEC filings during the relevant time period. In particular, Plaintiffs allege that, when VEON referred to the increase in its broadband subscriptions, including in Uzbekistan, and revenue in general, it "put the topic of the cause of its financial success at issue," thereby obligating the company to report that the increase in subscriptions in Uzbekistan was due, at least in part, to the bribes paid to Karimova. *Id.* ¶ 97; *accord id.* ¶ 98-103, 109-17, 123-33, 139-46, 156-59, 161-62, 167-70. Plaintiffs do not allege that the actual numbers reported were inaccurate.

Plaintiffs also allege that VEON misrepresented that "[t]he government authorities responsible for supervising the telecommunications industry in the Republic of Uzbekistan are the Republic of Uzbekistan Cabinet and a specially authorized telecommunications agency." *Id.*

¶ 104. Plaintiffs contend that this was a misrepresentation because it failed to disclose the role that Karimova played. *Id.* ¶ 105; *accord id.* ¶¶ 118-19, 134-35.

Finally, Plaintiffs identify a number of VEON's disclosures in its annual reports regarding the company's internal controls. In its annual reports for the calendar years 2010 and 2012, VEON stated that, "[b]ased on the assessment" of its "internal control over financial reporting," its management "believes our company maintained effective internal control over financial reporting" during the relevant calendar year. *Id.* ¶¶ 106, 136. Stated somewhat differently in its 2014 Form 20-F, the company disclosed that, "as a result of management's assessment of our internal control over financial reporting as of December 31, 2014, management concluded that that our internal control over financial reporting was effective." *Id.* ¶ 164. That year, VEON also assured the market that its "internal control system was designed to provide reasonable assurance regarding the reliability of financial reporting." *Id.* ¶; *accord id.* ¶ 120 (2011 Form 20-F). Plaintiffs also quote from VEON's website regarding the company's compliance program. *Id.* ¶ 147.

In a similar vein, between 2010 and 2014, VEON executives signed certifications pursuant to the Sarbanes Oxley Act of 2002 that the information in the company's Forms 20-F was accurate. *Id.* ¶¶ 108, 122, 138, 155, 165.

VEON later admitted in connection with its DPA that it:

> (a) failed to implement adequate internal accounting controls; (b) failed to enforce the internal accounting controls it did have in place, which permitted the above-referenced bribe payments to occur without detection or remediation; (c) failed to implement a system for conducting, recording, and verifying due diligence on third parties, including joint venture partners, consultants, reseller companies, and suppliers to uncover their true nature, beneficial ownership, and possible corruption risks; and (d) failed to require that all consulting agreements be for *bona fide* services, that agreed-upon payments were commensurate with the services to be performed, and that services paid for were, in fact, performed.

*Id.* ¶¶ 107, 121, 137, 148.

Plaintiffs allege that, beginning with a Form 6-K disclosure on March 12, 2014, the truth began to emerge. *Id.* ¶ 149. VEON disclosed that it had been informed that the Securities Exchange Commission ("SEC") was conducting an investigation into the company and that its Amsterdam headquarters had been visited by Dutch law enforcement. The company stated that "[t]he investigations appear to be concerned with the Company's operations in Uzbekistan." That day, the price of VEON's American Depository Receipts ("ADRs") dropped 6.3%, from $8.85 the previous day to an intraday low of $8.29. *Id.* ¶ 150. The following week, VEON disclosed that the United States Department of Justice also was investigating the company, and the ADR price declined 5.6%, from an intraday high of $9.07 to a low of $8.57. *Id.* ¶¶ 151-52.

In VEON's 2013 Form 20-F filed on May 15, 2014, the company reiterated the existence of these investigations and provided more detail on the issues, which the company disclosed involved money laundering and bribery, and identified Karimova's company, Takilant. *Id.* ¶¶ 153-54. VEON also explained that, in 2013, the company began an internal investigation into its business in Uzbekistan and its relationship with Takilant, led by outside counsel with FCPA expertise. VEON made similar disclosures in its Form 20-F filed in 2015. *Id.* ¶ 163.

After the close of the market on August 13, 2015, there were reports that United States authorities had asked their European counterparts "to seize roughly $1 billion in assets related to a wide-ranging criminal probe of alleged corruption by [VEON], MTS, and TeliaSonera, for paying hundreds of millions of dollars to businesses controlled by Ms. Karimova to secure wireless spectrum in Uzbekistan." *Id.* ¶ 171. After that report, VEON's ADR price fell from $5.56 on August 13 to an intraday low of $5.305 the following day. *Id.* ¶ 172. Finally, on November 3, 2015, when VEON announced that it had reserved $900 million for litigation costs

related to the ongoing investigations, the company's ADRs declined 5.0%, from the previous day's high of $3.665 to an intraday low of $3.48. *Id.* ¶¶ 173-74.

## II.    Procedural History

After the Court consolidated this action with another related action against VEON and appointed Westway Alliance Corp. as the Lead Plaintiff in this action, Westway filed its Amended Complaint on behalf of a putative class of individuals who purchased VEON securities between December 4, 2010 and November 3, 2015. *See* ECF No. 45. In the Amended Complaint, Plaintiffs assert two causes of action for violations of § 10(b), and Rule 10b-5 promulgated thereunder, and § 20(a) of the Exchange Act. Thereafter, VEON moved to dismiss the Amended Complaint, arguing that Plaintiffs had failed to state a cause of action under Rule 10b-5 because they did not adequately allege any actionable misstatements, scienter on behalf of the corporation, or loss causation. ECF Nos. 47 (Motion), 48 ("Def's Memo."), 49 (Declaration of John P. Coffey).[2] VEON further argued that, because Plaintiffs failed to state a cause of action under § 10(b), they could not state a claim under § 20(a). Plaintiffs oppose the motion. ECF No. 50 ("Pl's Memo."). VEON has submitted its reply brief, ECF No. 52 ("Def's Reply"), and the Court considers the motion fully submitted.

## LEGAL STANDARD

To survive a motion to dismiss pursuant to Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is facially plausible "when the plaintiff pleads factual content that allows

---

[2] The time for the individual defendants who have appeared in this action to answer or otherwise respond to the Amended Complaint was extended by stipulation to 21 days after the Court's decision on VEON's motion to dismiss. ECF Nos. 54, 60.

the Court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id*. (citing *Twombly*, 550 U.S. at 556). The plaintiff must allege sufficient facts to show "more than a sheer possibility that a defendant has acted unlawfully," and accordingly, where the plaintiff alleges facts that are "'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of entitlement to relief.'" *Id*. (quoting *Twombly*, 550 U.S. at 557).

In considering a motion to dismiss, the court accepts as true all factual allegations in the complaint and draws all reasonable inferences in the plaintiff's favor. *See Goldstein v. Pataki*, 516 F.3d 50, 56 (2d Cir. 2008). However, the court need not credit "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements." *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 555); *see also id*. at 681. Instead, the complaint must provide factual allegations sufficient "to give the defendant fair notice of what the claim is and the grounds upon which it rests." *Port Dock & Stone Corp. v. Oldcastle Northeast, Inc.*, 507 F.3d 117, 121 (2d Cir. 2007) (citing *Twombly*, 550 U.S. at 555). In addition to the factual allegations in the complaint, the court also may consider "the documents attached to the complaint as exhibits, and any documents incorporated in the complaint by reference." *Peter F. Gaito Architecture, LLC v. Simone Dev. Corp.*, 602 F.3d 57, 64 (2d Cir. 2010) (citation and internal quotation marks omitted).

Where, as here, a plaintiff has alleged fraud claims under § 10(b) of the Exchange Act, the complaint is subject to the heightened pleading requirements of Federal Rule of Civil Procedure 9(b) and the Private Securities Litigation Reform Act of 1995 (the "PSLRA"). Rule 9(b) requires that the complaint "state with particularity the circumstances constituting fraud or mistake." To satisfy the particularity requirement, a complaint must "(1) detail the

statements (or omissions) that the plaintiff contends are fraudulent, (2) identify the speaker, (3) state where and when the statements (or omissions) were made, and (4) explain why the statements (or omissions) are fraudulent." *Eternity Global Master Fund Ltd. v. Morgan Guar. Trust Co.*, 375 F.3d 168, 187 (2d Cir. 2004) (citation and internal quotation marks omitted).

The PSLRA holds private securities plaintiffs to an even more stringent pleading standard. Under the PSLRA, a plaintiff must "(1) specify each statement alleged to have been misleading [and] the reason or reasons why the statement is misleading; and (2) state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind. *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 321 (2007) (internal citation and quotation marks omitted) (quoting 15 U.S.C. § 78u-4(b)). To determine that an inference of scienter is strong, the court must decide whether "a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Tellabs*, 551 U.S. at 324.

## DISCUSSION

### I.  Section 10(b) Claim

Plaintiffs assert a securities fraud claim against VEON under § 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder. Am. Compl. ¶¶ 184-87. To state a claim under § 10(b) and Rule 10b-5, a plaintiff must allege that the defendant "(1) made misstatements or omissions of material fact, (2) with scienter, (3) in connection with the purchase or sale of securities, (4) upon which the plaintiff relied, and (5) that the plaintiff's reliance was the proximate cause of its injury." *ATSI Commc'ns*, 493 F.3d at 105. VEON argues that Plaintiffs have failed to allege any actionable misstatements, scienter, or loss causation. For the reasons that follow, the Court denies VEON's motion to dismiss the Amended Complaint in large part.

## A. Material Misstatements and Omissions

Plaintiffs allege four categories of alleged misstatements and omissions during the relevant time period: (1) VEON's financial disclosures without a corresponding disclosure of the bribery that enabled the company's financial successes; (2) disclosures identifying the Uzbek authorities responsible for overseeing the company's actions there without describing Karimova's role and assertions regarding the availability of equal protection under Uzbek law; and (3) the company's statements regarding the efficacy of its internal audit and compliance functions. VEON argues that none of these are misstatements or actionable omissions.

### 1. Financial Disclosures

VEON argues that Plaintiffs' claims regarding the company's financial disclosures are, in reality, an improper attempt to enforce the FCPA, which has no private right of action. It further argues that a company is not required to disclose uncharged wrongdoing, and Plaintiffs do not allege that the financial reporting was, itself, inaccurate. Def's Memo. at 10-13. As described further in this section, Plaintiffs' claim is not simply that VEON should be found liable for violations of Rule 10b-5 and § 20(a) because it did not disclose its FCPA violations. Plaintiff contends that, once VEON put at issue its increased subscribers and income in Uzbekistan, "it was duty bound not to omit the rest of the story, *i.e.*, that the growth was attributable to falsely concealed bribery payments. By failing to do so, its omissions were actionable." Pl's Memo. at 21. The Court agrees in large part.

As a preliminary matter, there is no real dispute that the FCPA does not contain a private right of action. *See Republic of Iraq v. ABB AG*, 768 F.3d 145, 170-71 (2d Cir. 2014). Therefore, the question is whether disclosures made by VEON during the course of FCPA violations are independently actionable under the Exchange Act or if a claim based on the facts presented constitutes an impermissible end-run around the FCPA's lack of a private right of action. The

Court finds that Plaintiffs' allegations regarding the misrepresentations in VEON's SEC filings are sufficiently distinct to avoid any potential concern that Plaintiffs are seeking to enforce the FCPA by this securities fraud action. *See, e.g., In re Braskem S.A. Sec. Litig.*, --- F. Supp. 3d ---, No. 15-cv-5132 (PAE), 2017 WL 1216592 (S.D.N.Y. Mar. 30, 2017) (allowing securities law claim based on FCPA violations to proceed); *Citicorp Int'l Trading Co. v. W. Oil & Ref. Co.*, 771 F. Supp. 600, 607 (S.D.N.Y. 1991) (dismissing private FCPA claim, but contemplating availability of tort claim based on bribes, but finding claim insufficient for other reasons).

Generally, "[d]isclosure is not a rite of confession, and companies do not have a duty to disclose uncharged, unadjudicated wrongdoing." *City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*, 752 F.3d 173, 184 (2d Cir. 2014) (citations and internal quotation marks omitted). However, the failure to disclose uncharged criminal conduct may be actionable where the failure to do so would make other disclosures materially misleading. *In re Braskem*, 2017 WL 1216592, at *11 (collecting cases); *In re Sanofi Sec. Litig.*, 155 F. Supp. 3d 386, 403 (S.D.N.Y. 2016). This duty to disclose may arise when a company "puts the topic of the cause of its financial success at issue." *In re Van der Moolen Holding N.V. Sec. Litig.*, 405 F. Supp. 2d 388, 401 (S.D.N.Y. 2005). Under these circumstances, the company is "obligated to disclose information concerning the source of its success," including illegal sources. *Id.* (citation and internal quotation marks omitted)

While some courts have read *Van der Moolen* to suggest that accurate financial reporting may be an actionable misstatement if some of the revenue derived from illegal activity, *see, e.g., Freudenberg v. E*Trade Fin. Corp.*, 712 F. Supp. 2d 171, 180 (S.D.N.Y. 2010), the Court agrees with the district courts that have read *Van der Moolen* more narrowly. *See In re FBR Inc. Sec. Litig.*, 544 F. Supp. 2d 346, 356 (S.D.N.Y. 2008); *In re Marsh & Mclennan Cos., Inc. Sec. Litig.*,

501 F. Supp. 2d 452, 470 (S.D.N.Y. 2006). The district court's decision in *Marsh & Mclennan* draws a sensible distinction: "[A] company's misleading statements about the sources of its revenue do not make the company's statements of the revenue figures misleading; rather, liability is limited to the misleading statements themselves." *In re Marsh & Mclennan*, 501 F. Supp. 2d at 470. That is, accurately reported income derived from illegal sources is non-actionable despite a failure to disclose the illegality. By contrast, statements "putting the source of those revenues at issue" may be actionable. *Id.*

The recent decision in *In re Virtus Inv. Partners, Inc. Sec. Litig.*, 195 F. Supp. 3d 528 (S.D.N.Y. 2016), provides a useful comparison. In that case, the district court found that the defendant's statements regarding the source of "strong relative investment performance," where that performance was described as "a key driver of [defendant's] high levels of sales and net flows," were actionable misstatements because the company failed to disclose certain related conflicts of interest. *In re Virtus*, 195 F. Supp. 3d at 537. By contrast, the company's disclosure that revenues increased "primarily as a result of an increase in average assets and an increase in average management fees" was not actionable because it did "nothing more than put into words information reflected in the company's financial statements." *Id.*; *see also In re Sanofi*, 155 F. Supp. 3d at 404 (reporting growth in sales of diabetes products without disclosure that growth was boosted by illegal scheme was not actionable because it "merely reported the financial health of the company and the percentage growth in diabetes product sales"); *cf. In re Braskem*, 2017 WL 1216592, at *11 (statement describing many reasons for price defendant paid for naphtha was materially misleading because it did not disclose importance of side agreement secured by bribery).

Here, the Court finds that many of the statements identified by Plaintiffs are nothing more than a narrative restatement of accurate financial reporting that is not, without more, actionable. Sometimes Plaintiffs cite a portion of VEON's disclosures that is not a narrative at all; Plaintiffs refer only to the financial reporting itself. *See, e.g.*, Am. Compl. ¶¶ 96 (Dec. 2, 2010 Form 6-K) (reporting increased broadband subscriptions in Uzbekistan), 98 (Mar. 29, 2011 Form 6-K) (reporting net operating revenue increase in Uzbekistan), 99 (June 1, 2011 Form 6-K) (same), 102 (2010 Form 20-F) (reporting number of customers in Uzbekistan), 116 (2011 Form 20-F) (same), 132 (2012 Form 20-F) (same); *see also* ¶¶ 145 (Mar. 6, 2014 Form 6-K), 156 (Aug. 6, 2014 Form 6-K), 158 (Nov. 12, 2014 Form 6-K), 161 (Feb. 26, 2015 Form 6-K), 167 (May 14, 2015 Form 6-K), 169 (Aug. 6, 2015 Form 6-K). The references to sales and subscriber numbers in Uzbekistan without further statements regarding the nature of those numbers or their importance to VEON's business do not sufficiently place the company's sales in Uzbekistan at issue so as to require further disclosure regarding the bribes paid to Karimova.

However, certain other of the statements—particularly, those in VEON's Forms 6-K reporting quarterly earnings—sufficiently place the reasons for growth in Uzbekistan at issue to make further disclosure necessary. For example, in VEON's September 7, 2011 Form 6-K, VEON asserted that its "sales and marketing efforts" in Uzbekistan resulted in increased mobile subscribers and revenues, which it asserted "demonstrat[e] the underlying strength of our core." *Id.* ¶ 109. The Court's review of that disclosure provides even greater context to the statement quoted in the Amended Complaint. In particular, VEON disclosed that "[d]espite intensified competition in some of the CIS countries, revenues are growing at double-digit rates YoY in nearly all CIS markets as a result of the improving macroeconomic situation, product quality and efficient sales and marketing efforts." While the growing revenues may have been due to

"improving macroeconomic situation, product quality and efficient sales and marketing efforts,"

Plaintiffs allege that, in Uzbekistan, at least, this growth also was due to bribes VEON paid to

Karimova.

Similarly, in the company's November 14, 2011 and March 13, 2012 Forms 6-K, VEON

attributed its growth in Uzbekistan to particular causes, such as its "sales and marketing

activities, regional 3G network roll-out and data development," or "efficient SG&A spending,"

without mentioning the bribes paid to Karimova. *See id.* ¶¶ 111, 113; *see also* ¶¶ 123 (May 15,

2012 Form 6-K) (describing increased competition as one of reasons for EBIDTA margin), 125

(Aug. 15, 2012 Form 6-K) (noting "record mobile internet user growth" in Uzbekistan), 127

(Nov. 14, 2012 Form 6-K) (describing reasons for EBITDA increases), 129 (Mar. 6, 2013 Form

6-K) (attributing revenue increase to growth of "high value subscribers"), 139 (May 15, 2013

Form 6-K) (same), 141 (Aug. 7, 2013 Form 6-K) (same), 143 (Nov. 6, 2013 Form 6-K) (same).

The Court finds that these disclosures are in line with those that the district court found

actionable in *Braskem*, where the defendant disclosed certain reasons supporting the price it paid

for a particular raw material, but did not disclose that the price also was due to a side agreement

the company had secured through bribery. *In re Braskem*, 2017 WL 1216592, at *11.

### 2. Government Authorities in Uzbekistan and Uzbek Law

VEON also argues that its disclosures regarding the government authorities in Uzbekistan

responsible for overseeing the telecommunications sector were accurate and not materially

misleading despite their failure to disclose Karimova's involvement. Def's Memo. at 13-14.

Plaintiffs did not respond to VEON on this point. Relatedly, VEON argues that its disclosures

regarding equal protection under Uzbek law are not actionable. *Id.* at 17-19. The Court agrees

with VEON's argument regarding governmental oversight, but not equal protection.

Accordingly, only claims based on the former disclosures are dismissed.

First, in each of its annual reports for 2010 to 2012, VEON disclosed that "[t]he government authorities responsible for supervising the telecommunications industry in the Republic of Uzbekistan are the Republic of Uzbekistan Cabinet and a specially authorized telecommunications agency ['UzACI']." Am. Compl. ¶¶ 104, 118, 134. In alleging that these statements were materially misleading, Plaintiffs do not allege that the Republic of Uzbekistan Cabinet and UzACI were not responsible for overseeing VEON and others in the telecommunications sector. *See* Am. Compl. ¶¶ 28, 45, 48, 64 (noting continued involvement of UzACI in approval processes). Plaintiffs' contention is not that these governmental entities had no oversight authority, but that VEON needed Karimova's support to secure favorable concessions from those authorities. The Court agrees with VEON that the disclosures regarding the relevant government oversight bodies are non-actionable, true statements. The Court also finds that the failure to disclose Karimova's involvement does not render the statements materially misleading because, while Karimova was connected to those in government and allegedly held "several positions" in the Uzbek government, she was not a "government authority," herself and had no oversight authority in the telecommunications industry. *Id.* ¶ 22.

Second, Plaintiffs allege that VEON made a material misrepresentation when it stated that "[a]ll owners of telecommunications networks have equal rights and enjoy equal protection guaranteed by the law." Am. Compl. ¶¶ 104, 118, 134. They allege that this statement was materially misleading because VEON had to engage in bribery to enter and remain in the Uzbek market. Plaintiffs' argument is not simply, as VEON contends, that the existence of FCPA violations renders VEON's interpretation of Uzbek law inaccurate. Def's Reply at 8. In the DPA, VEON admitted that bribes were necessary "for, among other things, the opportunity to conduct future operations [in Uzbekistan] without hurdles," and that the failure to pay bribes

would lead to "a number of negative governmental reactions." DPA Statement of Facts ¶ 60 (internal quotation marks omitted). Based on these subsequent admissions, Plaintiffs have adequately alleged that, at a minimum, VEON did not "enjoy equal protection guaranteed by the law," making that statement at best misleading. Nor has VEON made any meaningful argument regarding this statement's lack of materiality to investors. Def's Memo. at 18; Def's Reply at 8. The only decision VEON cites, *In re Yukos Oil Co. Sec. Litig.*, No. 04-cv-5243 (WHP), 2006 WL 3026024, at *15 (S.D.N.Y. Oct. 25, 2006), involves the defendant's interpretation of a Russian law. Here, by contrast, Plaintiffs do not argue that VEON misinterpreted Uzbek law, only that VEON knew that any promise of equal protection contained in Uzbek law was illusory given the necessity of bribes.

### 3. Internal Controls

Finally, with regard to VEON's disclosures regarding its internal controls, VEON argues that Plaintiffs really have alleged corporate mismanagement, which is not actionable under *Santa Fe Indus., Inc. v. Green*, 430 U.S. 462 (1977). Def's Memo. at 14-16. VEON further contends that its statements about internal controls are non-actionable forward-looking statements or mere puffery regarding the adequacy of its controls. *Id.* at 16-19. Plaintiffs counter that the safe harbor for forward-looking statements does not protect VEON's alleged statements. Pl's Memo. at 13-20. For the reasons that follow, the Court finds that VEON's statements about its internal controls are actionable.

First, the Court agrees with Plaintiffs that *Santa Fe Industries* and the line of decisions involving corporate mismanagement are not applicable here. Plaintiffs' claim is not based solely on the underlying failures of VEON's internal controls to detect and prevent the FCPA violations; Plaintiffs allege that VEON's disclosures regarding the existence and efficacy of those controls were false. That distinguishes the allegations in this action from those in *Santa Fe Industries, In*

*re Citigroup, Inc. Sec. Litig.*, 330 F. Supp. 2d 367 (S.D.N.Y. 2004), and the other decisions

VEON cites that involved "a breach of fiduciary duty . . . without any deception,

misrepresentation, or nondisclosure." *Santa Fe Indus.*, 430 U.S. at 476; *see also* Def's Memo. at

14-16. Contrary to *Citigroup*, for example, the issue here is not simply that VEON did not

follow the internal controls that it touted in its disclosures. *See In re Citigroup*, 330 F. Supp. 2d

at 376 (plaintiff's claims "focus[ed] not on specific factual or opinion disclosures alleged to have

been false or misleading, or on omissions of specific facts, but rather on Plaintiff's contention

that Citigroup's business would have been conducted differently had the company adhered to the

management principles disclosed in its public filings"). To the extent Plaintiffs' claim is based

merely on the failure to follow internal controls, without more, that aspect of their claim is

dismissed.

The facts admitted in the DPA also make this case distinguishable from *Andropolis v.

Red Robin Gourmet Burgers, Inc.*, 505 F. Supp. 2d 662 (D. Colo. 2007), which VEON cites and

which otherwise appears factually analogous. *See* Def's Reply at 4. In *Andropolis*, the district

court held that the defendant's statements regarding the efficacy of its internal controls were not

actionable because the plaintiff did not allege that management had failed to review the internal

controls or had reviewed the controls and found them to be ineffective, but that, "had

management evaluated the Company's disclosure and financial reporting controls correctly, it

would have or should have found them to be deficient-considering the widespread abuse." 505

F. Supp. 2d at 683. By contrast here, Plaintiff alleges, based on VEON's admissions in the DPA,

that management knowingly failed to implement adequate controls governing due diligence,

contract approval, and internal audit, and, at the time, was aware that its internal controls were

not effective. *See* Am. Compl. ¶¶ 107, 121, 137, 166; DPA Statement of Facts ¶¶ 62-66.

Second, VEON argues that its disclosures and certifications regarding "financial reporting" controls are distinct from the admissions it made in the DPA regarding the deficiencies in its due diligence, conflicts of interest review, and other internal audit functions, making the statements alleged factually true. *See* Def's Memo. at 16-17; Def's Reply. at 5. VEON's disclosures regarding internal controls over financial reporting relate to Exchange Act Rules 13a-15(f) and 15d-15(f). With one exception, those rules do not cover the types of due diligence and conflict of interest review that Plaintiffs identify as lacking and regarding which VEON made admissions in the DPA. *See* 17 C.F.R. 240.13a-15(f) (internal control over financial reporting "provide[s] reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes . . . and includes those policies and procedures" relating to maintenance of accurate records of transactions); 17 C.F.R. 240.15d-15(f) (same). Falsely recording a bribe as the acquisition of an asset or consulting services, *see* Am. Compl. ¶¶ 88-90, would seem to violate policies or procedures that "[p]ertain to the maintenance of records that in reasonable detail accurately and fairly reflect the transactions . . . of the issuer." 17 C.F.R. 240.13a-15(f)(1); *see also In re PetroChina Co. Ltd. Sec. Litig.*, 120 F. Supp. 3d 340, 358-59 & n.22 (S.D.N.Y. 2015) (when discussing Sarbanes-Oxley Act certifications, distinguishing case based on lack of allegations that bribes were falsely recorded), *aff'd* (Mar. 21, 2016).

Third, VEON argues that, even if false, its statements are protected by the PSLRA's safe harbor for forward-looking statements. Def's Memo. at 17-19. This safe harbor protects only those statements that are "identified" as such and are "accompanied by meaningful cautionary language," are immaterial, or where "the plaintiff fails to prove that it was made with actual knowledge that it was false or misleading." *Slayton v. Am. Exp. Co.*, 604 F.3d 758, 766 (2d Cir.

2010); *see also* 15 U.S.C. § 78u-5(c)(1)(A). However, many of the statements regarding VEON's internal controls are backward, not forward, looking, taking them outside of the ambit of the safe harbor and the common law "bespeaks caution" doctrine. *Iowa Pub. Employees' Ret. Sys. v. MF Glob., Ltd.*, 620 F.3d 137, 142 (2d Cir. 2010) (bespeaks caution doctrine); *see* Am. Compl. ¶¶ 106, 136, 164 (each disclosing that, based on company's review, management "believed" or "concluded" internal controls over financial reporting were effective in fiscal year being reported). They are statements of historical fact, not predictions of future compliance. Moreover, even if the safe harbor were applicable, as it might be to certain of the other more general or forward-looking disclosures, it would not protect statements made with actual knowledge of falsity. 15 U.S.C. § 78u-5(c)(1)(B); *see, e.g.*, Am. Compl. ¶¶ 120 ("control system was designed to provide reasonable assurance regarding the reliability of financial reporting . . . "); 147 (VEON's website on anti-bribery and anti-corruption policies).

Further, with respect to VEON's statements on its website, in particular, those disclosures are more specific than statements courts typically discount as mere "puffery," including those cited by VEON. *Id.* ¶ 147 (describing specific steps taken); *see, e.g.*, *City of Brockton Ret. Sys. v. Avon Prod., Inc.*, No. 11-cv-4665 (PGG), 2014 WL 4832321, at *14-16 (S.D.N.Y. Sept. 29, 2014) (statements "reflecting concrete steps that [defendant] had taken" could be actionable, while statements that defendant "maintain[s] the highest standards of integrity and ethical conduct" were not); *In re Marsh & McLennan Cos., Inc. Sec. Litig.*, No. 04-cv-8144 (SWK), 2006 WL 2789860, at *2 (S.D.N.Y. Sept. 27, 2006) ("commitment to client service and professional standards" and "culture of high ethical standards and commitment to compliance" were puffery); *In re JP Morgan Chase Sec. Litig.*, 363 F. Supp. 2d 595, 632-33 (S.D.N.Y. 2005)

(statements that defendant was "an institution of integrity with sound risk-management procedures" were puffery).

## B. Scienter

VEON next argues that Plaintiffs have failed to allege facts giving rise to a strong inference of scienter. Def's Memo. at 19-21. In particular, VEON contends that Plaintiffs have, at best, alleged that the company was negligent. It further argues that the executives at VEON who perpetrated the scheme to bribe Karimova did not have the requisite scienter such that their intent can be attributed to VEON. Def's Reply at 9. The Court disagrees.

Under the PSLRA, a plaintiff must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2)(A). "The requisite state of mind in a Rule 10b-5 action is 'an intent to deceive, manipulate or defraud.'" *Ganino v. Citizens Utilities Co.*, 228 F.3d 154, 168 (2d Cir. 2000) (quoting *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193 & n.12 (1976)).

To satisfy the PSLRA's pleading requirements for scienter, a plaintiff must allege facts "(1) showing that the defendants had both motive and opportunity to commit the fraud or (2) constituting strong circumstantial evidence of conscious misbehavior or recklessness." *ATSI Commc'ns*, 493 F.3d at 99. In evaluating whether either of these showings has been made, the court may consider, among other things, whether the plaintiff has alleged that the defendant "(1) benefitted in a concrete and personal way from the purported fraud; (2) engaged in deliberately illegal behavior; (3) knew facts or had access to information suggesting that their public statements were not accurate; or (4) failed to check information they had a duty to monitor." *Novak v. Kasaks*, 216 F.3d 300, 311 (2d Cir. 2000) (internal cross references omitted). When examining these factors, a court must be mindful that the inquiry is "whether all of the

facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Tellabs*, 551 U.S. at 322-23.

Where, as here, the scienter of a corporation is at issue, the plaintiff must allege "facts sufficient to create a strong inference either (1) that 'someone whose intent could be imputed to the corporation acted with the requisite scienter' or (2) that the statements 'would have been approved by corporate officials sufficiently knowledgeable about the company to know' that those statements were misleading." *Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*, 797 F.3d 160, 177 (2d Cir. 2015) (quoting *Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital Inc.*, 531 F.3d 190, 195-96 (2d Cir. 2008)). Often, "the most straightforward way to raise such an inference for a corporate defendant will be to plead it for an individual defendant. But it is possible to raise the required inference with regard to a corporate defendant without doing so with regard to a specific individual defendant." *Teamsters*, 531 F.3d at 195.

Plaintiffs do not argue that they have alleged scienter under the motive and opportunity prong. Therefore, the Court will focus on whether Plaintiffs have alleged facts constituting strong circumstantial evidence of conscious misbehavior or recklessness by VEON. For the reasons that follow, the Court finds that, considering all of the facts alleged in the Amended Complaint, the inference of VEON's scienter is "cogent and at least as compelling as any opposing inference one could draw." *Tellabs*, 551 U.S. at 324.

Plaintiffs have adequately alleged that VEON "knew facts or had access to information suggesting that [its] public statements were not accurate." As alleged in the Amended Complaint and admitted by VEON in the DPA, Executive 1, Executive 2, and others orchestrated a bribery scheme that violated the FCPA.[3] These executives also are alleged to have understood how these

---

[3] VEON has not argued that the relevant executives were not sufficiently senior. However, the Court briefly notes that, generally, courts in this district find that the scienter of "management level" employees can be attributed to

bribes could impact, or be reflected in, VEON's financial statements, and therefore took steps to

obscure those bribes in VEON's books and records as legitimate business transactions. *See* Am.

Compl. ¶ 89. With this understanding, it is reasonable to infer that they either knew or recklessly

ignored that VEON's public filings contained misrepresentations and omissions regarding the

company's business in Uzbekistan. *See, e.g.*, *In re Braskem*, 2017 WL 1216592, at *22

(individuals who participated in bribery had actual knowledge that statements in SEC filings

were misleading). This also constitutes "deliberately illegal behavior," as evidenced by VEON's

guilty plea.

These individuals' scienter can be attributed to VEON. VEON, relying on language in

*Teamsters*, argues that the Amended Complaint does not "connect the necessary dots" to show

that the executives with knowledge of the bribery had any role in financial reporting. Def's

Reply at 9. In *Teamsters*, after holding that the plaintiff had failed to allege a strong inference of

scienter, the Court of Appeals noted that a potential competing inference from the facts alleged

could be that "no one responsible for the statements made to investors had reason to believe that

Dynex employees were systematically flouting its underwriting guidelines or giving them false

information about the cause of the bonds' poor performance." *Teamsters*, 531 F.3d at 197. From

that, VEON argues that Plaintiffs must allege that the individuals whose state of mind is imputed

to the corporate defendant are the same individuals who made the relevant misstatements or

omissions. Def's Reply at 9. However, this argument has been rejected by numerous other

district courts when presented to them. "[T]he person whose state of mind is imputed to the

---

the corporation. *See Thomas v. Shiloh Indus., Inc.*, No. 15-cv-7449 (KMW), 2017 WL 2937620, at *3 (S.D.N.Y. July 7, 2017) (collecting cases). Here, at a minimum, Executive 1, who is described as a "high-ranking executive" of VEON in the CIS region with oversight over VEON's subsidiary in Uzbekistan, is sufficiently senior. Am. Compl. ¶ 29; DPA Statement of Facts ¶ 5.

corporate defendant need not also be the person who made the material misstatements at issue." *Patel v. L-3 Commc'ns Holdings Inc.*, 2016 WL 1629325, at *15 n.38 (S.D.N.Y. Apr. 21, 2016) (collecting cases); *accord In re Braskem*, 2017 WL 1216592, at *22 n.14.

Plaintiffs also allege facts allowing for the cogent inference that those even higher in the organization had some level of awareness of the bribes going to Karimova, including those who, by virtue of their position, would have had a role in approving VEON's public filings. In 2005, VEON's board of directors was aware of and approved the first bribe to Karimova. DPA Statement of Facts ¶¶ 15-21. This included a decision by management to send outside counsel a less than full picture of the transaction in order to secure a favorable FCPA opinion. *Id.* ¶ 20. While VEON's public filings from 2005 are not at issue in this action, the board's knowledge and approval of the initiating bribe which allowed VEON to establish its foothold in Uzbekistan is telling. Similarly, Plaintiffs allege that, in 2011—a year for which VEON's disclosures are at issue—VEON paid a $40 million bribe to Karimova which concerned at least one executive enough to "escalate[] the matter to the highest levels." Am. Compl. ¶ 63. In that vein, VEON also admitted that "[t]ime and again, board members, executives, and employees of [VEON] identified serious concerns with third parties, and [VEON] still failed to undertake adequate due diligence." DPA Statement of Facts ¶ 62.[4]

For all of these reasons the Court finds that Plaintiffs have alleged facts, taken together, that give rise to strong inference of corporate scienter that is at least as compelling as any other opposing inference.

---

[4] VEON contends that finding scienter here would cause every FCPA violation to have a corollary Exchange Act claim. Def's Reply at 9. That is not so. The Court's holding is limited to the specific facts of this case, in which VEON admitted in its DPA knowledge at the highest levels of management of a bribery scheme spanning years. Moreover, any FCPA violation still must be connected to a particular material misrepresentation or omission.

## C. Loss Causation

Finally, VEON argues that Plaintiffs cannot allege loss causation because any allegedly inflated price resulting from its misrepresentations and omissions was offset by ownership of those overvalued shares and because Plaintiffs have not tied their losses to the misrepresentations and omissions as compared to the underlying conduct. Def's Memo. at 21-23. The Court agrees, in part, although the most efficient resolution is to modify the proposed class definition rather than dismiss the claim for failure to allege loss causation.

"In any private action arising under this chapter, the plaintiff shall have the burden of proving that the act or omission of the defendant alleged to violate this chapter caused the loss for which the plaintiff seeks to recover damages." 15 U.S.C. § 78u-4(b)(4). This requirement is referred to as "loss causation" and "is the causal link between the alleged misconduct and the economic harm ultimately suffered by the plaintiff." *Lentell v. Merrill Lynch & Co., Inc.*, 396 F.3d 161, 172 (2d Cir. 2005) (citation and internal quotation marks omitted).

Since *Dura Pharm., Inc. v. Broudo*, 544 U.S. 336 (2005), there has been a split among the circuits as to whether the loss causation element is subject to the heightened pleading requirements of Rule 9(b) or the ordinary pleading standard of Rule 8(a). The Second Circuit Court of Appeals has yet to weigh in on this debate. *See Loreley Fin.*, 797 F. 3d at 182-83 (citing *Acticon AG v. China N.E. Petroleum Holdings, Ltd.*, 692 F. 3d 34, 37-38 (2d Cir. 2012)). Under either standard, however, the securities fraud plaintiff's burden is not a heavy one. She must only "provide a defendant with some indication of the loss and the causal connection that the plaintiff has in mind." *Dura*, 544 U.S. at 347. Ultimately, to prove loss causation, "a plaintiff must show that the loss [was a] foreseeable result of the defendant's conduct (*i.e.*, the fraud), and that the loss [was] caused by the materialization of the . . . risk concealed by the defendant's

alleged fraud. *In re Vivendi, SA Sec. Litig.*, 838 F.3d 223, 261 (2d Cir. 2016) (quoting *Lentell*, 396 F.3d at 173) (internal quotation marks omitted, alterations in original).

There can be no dispute that VEON both began paying bribes to Karimova and failed to disclose those bribes prior to December 2010 when members of the putative class began purchasing shares of VEON. VEON also concedes for purposes of argument that its share price was artificially inflated as a result of the failure to disclose the bribes. Def's Memo. at 22. Following VEON's disclosures, which began on March 12, 2014 after the various government investigations commenced, the price of VEON's ADRs declined. Am. Compl. ¶¶ 149-74. As a result, those members of the putative class who purchased their shares prior to March 12, 2014 did so at an artificially inflated price and lost money when the disclosures VEON subsequently made regarding the bribes and related government investigations caused its share price to decline.

However, any individual who both purchased and sold his or her shares prior to March 12, 2014 cannot demonstrate loss causation. Where, as here, a plaintiff alleges that it paid an inflated price for securities as a result of the defendant's misrepresentation or omission, the loss is not the purchase of shares at an artificially inflated price because "as a matter of pure logic, at the moment the transaction takes place, the plaintiff has suffered no loss; the inflated purchase payment is offset by ownership of a share that *at that instant* possesses equivalent value." *Dura*, 544 U.S. at 342 ("But if, say, the purchaser sells the shares quickly before the relevant truth begins to leak out, the misrepresentation will not have led to any loss."). More is required to establish loss causation.

Therefore, Plaintiffs' sole paragraph regarding damages is insufficient on its own. *See* Am. Compl. ¶ 187 ("Plaintiff and the Class have suffered damages in that, in reliance on the

integrity of the market, they paid artificially inflated prices for VimpelCom securities. Plaintiff and the Class would not have purchased VimpelCom securities at the prices they paid, or at all, if they had been aware that the market price had been artificially and falsely inflated by defendants' misleading statements."). Despite this facial deficiency, for the potential plaintiffs, including Lead Plaintiff Westway, who sold their shares after the March 12, 2014 disclosure or any subsequent disclosure, other portions of the Amended Complaint contain sufficient allegations of loss causation to survive a motion to dismiss. However, individuals who sold his or her shares prior to March 12, 2014 are excluded from the putative class.

VEON also argues that Plaintiffs have not shown that the decline in share price after the company made a number of disclosures in 2014 and 2015 was due to its misstatements or omissions rather than the disclosure of the underlying FCPA violation itself. Def's Memo. at 22; Def's Reply at 10. That is not the relevant question, however. "[A] misstatement or omission is the 'proximate cause' of an investment loss if the risk that caused the loss was within the zone of risk concealed by the misrepresentations and omissions alleged." *Lentell*, 396 F.3d at 173. Stated differently, when deciding if "the subject of the fraudulent statement or omission was the cause of the actual loss suffered," the court looks at whether "the misstatement or omission concealed something from the market that, when disclosed, negatively affected the value of the security." *Id.*

Here, Plaintiffs allege that VEON concealed from the market the existence of bribes paid to Karimova to secure the company's position in Uzbekistan and that, when information regarding the company's conduct in Uzbekistan began to make its way into the market, it had an immediate negative impact on the value of VEON's ADRs. In other words, the concealed risk that VEON's position in Uzbekistan was tenuous (or at least not as strong as presented) given the

company's reliance on bribes, for example, materialized when the company began to disclose that government agencies were investigating the entities related to those bribes and, ultimately, VEON itself. Despite the wording of paragraph 187 of the Amended Complaint, construing the allegations in a light most favorable to Plaintiffs, they have sufficiently alleged loss causation.

## II.      Section 20(a) Claim

VEON's only argument regarding Plaintiffs' § 20(a) claim, relegated to a footnote, is that "[b]ecause plaintiffs have failed to state a claim under Section 10(b), their Section 20(a) claim must also be dismissed." Def's Memo. at 23 n.8 (citing *Rombach v. Chang*, 355 F.3d 164, 177-78 (2d Cir. 2004)). Accordingly, because the Court has not dismissed Plaintiffs' § 10(b) claim in its entirety, VEON's motion to dismiss Plaintiffs' § 20(a) claim is denied as well.

## CONCLUSION

For all of the foregoing reasons, the Court denies VEON's motion to dismiss the Amended Complaint in part and grants the motion in part. The Individual Defendants who have appeared in this action must answer or otherwise respond to the Complaint on or before October 10, 2017. The Clerk of the Court is respectfully requested to close Docket Entry Number 48.

**SO ORDERED.**

**Dated**:      September 19, 2017
            New York, New York

_____
ANDREW L. CARTER, JR.
United States District Judge