USDC SDNY
DOCUMENT ELECTRONICALLY
FILED
DOC#: _____
DATE FILED: ___8-30-18___

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re Veon Ltd. Securities Litigation | **15-cv-08672 (ALC)** <br><br> **OPINION AND ORDER** |

**ANDREW L. CARTER, JR., United States District Judge:**

Lead Plaintiff Westway Alliance Corp ("Westway" or "Plaintiff") brings this putative

class action on behalf of all those who purchased the securities of Defendant Veon Ltd. ("Veon"

or "the Company") between December 2, 2010 and November 3, 2015, against Veon and four

senior executives, Alexander Izosimov, Joe Lunder, Cornelis Hendrik van Dalen, and Andrew

Mark Davies (collectively "Individual Defendants").[1]  Plaintiffs allege violations of

Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 arising out of Veon's admitted

bribery in Uzbekistan.  Individual Defendants move to dismiss the Amended Complaint pursuant

to, variously, Federal Rules of Civil Procedure 12(b)(2), (5), and (6).  For the reasons that follow,

the allegations against each Individual Defendant are DISMISSED.

## BACKGROUND

### I.    Factual Background

The following facts are taken from the allegations contained in the Amended Complaint,

which are presumed to be true for purposes of this motion to dismiss.  Plaintiffs' complaint also

relies heavily on a criminal complaint and Deferred Prosecution Agreement ("DPA") with Veon

for actions related to this case.  Additionally, the Court takes judicial notice of Veon's public

---

[1] Plaintiffs initially also brought suit against Jean-Yves Charlier, Veon's current CEO.  Plaintiffs voluntarily
dismissed Charlier on April 16, 2018.  ECF No. 113.

filings, many of which Plaintiffs quote from at length in the Amended Complaint. *See ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007).

Veon is a multinational telecommunications company headquartered in the Netherlands and incorporated in Bermuda. Amended Complaint ¶ 11 (ECF No. 45) ("FAC").[2] Its securities are publicly traded in the United States. *Id.* Izosimov served as Veon's Chief Executive Officer ("CEO") from October 2003 to June 2011. *Id.* ¶ 14. Lunder served as the Company's CEO from July 2011 to April 2015 and as a member of the Management Board. *Id.* ¶ 13. Since then, Jean-Yves Charlier, who has since been dismissed from this lawsuit, has served as Veon's CEO. *Id.* ¶ 12. van Halen served as Veon's Chief Financial Officer ("CFO") from September 2010 to November 2013. *Id.* ¶ 16. Davies has served as CFO since November 2013. *Id.* ¶ 15.

Essentially, Plaintiffs contend that Veon and its officers made, or attempted to make, millions of dollars in improper payments to Gulnara Karimova, the eldest daughter of Uzbekistan's President, in an effort to achieve favorable treatment for its telecommunications business in Uzbekistan. FAC ¶¶ 31-90.

On February 10, 2016, Veon entered into a DPA with the United States Department of Justice related to many of the allegations in this complaint. *Id.* ¶ 2. Pursuant to the DPA, Veon pleaded guilty to a two-count criminal information charging the company with conspiracy to violate the anti-bribery and books and records provisions of the Foreign Corrupt Practices Act of 1977 ("FCPA") and a violation of the internal controls provision of the FCPA. *Id.* ¶¶ 2-3; *see also* FAC Ex. A (ECF No. 45-1) ("DPA"). While the DPA discusses liability for actions committed by senior executives at Veon, the DPA does not identify any of those senior executives by name.

---

[2] During the course of this litigation, Defendant VimpelCom, Ltd. changed its name to Veon Ltd. *See* ECF No. 51. For clarity, the Court will refer to the Company by its new name throughout.

The Court briefly describes the alleged violations.

### A. Acquisition of Buztel

In 2005, Veon sought to acquire an Uzbek telecommunications company in order to enter the country's market. *Id.* ¶ 31. While there was a "sound business case" for solely purchasing Uzbek's second largest operator, Unitel, Veon ultimately also purchased Buztel, a much smaller company in which Karimova held an indirect interest. *Id.* According to the complaint, Veon purchased Buztel in order to "ensure Ms. Karimova's support for [Veon's] entry into the Uzbek telecommunications market." *Id.*

Members of Veon expressed concerns about potential FCPA violations in connection with the Buztel acquisition, including to senior executives, but their complaints were ignored. *Id.* ¶ 33-36. While Veon ultimately hired a law firm to conduct a FCPA analysis of the acquisition, Veon did not disclose Karimova's interest in Buztel. *Id.* ¶ 37. The acquisition was approved.

### B. Partnership with Takilant

Veon made numerous corrupt payments to Karimova in order to permit the Company to work in Uzbekistan. The Company routed these payments through a partnership with Takilant Limited, a company owned by Karimova and which Plaintiffs describe as a shell company. *Id.* ¶¶ 39, 90. The partnership was structured so that Takilant obtained an indirect interest of approximately 7% in Unitel for $20 million in exchange for an option to sell its shares back to Unitel for between $57.5 million and $60 million, resulting in a guaranteed net profit of at least $37.5 million. *Id.* ¶ 41. In documents related to the partnership, Karimova is referred to only as a "local partner." *Id.* ¶ 42.

The Company's approval of this partnership was again conditioned on an FCPA analysis. *Id.* As with the Buztel acquisition, Veon did not disclose Karimova's control of Takilant to the firm conducting the FCPA analysis. *Id.*

Veon unanimously approved the partnership, and indeed Takilant made a net profit of around $37.5 million while Veon and Unitel were able to continue to conduct business in Uzbekistan. *Id.* ¶¶ 43-44.

### i. Payments to Takilant

Plaintiffs allege that Veon made a number of unlawful payments to Takilant. For example, in 2007 Veon paid Karimova $25 million through Takilant in order to obtain 3G frequencies for Unitel in Uzbekistan. *Id.* ¶¶ 45-48. In 2008, Veon paid an additional $2 million bribe to Karimova. *Id.* ¶ 50. Veon created false, backdated documents to conceal the payment as a "consulting fee" to the Shell Company. *Id.* ¶ 50-52. The Company admitted that it considered ways to ensure the payments avoided unwanted scrutiny. *Id.* ¶ 53.

Then in 2011, two executives conspired with others to direct an additional $30 million bribe payment to Karimova through Takilant to acquire 4G mobile communications frequencies for Unitel. *Id.* ¶ 57. At the time, however, Unitel lacked the ability to employ 4G frequencies in Uzbekistan. *Id.* According to the DPA, Veon executives, including those charged with approving the transaction, "voiced serious anticorruption concerns about the deal at the highest level of [Veon] management." *Id.* ¶¶ 58; 61. Veon again obtained an FCPA opinion but yet again did not disclose important information, such as the fact that Takilant was known to be owned by Karimova. *Id.* ¶ 59. Veon further admitted that senior executives were aware of concerns that the agreement violated the FCPA but failed to act. *Id.* ¶¶ 62-63.

In 2011 and 2012, two unnamed executives sought to conceal two $10 million bribes to Karimova through Takilant through a series of sham agreements in order to avoid scrutiny. *Id.* ¶¶ 68-70; 73. Plaintiffs also describe contemplated bribes in 2012 and 2013 that apparently were not completed. *Id.* ¶¶ 75-77.

Veon's executives falsified the Company's books and records to hide the aforementioned unlawful payments. *Id.* ¶¶ 88-89.

### C. Due Diligence and Compliance Procedures

In the DPA, Veon admitted that the Company "failed to implement adequate internal accounting controls and failed to enforce the internal accounting controls it did have in place," thereby allowing the bribes to Karimova. *Id.* ¶ 78. It also identified problems with its internal audit function, including a knowing failure to have adequate processes for reviewing contracts and conflicts of interest. *Id.* ¶¶ 79-84. Veon admitted that it had "little to no anticorruption compliance program." *Id.* ¶ 87.

### D. False and Misleading SEC Filings

Plaintiffs allege that Veon made numerous material misstatements and omissions in its SEC filings during the relevant time period. First, Veon's SEC filings issued between 2010 and 2015 discussed its increase in broadband subscriptions and revenue, including in Uzbekistan. In so doing, Veon "put the topic of the cause of its financial success at issue" thereby obligating the Company to report that the increase in subscriptions in Uzbekistan was due, at least in part, to the bribes paid to Karimova. *Id.* ¶ 97; *accord id.* ¶¶ 96, 98-103, 109-17, 123-33, 139-46, 156-59, 161-62, 167-70. Plaintiffs do not allege that the actual numbers reported were inaccurate.

Second, Veon's 2010, 2011, and 2012 Form 20-Fs stated that (1) "[t]he government authorities responsible for supervising the telecommunications industry in the Republic of

Uzbekistan are the Republic of Uzbekistan Cabinet and a specially authorized telecommunications agency" and (2) "[a]ll owners of telecommunications networks have equal rights and enjoy equal protection guaranteed by the law." *Id.* ¶ 104; *accord id.* ¶¶ 118, 134. Plaintiffs allege that the aforementioned statements were misleading as they failed to disclose the role Karimova played in the Uzbek telecommunications market or that in order to enter that market they had to engage in bribery. *Id.* ¶¶ 105; *accord id.* ¶¶ 118-19, 134-35.

Third, Veon's 2010, 2011, 2012, and 2014 Form 20-Fs stated that Veon "maintained effective internal controls." *Id.* ¶ 106; *accord id.* ¶¶ 120 (2011: "Our internal control system was designed to provide reasonable assurance regarding the reliability of financial reporting"); 136 (2012: "Based on the assessment, our management believes our company maintained effective internal control over financial reporting"); 164 (2014: "As a result of management's assessment of our internal control over financial reporting as of December 31, 2014, management concluded that that our internal control over financial reporting was effective."). Plaintiffs contend that such statements were misleading because Veon admitted that it knew that its internal controls were ineffective. *Id.* ¶ 107; *accord id.* ¶¶ 121, 137, 166.

Izosimov and van Dalen signed the Sarbanes-Oxley Act ("SOX") certifications for the 2010 Form 20-F, stating that the information in the form was accurate. *Id.* ¶ 108. Lunder and van Dalen signed the SOX certifications for the 2011 and 2012 Form 20-Fs. *Id.* ¶¶ 122, 138. Lunder and Davies signed the 2013 and 2014 Form 20-F SOX certifications. *Id.* ¶¶ 155, 165.

Finally, Veon's website stated, "In 2014, we continued to strengthen our system of governance, policies and procedures focused on anti-bribery and anti-corruption" and described the company's FCPA compliance program. *Id.* ¶ 147.

### E. Revelation of Investigation

In a Form 6-K filing on March 12, 2014, Veon announced that it was facing investigations by the SEC and Dutch authorities related to its operations in Uzbekistan. *Id.* ¶ 149. That day, the price of Veon's American Depository Receipts ("ADRs") dropped 6.3%, from $8.85 the previous day to an intraday low of $8.29. *Id.* ¶ 150. The following week, Veon disclosed that the United States Department of Justice also was investigating the company, and the ADR price declined 5.6%, from an intraday high of $9.07 to a low of $8.57. *Id.* ¶¶ 151-52.

In Veon's 2013 Form 20-F filed on May 15, 2014, the Company reiterated the existence of these investigations and provided more detail on the issues. *Id.* ¶¶ 153-54. Veon also explained that it had begun an internal investigation into its business in Uzbekistan and its relationship with Takilant, led by outside counsel with FCPA expertise. *Id.* Veon made similar disclosures in its Form 20-F filed on March 24, 2015. *Id.* ¶ 163.

After the close of the market on August 13, 2015, there were reports that United States authorities had asked their European counterparts to seize approximately $1 billion in assets related to a wide-ranging criminal probe of alleged corruption by Veon and two other companies, in connection with hundreds of millions of dollars in payments to businesses controlled by Karimova to secure wireless spectrum in Uzbekistan. *Id.* ¶ 171. After that report, Veon's ADR price fell from $5.56 on August 13 to an intraday low of $5.305 the following day. *Id.* ¶ 172. Finally, on November 3, 2015, when Veon announced that it had reserved $900 million for litigation costs related to the ongoing investigations, the company's ADRs declined 5.0%, from the previous day's high of $3.665 to an intraday low of $3.48. *Id.* ¶¶ 173-74.

## II.     Procedural History

This action was filed on November 4, 2015.  On April 27, 2016 the Court consolidated this action with another related action against Veon and appointed Westway as the Lead Plaintiff. ECF No. 31.  On December 9, 2016, Westway filed an Amended Complaint on behalf of a putative class of individuals who purchased Veon securities between December 4, 2010 and November 3, 2015.  ECF No. 45.  In the Amended Complaint, Plaintiffs assert two causes of action for violations of § 10(b), and Rule 10b-5 promulgated thereunder, and § 20(a) of the Exchange Act.

On January 20, 2017, Veon moved to dismiss the Amended Complaint.  ECF Nos. 47-49. The motion was fully briefed (*see* ECF Nos. 50, 52) and on September 19, 2017 this Court denied Veon's motion to dismiss in large part.  *In re VEON Ltd. Sec. Lit.*, No. 15-cv-08672, 2017 WL 4162342 (S.D.N.Y. Sept. 19, 2017) ("Initial MTD Op") (ECF No. 63).  This Court made three primary relevant holdings with respect to material misstatements.  First, the Court held that statements constituting "nothing more than a narrative restatement of accurate financial reporting" or even that "refer only to the financial reporting itself" are "not, without more, actionable." *Id.* at *6.  However, other statements "sufficiently place the reasons for growth in Uzbekistan at issue to make further disclosure necessary." *Id.*  Second, the Court held that Veon's disclosures regarding the government authorities in Uzbekistan were not actionable, while its statements regarding equal protection were actionable.  *Id.* at *7.  Third, the Court held that Veon's statements about its internal controls were actionable.  *Id.* at *8.[3]

---

[3] The Court also held that Plaintiffs sufficiently alleged scienter and loss causation.  However, the Court excluded from the putative class individuals who bought and sold their share prior to March 12, 2014, when Veon's disclosures began, because such individuals could not demonstrate loss causation.  *Id.* at *11-12.

Veon answered the amended complaint on February 9, 2018. ECF No. 87. Also on that date, Izosimov, Lunder, Charlier, and Davies moved to dismiss the complaint for, variously, untimely service, lack of personal jurisdiction, time bar, and failure to state a claim. ECF Nos. 79 ("Izosimov Mem"); 82 ("Lunder Mem"); 85 ("Davies Mem"). On March 12, 2018, van Dalen filed a motion to dismiss. ECF No. 97 ("van Dalen Mem"). Plaintiffs filed their opposition memorandum on April 13, 2018. ECF No. 111 ("Pl Mem"). Defendants filed their reply briefs on May 14, 2018. ECF Nos. 116 ("van Dalen Reply"); 117 ("Davies Reply"); 118 ("Izosimov Reply"); 119 ("Lunder Reply"). Accordingly, the Court considers the motion fully submitted

## DISCUSSION

### I.      Personal Jurisdiction

As an initial matter, the Court addresses whether it has personal jurisdiction over the Individual Defendants.

#### A. Legal Standard

On a motion to dismiss for lack of personal jurisdiction, "plaintiff bears the burden of showing that the court has jurisdiction over the defendant." *In re Magnetic Audiotape Antitrust Lit.*, 334 F.3d 204, 206 (2d Cir. 2003) (citation omitted). Where such a motion is raised prior to discovery, the plaintiff need only make a "*prima facie* showing of jurisdiction." *Jazini v. Nissan Motor Co., Ltd.*, 148 F.3d 181, 184 (2d Cir. 1998) (internal quotation marks and citations omitted). Accordingly, "the plaintiff must plead facts which, if true, are sufficient in themselves to establish jurisdiction as to each defendant." *S.E.C. v. Straub*, 921 F. Supp. 2d 244, 251 (S.D.N.Y. 2013) (citation and internal quotation marks omitted).

"In securities cases like this one involving securities listed on domestic exchanges, Section 27 of the Securities Exchange Act, 15 U.S.C. § 78aa (the "Exchange Act"), establishes the exclusive basis for personal jurisdiction." *Id.* at 252.  The Exchange Act "permits the exercise of personal jurisdiction to the limit of the Due Process Clause of the Fifth Amendment." *S.E.C. v. Unifund SAL*, 910 F.2d 1028, 1033 (2d Cir. 1990).  Accordingly, the Court must test Defendants' personal jurisdiction challenge "against due process standards." *Id.*

Those due process standards require "that if a defendant is 'not present within the territory of the forum, he [must] have certain minimum contacts with it such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice.'" *In re Banco Bradesco S.A. Sec. Lit.*, 277 F. Supp. 3d 600, 642 (S.D.N.Y. 2017) (quoting *Int'l Shoe Co. v. Washington*, 320 U.S. 310, 316 (1945)).[4]  The analysis consists of two prongs: (1) the "minimum contacts" prong and (2) the "reasonableness" prong.  *Id.* (citation omitted).

## B.  Analysis

### i.  Minimum Contacts

In assessing minimum contacts, courts focus on "the relationship among the defendant, the forum, and the litigation."  *Straub*, 921 F. Supp. 2d at 253 (quoting *Keeton v. Hustler Magazine, Inc.*, 465 U.S. 770, 775 (1984)).   Courts in this District have held that "[b]ecause the Exchange Act authorizes worldwide service of process, the relevant contacts . . . are those with the United States as a whole." *In re Banco Bradesco*, 277 F. Supp. 3d at 642 (collecting cases).

In order to "establish the minimum contacts necessary to satisfy due process with respect to a nonresident defendant, the plaintiff must show that its 'claim arises out of, or relates to, the defendant's contacts with the forum . . . [and that] the defendant purposefully availed itself of the

---

[4] Plaintiffs do not allege that this Court can exercise general jurisdiction over Defendants and accordingly the Court only addresses specific personal jurisdiction.

privilege of doing business in the forum and could foresee being haled into court there.'" *Id.*

(quoting *Bank Brussels Lambert v. Fiddler Gonzalez & Rodriguez*, 305 F.3d 120, 127 (2d Cir.

2002)).  While "a defendant may 'not be haled into a jurisdiction solely as a result of random,

fortuitous, or attenuated contacts, . . . [j]urisdiction is proper . . . where the contacts proximately

result from actions by the defendant himself that create a substantial connection with the

forum.'" *Straub*, 921 F. Supp. 2d at 253-54 (quoting *Burger King Corp. v. Rudzewicz*, 471 U.S.

462, 475 (1985)).  Additionally, "a defendant's physical absence from a forum is insufficient to

defeat personal jurisdiction." *Id.* at 254 (citing *Burger King*, 471 U.S. at 475).

The Supreme Court has emphasized that "'it is the defendant's actions, not his

expectations, that empower a [forum's] courts to subject him to judgment.'" *Id.* (quoting *J.*

*McIntyre Machinery, Ltd. v. Nicastro*, 564 U.S. 873, 88 (2011)).  Furthermore, while "effects in

the United States attributable to conduct abroad may be sufficient" to provide for personal

jurisdiction, "foreseeability *alone* has never been a sufficient benchmark" under the Due Process

Clause. *Id.* (citations and internal quotation marks omitted).  Thus, courts look to whether the

"foreign actor's activity in relation to the United States" is "sufficiently extensive and regular to

make [the] possibility [of litigation in the United States] a foreseeable risk of the business." *Id.*

(citation omitted).

In accordance with these principles, "courts have exercised personal jurisdiction over

individuals who orchestrated bribery schemes aimed at foreign governments *and* as part of that

scheme signed off on misleading management representations to company auditors and signed

false SEC filings." *In re Banco Bradesco*, 277 F. Supp. 3d at 643-44 (citation omitted); *accord*

*Straub*, 921 F. Supp. 2d at 255 (an "attempt to obstruct [forum state's] laws", such as through

securities fraud, can trigger personal jurisdiction).

Here, the Court determines that Plaintiffs have met their burden of alleging a *prima facie* case of personal jurisdiction as to each Individual Defendant at this early pleading stage. Regardless of the merits of Plaintiffs' claims, Plaintiffs allege that each Individual Defendant served as a high-level official in a "multinational" company that maintained "a class of publicly traded securities" registered under the Securities Exchange Act and which accordingly "was required to file periodic reports with the SEC." FAC ¶¶ 11-17.  In this capacity, as detailed below, each Defendant signed multiple SEC filings.  *See* Pl Opp at 44.  Plaintiffs allege that those filings contained materially misleading information.  *Id.*  The dissemination of these materially misleading filings allegedly resulted in harm to people and entities in the United States that had purchased Veon's securities.  FAC ¶ 1.  Even if the alleged scheme was not "principally directed" at the United States, this alleged conduct "was designed to violate United States securities regulations and was thus necessarily directed toward the United States."  *Straub*, 921 F. Supp. 2d at 255.  Indeed, through making regular SEC filings, Defendants "knew or had reason to know that any false or misleading financial reports would be given to prospective American purchasers of those securities."  *Id.* (citation omitted).

Defendants argue that merely filing SEC documents is insufficient to show minimum contacts, since Plaintiffs do not state a claim that Defendants were actually involved in any fraudulent conduct.  Yet under similar circumstances—and even where courts ultimately held that Plaintiffs failed to state a claim—courts have found minimum contacts.  *See In re Banco Bradesco*, 277 F. Supp. 3d at 643-44 (minimum contacts over officer allegedly involved in "bribery schemes aimed at the Brazilian government" who signed press releases and SEC filings); *Straub*, 921 F. Supp. 2d at 256 (collecting cases).  Importantly, unlike cases relied on by Defendants, Plaintiffs' allegations are not conclusory.  Plaintiffs allege that each Individual

Defendant signed specific SEC filings that contained allegedly misleading information. *Cf. In re Braskem S.A. Sec. Lit.*, 246 F. Supp. 3d 731, 770 (S.D.N.Y. 2017) (no minimum contacts where complaint "does not allege, concretely, that [Defendant] played *any* role in making, proposing, editing, or approving [company's] public filings in the United States").

Accordingly, Plaintiffs have sufficiently alleged minimum contacts.

### ii.  Reasonableness

The reasonableness analysis asks "whether the assertion of personal jurisdiction comports with traditional notions of fair play and substantial justice—that is, whether it is reasonable under the circumstances of the particular case." *Bank Brussels*, 305 F.3d at 129 (citation and internal quotation marks omitted). If, as here, the plaintiff sufficiently alleges minimum contacts, then "a defendant may defeat jurisdiction only by presenting 'a compelling case that the presence of some other considerations would render jurisdiction unreasonable.'" *In re Banco Bradesco*, 277 F. Supp. 3d at 643-43 (quoting *Burger King*, 471 U.S. at 477). Indeed, courts have determined that this inquiry "is largely academic in non-diversity cases brought under a federal law which provides for nationwide service of process because of the strong federal interests involved." *Straub*, 921 F. Supp. 2d at 259 (citations omitted).

Here, Defendants have not proffered compelling reasons as to why jurisdiction would be unreasonable. While litigating in the U.S. "might not be convenient," Defendants "have not made a particular showing that the burden on them would be 'severe' or 'gravely difficult.'" *Id.* Moreover, "because this case was brought under federal law, the judicial system has a strong federal interest in resolving this issue here." *Id.*

Accordingly, the Court finds that the exercise of personal jurisdiction over Defendants is not unreasonable.

## II.    Service of Process

Next, Izosimov and van Dalen argue that service of process was improper under Fed. R.

Civ. P. 12(b)(5).

### A.  Legal Standard

"Before a federal court may exercise personal jurisdiction over a defendant, the

procedural requirement of service of summons must be satisfied." *Dynegy Midstream Serv's. v.*

*Trammochem*, 451 F.3d 89, 94 (2d Cir. 2006) (citation omitted).  When "a defendant challenges

service of process, the burden of proof is on the plaintiff to show the adequacy of service."

*DeLuca v. AccessIT Group, Inc.*, 695 F. Supp. 2d 54, 64 (S.D.N.Y. 2010) (citations and internal

quotation marks omitted).  A court analyzes a Rule 12(b)(5) motion to dismiss for insufficient

service of process by looking to Rule 4, which "governs the content, issuance, and service of a

summons." *Id.* (citing Fed. R. Civ. P. 4).

Pursuant to Rule 4(m), "[i]f service is not made upon a defendant within 120 days after

filing of the complaint, the action shall be dismissed as to that defendant unless good cause for

the failure to serve is shown." *Id.* at 66 (citations and internal quotation marks omitted).[5]

"Although Rule 4(m) creates an exception for service in a foreign country pursuant to

subdivision (f) . . . this exception does not apply if . . . the plaintiff did not attempt to serve the

defendant in the foreign country." *USHA (India), Ltd. v. Honeywell Intern., Inc.*, 421 F.3d 129,

133-34 (2d Cir. 2005) (internal quotation mark and citations omitted); *accord DEF v. ABC*, 366

Fed. App'x 250, 253 (2d Cir. 2010) (Second Circuit has "previously held inapplicable the foreign

---

[5] Pursuant to a December 1, 2015 amendment, "[t]he presumptive time for serving a defendant [was] reduced from 120 days to 90 days." Fed. R. Civ. P. 4.  Since the complaint was filed in November 2015, before the amendment took effect, the Court applies the 120-day period instead. *See Cankat v. Café Iguana, Inc.*, No. 15-cv-5219, 2016 WL 1383490, at * 1, n.1 (E.D.N.Y. Apr. 7, 2016).  However, applying the 90-day period would not have altered the Court's analysis.

country exception to . . . 4(m)'s 120–day time limit for service where a party did not attempt

service within the 120–day limit and 'ha[d] not exactly bent over backward to effect service.'").

"When the foreign country exception does apply, the court use[s] a flexible due diligence

standard to determine whether service of process was timely." *In re Bozel S.A.*, No. 16-v-3739,

2017 WL 3175606, at *2 (S.D.N.Y. July 25, 2017) (citations and internal quotation marks

omitted). The plaintiff bears the burden of proving "that it exercised due diligence in not timely

serving the defendant." *Id.* (citation omitted). In this analysis, "the court assesses the

reasonableness of the plaintiff's efforts and the prejudice to the defendants from any delay." *Id.*

(collecting cases).

If the foreign country exception does not apply, "[u]nder Rule 4(m), the Court *must*

extend the time to serve if plaintiff has shown good cause, and *may* extend the time to serve even

in the absence of good cause." *DeLuca*, 695 F. Supp. 2d at 66 (citation omitted). "In

determining whether a plaintiff has shown good cause, courts weigh the plaintiff's reasonable

efforts and diligence against the prejudice to the defendant resulting from the delay." *Id.*

(citations omitted). Courts "have observed that the 'good cause' standard for delay in service of

process [under 4(m)] and the 'due diligence' standard [under the foreign country exception] are

practically the same." *In re Bozel*, 2017 WL 3175606, at *2 n.4 (citations omitted).

## B. Analysis

Here, Plaintiffs filed the initial complaint on November 4, 2015. ECF No. 1. Electronic

summonses were issued the following day. ECF No. 6. It is undisputed that Defendants were

not served within 120 days of the initial complaint.

The first issue is when the 120-day clock begins running. Plaintiffs rely on a District of

Massachusetts case to argue that the time period under 4(m) begins "once the first lead plaintiff

15

file[s] its consolidated complaint." *Wang Yan v. Rewalk Robotics Ltd.*, No. 17-cv-10169, 2018 WL 1041541, at *4 (D. Mass. Feb. 23, 2018).

As Defendants note, *Wang Yan* is not applicable here. As an initial matter, as a District of Massachusetts case it is not binding on this Court. Next, the *Wang Yan* Court did not hold that, as a rule, the period for service of process begins after a PSLRA plaintiff files its consolidated complaint. The court found "good cause" due to the "peculiar circumstances presented" in that case, including the fact that the plaintiff attempted service on some defendants only four days after the initial deadline and, "within days" of being appointed Lead Plaintiff, called Defendants' counsel to inquire about service of process. *Id.* at *1-4. Finally, courts in this District have held that, to the contrary, "[t]he filing of an amended complaint [] does not restart the 120 day period for service under Rule 4(m)." *Sikhs for Justice v. Nath*, 893 F. Supp. 2d 598, 607 (S.D.N.Y. 2012) (collecting cases).[6] Accordingly, the filing of the amended complaint here did not restart the 120-day clock.

Nevertheless, some courts have distinguished PSLRA cases since "a lead plaintiff in a securities action may not be selected until the 120-day period provided for in Rule 4(m) is already over." *In re Comverse Tech., Inc. Sec. Lit.*, 543 F. Supp. 2d 134, 147 (E.D.N.Y. 2008). While "this circumstance might not be sufficient to excuse defective service on its own," it can "weigh in favor of granting discretionary relief," especially if the plaintiff "attempted to remedy defects in the service of process after it was named lead plaintiff." *Id.*

---

[6] One court in this District did start the 120-day clock from the filing of the amended complaint. *See Gear Inc. v. LA Gear Cal., Inc.*, 637 F. Supp. 1323 (S.D.N.Y. 1986). Yet there, as in *Wang Yan*, the Court's decision was grounded in good cause for the delay in service. *Id.; see Sikhs for Justice*, 893 F. Supp. 2d at 597.

Here, whether the 120-day clock ran from November 4, 2015 (the date the initial complaint was filed) or April 27, 2016 (the date Westway was appointed Lead Plaintiff) is of no moment.  In either event, Plaintiffs did not effect service within the 120-day period.

The next issue is whether the foreign country exception applies.  As discussed below, Plaintiffs "ha[d] not exactly bent over backward to effect service." *DEF*, 366 Fed. App'x at 253.  Accordingly, the foreign country exception is inapplicable here.  Service is only timely, then, if Plaintiffs can show good cause or the Court exercises its discretion.[7]

### i. Izosimov

#### 1. Plaintiff's Reasonable Efforts and Diligence

"Good cause, or 'excusable neglect,' is evidenced only in exceptional circumstances, where the insufficiency of service results from circumstances beyond the plaintiff's control." *Feingold v. Hankin*, 269 F. Supp. 2d 268, 276 (S.D.N.Y. 2003).  Further, "[a]n attorney's ignorance of the rules, inadvertence, neglect, or mistake do not constitute good cause." *Id.*  "Courts assessing good cause also consider [] whether the plaintiff has moved under Rule 6(b) for an enlargement of time." *Cassano v. Altshuler*, 186 F. Supp. 3d 318, 322 (S.D.N.Y. 2016) (citation omitted).

Here, Plaintiffs have not shown reasonable efforts and diligence.  Izosimov was not properly served until January 9, 2018, more than 600 days after Westway was appointed Lead Plaintiff and nearly 800 days after the initial complaint was filed.  *See* Declaration of Thomas J. McKenna ¶¶ 3, 4, 19 (ECF No. 112) ("McKenna Decl").  Plaintiffs were not diligent in attempting service.  Plaintiffs did not even request a summons for Izosimov until January 6,

---

[7] Even if the Court applied the exception, its analysis would not change.  The Court considered factors applicable to both standards, which are generally interpreted in the same way. *See In re Bozel*, 2017 WL 3175606, at *2 n.4 (citations omitted).

2017, more than 250 days after Westway's appointment as Lead Plaintiff. *Id.* ¶ 8. And Plaintiffs did not attempt service on Izosimov until March 23, 2017, more than 300 days after its appointment as Lead Plaintiff. *Id.* ¶ 13. Plaintiffs never requested an extension of time.

Moreover, its service attempts were flawed. Plaintiffs state that they effected service on Izosimov at Veon's Amsterdam office on March 23, 2017. *Id.* ¶ 13. Then, Plaintiffs aver that they requested an amended summons and served Izosimov at his place of business in London on June 29, 2017. *Id.* ¶¶ 14-17. Izosimov argues that both attempts at service were improper. Izosimov had resigned from Veon years earlier, in 2011. Izosimov contends that Plaintiffs were well-aware that Izosimov no longer worked at Veon since the fact that Izosimov stepped down as CEO in 2011 is in the complaint. *See* ECF No. 1 ¶ 19; FAC ¶ 14. Further, Izosimov contends that Plaintiffs knew, or easily could have discovered, that Izosimov lived and worked in Sweden. Indeed, Izosimov's address in Sweden was publicly available online since at least 2014. *See* Declaration of Steven W. Perlstein (ECF No. 80) ("Perlstein Decl") Ex. D. Further, Plaintiffs wrote to Izosimov at his home address in Sweden on November 6, 2017. *See id.* Ex. C.

This does not constitute diligence or reasonable efforts. *See, e.g., DHL Global Forwarding Mgm't Latin America, Inc. v. Pfizer, Inc.*, No. 13-cv-8218, 2014 WL 5169033, at *5 (S.D.N.Y. Oct. 14, 2014) (no good cause for failure to attempt service on foreign Plaintiffs for over a year); *In re Crysen/Monetnay Energy Co.*, 166 B.R. 546, 551 (S.D.N.Y. 1994) (failure to show good cause for 14-month delay).[8]

## 2. Prejudice

---

[8] Izosimov lodges numerous additional objections to the propriety of Plaintiff's attempted service. *See* Izosimov Mem at 17-18. This Court need not address all of these arguments here since it determines that service was improper.

Plaintiffs argue that, in any event, there is no prejudice here. First, Plaintiffs contend that Izosimov was not prejudiced because, regardless of proper service, he had actual notice of the complaint. Second, Plaintiffs point to the early stage of this case: there has been no discovery, Izosimov had the benefit of the Court dismissing some claims before filing his own motion, and no schedules have been altered.

However, "[n]either actual notice nor absence of prejudice to the defendant provides an adequate basis for excusing noncompliance with Rule 4(m), unless plaintiff has diligently attempted to complete service." *Cassano*, 186 F. Supp. 3d at 323 (collecting cases). As discussed above, Plaintiffs have not diligently attempted service. Thus, even assuming there is no prejudice and that Izisomiv was aware of the case, there is not good cause for failure to properly serve Izosimov here.

### 3.  Discretion

Finally, a court "has the discretion to grant an extension of time to serve the defendant with or without good cause." *Hahn v. Office & Prof. Empls. Intern. Union, AFL-CIO*, 107 F. Supp. 3d 379, 382 (S.D.N.Y. 2015) (citation omitted). "In making this decision, [c]ourts will consider whether (1) the defendant had actual notice that the plaintiff had filed a claim; (2) the defendant concealed a defect in attempted service; (3) the defendant suffered prejudice as a result of plaintiff's delay; and (4) if the statute of limitations would bar the refiled action." *Osrecovery, Inc. v. One Group Intern., Inc.*, 234 F.R.D. 59, 62 (S.D.N.Y. 2005) (citation and internal quotation marks omitted). Additionally, courts consider "plaintiffs' diligence in attempting to effect service." *Id.*

Here, the Court declines to exercise such discretion.  Among other reasons, Plaintiffs do not allege that Izosimov concealed a defect in service, and Plaintiffs were not diligent in attempting service.

### ii.  van Dalen

Here again, Plaintiffs have not made an adequate showing of reasonable efforts and diligence.  Plaintiffs did not properly effect service on van Dalen until December 6, 2017, nearly 600 days after Westway was appointed Lead Plaintiff and more than 760 days after the filing of the initial complaint.  McKenna Decl ¶ 34.  As with Izosimov, Plaintiffs did not even request the issuance of a summons until January 6, 2017, well after the 120-day period expired.  *Id.* ¶ 21.  Plaintiffs aver that they received a "Proof of Service" for service upon van Dalen at Veon's Amsterdam office on April 19, 2017.  *Id.* ¶ 27.  Yet as with Izosimov, Plaintiffs knew that van Dalen stopped working at Veon in 2013.  *See* FAC ¶ 16.  Even if it had been the proper address, the service attempt was still more than 350 days after Westway was appointed Lead Plaintiff.  As discussed above, such delays do not show reasonable efforts or diligence.

Furthermore, for the same reasons elucidated above dismissal would be warranted even in the absence of prejudice, and the Court will not exercise its discretion to grant an extension.

## III.   Time Bar

Izosimov and van Dalen argue that as a result of Plaintiffs' undue delay in effecting service, the Plaintiffs' claims are time-barred.

### A.  Legal Standard

Securities Act claims must be brought within (1) "2 years after the discovery of the facts constituting the violation" or (2) "5 years after such violation."  28 U.S.C. § 1658(b).  "The former limitation is a statute of limitation, while the latter has been identified as a statute of

repose." *Fogel v. Wal-Mart de Mexico SAB de CV*, No. 13-cv-2282, 2017 WL 751155, at \*7 (S.D.N.Y. Feb. 27, 2017) (collecting cases).

With respect to § (b)(1), "the Supreme Court has instructed that 'a cause of action accrues [i] when the plaintiff did in fact discover, or [ii] when a reasonably diligent plaintiff would have discovered, 'the facts constituting the violation'—whichever comes first.'" *Id.* (quoting *Merck & Co. v. Reynolds*, 559 U.S. 633, 637 (2010)). "'[D]iscovery' as used in this statute encompasses not only those facts the plaintiff actually knew, but also those facts a reasonably diligent plaintiff would have known [,] ... irrespective of whether the actual plaintiff undertook a reasonably diligent investigation." *Id.* (quoting *Merck & Co*, 559 U.S. at 648-53).

Under Rule 4(m), "[d]uring the 120 days after the filing of the complaint the statute of limitations on the underlying claims is effectively tolled." *Ocasio v. Fashion Inst. of Tech.*, 86 F. Supp. 2d 371, 376 (S.D.N.Y. 2000) (citation omitted); *see also Bomar v. Keyes*, 162 F. 2d 136, 140 (2d Cir. 1947). "If service is not complete by the end of the 120 days, however, the governing statute of limitations again becomes applicable." *Frasca v. United States*, 921 F.2d 450, 453 (2d Cir. 1990); *accord Camotex, S.R.L. v. Hunt*, 741 F. Supp. 1086, 1092 (S.D.N.Y. 1990) ("The rule does not apply, however, to cases involving undue delays in service which have the effect of negating the fact that a complaint was ever filed.").

## B. Analysis

### i. Izosimov

The only specific allegation against Izosimov is that he signed an SOX certificate on June 30, 2011. *See* FAC ¶¶ 101, 108. Thus, the five-year statute of repose under § b(2) expired on June 30, 2016. Since Izosimov was not served until January 2018, claims against him are

untimely.  Even Plaintiff's attempt to serve Izosimov in Amsterdam in March 23, 2017 would not

meet the statute of repose's time constraints.

Plaintiffs urge this Court to apply *American Pipe*'s equitable tolling doctrine.  However, §

1658(b)(2) is "a statute of repose, which [unlike a statute of limitation] is not a limitation of a

plaintiff's remedy, but rather defines the right involved in terms of the time allowed to bring

suit." *SRM Global Master Fund Ltd P'ship v. Bear Stearns Co. LLC*, 829 F.3d 173, 176 (2d Cir.

2016) (citations and internal quotation marks omitted).  The Supreme Court has clarified that,

"[i]n light of the purpose of a statute of repose, the provision is in general not subject to tolling."

*Cal. Pub. Empls'. Ret. Sys. v. ANZ Sec., Inc.*, 137 S. Ct. 2042, 2050 (2017).  Accordingly,

equitable tolling is unavailable here.

Finally, because § 20(a) creates derivative liability, such claims are also barred.  *See*

*Dodds v. Cigna Sec., Inc.*, 12 F.3d 346, 350 n.2 (2d Cir. 1993) ("Because Section 20 merely

creates a derivative liability for violations of other sections of the Act, claims under Section 20

are governed by the limitations periods for those other sections."); *Fogel*, 2017 WL 751155, at

*6 n.10 (28 U.S.C. § 1658 "timeliness requirements apply with equal force to claims brought

under Section 20(a).")

### ii.  van Dalen

Plaintiffs seek to hold van Dalen liable for Form 20-Fs signed on June 30, 2011 (FAC ¶¶

101, 108), April 30, 2012 (*id.* ¶¶ 115, 122) and March 22, 2013 (*id.* ¶¶ 131, 138).  The statute of

repose under § b(2) for each violation expired, accordingly, on June 30, 2016, May 1, 2017, and

March 22, 2018 respectively.  Since van Dalen was not served until December 6, 2017, claims

for the Form 20-Fs signed in 2011 and 2012 are barred.

22

With respect to the March 22, 2013 Form 20-F, the Court addresses the statute of limitations under § b(1). The latest possible date at which Plaintiffs could have discovered the facts that formed the basis for this suit was November 4, 2015, the date the initial complaint was filed. Since van Dalen was not served until December 6, 2017—more than two years later—the remaining claim is untimely. Finally, equitable tolling could be applicable under § b(1). However, the Court declines to apply it here because, as discussed above, Plaintiffs were not diligent in serving Defendants. *See In re Nat'l Australia Bank Sec. Lit.*, No. 03-cv-6537, 2006 WL 3844463, at *4 (S.D.N.Y. Nov. 8, 2006) ("tolling rule applies only upon timely service of the class complaint").

## IV.   Section 10(b) Claim

Regardless of the time bar and improper service, the Court addresses the merits of the 10(b) claim. This Court has held that Plaintiffs state a claim against Veon. The question is whether they also state a claim against the Individual Defendants.

### A. Legal Standard

To survive a motion to dismiss pursuant to Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is facially plausible "when the plaintiff pleads factual content that allows the Court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556). The plaintiff must allege sufficient facts to show "more than a sheer possibility that a defendant has acted unlawfully," and accordingly, where the plaintiff alleges facts that are "'merely consistent with' a defendant's liability, it 'stops

short of the line between possibility and plausibility of entitlement to relief.'" *Id.* (quoting *Twombly*, 550 U.S. at 557).

In considering a motion to dismiss, the court accepts as true all factual allegations in the complaint and draws all reasonable inferences in the plaintiff's favor. *Goldstein v. Pataki*, 516 F.3d 50, 56 (2d Cir. 2008). However, the court need not credit "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements." *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 555). Instead, the complaint must provide factual allegations sufficient "to give the defendant fair notice of what the claim is and the grounds upon which it rests." *Port Dock & Stone Corp. v. Oldcastle Northeast, Inc.*, 507 F.3d 117, 121 (2d Cir. 2007) (citing *Twombly*, 550 U.S. at 555). In addition to the factual allegations in the complaint, the court also may consider "the documents attached to the complaint as exhibits, and any documents incorporated in the complaint by reference." *Peter F. Gaito Architecture, LLC v. Simone Dev. Corp.*, 602 F.3d 57, 64 (2d Cir. 2010) (citation and internal quotation marks omitted).

Securities fraud claims are subject to a heightened pleading standard. *ATSI Commc'ns*, 493 F.3d at 99. First, "a complaint alleging securities fraud must satisfy Rule 9(b), which requires that 'the circumstances constituting fraud . . . shall be stated with particularity.'" *Id.* (quoting Fed. R. Civ. P. 9(b)). "A securities fraud complaint based on misstatements must (1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *Id.* (citing *Novak v. Kasaks*, 216 F.3d 300, 306 (2d Cir. 2000)). "Allegations that are conclusory or unsupported by factual assertions are insufficient." *Id.* (citing *Luce v. Edelstein*, 802 F.2d 49, 54 (2d Cir. 1986)).

Second, private securities fraud actions must also comply with the Private Securities

Litigation Reform Act of 1995 ("PSLRA").  Under the PSLRA, a plaintiff must "(1) specify each

statement alleged to have been misleading [and] the reason or reasons why the statement is

misleading; and (2) state with particularity facts giving rise to a strong inference that the

defendant acted with the required state of mind." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,

551 U.S. 308, 321 (2007) (internal citation and quotation marks omitted).

### B.  Analysis

To state a claim under § 10(b) and Rule 10b-5 for misstatements, a plaintiff must allege

that the defendant "(1) made misstatements or omissions of material fact, (2) with scienter, (3) in

connection with the purchase or sale of securities, (4) upon which the plaintiff relied, and (5) that

the plaintiff's reliance was the proximate cause of its injury." *ATSI Commc'ns*, 493 F.3d at 105.

### i.  Material Misstatements or Omissions

Rule 10b–5 "renders it unlawful to make any untrue statement of a material fact or to

omit to state a material fact necessary in order to make the statements made, in the light of the

circumstances under which they were made, not misleading." *Levy v. Maggiore*, 48 F. Supp. 3d

428, 444 (E.D.N.Y. 2014) (citation and internal quotation marks omitted).  "A statement is

considered materially misleading under § 10(b) when its representations, viewed as a whole,

would have misled a reasonable investor." *Id.* (citations and internal quotation marks omitted).

When the alleged material misstatement is one of belief or opinion, "liability lies only to the

extent that the statement was both objectively false and disbelieved by the defendant at the time

it was expressed." *Fait v. Regions Fin. Corp.*, 655 F.3d 105,110 (2d Cir. 2011) (citation omitted);

*see also City of Omaha, Neb. Civilian Empls. Ret. Sys. v. CBS Corp.*, 679 F.3d 64, 67-68 (2d Cir.

2012) (applying *Fait* to Section 10(b) and 20(a) claims).  In contrast, when alleging a material

misstatement of fact, a plaintiff "need only plead facts that, if true, would be sufficient to show that the statement is, in fact, false . . . [T]he speaker's belief as to the accuracy of the statement is irrelevant." *In re Lehman Bros. Sec. and Erisa Lit.*, 131 F. Supp. 3d 241, 251-52 (S.D.N.Y. 2015).

At the motion to dismiss stage, "'a complaint may not properly be dismissed . . . on the ground that the alleged misstatements or omissions are not material unless they are so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance.'" *Litwin v. Blackstone Group, L.P.*, 634 F.3d 706, 717 (2d Cir. 2011) (quoting *Ganino v. Citizens Utils. Co.*, 228 F.3d 154, 162 (2d Cir. 2000)).

Here, as this Court determined in its Initial MTD Op, Plaintiffs sufficiently alleged that Veon made numerous material misstatements.  Those statements include:

(1) Financial disclosures that put the source of its revenues at issue without disclosing the unlawful payments, such as SEC filings issued between November 14, 2011 and August 7, 2013 (FAC ¶¶ 109, 111, 113, 123, 125, 127, 129, 139, 141, 143; *see also* Initial MTD Op at *6-7);

(2) Statements that all owners of telecommunications networks in Uzbekistan have equal rights and enjoy equal protection under the law in its 2010 through 2012 Form 20-Fs (FAC ¶¶ 104, 118, 134; *see also* Initial MTD Op at *7); and

(3) Statements touting Veon's internal controls despite admissions that Veon's management knew its internal controls were not effective, such as the 2010, 2011, 2012, and 2014 Form 20-Fs (FAC ¶¶ 107, 121, 137, 166; *see also* Initial MTD Op at *8).

**ii.  Attribution to Individual Defendants**

In cases such as this, where there are multiple defendants, the complaint must allege that each particular defendant "'made' the material misstatements." *Janus Capital Group, Inc. v. First Derivative Traders*, 564 U.S. 135, 141 (2011). As the Supreme Court explained, "the maker of a statement is the person or entity with ultimate authority over the statement, including its content and whether and how to communicate it." *Id.* at 142.

Additionally, under the "group pleading doctrine," a plaintiff may "rely on a presumption that *written* statements that are 'group-published,' e.g., SEC filings and press releases, are statements made by all individuals 'with direct involvement in the everyday business of the company.'" *City of Pontiac Gen. Empls' Ret. Sys. v. Lockheed Martin Corp.*, 875 F. Supp. 2d 359, 373 (S.D.N.Y. 2012) (quoting *Camofi Master LDC v. Riptide Worldwide, LLC*, No. 10-cv-4020, 2011 WL 1197659, at *6 (S.D.N.Y. Mar. 25, 2011)). It thus is "an exception to the requirement that the fraudulent acts of each defendant be identified separately in the complaint." *In re Vivendi Univ., S.A.*, 381 F. Supp. 2d 158, 191 (S.D.N.Y. 2003) (citation and internal quotation marks omitted). The doctrine is "extremely limited in scope." *City of Pontiac*, 875 F. Supp. 2d at 373 (citations omitted). It is "most commonly applied to 'high-ranking officers' in a corporation." *In re Cannavest Corp. Sec. Lit.*, 307 F. Supp. 3d 222, 241 (S.D.N.Y. 2018) (collecting cases). This includes CEOs and CFOs. *In re Vivendi*, 381 F. Supp. 2d at 191.

However, it is unclear whether the group pleading doctrine survives *Janus*. *See In re Banco Bradesco*, 277 F. Supp. 3d at 637-41 (describing split within District over whether group pleading doctrine still applies and holding it no longer applies); *In re Cannavest*, 307 F. Supp. 3d at 240-41 (same and holding doctrine still applies). This Court need not reach this issue since, even if the group pleading doctrine applies, Plaintiffs have not satisfied the scienter requirement.

Accordingly, without deciding the issue, the Court assumes *arguendo* that the group pleading doctrine applies.

### 1. Izosimov

First, Plaintiffs seek to hold Izosimov liable for alleged material misstatements in the 2010 Form 20-F SOX certification. That certification states, in part that, that "based on [his] knowledge, this report does not contain any untrue statement of material fact" and that it disclosed "[a]ny fraud, whether or not material, that involves management" and "[a]ll significant deficiencies and material weaknesses in the design or operation of internal control." Perlstein Decl Ex. B; *see* FAC ¶ 108. Plaintiffs contend that the certification is materially misleading because (1) the representation that Izosimov disclosed "any fraud" is "belied by the undisclosed, multi-year bribery scheme perpetrated herein" and (2) the form omitted material facts, namely that Veon knowingly failed to implement adequate controls and was aware that its internal controls were ineffective. Isozimov responds that Plaintiffs have not alleged that *he* had any reason to believe that his statements were false.

The statements are properly attributed to Izosimov because he signed the SOX certification. *City of Roseville Empls.' Ret. Sys. v. EnergySolutions, Inc.*, 814 F. Supp. 2d 395, 417 (S.D.N.Y. 2011) ("There is no dispute that . . . each of the Individual Defendants who signed the Registration Statements 'made' the statements under *Janus*"). The Court next considers whether the statements are materially misleading as to Izosimov. "The SOX certification[] contained an important qualification that the certifying officer's statements are true 'based on [his] knowledge." *Menaldi v. Och-Ziff Capital Mgm't Group LLC*, 277 F. Supp. 3d 500, 517 (S.D.N.Y. 2017). As discussed below, Plaintiffs do not state a claim that Izosimov had actual knowledge of bribery or the Company's defunct internal controls. This "undermines the

allegations that [he] knew that the SOX certifications were false." *Id.* Since the statements are predicated on the certifying officer's belief, and Plaintiffs do not sufficiently allege that Izosimov believed the statements were false or misleading, the SOX certification here is not actionable.

Second, based on Isozimov's position as Veon's CEO from October 2003 to June 2011, Plaintiffs seek to hold him liable for (1) the 2010 Form 20-F portions discussing equal protection in Uzbekistan (FAC ¶ 104) and (2) the September 7, 2011 Form 6-K that attributed Veon's growth to certain causes without mentioning the bribes paid to Karimova (*id.* ¶ 109).

As discussed above, the 2010 Form 20-F is properly attributable to Izosimov because he signed it. Further, due to his "executive position[] within the company," Izosimov is "linked to the allegedly fraudulent statements" under the group pleading doctrine. *Camofi Master*, 2011 WL 1197659, at *9; *accord In re BISYS Sec. Lit.*, 397 F. Supp. 2d 430, 441 (S.D.N.Y. 2005) ("By virtue of their high level positions at the Company throughout the Class Period, the Court is bound to infer at this stage that all three had direct involvement in [the Company's] daily affairs.").

The Form 6-K would likewise be properly attributed to Izosimov under the group pleading doctrine. However, the form was signed in September 2011, months after Izosimov had left his position at Veon in June of that year. *See In re Braksem*, 246 F. Supp. 3d at 762 (Defendant "cannot be held to have violated § 10(b) based on the Form 20-Fs" filed after Defendant left position as CEO). Accordingly, only the 2010 Form 20-F statement about equal protection is actionable as to Izosimov.

### 2. Lunder

First, Plaintiffs allege that Lunder made material misstatements by signing the 2011 through 2014 Form 20-F SOX certifications. *See* FAC ¶¶ 122, 138, 155, 165. As with Izosimov,

since Plaintiffs failed to plead that Lunder knew that the statements were misleading, the statements are not actionable.

Second, Plaintiffs seek to hold Lunder liable for statements in the 2011 and 2012 Form 20-Fs regarding equal protection in Uzbekistan. *See id.* ¶¶ 118, 134. As discussed above, due to his role as CEO and the fact that he signed the forms, the statements were "made" by him.

Third, based on his role as CEO from July 2011 until April 2015, Plaintiffs attribute liability for (1) statements regarding the reasons for the Company's growth in Uzbekistan on six Form 6-Ks issued between May 15, 2012 and November 6, 2013 (FAC ¶¶ 123, 125, 127, 129, 139, 143), and (2) statements on the Company's website.

For the reasons discussed above, Lunder can be held liable under the group pleading doctrine for the Form 6-Ks issued while he served as Veon's CEO. However, the group pleading doctrine is "limited" in scope and does not extend to statements on Veon's website, since "it is far from obvious that senior corporate officers would be involved in drafting text for a corporate website." *DeAngelis v. Corzine*, 17 F. Supp. 3d 270, 281 (S.D.N.Y. 2014) (citation and internal quotation marks omitted). The complaint does not provide any other factual allegations tying Lunder to the website.

### 3. van Dalen

Plaintiffs seek to hold van Dalen liable for: (1) false statements about the Company's internal controls in the Company's Form 20-Fs for 2010 through 2012, based on his signature on the SOX certifications (FAC ¶¶ 108, 122, 138); (2) Form 6-Ks issued between September 2011 and November 2013 that discuss the reasons for the Company's growth in Uzbekistan, based on his position as CFO during the relevant time period (FAC ¶¶ 109, 111, 113, 123, 125, 127, 129, 139, 143); and (3) the 2010 through 2012 Form 20-Fs that discuss equal protection in

30

Uzbekistan, again based on his position as CFO and the fact that he signed the documents (FAC ¶¶ 104, 118, 134).

As with Izosimov, since Plaintiffs do not sufficiently plead that van Dalen knew the statements in the Form 20-F SOX certifications were false, he cannot be held liable for them. However, for the reasons articulated above, the Form 6-Ks attributing causes to Veon's growth and the Form 20-Fs discussing equal protection are actionable misstatements as to van Dalen.

### 4. Davies

Plaintiffs allege that Davies is liable for (1) statements regarding Veon's internal controls in the 2013 and 2014 Form 20-Fs, which Davies signed during his tenure as CFO from November 7, 2013 to December 31, 2017 (FAC ¶¶ 155, 165), (2) three Form 6-Ks issued between May 15, 2013 and November 6, 2013 that discuss the reasons for Veon's growth in Uzbekistan, based on Davies' position as CFO (FAC ¶¶ 129, 141, 143); and (3) statements on Veon's website made while he was CFO.

First, the complaint does not allege any material misstatement in the 2013 Form 20-F. *See* FAC ¶¶ 154-55. Moreover, as to the 2014 Form 20-F Plaintiffs again have not sufficiently pled that Davies knew any statements were materially false or misleading. As with his co-defendants, then, Davies cannot be held liable.

Second, according to Plaintiffs' own memorandum, Davies' tenure as CFO did not begin until November 7, 2013—after all of the Form 6-Ks Plaintiffs claim are actionable against him were issued. Davies Reply at 6 (citing Pl Mem at 27). As discussed above, Davies cannot be held liable for statements issued before he began serving as Veon's CFO.

Finally, for the reasons adduced above, Davies cannot be held liable for the statements on the website. Accordingly, Plaintiffs have not pled any material misstatement as to Davies.

### iii. Scienter

Next, the Court addresses whether Plaintiffs have alleged scienter. "The requisite state of mind in a Rule 10b–5 action is 'an intent to deceive, manipulate or defraud.'" *Ganino*, 228 F.3d at 168 (quoting *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193 n.12 (1976)). The PSLRA, "which governs scienter pleading in securities fraud actions . . . requires that a plaintiff's complaint 'state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind.'" *Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital, Inc.*, 531 F.3d 190, 194 (2d Cir. 2008) (quoting 15 U.S.C. § 78u-4(b)(2)). In this analysis, the Court recalls that "it is possible to raise the required inference with regard to a corporate defendant without doing so with regard to a specific individual defendant." *Id.* at 195.

This state of mind "can be established 'either (a) by alleging facts to show that defendants had both motive and opportunity to commit fraud, or (b) by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness.'" *Ganino*, 228 F.3d at 168-69 (citations omitted). Here, Plaintiffs do not allege liability under the motive and opportunity prong. *See* Initial MTD Op at *10. Thus, the Court only addresses the second prong.

Recklessness in the securities fraud context is "at the least, conduct which is highly unreasonable and which represents an extreme departure from the standards of ordinary care to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it." *In re Carter-Wallace, Inc., Sec. Lit.*, 220 F.3d 36, 39 (2d Cir. 2000) (citation and internal quotation marks omitted). The requisite strong inference of recklessness can be established where a complaint sufficiently alleges that Defendants:

> (1) benefitted in a concrete and personal way from the purported fraud; (2) engaged in deliberately illegal behavior; (3) knew facts or had access to information suggesting

32

that their public statements were not accurate; or (4) failed to check information they had a duty to monitor.

*Teamsters Local 445*, 531 F.3d at 194 (quoting *Novak*, 216 F.3d at 311).

With respect to option 3, "[t]o determine whether a plaintiff has specifically alleged defendants' knowledge of facts or access to information contradicting their public statements, Second Circuit cases uniformly rely on allegations that [1] *specific* contradictory information was available to the defendants [2] *at the same time* they made their misleading statements." *In re PXRE Grp., Ltd., Sec. Lit.*, 600 F. Supp. 2d 510, 536 (S.D.N.Y. 2009) (internal citations and quotation marks omitted); *see also In re Refco, Inc. Sec. Lit.*, 503 F. Supp. 2d 611, 649 (S.D.N.Y. 2007) ("[S]cienter may be found where there are specific allegations of various reasonably available facts, or 'red flags,' that should have put the officers on notice that the public statements were false."). The complaint "must specifically identify the reports or statements containing this information." *Novak*, 216 F.3d at 309.

Further, "[c]ourts in this Circuit have long held that accusations founded on nothing more than a defendant's corporate position are entitled to no weight." *Plumbers & Steamfitters Local 773 Pension Fund v. Canadian Imperial Bank of Commerce*, 694 F. Supp. 2d 287, 300 (S.D.N.Y. 2010) (citation omitted); *accord In re Sotheby's Holdings, Inc.*, No. 00-cv-1041, 2000 WL 1234601, at *7 (S.D.N.Y. Aug. 31, 2000) ("It is well established that boilerplate allegations that defendants knew or should have known of fraudulent conduct based solely on their board membership or executive positions are insufficient to plead scienter.") (collecting cases). Indeed, "officers cannot be imputed with knowledge about all transactions which occur at a corporation for purposes of pleading scienter." *In re Rhodia S.A. Sec. Lit.*, 531 F. Supp. 2d 527, 550 (S.D.N.Y. 2007) (citation omitted).

In the final analysis, "[t]aking into account plausible opposing inferences, a court should find the complaint to sufficiently allege scienter where 'a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged.'" *Varghese v. China Shenghuo Pharm. Holdings, Inc.*, 672 F. Supp. 2d 596, 607 (S.D.N.Y. 2009) (citing *Tellabs*, 551 U.S. at 314). As compared to the "motive and opportunity" prong, with the recklessness prong "the strength of the circumstantial allegations must be correspondingly greater." *Kalnit v. Eichler*, 264 F.3d 131, 142 (2d Cir. 2001) (internal quotation marks and citation omitted). Finally, "the Court must consider whether 'all of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard.'" *In re PXRE Group*, 600 F. Supp. 2d at 536 (quoting *Tellabs*, 551 U.S. at 323).

### 1. Izosimov

Plaintiffs primarily seek to show scienter based on Izosimov's position at CEO from 2005 until 2011. Essentially, Plaintiffs assert that it is implausible that, as CEO, Izosimov entered into the partnership with Takilant, and allowed the Company to transfer millions of dollars to Takilant, without knowing the identity of the "local partner." Plaintiffs point to:

- A December 13, 2005 Company Finance Committee meeting, during which "senior management" discussed political reasons to purchase Buztel, and an unidentified employee raised concerns about "FCPA issues" with management. FAC ¶¶ 32-35; Pl Mem at 29-31.

- A December 14, 2005 Veon Board meeting where unidentified employees expressed concerns about FCPA issues with the Buztel acquisition. FAC ¶¶ 33-36; Pl Mem at 29-31.

- The fact that Izosimov never questioned why the "local partner" was not being discussed, even though minutes from an August 28, 2006 Finance Committee meeting declined to identify the local partner by name and noted the "'extremely sensitive' nature of the issue." FAC ¶ 42; Pl Mem at 31-32.

- The Company's failure to conduct any FCPA analysis concerning the consulting services agreement with Takilant even though Takilant had originally said it did not contemplate entering into a consultancy agreement with Veon. Pl Mem at 33.

However, Plaintiffs do not allege that Izosimov was actually present during the relevant meetings, read the meeting minutes, or otherwise knew about the alleged misconduct. Plaintiffs routinely refer only generally to "[Veon] management." *See, e.g.*, FAC ¶ 39. Moreover, the DPA Statement of Facts states that only "*[c]ertain* [Veon] management" knew of Karimova's interest in Buztel. DPA ¶ 14 (emphasis added).

Courts in this Circuit have rejected similar attempts to hold senior officers liable based on their position and complaints to "senior management" in the absence of specific allegations that the named defendant actually received information about the fraud. *See City of Brockton Ret. Sys. v. Avon Prods., Inc.*, No. 11-cv-4665, 2014 WL 4832321, at *20-21 (S.D.N.Y. Sept. 29, 2014) (allegations that CEO knew about bribes to Chinese officials based on her position, meetings with officials in China, and a whistleblower letter discussing possible FCPA violations received by "senior [] executives" insufficient to show CEO's scienter); *Johnson v. Siemens AG*, No. 09-cv-5310, 2011 WL 1304267, at *16 (E.D.N.Y. Mar. 31, 2011) (allegations that senior management generally had access to reports and statements providing contrary information insufficient without specific allegations that individual defendants "ever received any of the reports identified" in the complaint); *In re PXRE Group*, 600 F. Supp. 2d at 537 (differentiating

facts of case, where plaintiff failed to allege that concerns "were ever brought to the attention of the individual Defendants" from *Ruskin v. TIG Holdings*, No. 98-cv-1068, 2000 WL 1154278 (S.D.N.Y. Aug. 14, 2000), where complaint alleged individual defendant received memorandum informing him of contrary information). Izosimov's position as CEO thus "is too general an allegation from which to conclude [Izosimov] had actionable data alerting him to the falsity of his statements." *Plumbers*, 694 F. Supp. 2d at 300.

Second, Plaintiffs appear to allege scienter based on Izisomiov's signature on the 2010 Form 20-F. However, a "plaintiff cannot raise an inference of fraudulent intent based on the signing of a certification without alleging any facts to show a concomitant awareness of or recklessness to the materially misleading nature of the statements." *Plumbers & Pipefitters Nat. Pension Fund v. Orthofix Intern. N.V.*, 89 F. Supp. 3d 602, 615 (S.D.N.Y. 2015) (collecting cases); *In re MBIA, Inc. Sec. Lit.*, 700 F. Supp. 2d 566, 590 (S.D.N.Y. 2010) ("allegations that [Senior Executives] signed MBIA's SEC disclosures and Sarbanes–Oxley certificates are insufficient to support a strong inference of recklessness in the absence of more particularized allegations"). Here, as discussed above Plaintiffs have not provided facts sufficient to allege awareness or recklessness.

Finally, Plaintiffs allege that Izisomiov's resignation creates a strong inference of scienter. Resignations, while insufficient alone, can give rise to an inference of scienter. *See In re OSG Sec. Lit.*, 12 F. Supp. 3d 622, 633 n.84 (S.D.N.Y. 2014) (collecting cases). Nevertheless, such an inference is not always appropriate as "there are any number of reasons that an executive might resign, most of which are not related to fraud." *In re BISYS*, 397 F. Supp. 2d at 446.

Here, Plaintiffs do not provide factual allegations "linking the [] resignations and the alleged fraud." *See id.* at 447. The mere fact that each defendant resigned "with the CEO and

CFO positions being vacated, filed [sic], and then vacated again," Pl Mem at 38, does not

support an inference of conscious misbehavior or recklessness. *See In re BISYS*, 397 F. Supp. 2d

at 447.

### 2.  Lunder

In its opposition to Lunder's motion to dismiss, Plaintiffs seek to show Lunder's scienter

by virtue of his position as Chairman of the Company's Finance Committee and the Board in

2005.  Pl Mem at 29-33.  Plaintiffs did not make any allegations about Lunder's role on the

Finance Committee or Board in its complaint.  Indeed, Plaintiffs pled only that Lunder "served

as the Company's CEO from July 2011 to April 2015" and "served [sic] a member of the

Management Board."  FAC ¶ 13.

Lunder contends that the Court should not consider allegations regarding these corporate

positions in 2005, since they were not pled in the complaint.  Courts in this Circuit have held that

a plaintiff "is not permitted to interpose new factual allegations or a new legal theory in opposing

a motion to dismiss." *Uddoh v. United Healthcare*, 254 F. Supp. 3d 424, 429 (E.D.N.Y. 2017)

(collecting cases).

Even if the Court considered these new allegations, Plaintiffs would not meet their

burden to show scienter for the reasons elucidated above.  Its new allegations with respect to

Lunder are stronger as, given Lunder's role as Chair of the Finance Committee, he more likely

was aware of the FCPA concerns raised during the 2005 and 2006 meetings.  Nevertheless, as

with Izosimov, Plaintiffs do not provide specific factual allegations that Lunder was aware of

such concerns or other contradictory information at the time he made any alleged material

misstatements.

Additionally, as discussed *supra* the facts that Lunder signed Form 20-Fs and Form 6-Ks and that he resigned in April 2015 are insufficient to support an inference of scienter.

### 3.  van Dalen

Plaintiffs essentially allege that van Dalen was reckless because during his tenure as CFO and a member of the Management Board, from September 2010 to November 2013, (1) Veon paid over $49 million in bribes; (2) Veon admitted its internal controls were inadequate and "these duties were in the portfolio of CFO van Dalen," meaning that van Dalen failed to attend to them; and (3) a Veon employee emailed "several senior VEON executives" and an in-house attorney to raise concerns about potential FCPA violations, and ultimately escalated the concern to "the highest levels within VEON management."  Pl Mem at 33-35.  Plaintiffs contend that these red flags put van Dalen on notice.

For the same reasons discussed above, these general allegations, which do not specifically allege any knowledge by van Dalen, are insufficient to meet the scienter requirement.  Likewise, his resignation alone is insufficient to support an inference of scienter.

### 4.  Davies

Plaintiffs allege that Davies either knew or was reckless in not knowing about the bribery scheme because: (1) Dutch law enforcement raided Veon's offices on March 2014, while Davies was CFO and a member of the Management Board; (2) Davies was responsible for the Company's financial reporting and internal controls, and represented on Veon's website that the internal controls were efficient; and (3) he played a "crucial role in financial reporting" as CFO from 2013 to 2017, which "should have alerted him" to the lack of internal controls.  Pl Mem at 37.

First, Plaintiffs do not plead the March 2014 raid in their complaint. Accordingly, the Court need not consider it. *See Uddoh*, 254 F. Supp. at 429. In any event, there are no allegations either in the complaint or Plaintiffs' brief that Davies had any knowledge of improper activities during the raid. Further, the following day Veon disclosed that it was facing investigation by the Dutch authorities as well as the SEC, and further established a committee to oversee an internal investigation. FAC ¶¶ 149, 154. Such actions "weaken[] rather than strengthen[] an inference of scienter." *Slayton v. Am. Exp. Co.*, 604 F.3d 758, 777 (2d Cir. 2010) (citations omitted). Second, as discussed above Davies' role as CFO and his resignation do not give rise to an inference of scienter.

## V.   Section 20(a) Claim

### A.  Legal Standard

To establish a prima facie case of control person liability, a plaintiff must show "(1) a primary violation by the controlled person, (2) control of the primary violator by the defendant, and (3) that the defendant was, in some meaningful sense, a culpable participant in the controlled person's fraud." *ATSI Commc'ns,* 493 F.3d at 108 (citing *S.E.C. v. First Jersey Sec., Inc.*, 101 F.3d 1450, 1472 (2d Cir. 1996)).

"Once the plaintiff makes out a prima facie case of § 20(a) liability, the burden shifts to the defendant to show that he acted in good faith, and that he did not directly or indirectly induce the act or acts constituting the violation." *First Jersey*, 101 F.3d at 1473 (internal citations and quotation marks omitted). "To meet the burden of establishing good faith, the controlling person must prove that he exercised due care in his supervision of the violator's activities in that he maintained and enforced a reasonable and proper system of supervision and internal control[s]." *Id.* (internal citations and quotation marks omitted).

### B.  Analysis

#### 1.   Primary Violation

This Court has already held that Plaintiffs state a claim for a primary violation against Veon. *See* Initial MTD Op.

#### 2.   Control

"Control over a primary violator may be established by showing that the defendant possessed 'the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract, or otherwise.'" *First Jersey Sec.*, 101 F.3d at 1472-73 (internal quotation marks and citation omitted).  "Actual control is essential to control person liability." *In re Alstom SA*, 406 F. Supp. 2d 433, 486 (S.D.N.Y. 2005) (collecting cases).  "Moreover, the Section 20(a) defendant must not only have actual control over the primary violator, but have actual control over the transaction in question." *Id.* at 487 (collecting cases).   "However, [f]or purposes of Section 20(a) liability, actual control requires only the ability to direct the actions of the controlled person, and not the active exercise thereof." *In re Tronox, Inc. Sec. Lit.*, 769 F. Supp. 2d 202, 207 (S.D.N.Y. 2011) (citation and internal quotation marks omitted).

In this analysis, "courts have held that officer or director status alone does not constitute control for the purposes of Section 20(a) liability." *In re Alstom*, 406 F. Supp. 2d at 487 (collecting cases).  "Nonetheless, corporate officers usually are presumed to possess the ability to control the actions of their employees [and][d]irectors and officers who sign registration statements or other SEC filings are presumed to control those who draft those documents." *In re BioScrip, Inc. Sec. Lit.*, 95 F. Supp. 3d 711, 741 (S.D.N.Y. 2015) (citation and internal quotation marks omitted).

"Allegations of control are not averments of fraud and therefore need not be pleaded with particularity." *In re Tronox*, 769 F. Supp. 2d at 208 (internal quotation marks and citation omitted). Accordingly, at the pleading stage Rule 8's standard governs. *Id.* Additionally, "[w]hether a person is a 'controlling person' is a fact-intensive inquiry, and generally should not be resolved on a motion to dismiss." *Id.* (internal quotation marks and citation omitted).

Here, Plaintiffs allege that each Individual Defendant was a control person because they "each signed VEON's SEC filings during the Class period" and were "in a position to control the contents of VEON's SEC filings and press releases." Pl Mem at 51. Defendants respond that Plaintiffs have not pled sufficient factual allegations to support this claim. Further, Defendants argue that control person liability is impossible since the complaint alleges that "[Veon] controlled the Individual Defendants and all of its employees." FAC ¶ 189.

Given the early pleading stage and flexible pleading standards, it is "not implausible that plaintiffs could develop a record that could support a finding of control," *In re Refco*, 503 F. Supp. 2d at 638, as to Izosimov, Lunder, and van Dalen based on the actionable SEC filings they signed during their tenure as executive officers. *See In re Fannie Mae 2008 Sec. Lit.*, 742 F. Supp. 2d 382, 416 (S.D.N.Y. 2010) (control pled because "CEO[] was not only [company's] most senior officer, but he signed the 10–Ks and 10–Qs that contained many of [company's] purported misstatements, as did [] [company's] CFO."). Since, as discussed above, no alleged misstatements are properly attributed to Davies, he cannot be liable as a control person.

Further, Plaintiffs' allegation that Veon controlled the officers is of no moment since "[a]s a matter of logic [], it makes little sense to say that controlling entities should escape liability on the grounds that other entities in turn controlled them." *In re Refco*, 503 F. Supp. 2d at 638.

### 3. Culpable Participation

"The Second Circuit has repeatedly stated that 'culpable participation' is the third element of a prima facie control liability case," including at the motion to dismiss stage. *In re: EZCorp, Inc. Sec. Lit.*, 181 F. Supp. 3d 197, 212 (S.D.N.Y. 2016) (collecting cases).  However, the Circuit has not explicitly defined that term. *Id.*  As a result, there is a split as to whether the PSLRA's heightened pleading standard applies to the culpable participation prong. *Id.*

The majority of courts in this District hold that since "'culpable participation' is an element of a Section 20(a) claim," it "must be pleaded with the same particularity as scienter." *Special Situations Fund III QP, L.P. v. Deloitte Touche Tohmatsu CPA, Ltd.*, 33 F. Supp. 3d 401, 438 (S.D.N.Y. 2014) (collecting cases); *accord S.E.C. v. Yorkville Advisors, LLC*, 305 F. Supp. 3d 486, 511 (S.D.NY. 2018) ("Among the district courts in this Circuit, the weight of well-reasoned authority requires the plaintiff to prove some level of culpable participation at least approximating recklessness in the section 10(b) context.").  Accordingly, the plaintiff must meet the PSLRA's standard of alleging facts indicating "that the controlling person knew or should have known that the primary violator, over whom that person had control, was engaging in fraudulent conduct." *Special Situations*, 33 F. Supp. 3d at 439 (citation and internal quotation marks omitted).

A minority of courts in this District have held that "culpable participation is a less demanding standard than scienter." *Id.* at 438 (collecting cases); *accord S.E.C. Lek Sec. Corp*, 276 F. Supp. 3d 49, 63-64 (S.D.N.Y. 2017) ("[T]here is no required state of mind for a defendant's culpable participation in a Section 20(a) offense.").  Thus, Rule 8's pleading standard would govern the analysis. *See In re Tronox, Inc. Sec. Lit.*, No. 09-cv-6220, 2010 WL 2835545, at *5 (S.D.N.Y. June 28, 2010) (collecting cases).

However, "[t]he minority, notice pleading standard seems to read out the 'culpable participation' prong entirely," essentially allowing "[n]aked allegations of control" to suffice. *EZCorp*, 181 F. Supp. 3d at 212 (quoting *Pension Comm. of Univ. of Montreal Pension Plan v. Banc of Am. Sec., LLC*, 446 F. Supp. 2d 163, 190 (S.D.N.Y. 2006)).  Since the Circuit has repeatedly held that culpable participation is an element of a control person claim, then this Court cannot simply write out an element of that claim.  Accordingly, this Court will follow the majority rule and apply the PSLRA's heightened pleading standard when assessing culpable participation.

Here, Plaintiffs have failed to plead scienter as to any defendant.  Accordingly, Plaintiffs have not stated a claim that any defendant was a "culpable participant."  *See In re Alstom*, 406 F. Supp. 2d at 496 (dismissing § 20(a) claim because "[a]s discussed in the analysis of [Defendant's] scienter under Section 10(b), the Complaint contains no allegations supporting any reasonable inference that [Defendant] knew or should have known about the [] Fraud.").

## CONCLUSION

For the foregoing reasons, the claims against the Individual Defendants are DISMISSED.  The Clerk of Court is kindly requested to terminate the motions at ECF Nos. 78, 81, 84, and 96.

**SO ORDERED.**

**Dated**:   August 30, 2018
          New York, New York

**ANDREW L. CARTER, JR.**
**United States District Judge**