**THE ROSEN LAW FIRM, P.A.**
Phillip Kim, Esq. (PK 9384)
Laurence M. Rosen, Esq. (LR 5733)
Jonathan Horne, Esq. (JH 7258)
275 Madison Avenue, 40th Floor
New York, New York 10016
Telephone: (212) 686-1060
Fax: (212) 202-3827
Email: pkim@rosenlegal.com
Email: lrosen@rosenlegal.com
Email: jhorne@rosenlega.com

*Lead Counsel for Lead Plaintiff and Class*

[Additional counsel on signature page]

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re VEON Ltd. Securities Litigation | **CASE No.: 1:15-cv-08672-ALC-OTW**<br><br>**PLAINTIFF LVOV'S AMENDED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS**<br><br>**CLASS ACTION** |

Lead Plaintiff Boris Lvov, for his complaint against Defendant Veon Ltd., f/k/a VimpelCom Ltd. (referred to herein as "VimpelCom"), alleges the following based on personal knowledge as to himself and his own acts and information and belief as to all other matters.

## I. NATURE OF THE ACTION[1]

1. This is a securities class action on behalf of all persons or entities that purchased VimpelCom American Depositary Shares ("ADSs") between December 4, 2010, and November 3, 2015, inclusive ("Class Period") and who held such ADSs through at least one corrective disclosure identified below, pursuing claims for Defendants' violations of the Securities Exchange Act of 1934 ("Exchange Act") and Rule 10b-5 promulgated thereunder.

2. During the Class Period, VimpelCom assured investors that (a) it had effective internal controls, (b) it succeeded in Uzbekistan because of its business savvy, and (c) all telecommunications providers had equal access to the Uzbek market and received equal protection of Uzbek law.

3. On February 10, 2016, VimpelCom entered into a deferred prosecution agreement in which it admitted that it had paid more than $100 million in bribes so that it could do business in Uzbekistan.

4. VimpelCom admitted that it paid its first bribe in 2006.

5. VimpelCom admitted that it paid the last bribe in May 2012.

6. VimpelCom admitted that two of its executives had conspired to pay the bribes.

7. VimpelCom admitted that several of its "senior executives" were aware that VimpelCom might be paying the bribes.

8. VimpelCom pled guilty to two felonies concerning the bribes. It paid $795 million

---

[1] Unless otherwise noted, all ***bold italicized*** emphases are added.

to settle the criminal and civil charges that had been leveled against it by Dutch and U.S. prosecutors and the U.S. Securities and Exchange Commission ("SEC").

9. VimpelCom admitted that despite its Class Period statements to the contrary, it had "failed to implement adequate internal accounting controls and failed to enforce the internal controls it did have in place."

10. VimpelCom admitted that it had engaged in a scheme to falsify its books and records. The bribes were falsely recorded on VimpelCom's books and records as consulting or professional services, or acquisitions of intangible assets. These books and records were used to create VimpelCom's financial statements, which it filed with the SEC.

11. Because VimpelCom secured market access through bribes, its statements about equal access to Uzbek markets and equal protection of Uzbek law were false.

12. Thus, VimpelCom admitted that it had made materially false statements to investors which at least two of its executives knew were false.

13. During the Class Period, a series of partial corrective disclosures revealed that VimpelCom's statements had been false. Each of these disclosures caused VimpelCom's stock price to fall, damaging investors.

14. In early 2012, a VimpelCom competitor in Uzbekistan had its licensed revoked. The government alleged that the entity had not paid taxes. VimpelCom knew better: the competitor lost its license because it had stopped paying bribes. Questioned about the competitor's fall from grace in Uzbekistan, VimpelCom told investors they had nothing to worry about because VimpelCom followed the law and even gloated that it would poach some of the competitor's customers.

15. In 2012, TeliaSonera AB, which competes with VimpelCom in Uzbekistan, was accused in a television program of paying bribes to Uzbek officials through a Gibraltar company, Takilant Ltd. On January 8, 2013, before trading, TeliaSonera denied that it had paid bribes, but

admitted that after an investigation, the only Takilant beneficial owner it had been able to find was Gayane Avakyan. At the time of the bribes, Avakyan was in her early twenties—and a friend of the Uzbek President's daughter Gulnara Karimova. The news was concerning to VimpelCom investors because it had been publicly reported that VimpelCom itself had done business with Takilant. On January 8, 2013, the price of VimpelCom's ADSs fell 3.7%, damaging investors. VimpelCom continued to deny any misconduct.

16. Swedish prosecutors commenced a criminal investigation against TeliaSonera. On March 24, 2014, before trading, it was reported that Swedish prosecutors had stated in a filing that "there is now a concrete basis, including information on control over assets, which gives reason to suspect that Gulnara Karimova, who also served as a public official during the time period relevant for the case, was the one who orchestrated, controlled, and also was the one who primarily benefited from the procedure." On the news that an investigation was bearing out the allegations against TeliaSonera, the price of VimpelCom's ADSs fell 3.6%, damaging investors.

17. During the Class Period, Telenor Group, a company majority-owned by the Norwegian state, held about a third of VimpelCom's shares. On December 4, 2014, a Norwegian Member of Parliament announced that the Parliament would haul Telenor and VimpelCom in for a public hearing on the allegations that VimpelCom had paid bribes. The news revealed the risk that the Norwegian state might force Telenor to sell its VimpelCom shares. That day, the price of VimpelCom's ADSs fell 6.3%, damaging investors.

18. On December 8, 2014, Telenor's President announced that he was resigning his seat on VimpelCom's board of directors, citing the allegations that VimpelCom may have paid bribes in Uzbekistan. On December 8, 2014, the price of VimpelCom's ADSs fell 7.3%, damaging investors.

19. The investigations of VimpelCom's bribery reached ten-figure asset seizures in the summer of 2015. On August 14 and 20, respectively, it was revealed that U.S. prosecutors were

seeking to freeze $1 billion of Takilant's money and that Swiss prosecutors had seized $828 million and even expanded their probe against Karimova. These disclosures caused the price of VimpelCom's ADSs to fall from $5.56 on August 13 to $4.51 on August 21, damaging investors.

20. But the scope of VimpelCom's misconduct and liability only became clear in late October/early November 2015. On Friday October 30, 2015, before trading, a Norwegian Minister announced that she had received new information that caused her to lose confidence in the chairman of Telenor's board, whose resignation was announced contemporaneously. On Saturday October 31, Bloomberg published a link to an October 30 Norwegian-language article setting out the information which had caused the Minister to lose confidence: documents that showed Telenor's Board had discussed bribery concerns contemporaneously with Takilant investment and that it had access to significantly more information than previously disclosed. The documents suggested that high-level Telenor directors and executives knew of the bribes, which in turn suggested that high-level ***VimpelCom*** directors and executives did as well. The price of VimpelCom's ADSs fell a combined 4.9% over October 30 and the next trading day, November 2, 2015, damaging investors.

21. On November 3, 2015, VimpelCom announced that it was recognizing an accounting reserve of $900 million in connection with the investigations over the bribes it had paid in Uzbekistan. That day, the price of VimpelCom's ADSs fell 4.6%, damaging investors.

22. VimpelCom paid approximately $900 million to investigate and settle claims arising from paying bribes in Uzbekistan. That is $900 million that VimpelCom would never have had to spend had its statements to investors been true. By concealing the scope of its misconduct and the pervasiveness of corruption in its operations, VimpelCom defrauded investors.

## II. JURISDICTION AND VENUE

23. The claims asserted herein arise under and pursuant to §§ 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a) and Rule 10b-5 promulgated thereunder by the SEC)

(17 C.F.R. § 240.10b-5).

24. This Court has jurisdiction over the subject matter of this action pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa), and 28 U.S.C. § 1331.

25. Venue is proper in this Judicial District pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa and 28 U.S.C. § 1391(b). Many of the acts and transactions alleged herein, including the preparation and dissemination of materially false and misleading information, occurred in substantial part in this Judicial District.

26. In connection with the acts, conduct and other wrongs alleged in this Complaint, VimpelCom, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mails, interstate telephone communications and the facilities of the national securities exchange.

## III. THE PARTIES

### A. Plaintiff

27. Lead Plaintiff Boris Lvov, as set forth in his previously-filed certification, which is incorporated by reference, purchased VimpelCom ADSs at artificially inflated prices during the Class Period and was damaged thereby.

### B. Defendant

28. Defendant VimpelCom is a multinational telecommunications company headquartered in the Netherlands and incorporated in Bermuda. During the Class Period, its ADSs traded in the U.S. under ticker VIP, at first on the New York Stock Exchange, then beginning September 10, 2013, on the NASDAQ.

29. VimpelCom conducts its operations through direct and indirect subsidiaries in various countries around the world. One of its business units is responsible for its operations in the Commonwealth of Independent States ("CIS"), an organization of former Soviet Republics.

Uzbekistan is a member of CIS. Regional heads of VimpelCom's businesses have been members of VimpelCom's senior management group. VimpelCom is headed by a Supervisory Board ("Board").

30. From 1996 through the present, VimpelCom has continuously maintained a class of publicly traded securities registered pursuant to Section 12(b) of the Exchange Act, 15 U.S.C. § 78*l*, and was required to file periodic reports with the SEC under Section 15(d) of the Exchange Act, 15 U.S.C. § 78o(d). Accordingly, VimpelCom was an "issuer" under the FCPA. 15 U.S.C. § 78dd-1(a).

**C. Other Relevant Entities and Individuals**

31. Alfa Group is a Russian conglomerate founded by Mikhail Fridman.

32. Altimo Coöperatief U.A. is a wholly-owned subsidiary of Alfa Group. During the Class Period, Altimo held between 31.4% and 56.2% of VimpelCom's shares, with a voting interest of between 25.0% and 47.9%. Some of Altimo's interest consisted of shares and some of its interest consisted of ADSs, each of which was convertible into one share.

33. Aqute Holdings & Investments is a subsidiary of Alfa Group.

34. Andrew Mark Davies ("Davies") has served as the Company's Chief Financial Officer ("CFO") from November 2013 through all relevant times.

35. Bakrie Uzbekistan Telecom ("Buztel") is a mobile telecommunications operator in Uzbekistan that was merged into Unitel following its acquisition.

36. Bekhzod Akhmedov ("Akhmedov") was Karimova's associate and telecommunications representative. He also headed MTS's Uzbek subsidiary, Uzdunrobita.

37. Buzton JV Ltd ("Buzton"), an Uzbek company majority-owned by VimpelCom since 2008, provides fixed-line telecommunications services in Uzbekistan. Buzton is part of VimpelCom's CIS business unit and, like Unitel, is managed by local managers and a supervisory committee largely comprised of senior members of the CIS business unit management.

38. Cornelis Hendrik van Dalen ("van Dalen") served as the Company's CFO from

September 2010 to November 2013.

39. Gayane Avakyan ("Avakyan") was Karimova's close associate. Avakyan was the sole director and sole shareholder of Takilant during the entire period in which VimpelCom paid bribes through it.

40. Gulnara Karimova ("Karimova") is Uzbekistan's President's eldest daughter. From at least 1995 until July 2013, Karimova held several positions in the Uzbek government. Karimova is currently serving a 13-year prison term for corruption.

41. Jean-Yves Charlier ("Charlier") has served as the Company's Chief Executive Officer ("CEO") from April 2015 through all relevant times.

42. Jo Lunder ("Lunder") served as the Company's CEO from July 2011 to April 2015. Lunder was also a member of VimpelCom's Management Board. In or around November 2015, Norwegian prosecutors detained and questioned Lunder on suspicions of corruption related to VimpelCom's operations in Uzbekistan.

43. Mikhail Fridman ("Fridman"), a Russian oligarch, founded Alfa Group. During the Class Period, he was its chairman and largest shareholder. Fridman also sat on VimpelCom's supervisory board at all relevant times. Fridman was sanctioned by the UK and EU shortly after Russia invaded Ukraine on February 24, 2022. In its order sanctioning Fridman, the EU alleged that he had served as Russian President Vladimir Putin's agent.

44. Mobile TeleSystems PJSC ("MTS") competes with VimpelCom in Uzbekistan. MTS entered into a Deferred Prosecution Agreement with the United States in February 2019. In it, MTS admitted that it paid bribes to Karimova for market access in Uzbekistan. When MTS stopped paying bribes in the first half of 2012, Karimova retaliated by having an Uzbek court withdraw all of MTS's operating licenses. Because VimpelCom had continued to pay bribes, it was able to poach many of MTS's customers.

45. Takilant Ltd ("Takilant"), a Gibraltar company, is beneficially owned by Karimova. She used Takilant to conceal her involvement in a series of corrupt contracts and payments with VimpelCom and its affiliates. The corruption proceeds were laundered through a complex series of monetary transactions, including through bank accounts in Switzerland and the transfer of funds into and out of correspondent banking accounts at financial institutions in the United States.

46. Telenor Group ("Telenor") is a Norwegian telecommunications company. At the beginning of the Class Period, Telenor held a minority position of 31.7% of VimpelCom's common shares and/or ADSs and 25% of VimpelCom's voting rights. Telenor's holdings reached a Class Period high of 35.7% of VimpelCom's common shares and 43.0% of its voting interest. The Norwegian state holds a majority interest in Telenor and can appoint or remove Telenor's executives. VimpelCom was one of Telenor's largest investments. Jon Fredrik Baksaas, Telenor's President and CEO, was a member VimpelCom's Board from December 2011 through December 2014.

47. TeliaSonera AB ("TeliaSonera") competes with VimpelCom in Uzbekistan. Like VimpelCom, TeliaSonera paid bribes to Karimova through Takilant.

48. Unitel LLC ("Unitel"), an Uzbek company VimpelCom purchased in 2006, provides mobile telecommunications services in Uzbekistan. Unitel is part of VimpelCom's CIS business unit and is managed by local managers as well as a supervisory committee, which includes senior members of the CIS business unit management.

49. Uzbek Agency for Communications and Information ("UzACI") is an Uzbek governmental entity responsible for regulating operations and formulating state policy in the sphere of communication, information, and the use of the radio spectrum in Uzbekistan. As such, UzACI was a "department," "agency," and "instrumentality" of a foreign government, as those terms are used in the FCPA, 15 U.S.C. § 78dd-1(f)(l).

50. According to a February 10, 2016 Deferred Prosecution Agreement entered into between the United States and VimpelCom, which was publicly filed and is attached as Exhibit A hereto, from 2002 through January 2014, VimpelCom Executive 1—an individual whose identity is known to the United States —worked for various VimpelCom related entities. From in or around December 2009 through January 2014, Executive 1 was a high-ranking VimpelCom executive with responsibilities in CIS region, including oversight of Unitel in Uzbekistan.

51. According to the Deferred Prosecution Agreement, VimpelCom Executive 2 worked for various VimpelCom related entities. From February 2010 through February 2013, Executive 2 worked with Executive 1 relating to VimpelCom's business in the CIS region, including oversight of Unitel in Uzbekistan.

## IV. VIMPELCOM PAYS MORE THAN $114 MILLION IN BRIBES TO DO BUSINESS IN UZBEKISTAN[2]

### A. VimpelCom Corruptly Enters the Uzbek Market in 2006

52. In 2005, as part of a plan of expansion into the CIS region, VimpelCom sought to acquire an Uzbek telecommunications company. Two companies under consideration for acquisition were Unitel (the second largest operator in Uzbekistan with approximately 300,000 subscribers) and Buztel, which was a much smaller operator with only 2,500 subscribers. Although there was a sound business case for purchasing Unitel alone, VimpelCom ultimately purchased Buztel, as well. VimpelCom management knew that Karimova, Uzbekistan's President's eldest daughter, held an indirect interest in Buztel and that purchasing Buztel would ensure Karimova's support for VimpelCom's entry into the Uzbek telecommunications market.

53. From the beginning of VimpelCom's deliberations concerning its entry into

---

[2] Unless otherwise noted, all allegations in this Section IV. are drawn from the Deferred Prosecution Agreement, Exhibit A hereto. VimpelCom has admitted that the allegations in the Deferred Prosecution Agreement are true. Ex. A at 2.

Uzbekistan, there was an acknowledgment of the serious FCPA risks associated with any recommendation by VimpelCom's management to purchase Buztel in addition to Unitel. For example, on or about December 13, 2005, VimpelCom's Finance Committee of the Board met and considered management's recommendation to acquire both companies. Documents prepared for the December 13, 2005 Finance Committee meeting explained that Buztel was owned by a Russian company "and a partner" without further detailing the identity of the "partner." The materials documented that "[t]hrough a local partner, [VimpelCom was] in a preferred position to purchase both assets."

54. Although minutes from the December 13, 2015 Finance Committee meeting similarly failed to identify the local partner's identity, the participants at the meeting identified the likelihood of corruption and expressed concerns. As reflected in the minutes of the Finance Committee meeting, VimpelCom management explained that "due to certain political reasons (and this message should be taken by us as is), Buztel should be considered as an entry ticket into [the] Uzbekistan market and the buyer of Buztel would be considered a preferred buyer of Unitel." VimpelCom management stated that it was "more important to follow the political requirements suggested for entry into the market versus [the] questionable risk of acquisition of Unitel as [a] standalone" and VimpelCom would be "in opposition to a very powerful opponent and bring [the] threat of revocation of licenses after the acquisition of Unitel [as a] stand-alone."

55. A VimpelCom Finance Committee member questioned the wisdom of purchasing Buztel when Unitel was of a size sufficient for nationwide coverage and when the $60 million purchase price for Buztel could be better spent developing Unitel's network. The minutes of the meeting reflect that this same member also "expressed concern on the structure of the deal and FCPA issues" and noted "that if [VimpelCom] goes into this deal under this structure and if the structure violates the FCPA picture, [VimpelCom's] name could be damaged."

56. The Finance Committee voted to move forward with the acquisition process with the understanding that VimpelCom's Board should consider whether to "enter Uzbekistan through acquisitions of both Buztel (as a condition of entry into the market) and Unitel, . . . provided, however, that all issues related to FCPA should be resolved" or "to bid for Unitel only with understanding that potentially it may be more expensive and is connected with risks of business development without [the] local partner."

57. During a December 14, 2005, VimpelCom Board meeting, the likelihood of corruption was further discussed. For example, VimpelCom management explained that Karimova was actively influencing and interfering with Buztel's operations because of Karimova's ownership interest in the company. VimpelCom management added that Karimova appeared to have control and influence over the purchase price for Unitel. VimpelCom management also warned that there could be a falling out with the local partner if VimpelCom only purchased Unitel that would make it difficult, if not impossible, to operate in Uzbekistan. Concerns were raised about doing business with Karimova and the dangers associated with the Buztel transaction, and there was a recognition that a thorough analysis was needed to ensure that the Buztel payment was not merely a corrupt pretext for other services and favors. There were also numerous requests to ensure that the deal complied with the FCPA. Ultimately, VimpelCom's Board approved the Buztel and Unitel acquisitions, with a condition that an FCPA analysis from an international law firm be provided to VimpelCom.

58. VimpelCom's management then sought FCPA advice that could be used to satisfy the Board's requirement while allowing VimpelCom to proceed with a knowingly corrupt deal. Despite the known risks of Karimova's involvement in Buztel, VimpelCom management obtained FCPA legal opinions from an international law firm supporting the acquisition of Unitel and Buztel; however, VimpelCom management did not disclose to the law firm Karimova's known association

with Buztel. As a result, the legal opinion did not address the critical issue identified by the VimpelCom Board as a prerequisite to the acquisition. Management limited the law firm's FCPA review of the transaction to ensure that the legal opinion would be favorable.

59. Having obtained a limited FCPA legal opinion designed to ostensibly satisfy the Board's requirement, VimpelCom management then proceeded with the Buztel acquisition and corrupt entry into the Uzbek market. VimpelCom, through subsidiaries, purchased Buztel for approximately $60 million on or about January 18, 2006 and Unitel for approximately $200 million on or about February 10, 2006, along with the assumption of some debt.

**B. VimpelCom Corruptly Enters into a Local Partnership in 2006 and 2007**

60. As VimpelCom entered the Uzbek market through the acquisitions of Unitel and Buztel, VimpelCom management learned that VimpelCom would be required to enter into a partnership with Takilant in order to conceal corrupt payments to Karimova in exchange for her support to allow VimpelCom and Unitel to do business in Uzbekistan.

61. In internal VimpelCom documents, Karimova frequently was identified only as "partner" or "local partner" rather than by name. For example, documents prepared for an April 7, 2006 Board meeting concerning the proposed partnership agreement with Takilant referred only to a "Local Partner" who was the 100% owner of Takilant.

62. VimpelCom structured the partnership agreement to hide the bribe payments to Karimova. Under the deal, Takilant obtained an indirect interest of approximately 7% in Unitel for $20 million, and Takilant received an option to sell its shares back to Unitel in 2009 for between $57.5 million and $60 million for a guaranteed net profit of at least $37.5 million. In proposing the partnership, VimpelCom justified it in part by explaining that the partner would provide the "[r]evision of the licensing agreement for the major licenses" and "transfer of frequencies," while also noting that the direct transfer of frequencies was not allowed in Uzbekistan.

63. VimpelCom's Board approved the partnership on or about April 7, 2006, but its approval again was conditioned on "FCPA analysis by an international law firm" and required that "the identity of the Partner . . . [be] presented to and approved by the Finance Committee." VimpelCom received an FCPA opinion on the sale of the indirect interest in Unitel to Takilant on or about August 30, 2006. The FCPA advice VimpelCom received was not based on important details that were known to VimpelCom management and that VimpelCom management failed to provide to outside counsel, including Karimova's control of Takilant. In addition, documents, including minutes from the Finance Committee's meeting on August 28, 2006, failed to disclose the true identity of the local partner by name while noting the "extremely sensitive" nature of the issue.

64. On or about March 28, 2007, VimpelCom's Board unanimously approved the partnership agreement with Takilant, and the deal progressed as planned. Ms. Gayane Avakyan[3] signed the agreement on behalf of Takilant as the "Director" and on or about June 12, 2007, Takilant transferred $20 million from its Latvian bank account to VimpelCom's bank account. Less than three years later, in or around September 2009, Takilant exercised its guaranteed option to have VimpelCom's subsidiary repurchase Takilant's shares, and VimpelCom transferred $57,500,000 from its bank account to Takilant's bank account in Hong Kong. Both transfers were executed through transactions into and out of correspondent bank accounts at financial institutions in New York, New York.

65. As a result of VimpelCom's partnership agreement and transfer of funds to Takilant, Karimova made a net profit of approximately $37.5 million and VimpelCom and Unitel were able to continue to conduct business in Uzbekistan.

[3] Avakyan was Karimova's close associate, and was twenty years old when Takilant was incorporated in 2004 and had no significant experience in the telecommunications industry. Avakyan served as the sole director and sole shareholder of Takilant during the relevant time period.

**C. VimpelCom Corruptly Pays $25 Million for 3G Frequencies in 2007**

66. In 2007, VimpelCom arranged to pay Karimova, through Takilant, an additional $25 million bribe to obtain 3G frequencies for Unitel in Uzbekistan. VimpelCom made this bribe payment in order to secure Karimova's continued support and to ensure that Takilant's subsidiary waived its right to certain 3G frequencies with the expectation, and pursuant to a success fee, that UzACI would reissue the 3G frequencies to Unitel. VimpelCom management negotiated the transfer of the 3G frequencies with Bekhzod Akhmedov,[4] whom they knew was Karimova's representative for Takilant. VimpelCom management also knew that Akhmedov was the head of one of Unitel's primary competitors in Uzbekistan.

67. Materials prepared for an October 12, 2007 Board meeting document that VimpelCom had "been offered to acquire" 3G frequencies held by a wholly-owned subsidiary of Takilant. The documents explained that, "[a]s the rights to frequencies are not transferable in Uzbekistan and cannot be sold, [Takilant]'s subsidiary has agreed to waive its rights to the frequencies and we expect the frequencies to be reissued to Unitel." The first $10 million would be "payable to [Takilant] upon waiver of the frequencies," and the final $15 million would be "payable to [Takilant] upon receipt of the frequencies by Unitel." On or about October 12, 2007, VimpelCom's Board unanimously approved the 3G transaction.

68. VimpelCom management communicated with Akhmedov to arrange for the transfer of the 3G licenses through a sham contract with Takilant to conceal the corrupt payment to Karimova. For example, on or about October 15, 2007, Akhmedov emailed VimpelCom management from his personal email address. Using a pseudonym, Akhmedov wrote, "Enclosed you may find the docs that you have requested." Attached to the email were several documents,

[4] Akhmedov was Karimova's associate and telecommunications representative. He also headed MTS's Uzbek subsidiary, Uzdunrobita.

including a draft contract between a VimpelCom subsidiary and Takilant and a copy of Takilant's subsidiary's telecommunications license, which would be repudiated as part of the agreement. According to Takilant's subsidiary's license, the subsidiary only obtained the license weeks earlier, on September 27, 2007.

69. In return for the $25 million bribe payment, VimpelCom and Unitel obtained an amended license within a matter of days, which permitted Unitel to use 3G frequencies previously held by Takilant's subsidiary. During this time, VimpelCom management negotiated directly with Akhmedov, and a Unitel executive who worked with Akhmedov and exchanged documents with government regulators, including a high-ranking official at UzACI, to help close the deal. On or about November 7, 2007, a VimpelCom subsidiary transferred $10 million from its Netherlands bank account to Takilant's Latvian bank account. The following day, a VimpelCom employee emailed confirmation of the payment to Akhmedov at his personal email account using Akhmedov's pseudonym, and explained: "We are ready to start 3G frequency allocation to Unitel." Later that day, Akhmedov emailed VimpelCom management, and explained that the Uzbek telecom regulator had assigned the frequencies to Unitel and that the "[o]riginal will be given to your Local Representative." Akhmedov attached a scanned copy of Unitel's amended license dated that day. The next day, on or about November 9, 2007, a VimpelCom subsidiary transferred the remaining $15 million from its Netherlands bank account to Takilant's Latvian bank account, completing VimpelCom's corrupt payment to Karimova for the acquisition of the necessary 3G frequencies for Unitel. The corrupt payments from the VimpelCom subsidiary to Takilant's Latvian bank account totaled $25 million and were executed through transactions into and out of correspondent bank accounts at financial institutions in New York, New York.

70. According to a complaint filed by the Securities and Exchange Commission against VimpelCom ("SEC Complaint") (Exhibit B hereto), the $25 million payment was made by

Watertrail, a VimpelCom holding company responsible for VimpelCom's operations in Georgia. Watertrail had no role in VimpelCom's Uzbek operations. Exh. B ¶26.

### D. VimpelCom Enters Into a Corrupt Consulting Contract To Pay Bribes Through Takilant in 2008 and 2011

71. In 2008 and again in 2011, VimpelCom, directly or through a subsidiary, knowingly entered into contracts for fake consulting services with Takilant in order to provide Karimova with approximately $32 million in exchange for valuable telecommunications assets and to allow Unitel to continue to conduct business in Uzbekistan.

72. In 2008 VimpelCom management, Akhmedov, and others conspired to pay an additional $2 million bribe to Karimova that had originally been contemplated in 2006. VimpelCom management justified the payment as a "consulting" fee to Takilant and created false, backdated documents to conceal the corrupt payment.

73. On or about February 13, 2008, a VimpelCom executive emailed VimpelCom management to explain that "the partner, citing the earlier verbal agreements, is returning to the issue [of $2 million] and is asking us to recognize the obligations and make payments." In response, on or about February 14, 2008, a VimpelCom in-house attorney indicated that a presentation to VimpelCom's Board in April 2006 included a $2 million payment for "the partner's services" in approximately nine potential areas, however, the "payout term of the amount was not specified" and the in-house attorney did "not know if all the services listed in the presentation [had] to be fulfilled as a condition for the payment." Shortly thereafter, a VimpelCom employee with knowledge of the deal replied to confirm that the amount owed to the local partner was $2 million and that "[t]he obligations were incurred from the moment of payment for the acquisition of Unitel."

74. VimpelCom management then endeavored to find a way to pay Takilant $2 million to satisfy Karimova's demand. They proceeded to draft paperwork, in consultation with Akhmedov,

in order to create false documents that would contain plausible services Takilant could purport to perform under a consulting agreement. Drafts of the consulting agreements included varying limited services until the final agreement only required Takilant to provide services related to "documentation packages required to assign channels" to Unitel.

75. VimpelCom management also considered ways to ensure that the contractual payments avoided unwanted scrutiny. For example, on or about July 1, 2008, VimpelCom management emailed about a phone call from Akhmedov and his statement that "they have a strong desire to receive these funds from an offshore [company]." In response, one VimpelCom executive wrote, "[t]his complicates our objective as it requires organization of financing (we do not keep spare money in offshores). . . . Will we be able to make a payment of 2 million the same way as the payment for 3G." On or about July 2, 2008, another VimpelCom executive responded, "we do not have approved loans in the jurisdictions where they do not closely look at the documents (we paid for 3G for Uzbekistan from BVI). There is undrawn limit for 4 million in [a Dutch entity], but they have strict compliance—it will be necessary to prove with the documents that consulting services are provided . . . ."

76. Several other aspects of the consultancy arrangement demonstrated its sham nature. For example, at Akhmedov's request, VimpelCom, not Takilant, drafted Takilant's invoice for the work that Takilant purportedly performed, and VimpelCom drafted Takilant's service acceptance act. In addition, both documents were backdated to July 18, 2008, and the final, executed version of the consulting agreement between VimpelCom and Takilant was backdated to June 30, 2008. The final documents thus made it appear that Takilant conducted $2 million of consulting work for VimpelCom in only 18 days. In fact, Takilant did no legitimate work to justify the $2 million payment.

77. On or about August 8, 2008, VimpelCom transferred $2 million from its bank

account to Takilant's bank account in Latvia, which was executed through transactions into and out of correspondent bank accounts at financial institutions in New York, New York.

78. VimpelCom did not conduct any FCPA analysis concerning this purported consulting services agreement with Takilant. This was despite the fact that VimpelCom management had received a prior FCPA opinion concerning Takilant, which explicitly excluded any FCPA analysis associated with consulting services provided by Takilant. Moreover, during the earlier due diligence process, Takilant had represented that "[Takilant] does not contemplate entering into consultancy or similar agreement with VimpelCom . . . ."

79. In 2011, Executive 1 conspired with Executive 2 and others to direct an additional $30 million payment to Karimova through Takilant. This $30 million bribe payment was made specifically to acquire 4G mobile communication frequencies for Unitel, but was also part of the broader effort to enable Unitel to continue to operate in the Uzbek telecommunications market without interference by Karimova. Executive 1, Executive 2 and others modeled the 2011 4G agreement on the 2007 3G agreement, except that the 2011 4G agreement purportedly was for consulting services and full payment was not contingent on obtaining the 4G frequencies. At the time, Unitel had no need for 4G frequencies, because Unitel lacked the ability to employ 4G frequencies in Uzbekistan in 2011 or the near future. VimpelCom management knew that the 4G consulting agreement was a sham and that Takilant would not be required to provide any actual services in return for the $30 million fee.

80. Several aspects of the 4G consulting agreement with Takilant caused substantial internal criticism by some VimpelCom executives, including those who were charged with approving the transaction. "Witness," a consultant functioning as a senior VimpelCom executive and whose identity is known to the DOJ, was among the chief critics of the 4G consulting agreement with Takilant, repeatedly voicing serious anticorruption concerns about the deal at the highest level

of VimpelCom management. For example, on or about August 20, 2011, Witness emailed several senior VimpelCom executives explaining that Witness was "very uncomfortable" and could "see no rationale" why "we are solely paying to the agent working for getting the license for us, and nothing to the [Uzbek] Government[.]" Witness compared the proposed deal to another "corruption case," which resulted in "heavy fines . . . plus criminal charges against the company and individual employees." Witness cautioned, "[u]nless there is absolute transparency of our consultants' Gibraltar company, its ownership structure and the further cash flows from this, I cannot see how I can be able to sign off on this . . . unless the legal FCPA analysis can clarify this and settle my concerns."

81. VimpelCom management again sought an FCPA opinion from outside counsel to provide a plausible cover to go forward with the transaction. VimpelCom management then failed to provide outside counsel with important information, most notably that Takilant was known to be owned by Karimova, because VimpelCom management were willing to accept an opinion that focused on Takilant as an unrelated third party without analyzing or addressing the nature of the transaction itself or its high dollar value.

82. The purported FCPA due diligence on Takilant was flawed in design and execution. No in-house or outside lawyer ever directly contacted Takilant's purported owner, Karimova, and instead, the FCPA questionnaires purportedly designed to uncover beneficial owners and potential corruption risks were sent to intermediaries to respond. For example, on or about August 5, 2011, a VimpelCom in-house lawyer emailed FCPA questionnaires to Executive 1 to pass along "to the [Takilant] representative to fill out." On or about August 6, 2011, Executive 1 forwarded the FCPA questionnaires both to Executive 1's personal email account and the personal email account of Akhmedov. Executive 1 also forwarded the email with the FCPA questionnaires to Executive 2 who replied: "Hardcore, of course . . . . But in my opinion with the exception of the first and last names

they can answer everything else."

83. In or around August and September 2011, Witness continued to raise concerns. On or about September 2, 2011, Witness emailed a then in-house VimpelCom attorney to explain that Witness was "very concerned about this way of structuring the payment," and Witness asked whether VimpelCom had received "any official 'ok' from US Governmental body/SEC . . . ." On or about September 5, 2011, Witness received a response from VimpelCom's then in-house counsel that acknowledged that, "[t]his transaction deserves caution but on the legal side the question boils down to whether there is a reasonable basis to believe that our counter-party will make illegal payments. We cannot establish conclusively that there will not be any illegal payments . . . ." VimpelCom's then in-house counsel added ". . . our due diligence is our defense in the event that there is a claim against us so we have to ask ourselves whether the situation warrants additional due diligence. [We are] comfortable that additional due diligence is not warranted. We are going to monitor the process and ensure that real work is being done by the counter-party." However, VimpelCom, including its in-house attorneys, did not thoroughly monitor the process to ensure that Takilant performed any services. Once the FCPA opinion was obtained, VimpelCom proceeded with the deal.

84. The 4G consulting agreement required approvals from senior VimpelCom executives reviewing the transaction from their areas of expertise. After receiving repeated assurances from VimpelCom's then in-house lawyers, in or around mid-September 2011, Witness eventually provided the sign-off for Witness's expert area for the proposed 4G consulting agreement with Takilant. However, Witness handwrote an unusual caveat below Witness's signature: "This sign off is solely related to [my expert area]. My sign off confirm[s] that I have reviewed the technical . . . position and approved with it." Notably, other VimpelCom executives specifically limited their approval or expressed reservations before signing off on their expert areas. Executive

2 expressed no reservations before providing the necessary approval on behalf of the business unit.

85. Soon after providing the limited sign-off on the deal, Witness escalated the matter to the highest levels within VimpelCom management, with whom Witness met on or about September 30, 2011. However, VimpelCom management failed to act on Witness's concerns and the 4G deal remained in place after the meeting.

86. Executive 1 and Executive 2 closely monitored the approval process and ensured that Takilant was paid quickly. On or about September 19, 2011, Executive 2 received an email showing that all approvals had been received for the 4G consulting agreement. That same day, the agreement was executed with Executive 2 signing as the director of a VimpelCom subsidiary, and Avakyan signing as the director of Takilant. Two days later, on or about September 21, 2011, the VimpelCom subsidiary transferred $20 million as an advance payment under the 4G consulting agreement to Takilant's Swiss bank account. On or about October 18, 2011, UzACI issued a decision amending Unitel's license to allow it to use 4G frequencies. That same day, on or about October 18, 2011, Avakyan also sent a letter on Takilant letterhead to Executive 1 referencing the consulting agreement and enclosing "reports and presentations based on the work that we have done in the course of providing services to your Company." The following day, on or about October 19, 2011, the VimpelCom subsidiary sent the final $10 million payment in recognition of its full performance under the deal to Takilant's Swiss bank account. The corrupt payments from the VimpelCom subsidiary to Takilant's Swiss bank account totaled $30 million and were executed through transactions into and out of correspondent bank accounts at financial institutions in New York, New York.

87. Takilant never provided any legitimate consulting services to Unitel to justify its $30 million fee. In fact, Takilant's consulting reports and presentations, which were prepared in supposed satisfaction of its obligations under the consulting agreement, were not needed by

VimpelCom or Unitel, and the reports were almost entirely plagiarized from Wikipedia entries, other internet sources, and internal VimpelCom documents.

88. According to the SEC Complaint, VimpelCom made the $30 million payment through Watertrail. Exh. B ¶29.

### E. VimpelCom Makes Corrupt Payments Through "Reseller" Companies in 2011 and 2012

89. Because of significant currency conversion restrictions in Uzbekistan and the inability to use Uzbek som (the Uzbek unit of currency) to obtain necessary foreign goods, Unitel frequently entered into nontransparent transactions with purported "reseller" companies to pay foreign vendors in hard currency for the provision of goods in Uzbekistan. Typically, Unitel would contract with a local Uzbek company in Uzbek som, and that Uzbek company's related companies located outside of Uzbekistan would agree to pay an end supplier using the hard currency (usually, U.S. dollars).

90. In February and March 2011, Executive 1 conspired with Executive 2 and others to take advantage of the murky reseller process to conceal a $10 million bribe to Karimova via Takilant through various purported reseller transactions to Takilant. To effectuate the corrupt payment, Unitel entered into contracts with an Uzbek entity for services that were unnecessary and/or were made at highly inflated prices. These transactions were approved without sufficient justification and bypassed the normal competitive tender processes. Unitel then made payments in Uzbek som to the Uzbek company. Thereafter, in or around February and March 2011, an offshore company affiliated with the Uzbek company sent approximately 14 payments totaling $10.5 million to another intermediary, which in turn sent approximately 14 wire payments, each under $1 million and totaling approximately $10,000,023 to Takilant's Swiss bank account, which was executed through transactions into and out of correspondent bank accounts at financial institutions in New York, New

York.

91. The $10 million payment to Karimova in 2011 was achieved through a series of sham agreements whose only purpose was to justify associated payments using a number of reseller companies based in Uzbekistan or elsewhere. The reseller companies used in these transactions were fungible, as no real work from the end recipient of the funds was expected as the payment was, in fact, a bribe. For example, on or about December 15, 2010, Executive 2 received an email with only the words, "The companies," which included a forwarded email with two names of purported reseller companies and the message, "Choose any . . ." Attached to the email was banking information for the Cypriot bank account one of the companies. The following day, Executive 2 forwarded the email to two Unitel executives, and wrote, "below are the companies with which we must work on the question of the 10 mill . . . . Keep me informed pls how you will be doing it."

92. VimpelCom and Unitel, through Executive 1, Executive 2, and others, used these transactions with reseller companies to make and conceal the $10 million bribe to Karimova through Takilant. Takilant performed no legitimate services to justify a $10 million payment, and there was no need for VimpelCom or Unitel to make any payments for the specific contracted services in U.S. dollars. By using the reseller scheme, VimpelCom and Unitel executives avoided additional scrutiny, including FCPA analysis, of the transactions and payments.

93. In 2012, Executive 1 again conspired with Executive 2 and others to make and conceal another $10 million bribe payment to Karimova via Takilant through purported transactions with reseller companies. As in 2011, Executive 1 and Executive 2 knew that the true purpose of these transactions was to funnel $10 million to Takilant, and they took efforts to ensure that the transactions were approved without unwanted scrutiny.

94. Between February and May 2012, Unitel entered into contracts, this time with multiple Uzbek entities for services that were unnecessary and/or were made at highly inflated

prices. These transactions were approved without sufficient justification and bypassed the normal competitive tender processes. Unitel then made payments in Uzbek som to those Uzbek companies. Thereafter, in or around April and May 2012, a company affiliated with the subcontractor sent approximately 12 payments totaling over $10.5 million to a designated reseller company, and then that designated reseller company sent approximately 13 wire payments, each under $1 million and totaling approximately $10 million, to Takilant's Swiss bank account, which was executed through transactions into and out of correspondent bank accounts at financial institutions in New York, New York.

95. Unitel entered into these transactions even after Executive 1 was alerted to serious concerns about one of the reseller companies that was used in the corrupt scheme. On or about February 10, 2012, a Unitel employee emailed Executive 1 and another executive to complain that the employee had been "forced to sign a notice of voluntary [resignation]" after reporting problems after the employee's visit to the reseller company's office related to another tender. Specifically, the employee found, among other things, that the office was "located in an old rundown house [building], without any signage" and "[t]here were no specialists [or technicians] there." The employee recommended against using the reseller company as a contractor for Unitel, as it was "not qualified and there are big risks . . . ." The employee noted in the email to Executive 1 that, in response to the information the employee provided, the employee was warned by Unitel personnel "not to interfere," and, when the employee persisted, "they began to put pressure on me to resign." This complaint did not deter Executive 1 from moving forward with the scheme.

96. Executive 2 and others also took steps to ensure that the 2012 payments to the reseller companies would not be scrutinized during a May 2012 in-house audit of Unitel. The audit included a review of certain contracts with reseller companies, including the February 2012 agreement between Unitel and a certain reselling company. However, a Unitel executive who worked closely

with Executive 2 refused to cooperate with the audit, claiming to in-house auditors that the matter was "confidential" and that no materials or information could be shared with them. When the dispute was escalated, Executive 2 intervened on or about May 22, 2012, and claimed that the transaction was "not a reselling operation," which resulted in the purported reseller company contract being removed from the audit.

97. Just as in 2011, VimpelCom and Unitel, through Executive 1, Executive 2, and others, used these transactions with reseller companies to make and conceal the $10 million bribe to Karimova through Takilant. Takilant performed no legitimate services to justify a $10 million payment, and there was no need for VimpelCom or Unitel to make payments for the contracted services in U.S. dollars. By again using the non-transparent reseller scheme, VimpelCom and Unitel executives were able to avoid additional scrutiny, including FCPA analysis, of the transactions and payments.

98. VimpelCom Attempts to Make Other Corrupt Payments in December 2012 and January 2013

99. In the summer of 2012, a primary competitor of Unitel's was forced into bankruptcy and exited the Uzbek marketplace. Later that summer, international news reports linked Takilant with Karimova.

100. VimpelCom and Unitel management discussed how to continue participating in the corrupt scheme involving Karimova and her associates. On December 3, 2012, a Unitel executive emailed Executive 1 with a draft letter for further dissemination which included an explanation of "the situation that has currently arisen in . . . Uzbekistan." The Unitel executive explained that as Unitel's business expanded significantly in 2012, Unitel began to receive all kinds of inquiries from local "partners," and that "a critical situation ha[d] arisen" concerning Unitel's failure to obtain various government permits and approvals for Unitel's on-going telecom business, and the "[l]ocal

'partners' claim that the solution to our problems directly depends on the assistance to them. The sooner we can help, the faster our requests will be addressed."

101. On or about January 30, 2013, Executive 2 sent multiple emails to Executive 1 concerning a plan being contemplated to pay additional bribes totaling $16 million in exchange for, among other things, the "[o]pportunity to conduct future operations without hurdles from the 'partner' and regulatory agencies." Executive 2 proposed concealing the bribe payments by structuring them through "local reseller companies," noting that "[o]ffshore companies provided by the 'partner' will be final beneficiaries of these payments." Executive 2 evaluated the risks associated with "non-payment" of the bribes to involve a number of negative governmental reactions, including "disconnecting of existing base stations," "refusing to issue building permits," "refusing to issue additional numbering capacity," "possible challenges from the tax authority," and even "[r]ecall of the license." Executive 2 ultimately valued the "cumulative amount of possible risks" for "nonpayment" at approximately $61.2 million, and Executive 2 noted that if they made the decision to pay, it would also be necessary to address the "FCPA" and "[i]nternal and external audit."

**F. VimpelCom Failed to Implement and Enforce Internal Accounting Controls**

102. Throughout the time period of VimpelCom's bribery of Karimova, VimpelCom failed to implement adequate internal accounting controls and failed to enforce the internal accounting controls it did have in place, which permitted the above-referenced bribe payments to occur without detection or remediation.

103. VimpelCom failed to implement a system for conducting, recording, and verifying due diligence on third parties, including joint venture partners, consultants, reseller companies, and suppliers to uncover their true nature, beneficial ownership, and possible corruption risks. Time and again, Board members, executives, and employees of VimpelCom identified serious concerns with

third parties, and VimpelCom still failed to undertake adequate due diligence.

104. VimpelCom knowingly failed to require that all consulting agreements be for bona fide services, that agreed-upon payments were commensurate with the services to be performed, and that services paid for were, in fact, performed. VimpelCom knowingly failed to conduct meaningful auditing or testing of its consultant agreements, invoices, and payments, including those with Takilant and, as demonstrated above, failed to conduct adequate investigations of corruption complaints. VimpelCom also had no policy regarding payments to bank accounts located in places where the contractual partner neither performed work nor had operations.

105. In 2011 and 2012, VimpelCom paid $20 million in bribes through single source decisions with reseller companies that allowed executives to structure nontransparent transactions. VimpelCom knowingly failed to implement and maintain adequate controls for approving and transacting with reseller companies and intermediaries to ensure that reseller companies were scrutinized and that single-source contracting decisions were justified. VimpelCom and Unitel executives took advantage of these control failures to engage in transactions designed to obfuscate the actual purpose of the payments, which was to corruptly influence Karimova.

106. As a result of the facts described herein and the failures of VimpelCom's management, VimpelCom also knowingly lacked a sufficient internal audit function to provide reasonable assurances that corporate assets were not used to make bribery payments to foreign officials and failed to enforce audit protocols or conduct adequate internal audits to detect and prevent criminal activity. As discussed above, VimpelCom knowingly failed to implement and enforce internal controls to keep a 2012 reseller transaction within a regularly conducted audit after Executive 2 intervened to cause its removal, thereby allowing a bribe payment to Karimova, through Takilant, to go undetected.

107. VimpelCom management also knowingly failed to implement and maintain adequate

controls governing processes concerning conflicts of interest. For example, VimpelCom management knew of a conflict with Akhmedov's representation of Takilant, because at the time Akhmedov was a chief executive of one of Unitel's primary competitors in Uzbekistan. Moreover, Akhmedov requested to be contacted about work matters on a personal email account and through a pseudonym. VimpelCom failed to implement or enforce any meaningful policy to adequately scrutinize business deals with representatives who had such conflicts of interest or otherwise engaged in non-transparent activities.

108. Other failures that contributed to VimpelCom's lax control environment were its failure to enforce price thresholds that determined the required level of approval authority, failure to retain documentation of deliverables for contracts, and failure to adequately classify and obtain approvals for purported charitable contributions that were made in exchange for state-provided assets.

109. VimpelCom's failures to implement and enforce adequate internal controls contributed to an environment where it was possible for VimpelCom and Unitel executives to pay Karimova through Takilant over $114 million in bribes.

110. VimpelCom also had particularly severe deficiencies in its general compliance function and its anticorruption compliance policies and procedures. When VimpelCom entered the Uzbek market, it had no Chief Compliance Officer ("CCO"). To the extent that compliance was considered by VimpelCom, it was the responsibility of the legal department and was thought of as a "completeness check" that legal formalities were followed. When VimpelCom later did designate a CCO, whose formal title was the Head of Department of Compliance with Obligations and Disclosure of Information and Corporate Law, the junior executive selected had no background in compliance and was given no staff or support. Furthermore, all of VimpelCom's compliance duties were expected to take a small fraction of the executive's time. In fact, there was no dedicated

compliance function at VimpelCom until 2013, and CCO was not a senior management group position until 2014.

111. During the duration of the conspiracy, high-level VimpelCom management knew of the FCPA, yet VimpelCom had little to no anticorruption compliance program, much less a program that was regularly and appropriately evaluated for effectiveness and provided appropriate incentives. VimpelCom's only anticorruption policy was encapsulated in two, high-level paragraphs in VimpelCom's code of conduct, which required consultation with the legal department "before providing anything of value to a government official." In fact, VimpelCom's legal department did no internal FCPA review of transactions. When corruption issues were identified in the above-mentioned cases, the subsequent "FCPA review" was seen as a "check list and a confirmation from [outside counsel]." As demonstrated above, VimpelCom management withheld crucial information in such situations in Uzbekistan from outside counsel and overly restricted the scope of FCPA opinions such that the advice given was of no value. Training on the FCPA during the course of the corruption conspiracy, to the extent it existed at all, was inadequate and *ad hoc*. In short, rather than implement and enforce a strong anticorruption ethic, VimpelCom sought ways to give itself plausible deniability of illegality while proceeding with business transactions known to be corrupt.

### G. VimpelCom Schemed to Falsify Books and Records

112. Due to VimpelCom's failure to implement effective internal accounting controls, VimpelCom, acting through its executives, disguised on its books and records over $114 million in bribe payments made for the benefit of Karimova in exchange for VimpelCom and Unitel's ability to enter and conduct business in the Uzbek telecommunications market.

113. Although all of VimpelCom's and Unitel's bribes to Karimova were funneled through Takilant, it was part of the scheme that VimpelCom management and others used a variety of non-transparent transactions with different purported business purposes so that the payments

would be inaccurately recorded as legitimate transactions:

(a) The bribe related to the partnership agreement in which Takilant first purchased and then sold an indirect equity interest in Unitel was falsely recorded in VimpelCom's consolidated books and records as the receipt of loan proceeds in 2007 to be repaid in 2009 and secured by shares in a VimpelCom subsidiary.

(b) The bribe related to the acquisition of 3G frequencies in 2007 was falsely recorded in VimpelCom's consolidated books and records as the acquisition of an intangible asset, namely 3G frequencies, and as consulting expenses.

(c) The bribe in 2008 was falsely recorded in VimpelCom's consolidated books and records as "submission and support documentation packages seeking assignment of 24 channels to Unitel" and treated as an acquisition of an intangible asset and consulting services.

(d) The bribe related to consultancy services associated with the acquisition of 4G frequencies in 2011 was falsely recorded in VimpelCom's consolidated books and records as "consulting services" and treated as consulting services and as an acquisition of an intangible asset, namely 4G frequencies.

(e) The bribes made through purported reseller transactions in 2011 and 2012 were falsely recorded in VimpelCom's consolidated books and records as "professional services" expenses. VimpelCom also created, and caused to be created, false and backdated records to further conceal these improper payments. For example, each bribe payment was concealed by false contracts that were intended to create the appearance of legitimacy. Some of these contracts included provisions prohibiting unlawful payments, including payments that would violate the FCPA, even though VimpelCom and Unitel executives knew that the payments called for by the contracts were, in fact,

bribes to Karimova in violation of the FCPA. At times, VimpelCom and Unitel executives also created false service acceptance acts, invoices, and other back-up documentation to justify supposedly legitimate business services when, in truth and in fact, those executives knew that no such work was performed to justify the generous payments made to Takilant. VimpelCom and Unitel executives also accepted plagiarized work product to falsely substantiate consulting work that was never performed.

## V. SUMMARY OF VIMPELCOM'S CORRUPT PAYMENTS

114. The following corrupt payments, described in the preceding sections, were made by or on behalf of VimpelCom, an Alfa Group subsidiary, AQUTE, or a reseller company to Takilant. At least $134,500,023 of these payments were executed through transactions that were transferred into and out of correspondent bank accounts at financial institutions in New York, New York, including through J.P. Morgan Chase, Standard Chartered Bank, Citibank, and Wells Fargo:

| Date (On or | Originating Party | Originating Bank | Beneficial Party | Beneficial Bank | Amount |
|---|---|---|---|---|---|
| 01/20/06 | AQUTE (the seller of Buztel and a subsidiary of Alfa Group) | Amsterdam Trade Bank, Netherlands | Takilant | Aizkraukles Lativa | $19,000,000 |

| Date (On or about) | Originating Party | Originating Bank | Beneficial Party | Beneficial Bank | Amount |
|---|---|---|---|---|---|
| 11/07/07 | VimpelCom subsidiary Watertrail | ING Bank, Netherlands | Takilant | Parex, Lativa | $10,000,000 |
| 11/09/07 | VimpelCom subsidiary Watertrail | ING Bank, Netherlands | Takilant | Parex, Lativa | $15,000,000 |
| 08/08/08 | VimpelCom | Citibank, Russia | Takilant | Parex, Lativa | $2,000,000 |
| 09/23/09 | VimpelCom | Citibank, Russia | Takilant | Standard Chartered, Hong Kong | $57,500,000 |
| 03/03/11 | Reseller Company 1 | Hellenic Bank, Cyrpus | Takilant | Lombard Odier, Switzerland | $780,000 |
| 03/04/11 | Reseller Company 1 | Hellenic Bank, Cyrpus | Takilant | Lombard Odier, Switzerland | $740,000 |
| 03/04/11 | Reseller Company 1 | Hellenic Bank, Cyrpus | Takilant | Lombard Odier, Switzerland | $889,644 |
| 03/08/11 | Reseller Company 1 | Hellenic Bank, Cyrpus | Takilant | Lombard Odier, Switzerland | $840,000 |
| 03/08/11 | Reseller Company 1 | Hellenic Bank, Cyrpus | Takilant | Lombard Odier, Switzerland | $590,000 |
| 03/09/11 | Reseller Company 1 | Hellenic Bank, Cyrpus | Takilant | Lombard Odier, Switzerland | $910,00 |
| 03/11/11 | Reseller Company 1 | Hellenic Bank, Cyrpus | Takilant | Lombard Odier, Switzerland | $940,000 |
| 03/11/11 | Reseller Company 1 | Hellenic Bank, Cyrpus | Takilant | Lombard Odier, Switzerland | $980,000 |
| 03//14/11 | Reseller Company 1 | Hellenic Bank, Cyrpus | Takilant | Lombard Odier, Switzerland | $284,997 |
| 03/14/11 | Reseller Company 1 | Hellenic Bank, Cyrpus | Takilant | Lombard Odier, Switzerland | $740,000 |
| 03/17/11 | Reseller Company 1 | Hellenic Bank, Cyrpus | Takilant | Lombard Odier, Switzerland | $854,994 |
| 03/21/11 | Reseller Company 1 | Hellenic Bank, Cyrpus | Takilant | Lombard Odier, Switzerland | $980,000 |
| 03/21/11 | Reseller Company 1 | Hellenic Bank, Cyrpus | Takilant | Lombard Odier, Switzerland | $444,988 |
| 03/24/11 | Reseller Company 1 | Hellenic Bank, Cyrpus | Takilant | Lombard Odier, Switzerland | $25,080 |
| 09/21/11 | VimpelCom subsidiary Watertrail | ING Bank, Netherlands | Takilant | Lombard Odier, Switzerland | $20,000,000 |
| 10/19/11 | VimpelCom subsidiary Watertrail | ING Bank, Netherlands | Takilant | Lombard Odier, Switzerland | $10,000,000 |
| 04/13/12 | Reseller Company 2 | Marfin Popular Bank, Cyprus | Takilant | Lombard Odier, Switzerland | $854,985 |

| Date (On or | Originating Party | Originating Bank | Beneficial Party | Beneficial Bank | Amount |
|---|---|---|---|---|---|
| 04/20/12 | Reseller Company 2 | Marfin Popular Bank, Cyprus | Takilant | Lombard Odier, Switzerland | $854,985 |
| 04/24/12 | Reseller Company 2 | Marfin Popular Bank, Cyprus | Takilant | Lombard Odier, Switzerland | $892,702 |
| 04/24/12 | Reseller Company 2 | Marfin Popular Bank, Cyprus | Takilant | Lombard Odier, Switzerland | $854,985 |
| 04/24/12 | Reseller Company 2 | Marfin Popular Bank, Cyprus | Takilant | Lombard Odier, Switzerland | $854,985 |
| 04/25/12 | Reseller Company 2 | Marfin Popular Bank, Cyprus | Takilant | Lombard Odier, Switzerland | $799,027 |
| 04/25/12 | Reseller Company 2 | Marfin Popular Bank, Cyprus | Takilant | Lombard Odier, Switzerland | $892,702 |
| 04/25/12 | Reseller Company 2 | Marfin Popular Bank, Cyprus | Takilant | Lombard Odier, Switzerland | $854,985 |
| 04/25/12 | Reseller Company 2 | Marfin Popular Bank, Cyprus | Takilant | Lombard Odier, Switzerland | $854,985 |
| 04/25/12 | Reseller Company 2 | Marfin Popular Bank, Cyprus | Takilant | Lombard Odier, Switzerland | $854,985 |
| 05/26/12 | Reseller Company 2 | Marfin Popular Bank, Cyprus | Takilant | Lombard Odier, Switzerland | $854,985 |
| 05/04/12 | Reseller Company 2 | Marfin Popular Bank, Cyprus | Takilant | Lombard Odier, Switzerland | $575,689 |
| 05/17/12 | Reseller Company 2 | Marfin Popular Bank, Cyprus | Takilant | Lombard Odier, Switzerland | $9,000 |
| | | | | **TOTAL** | **$153,500,023** |

## VI. VIMPELCOM PLEADS GUILTY

115. In a proceeding styled *U.S. v. VimpelCom, Ltd.*, 16 Cr. 137 (ER) (S.D.N.Y.) before the Honorable Edgardo Ramos, on arraignment, plea, and possible sentencing, the Company admitted to the following:

> THE COURT: Sir, can you tell me what it was that the company did that makes it guilty of the crime to which it wishes to plead guilty?
>
> MR. ROCHON: I just want to make sure, you are addressing this to me or to the company representative?
>
> THE COURT: To the company representative.
>
> MR. DRESSER: Thank you. Before I respond, I would like to make one comment. The company deeply regrets its actions here, and we will make sure it never happens again. I would like to first state that

the statement of facts I believe to be true and accurate, and they establish a factual basis for Unitel's guilt. I have been through them with counsel, and I am comfortable with simply having the Court rely on them as the factual basis.

THE COURT: Will the government please indicate the jurisdictional basis for having the case in the Southern District of New York?

MS. MRAZEK: Yes, your Honor. All of the bribe payments at issue passed into and out of correspondent banks in this district.

THE COURT: Mr. Rochon, do you believe that there is an adequate factual basis to support the plea of guilty?

MR. ROCHON: I do.

THE COURT: Ms. Mrazek, is there an adequate factual basis to support the plea of guilty?

MS. MRAZEK: There is.

THE COURT: Mr. Dresser, how does the company now plead to the charge in Count One of the information, guilty or not guilty?

MR. DRESSER: Guilty, your Honor.

THE COURT: Is the company in fact guilty of that charge?

MR. DRESSER: Yes, your Honor.

THE COURT: After consultation with counsel, is the company pleading guilty voluntarily and of its own free will?

MR. DRESSER: Yes, your Honor.

THE COURT: Very well. Is there any further question that you wish me to ask, Ms. Mrazek?

MS. MRAZEK: No, there is not.

THE COURT: Mr. Rochon.

MR. ROCHON: No, sir.

THE COURT: Thank you. Because the company acknowledges that it is in fact guilty as charged in Count One of the information, because I find that it knows its rights and is waiving them knowingly and voluntarily, with an understanding of the consequences of the plea, including the potential sentences that may be imposed, I accept

the plea of guilty and find Unitel guilty on the charge in the information.

I understand that this was an agreement with the government pursuant to Rule 11(c)(1)(C) of the Federal Rules of Criminal Procedure. So the parties have agreed to the punishment and have also agreed to waive the presentence report and proceed immediately to sentencing.

Ms. Mrazek, why should I proceed immediately to sentencing today?

MS. MRAZEK: Your Honor, because this is a (c)(1)(C) plea, the parties have agreed to what the appropriate penalty is. And there are two major reasons why this has been structured as a (c)(1)(C) plea.

The first is that we are talking about a very large penalty here and a very complex and sensitive negotiation, and the board members of VimpelCom have a fiduciary duty to their shareholders to make sure that they understand what kind of agreement they are entering into, and the certainty that a (c)(1)(C) plea gives is vital to effectuating that interest. In addition, as I discussed earlier, there is a very complicated set of other resolutions that are dependent upon this one and that are triggered by the sentencing of VimpelCom and so we would like to have that sentencing today, or as soon as possible.

THE COURT: Mr. Rochon, why should I sentence the company today?

MR. ROCHON: Your Honor, I agree, first of all, with what counsel for the government has said. As you know, the plea is on Unitel, but it reflects, of course, the agreement with VimpelCom and the amount that is paid pursuant to that agreement that we have reached with the United States through a deferred prosecution agreement. It is not only a complex situation with the Dutch, and just to be clear to the Court, the amounts that are owed in this case depend on that resolution as well, in the sense that the Dutch have financial penalties, and the Department of Justice needs to assess those penalties in terms of this case, and if this case doesn't move forward, it would unwind potentially the Dutch case.

THE COURT: Are the Dutch seeking sums over and above the 460-odd-million dollars that's being negotiated here?

MR. ROCHON: No. There is a combined amount that is reflecting what is negotiated with the three. And the total combined amount that will be paid by the company, as a result of all of the agreements, is $795 million. Some of it, obviously, not pursuant to the

agreements before you today.

There is a real interplay between the various agreements, and it's very important to the company and its shareholders to get that done. The company has cooperated, obviously, with the Department of Justice throughout these proceedings. We would cooperate further in that regard as well as part of the agreement.

For purposes of today, your Honor, and the closure that it gives this agreement, and the ability for certainty to the shareholders who have invested in the company and expect it to go forward and appropriate, and given the global nature of the agreements, the company would strongly ask you to enter into the agreed sentencing today and to waive a PSR.

THE COURT: Thank you. I did review the guideline calculations that the parties agreed to, and given the amount of money that was involved, it's quite literally off the charts in terms of what the total offense level is, but I do have one question that may be important, Ms. Mrazek.

To the extent that you're able to say, what was the extent of the knowledge of the corruption within the company? How many high-level executives, again, if you're in a position to say?

MS. MRAZEK: Your Honor, I am not really in a position to say. We have a very robust ongoing investigation into individuals that is sensitive for a whole host of reasons, and so, at this time, we haven't concluded that investigation. ***There certainly was high-level knowledge of the bribery at VimpelCom, and that is in part why it's such a significant resolution that we are seeking today, but I can't give you a number of individuals.***

THE COURT: Speak, if you will, then to the fact of their cooperation, or characterize it if you will. I asked earlier whether they self-reported and you indicated that they did not. What did they do when they were confronted?

MS. MRAZEK: Yes, your Honor. VimpelCom's cooperation in this case has been substantial, significant and full, both with respect to its own liability and with respect to various individuals at all levels who had involvement in the crimes at issue.

The company, when they first were notified by the Department of Justice of its investigation, immediately began that cooperation and ***promptly acknowledged the company's wrongdoing*** and began to cooperate in a best-of-show manner.

> ***They provided copious amounts of evidence, both evidence that they had collected during their own internal investigation of the matters at issue here, but also in response to various inquiries and requests made by the Department of Justice and our colleagues at the SEC and Dutch prosecution authority. Some of that evidence was actually very hard to obtain.*** As is clear from the statement of facts, this conduct is not mostly in the United States. It largely happened abroad, including in places like Russia and Uzbekistan, that are very difficult to investigate and have significant foreign data privacy and state secrecy laws that needed to be overcome.
>
> The company did do that investigation. It acted proactively and it voluntarily made its employees available for interviews. It assisted in helping us interview former employees of the company, and it collected, analyzed and translated a huge volume of evidence for the government. So this very full cooperation was an extremely significant factor for the government in coming to the resolution today.
>
> ***As I mentioned, the company also promptly acknowledged its wrongdoing, and it very promptly acknowledged its willingness to resolve its criminal liability***, which saved the government significant resources.

*U.S. v. VimpelCom, Ltd, and Unitel, LLC*, 16 Cr. 137 (ER) Transcript, dated February 18, 2016, at pp. 27 through 33

## VII. THE TRUTH EMERGES

116. In early 2012, Uzbek authorities declared that a VimpelCom competitor, MTS, had not paid its taxes. To satisfy the tax bill, Uzbek authorities seized its assets in Uzbekistan and barred it from the market.

117. In truth, as VimpelCom well knew, Uzbek authorities seized MTS's assets because it had stopped paying bribes to Karimova. VimpelCom had negotiated bribes through the head of MTS's Uzbek operations.

118. Nevertheless, at the Q2 2012 earnings call taking place on August 15, 2012, CEO Lunder stated that "[w]hen it comes to your question on Uzbekistan, of course, we operate in all our market[s] in strict accordance with the local legislation[.]":

> Q: Yes, hi, I've got two questions as well on my side.
>
> * * * * *
>
> And the second question is, in Uzbekistan, I understand that one of your main competitors there [MTS] got some quite big pressure from the regulator and some government agencies. Do you expect a risk to happen on VimpelCom side, or do you think it's pretty specific to that competitor? Thank you.
>
> **JO LUNDER**: ***When it comes to your question on Uzbekistan, of course, we operate in all our market[s] in strict accordance with the local legislation. This includes Uzbekistan. And we see very limited risk from the current case in Uzbekistan for our operations going forward. So we have no information to share or disclose that indicates a high risk related to this specific example that you showed us. In fact, we think there are opportunities right now in Uzbekistan and we want to build capacity in the network and position ourselves for taking advantage of that.***

119. On August 15, 2012, following Lunder's false claim that investors had nothing to fear from Uzbekistan because VimpelCom followed the law, the price of VimpelCom's ADSs rose from their previous close of $9.38 to close at $10.20, up $0.82 (8.8%), having reached intraday highs of $10.45.

120. This statement and others like it made throughout the Class Period would deceive investors even as evidence that VimpelCom had paid bribes and of the scope of its wrongdoing emerged.

121. On September 19, 2012, an investigative report concerning corruption in Uzbekistan aired on Swedish television ("September 2012 Program").

122. The September 2012 Program charged that beginning in 2007, one of VimpelCom's competitors, TeliaSonera, may have paid $230 million bribes to Karimova.

123. The September 2012 Program suggested that TeliaSonera paid the bribes through Takilant. It drew a link between Takilant and Karimova by alleging that Takilant was owned by Avakyan and that she had "close ties" to Karimova.

124. TeliaSonera denied the charges. Its CEO called the money paid to Takilant "an investment." He stated he was "certain" there had been no improper conduct.

125. Nevertheless, citing the gravity of the allegations, TeliaSonera hired the Swedish law firm Mannheimer Swartling to conduct an internal investigation.

126. VimpelCom held its public Annual General Meeting on December 21, 2012. According to the minutes of the meeting, Telenor asked VimpelCom to affirm that it followed anti-corruption law, and VimpelCom did so:

> Telenor was given the floor and made a statement to the Company, expressing its expectation that the Company follow international anti-corruption law, observe principles of transparency in relations with business partners, that the Company respect human rights and participate in human rights initiatives sponsored by certain international organizations. ***The Company responded to this statement, affirming that it is following international anti-corruption law, that it is transparent in its relations with business partners, that it respects human rights and welcomes a continuing dialogue with Telenor on this topic.***

127. On January 8, 2013, TeliaSonera published a statement denying that it had paid any bribes to Takilant or acted improperly. However, in the statement, TeliaSonera admitted that (a) one of its employees had referred to Karimova as its local partner, and (b) it had attempted to identify Takilant's true beneficial owner but had not been able to identify anyone other than Avakyan:

> The documentation includes copies of email correspondence during the spring of 2007 from Serkan Elden, the former CEO of Fintur Holdings (a majority-owned subsidiary of TeliaSonera within Business area Eurasia), to employees in Fintur Holdings and TeliaSonera, in which Gulnara Karimova is mentioned as a local partner in Uzbekistan.
>
> * * * * *
>
> The agreement with the local partner Takilant was signed on December 24, 2007, with its only registered director Gayane Avakyan. If there were any other beneficiaries behind the local partner has been the subject of much speculation and rumors. The information we received during the negotiations was that a group of local businessmen were behind the local partner. Various rumors

> around who could be part of this group circulated, including Gulnara Karimova. In the due diligence process we investigated the ownership structure by asking questions and obtaining information regarding Takilant but we could not identify any other beneficiaries than Gayane Avakyan.

128. The statement was relevant to VimpelCom. Though VimpelCom was not itself publicly accused of bribery, it had been publicly reported that VimpelCom had done business with Takilant in Uzbekistan.[5] TeliaSonera's admission that it did not know of any beneficial owners besides Avakyan suggested, given her age and connection to Karimova, that Takilant was owned by Karimova.

129. On January 8, 2013, VimpelCom's stock price fell from its previous close of $10.98 to close at $10.57, down $0.41 (3.7%), having reached intraday lows of $10.50.

130. In February 2013, the Mannheimer Swartling report was released. It found that TeliaSonera had not been careful enough in its dealings with Takilant but did not find that TeliaSonera had violated any laws. The Mannheimer Swartling report did not reach a conclusion as to whether Karimova was Takilant's beneficial owner.

131. Swedish prosecutors had opened an inquiry into TeliaSonera after the September 2012 Program. After a handful of statements from prosecutors, the TeliaSonera investigation proceeded quietly through 2013. During this time, there was no direct reporting that VimpelCom was being investigated.

132. On March 12, 2014, VimpelCom announced that on March 11: (a) the SEC had informed VimpelCom by letter that it was the target of an investigation; (b) Dutch authorities had

---

[5] Eliza Ronalds-Hannon and Miranda Patrucic, Swedish Telecom Took Shortcuts in Central Asia, published by the Organized Crime and Corruption Reporting Project on December 29, 2012, available at https://www.occrp.org/en/investigations/1765-swedish-telecom-took-shortcut-in-central-asia ("In 2007, Russian mobile phone provider VimpelCom, partnered with Takilant as it worked on expanding into Uzbekistan.").

visited VimpelCom's offices, obtained documents from it, and informed it that it was the target of a criminal investigation. On March 18, 2014, VimpelCom announced that it was also being investigated by the Department of Justice.

133. The announcement that VimpelCom was being investigated was no surprise. Like TeliaSonera, VimpelCom had done material business with Takilant. Thus, this long-awaited investigation did not cause VimpelCom's stock price to fall materially.

134. On March 24, 2014, Swedish prosecutors made a filing in TeliaSonera's case asking for more time to file charges. In the filing, Swedish prosecutors alleged that there was a "concrete basis" to the allegations that had been raised in the September 2012 Program:

> In the investigation there is now a concrete basis, including information on control over assets, which gives reason to suspect that Gulnara Karimova, who also served as a public official during the time period relevant for the case, was the one who orchestrated, controlled, and also was the one who primarily benefited from the procedure. . . .

135. The filing and its accusations were reported before trading by several news outlets.[6]

136. The Swedish prosecutors' filing showed that the evidence was bearing out what Swedish television had reported and TeliaSonera had suggested: Avakyan was a straw for Gulnara Karimova. This disclosure, in turn, increased the risk that VimpelCom itself had paid bribes and would be held accountable.

137. On March 24, 2014, the price of VimpelCom's ADSs fell from their previous close of $8.89 to close at $8.57, down $0.42 (3.6%), having reached intraday lows of $8.52.

138. In November 2014, the Norwegian government began asking Telenor about its knowledge of and role in VimpelCom's corruption in Uzbekistan.

---

[6] https://twitter.com/KauppalehtiFi/status/448082023207280640;
https://twitter.com/srfinska/status/448083087302225921;
https://twitter.com/Finwire/status/448072631099875328

139. On or around November 19, 2014, Telenor executives met with the Norwegian Minister of Trade and Industry to discuss the investigation into VimpelCom.

140. On November 26, 2014, the Norwegian Minister of Trade and Industry made a public statement to the Norwegian Parliament's Standing Committee on Scrutiny and Constitutional Affairs. In her statement, the Minister recounted that Telenor had received assurances from VimpelCom that it had not paid bribes in connection with VimpelCom's Uzbek business. Specifically, the Minister reported that:

141. VimpelCom's management had assured Telenor that the investment in Uzbekistan had taken place in accordance with the U.S. FCPA;

(a) Since 2006, Telenor-appointed board members had required U.S. FCPA assessments of VimpelCom transactions;

(b) Immediately after the September 2012 Program, Telenor's CEO personally received assurances that VimpelCom's investments in Uzbekistan had complied with the U.S. FCPA;

(c) The minutes of a February 12, 2013 Telenor Boardmeeting provided that:

> There is no indication in the Board materials or protocols that OSJC VimpelCom Board was aware or made aware that Takilant's beneficial owner had any connection to anyone associated with Uzbekistan's President;

and

(d) At a February 2013 VimpelCom Board Meeting, the Chairman of Telenor's Board discussed the Uzbekistan case and did not receive information that would indicate that there were any matters worthy of criticism.

142. The Minister stated that she was satisfied with Telenor's performance.

143. These statements reassured investors that VimpelCom's dealings in Uzbekistan had

been aboveboard or that if any corruption had taken place, it involved only low-level VimpelCom employees.

144. At the same time, Telenor's Board began deliberating over whether its President and CEO, Jon Fredrik Baksaas, should withdraw from VimpelCom's Supervisory Board.

145. On December 4, 2014, during trading hours, *Bloomberg* reported that the Norwegian parliament would hold a hearing on the allegations of bribery leveled against VimpelCom, citing a conversation with Green Party Member of Parliament Rasmus Hansson. Parliament would bring in both VimpelCom and Telenor for the hearings.

146. The involvement of the Norwegian Parliament raised the stakes for VimpelCom. Among other things, because Telenor was majority state-owned, the Norwegian state could force Telenor to sell its VimpelCom shares.

147. On December 4, 2014, the price of VimpelCom's ADSs fell from their previous close of $5.05 to close at $4.73, down $0.32 (6.3%), having reached intraday lows of $4.71.

148. On December 8, 2014, Telenor announced that Baksaas was withdrawing from VimpelCom's Supervisory Board, effective immediately. Baksaas stated in the press release: "***I am stepping down from the VimpelCom [B]oard to solely focus on protecting Telenor's position. Telenor has zero tolerance for corruption.*** As an owner in VimpelCom we will assist the ongoing investigations. . . ."

149. On December 8, 2014, the price of VimpelCom ADSs fell from their previous close of $4.63 to close at $4.29, down $0.44 (7.3%), having reached intraday lows of $4.26.

150. In August 2015, the investigations began turning into billion-dollar asset seizures.

151. On August 13, 2015, after trading, the *Wall Street Journal* reported that the U.S. sought to seize $1 billion related to corruption in Uzbekistan.

152. On August 14, 2015, the price of VimpelCom's ADSs fell from its previous close of

$5.56 to close at $5.43, down $0.13 (2.4%), having reached intraday lows of $5.31.

153. On August 20, 2015, after trading, the Swiss Prosecutor's office reported that it had widened the probe into Karimova and confiscated more than $828 million.

154. On August 21, the price of VimpelCom's ADSs fell from their previous close of $5.03 to close at $4.51, down $0.52 (10.3%), having reached intraday lows of $4.50.

155. But the scope of VimpelCom's own misconduct did not become clear until November 2015.

156. Then, on October 30, 2015, a Friday, Norway's Minister of Trade and Industry announced that she "no longer ha[s] confidence in the chairman of Telenor's board of directors [Svein Aaser]". She added that "I have received new information about the case. This is information that both I and parliament's Constitution and Control committee should have received earlier." Aaser resigned that same day.

157. On Saturday October 31, 2015, Bloomberg reported that the previous day, Norwegian-language newspaper Norsk rikskringkasting AS ("NRK") had published a Norwegian-language article providing more details on the incident ("NRK Article"). The NRK Article was not published on the news feed available from the Bloomberg terminal.

158. The NRK Article revealed the damning facts that had led the Minister to lose confidence: an internal review had uncovered a document that showed Telenor managers had access to significantly more information than Telenor had previously disclosed. The document was included as an appendix to an October 23, 2015, memorandum from Telenor to the Norwegian government. The October 23, 2015, memorandum also reported that Telenor's Board had discussed concerns about bribery contemporaneously with VimpelCom's initial investment into Takilant.

159. Then, on Sunday, November 1, Telenor CEO Sigve Brekke announced that Telenor would launch an internal investigation of the alleged misconduct.

160. The information released on October 30, 2015, through November 1, 2015, suggested to investors that senior VimpelCom executives had known of the bribery. As a third-party investor, Telenor depended on VimpelCom for information about the business. Because Telenor's Board knew of or suspected the bribery, VimpelCom's senior executives did as well. The news caused the market to increase its estimate of the likelihood and amount of any penalty VimpelCom would have to pay to resolve allegations against it. Indeed, under U.S. sentencing guidelines, high-level personnel involvement risked a 5-point enhancement of VimpelCom's culpability score, §8C2.5(b)(1)(A), or in other words a 1.0-2.0 point increase in the multiplier, §8C2.6, potentially costing VimpelCom hundreds of millions of dollars.[7]

161. On October 30, VimpelCom's stock price fell from its previous close of $3.86 to close at $3.78, down $0.08 (2.1%), having reached intraday lows of $3.61.

162. On November 2, 2015, the next trading day, the price of VimpelCom's ADSs fell from its previous close of $3.78 to close at $3.67, down $0.16 (3.0%), having reached intraday lows of $3.62.

163. In total, the price of VimpelCom's ADSs fell $0.24 (4.9%).

164. Finally, on November 3, 2015, pre-market, the Company announced that it had recognized an accounting provision of $900 million in connection with U.S. and Dutch investigations into the Company's operations in Uzbekistan.

165. On November 3, 2015, the price of VimpelCom ADSs fell from its previous close of $3.67 to close at $3.50, down $0.17 (4.6%), having reached intraday lows of $3.32.

166. Even Telenor had not realized the seriousness of VimpelCom's corruption. On

[7] VimpelCom ultimately received an offense level of 48 with a base fine of $523 million, a culpability score of 8, and a 45% discount for cooperation. It paid $460 million; without the culpability enhancement, it would have paid $173 million. VimpelCom's high-level involvement cost it approximately $287 million in U.S. fines alone.

November 3, it published a press release stating that "VimpelCom's announced provisions increases Telenor's concerns."

167. As a result of VimpelCom's wrongful acts and omissions, Plaintiff and other class members have suffered significant losses and damages.

## VIII. ADDITIONAL FACTS FURTHER PROBATIVE OF SCIENTER

168. In 2015, Telenor retained Deloitte to investigate its role in and knowledge of VimpelCom's bribery in Uzbekistan. Deloitte interviewed witnesses and reviewed tens of thousands of documents.

169. Deloitte created a report, dated April 27, 2016, and a PowerPoint presentation dated April 29, 2016, setting out its findings (collectively, "Deloitte Report"). A copy of the Deloitte Report is attached as Exhibit C hereto and incorporated by reference.[8]

170. As set out in the Deloitte Report, in mid-August 2011, a Telenor employee seconded to VimpelCom ("Employee A") raised concerns to Telenor about potential bribes VimpelCom may be paying in connection with the purchase of 4G licenses from Takilant. He was advised by two Telenor executives to raise his concerns with members of VimpelCom Group's management. Employee A was experienced, able, and high-ranking. He reported directly to Telenor's CFO.

171. In late-August/September 2011, after escalating the issue, Employee A was still not satisfied. He held discussions and meeting which all three Telenor nominees on VimpelCom's Board: Kjell-Morten Johnsen, Ole Bjørn Sjulstad, and Jan Edvard Thygesen ("Telenor Nominees").

172. Employee A was still concerned and, on October 4, 2011, emailed the Telenor Nominees (i.e. Johnsen, Sjulstad, and Thygesen). In the email, Employee A:

---

[8] Available at https://www.telenor.com/wp-content/uploads/2016/04/Deloitte-Report_Telenor_290416_FINAL.pdf ; https://www.telenor.com/wp-content/uploads/2016/05/2016-Deloitte-presentation.pdf

(a) Described the transaction, specifically mentioning that the agreement with Takilant was to be entered into by an offshore VimpelCom subsidiary and that Takilant was incorporated in Gibraltar;

(b) Stated that Telenor's prior acquisition of its 3G licenses in Uzbekistan also involved Takilant;

(c) Stated that VimpelCom's applications for licenses in Uzbekistan may involve corruption;

(d) Stated that the FCPA analysis he had seen consisted of a questionnaire filled out by Takilant;

(e) Stated that he was concerned that the transaction may involve corruption; and

(f) Stated that he had raised his concerns with VimpelCom's top management but that he questioned the way VimpelCom management responded to his concerns.

173. The description of Employee A's actions in the Deloitte Report matches that of the Witness referenced in the Deferred Prosecution Agreement.

174. Thus, at a minimum, three members of VimpelCom's Supervisory Board were aware that the August 2011 4G transaction likely involved bribery.

175. A lawyer the Telenor Nominees consulted advised them to submit a written response to Employee A, but the Nominees declined to do so.

176. The Deloitte Report also shows that Telenor began asking questions of VimpelCom the day after the September 2012 Program.

177. According to the Deloitte Report, on October 1, 2012, VimpelCom's CEO Lunder answered questions that had been posed to him by Telenor's CEO regarding Uzbekistan and Takilant.

178. On December 4, 2012, Employee A repeated the concerns he had expressed in his October 4, 2011 email in an email to a Telenor executive.

179. On December 11, 2012, Telenor's CEO told its Board of Directors that there were material differences between TeliaSonera's case and VimpelCom's. These included that not only were the amounts of the payments materially smaller, but that VimpelCom had confirmed that it had performed a full FCPA investigation prior to the investments. These assurances must have been based on VimpelCom's statements because Telenor had no other source.

180. On December 14, 2012, Telenor held another meeting with VimpelCom in which the latter answered further questions about Takilant and operations in Uzbekistan.

181. Then, on December 18, 2012, Telenor met with Norway's Minister of Trade and Industry. Telenor confirmed that VimpelCom had engaged in transactions with Takilant but assured the Minister that there were "substantial differences" between the two cases.

182. On February 4, 2013, Aaser, Chairman of Telenor's Board, met VimpelCom's top management in Amsterdam. The meeting's purpose was to discuss VimpelCom's investments in Uzbekistan. VimpelCom represented that FCPA due diligence procedures were performed on all investments in Uzbekistan. The concerns raised by Employee A were not disclosed.

## IX. DEFENDANT'S FALSE STATEMENTS

### A. The FCPA Forbids Issuers Like VimpelCom From Paying Bribes and Mandates That They Develop Internal Controls

183. The Foreign Corrupt Practices Act of 1977, as amended, 15 U.S.C. §78dd-l, *et seq*, among other things, prohibits issuers with securities trading in the U.S. from acting corruptly in furtherance of an offer, promise, authorization, or payment of money or anything of value, directly or indirectly, to a foreign official for the purpose of obtaining or retaining business for, or directing business to, any person while knowing that all or a portion of the proceeds or thing of value will be

offered, given, or promised to any foreign official. 15 U.S.C. § 78dd-l(a)(1), (3).

184. The FCPA's prohibition applies to any issuer of publicly traded securities registered pursuant to Section 12(b) of the Securities Exchange Act of 1934 15 U.S.C. § 78*l*, or required to file periodic reports with the SEC under Section 15(d) of the Exchange Act, 15 U.S.C. § 78o(d), or affiliated persons. 15 U.S.C. § 78dd-l(a). Any such issuer is referred to herein as an "Issuer".

185. The Exchange Act requires that Issuers, among other things, make and keep books, records, and accounts that accurately and fairly reflect the transactions and disposition of the company's assets and prohibits the knowing and willful falsification of an issuer's books, records, or accounts. 15 U.S.C. §§ 78m(b)(2)(A), 78m(b)(5), and 78ff(a).

186. Additionally, the Exchange Act requires that Issuers maintain a system of internal accounting controls sufficient to provide reasonable assurances that: (a) transactions are executed in accordance with management's general or specific authorization; (b) transactions are recorded as necessary to (i) permit preparation of financial statements in conformity with generally accepted accounting principles or any other criteria applicable to such statements, and (ii) maintain accountability for assets; (c) access to assets is permitted only in accordance with management's general or specific authorization; and (d) the recorded accountability for assets is compared with the existing assets at reasonable intervals, and appropriate action is taken with respect to any differences. The Exchange Act also prohibits the knowing and willful failure to implement such a system of internal accounting controls. 15 U.S.C. §§ 78m(b)(5) and 78ff(a).

## B. VimpelCom Made False and Misleading Statements[9]

187. On December 2, 2010, the Company filed a report on Form 6-K with the SEC

---

[9] Plaintiff Lvov recognizes that the Court has found that certain of the statements contained in this Subsection VII.B. are not misleading. But though the Second Circuit does not require litigants to replead claims that have been dismissed with prejudice to preserve appellate rights, the claims were raised by the former lead plaintiff, not Lvov. Lvov realleges the statements to preserve any appellate

announcing its third quarter operating and financial results. The Company stated in relevant part: "Total number of broadband subscriptions increased 178.7% year-on-year ('YoY') and 15.0% quarter-on-quarter ('QoQ') as we continue to develop our broadband projects in Kazakhstan, Uzbekistan and Armenia."

188. The statements in the preceding paragraph were false and misleading as the increase in total number of broadband subscriptions and broadband projects was made possible by the bribery described above. Because VimpelCom put the topic of the cause of its financial success at issue, then it was obligated to disclose information concerning the source of its success, since reasonable investors would find that such information would materially alter the mix of available information.

189. On March 29, 2011, the Company filed a report on Form 6-K with the SEC announcing its fourth quarter and full year 2010 operating and financial results. In this March 29, 2011 filing, the Company reported a net operating revenue increase in Uzbekistan.

190. On June 1, 2011, the Company filed a report on Form 6-K with the SEC announcing its first quarter 2011 results. It was in this June 1, 2011 press release that the Company reported a net operating revenue increase in Uzbekistan.

191. The statements in the two preceding paragraphs were false and misleading as the net operating revenue increase in Uzbekistan was made possible by the bribery described above. Because VimpelCom put the topic of the cause of its financial success at issue, then it was obligated to disclose information concerning the source of its success, since reasonable investors would find that such information would materially alter the mix of available information.

192. On June 30, 2011, the Company filed an annual report on Form 20-F with the SEC announcing the Company's financial and operating results for the quarter and fiscal year ended

---

rights in light of the uncertainty of the law on this matter. The statements the Court has dismissed are alleged in ¶¶ 187, 189, 190, 193, 210, 222, 224, 229, 248, 251, 253, 259, and 261.

December 31, 2010 (the “2010 Form 20-F”).

193. In the 2010 Form 20-F, the Company stated that it had 4.8 million customers in Uzbekistan through its Unitel subsidiary as of December 31, 2010.

194. The Company then stated that “The increase in our subscriber base in Uzbekistan was primarily due to expansion of our mobile network coverage and the introduction of attractive tariff offers at competitive prices.”

195. The statements in the two preceding paragraphs were false and misleading because the increase in VimpelCom’s subscriber base was made possible at least in part by the bribery described above. Because VimpelCom put the topic of the cause of its financial success at issue, then it was obligated to disclose information concerning the source of its success, since reasonable investors would find that such information would materially alter the mix of available information.

196. With respect to regulation of the telecommunications industry in Uzbekistan, the Company stated:

> The ***government authorities responsible*** for supervising the telecommunications industry in the Republic of Uzbekistan are the Republic of Uzbekistan Cabinet and a specially authorized telecommunications agency.

197. The emphasized statement in the preceding paragraph was false and misleading as the government authorities responsible for supervising the telecommunications industry in the Republic of Uzbekistan were not the Republic of Uzbekistan Cabinet and a specially authorized telecommunications agency but rather the President of Uzbekistan’s eldest daughter Karimova. According to the DOJ’s Criminal Complaint, VimpelCom management explained that it was “more important to follow the political requirements suggested for entry into the [Uzbek] market versus [the] questionable risk of acquisition of Unitel as [a] standalone” and VimpelCom would be “in opposition to a very powerful opponent and bring [the] threat of revocation of licenses after the

acquisition of Unitel [as a] stand-alone." Because VimpelCom put the topic of its interactions with the authorities responsible for supervising the telecommunications industry in Uzbekistan at issue, then VimpelCom was obligated to disclose information concerning the reality of the Company's interactions with the real authorities, since reasonable investors would find that such information would materially alter the mix of available information.

198. The Company also stated:

> In accordance with the Law on Telecommunications, dated August 20, 1999, businesses offering communications services in the Republic of Uzbekistan may be privately or publicly held by Uzbek or foreign national individuals or legal entities. ***All owners of telecommunications networks have equal rights and enjoy equal protection guaranteed by the law*** and the legislation imposes no restrictions on foreign investors.

199. The emphasized statement in the preceding paragraph was false and misleading because the Company admitted in the Deferred Prosecution Agreement that to enter the Uzbek telecommunications market it had to engage in bribery and continue to bribe to remain in the market.

200. In the 2010 Form 20-F, the Company stated that its internal controls were effective and in place. The Company's 2010 Form 20-F states in relevant part:

> Our management has assessed the effectiveness of our company's internal control over financial reporting as of December 31, 2010. In making its assessment, our management has utilized the criteria set forth by the Committee of Sponsoring Organizations, or COSO, of the Treadway Commission in Internal Control—Integrated Framework, and Securities and Exchange Commission's Guidance Regarding Management's Report on Internal Control Over Financial Reporting Under Section 13(a) or 15(d) of the Exchange Act. ***Based on the assessment, our management believes our company maintained effective internal control over financial reporting as of December 31, 2010.***

201. The emphasized statement in the preceding paragraph regarding the Company's internal controls were false and misleading as the Company admitted in the Deferred Prosecution Agreement that it (a) failed to implement adequate internal accounting controls; (b) failed to enforce

the internal accounting controls it did have in place, which permitted the above-referenced bribe payments to occur without detection or remediation; (c) failed to implement a system for conducting, recording, and verifying due diligence on third parties, including joint venture partners, consultants, reseller companies, and suppliers to uncover their true nature, beneficial ownership, and possible corruption risks; and (d) failed to require that all consulting agreements be for bona fide services, that agreed-upon payments were commensurate with the services to be performed, and that services paid for were, in fact, performed. Further, the Company admits that it knowingly failed to conduct meaningful auditing or testing of its consultant agreements, invoices, and payments, including those with Takilant and failed to conduct adequate investigations of corruption complaints. The Company admits that it also had no policy regarding payments to bank accounts located in places where the contractual partner neither performed work nor had operations.

202. The 2010 Form 20-F contained Sarbanes-Oxley Act of 2002 (“SOX”) certifications signed by Izosimov and van Dalen, stating that the financial information contained in the 2010 Form 20-F was accurate and disclosed any material changes to the Company’s internal control over financial reporting. The SOX certifications were false because the 2010 Form 20-F was not accurate and VimpelCom’s internal controls were not adequate.

203. On September 7, 2011, the Company filed a report on Form 6-K with the SEC announcing the Company’s financial and operating results for the quarter ended June 30, 2011 (the “Q2 2011 6-K”). The Q2 2011 6-K stated in relevant part:

> In Uzbekistan, ***our sales and marketing efforts resulted*** in a 34% increase in the number of mobile subscribers as compared with the second quarter of 2010. Our revenues have increased by 28% YoY with strong EBITDA margin of 42.9% demonstrating the underlying strength of our core.
>
> * * * * *
>
> The CIS Business Unit continued to ***demonstrate strong operational***

> ***results despite intensified competition in some key CIS countries, due to the improving macroeconomic situation in the region***, product quality and efficient sales and marketing efforts.

204. The emphasized statements in the preceding paragraphs were false and misleading as the 34% increase in mobile subscribers and revenue increase with strong EBITDA margin of 42.9% in Uzbekistan was made possible in part by the bribery described above rather than sales and marketing efforts or improving macroeconomic conditions. Because VimpelCom put the topic of the cause of its financial success at issue, then it was obligated to disclose information concerning the source of its success, since reasonable investors would find that such information would materially alter the mix of available information.

205. On November 14, 2011, the Company filed a report on Form 6-K with the SEC announcing the Company's financial and operating results for the quarter ended September 30, 2011 (the "Q3 2011 6-K"). The Q3 2011 6-K stated in relevant part: "Revenues were up 36% YoY and EBITDA increased by 58% YoY ***due to our sales and marketing activities***, regional 3G network roll-out and data development."

206. The emphasized statements in the preceding paragraph were false and misleading as the 36% increase in revenue and 58% increase in EBITDA in Uzbekistan was made possible by the bribery described above rather than just through sales and marketing activities. Because VimpelCom put the topic of the cause of its financial success at issue, then it was obligated to disclose information concerning the source of its success, since reasonable investors would find that such information would materially alter the mix of available information.

207. On March 13, 2012, the Company filed a report on Form 6-K with the SEC announcing the Company's financial and operating results for the quarter and fiscal year ended December 31, 2011 (the "Q4 2011 6-K"). The Q4 2011 6-K stated in relevant part: "In Uzbekistan, the positive trend in subscriber base growth, coupled with positive dynamics in all KPIs, resulted in

revenue growth of 35% YoY in 4Q11. EBITDA was 54% higher YoYas a result of revenue growth and efficient SG&A spending."

208. The statements in the preceding paragraph were false and misleading as the positive trend in subscriber base growth, the 35% increase in revenue and 54% increase in EBITDA in Uzbekistan was made possible by the bribery described above. Because VimpelCom put the topic of the cause of its financial success at issue, then it was obligated to disclose information concerning the source of its success, since reasonable investors would find that such information would materially alter the mix of available information.

209. On April 30, 2012, the Company filed an annual report on Form 20-F with the SEC reiterating the financial and operating results previously announced in the Company's Q4 2011 6-K ( "2011 Form 20-F").

210. In the 2011 Form 20-F, the Company stated, in relevant part, that it had 6.4 million customers in Uzbekistan through its Unitel subsidiary as of December 31, 2011.

211. The statement in the preceding paragraph was false and misleading as the 6.4 million customers in Uzbekistan through the Company's Unitel subsidiary was made possible by the bribery described above. Because VimpelCom put the topic of the cause of its financial success at issue, then it was obligated to disclose information concerning the source of its success, since reasonable investors would find that such information would materially alter the mix of available information.

212. With respect to regulation of the telecommunications industry in Uzbekistan, the Company stated:

> The ***government authorities responsible for supervising*** the telecommunications industry in the Republic of Uzbekistan are the Republic of Uzbekistan Cabinet and a specially authorized telecommunications agency.

213. The emphasized statement in the preceding paragraph was false and misleading as

the government authorities responsible for supervising the telecommunications industry in the Republic of Uzbekistan were not the Republic of Uzbekistan Cabinet and a specially authorized telecommunications agency but rather the President of Uzbekistan's eldest daughter Karimova. According to the DOJ's Criminal Complaint, VimpelCom management explained that it was "more important to follow the political requirements suggested for entry into the [Uzbek] market versus [the] questionable risk of acquisition of Unitel as [a] standalone" and VimpelCom would be "in opposition to a very powerful opponent and bring [the] threat of revocation of licenses after the acquisition of Unitel [as a] stand-alone." Further, the following statement was false and misleading ("[a]ll owners of telecommunications networks have equal rights and enjoy equal protection guaranteed by the law") as the Company admitted in the Deferred Prosecution Agreement that to enter the Uzbek telecommunications market they had to engage in bribery and continue to bribe to remain in the market.

214. The Company continued:

> In accordance with the Law on Telecommunications, dated August 20, 1999, businesses offering communications services in the Republic of Uzbekistan may be privately or publicly held by Uzbek or foreign national individuals or legal entities. ***All owners of telecommunications networks have equal rights and enjoy equal protection guaranteed by the law*** and the legislation imposes no restrictions on foreign investors.

215. The emphasized statement in the preceding paragraph was false and misleading because the Company admitted in the Deferred Prosecution Agreement that to enter the Uzbek telecommunications market they had to engage in bribery and continue to bribe to remain in the market.

216. In the 2011 Form 20-F, the Company also stated that its internal controls were effective and in place. The Company's 2011 Form 20-F states in relevant part:

> Our management is responsible for establishing and maintaining

> adequate internal control over financial reporting as defined in Rules 13a-15(f) and 15d-15(f) under the Exchange Act. ***Our internal control system was designed to provide reasonable assurance regarding the reliability of financial reporting*** and the preparation and fair presentation of our company's published consolidated financial statements under generally accepted accounting principles.

217. The emphasized statement in the preceding paragraph regarding the Company's internal controls was false and misleading as the Company admitted in the Deferred Prosecution Agreement that it (a) failed to implement adequate internal accounting controls; (b) failed to enforce the internal accounting controls it did have in place, which permitted the above-referenced bribe payments to occur without detection or remediation; (c) failed to implement a system for conducting, recording, and verifying due diligence on third parties, including joint venture partners, consultants, reseller companies, and suppliers to uncover their true nature, beneficial ownership, and possible corruption risks; and (d) failed to require that all consulting agreements be for bona fide services, that agreed-upon payments were commensurate with the services to be performed, and that services paid for were, in fact, performed. Further, the Company admits that it knowingly failed to conduct meaningful auditing or testing of its consultant agreements, invoices, and payments, including those with Takilant and failed to conduct adequate investigations of corruption complaints. The Company admits that it also had no policy regarding payments to bank accounts located in places where the contractual partner neither performed work nor had operations.

218. The 2011 Form 20-F contained SOX certifications signed by Lunder and van Dalen, stating that the financial information contained in the 2011 Form 20-F was accurate and disclosed any material changes to the Company's internal control over financial reporting. The SOX certifications were false because the 2011 Form 20-F was not accurate and VimpelCom's internal controls were not adequate.

219. On May 15, 2012, the Company filed a report on Form 6-K with the SEC announcing

the Company's financial and operating results for the quarter ended March 31, 2012 (the "Q1 2012 6-K"). The Q1 2012 6-K stated in relevant part: "In Uzbekistan, the subscriber base continued to grow in all segments and revenue was up 33% YoY in 1Q12. The EBITDA margin was 44.6%, a slight decline YoY, as a result of increased competition and higher Opex due to a newly introduced tax on customer base. EBITDA increased 30% YoY."

220. The May 15, 2012 Form 6-K also provided that: "The CIS markets continue to provide strong growth opportunities in an increasingly competitive environment which has also been affected by certain governmental measures in key markets. In Kazakhstan and Uzbekistan, our key CIS markets, VimpelCom strengthened its market positions as a result of both strong product offerings and efficient sales and marketing efforts."

221. The statements in the two preceding paragraphs were false and misleading as the subscriber increase, the 33% increase in revenue and 30% increase in EBITDA in Uzbekistan, as well as the strong growth opportunities in Uzbekistan, were made possible by the bribery described above. Because VimpelCom put the topic of the cause of its financial success at issue, then it was obligated to disclose information concerning the source of its success, since reasonable investors would find that such information would materially alter the mix of available information.

222. On August 15, 2012, the Company filed a report on Form 6-K with the SEC announcing the Company's financial and operating results for the quarter ended June 30, 2012 (the "Q2 2012 6-K"). The Q2 2012 6-K stated in relevant part: "In Uzbekistan, the subscriber base continued to grow strongly, up 31% YoY, with record mobile internet user growth of 53% YoY. Revenue was up 35% YoY in 2Q12 . . . ."

223. The statement in the preceding paragraph was false and misleading as the subscriber increase and the 35% increase in revenue in Uzbekistan was made possible by the bribery described above. Because VimpelCom put the topic of the cause of its financial success at issue, then it was

obligated to disclose information concerning the source of its success, since reasonable investors would find that such information would materially alter the mix of available information.

224. On November 14, 2012, the Company filed a report on Form 6-K with the SEC announcing the Company's financial and operating results for the quarter ended September 30, 2012 (the "Q3 2012 6-K"). The Q3 2012 6-K stated in relevant part: "Revenue was up 88% organically YoY in 3Q12, supported by a 62% YoY increase in the subscriber base as well as 26% ARPU growth. If this were adjusted to the growth level of 1H12, the underlying revenue growth would have been approximately 35% YoY. EBITDA grew 123% and EBITDA margin was 56.2%, a sharp increase from 47.3% in 3Q11, supported by interconnect cost reduction and control of structural OPEX."

225. The statement in the preceding paragraph was false and misleading as the 88% increase in revenue, 62% increase in the subscriber base, the 26% ARPU growth, the 123% EBITDA growth in Uzbekistan was made possible by the bribery described above. Because VimpelCom put the topic of the cause of its financial success at issue, then VEON was obligated to disclose information concerning the source of the Company's success, since reasonable investors would find that such information would materially alter the mix of available information.

226. On March 6, 2013, the Company filed a report on Form 6-K with the SEC announcing the Company's financial and operating results for the quarter and fiscal year ended December 31, 2012 (the "Q4 2012 6-K"). The Q4 2012 6-K stated in relevant part: "Revenue was up 99% YoY in local currency, supported by a 60% YoY increase of the subscriber base as well as 26% YoY ARPU increase as a result of the growth of high value subscribers and increasing mobile data revenues. EBITDA grew 192% YoY and EBITDA margin was 60.3%, a sharp increase from 41.0% in 4Q11."

227. The statement in the preceding paragraph was false and misleading as the 99%

increase in revenue, the 60% YoY increase of the subscriber base, as well as 26% YoY ARPU increase as a result of the growth of high value subscribers and increasing mobile data revenues, the 192% increase in EBITDA in Uzbekistan was made possible by the bribery described above. Because VimpelCom put the topic of the cause of its financial success at issue, then it was obligated to disclose information concerning the source of its success, since reasonable investors would find that such information would materially alter the mix of available information.

228. On March 22, 2013, the Company filed an annual report on Form 20-F with the SEC reiterating its financial and operating results previously announced in the Company's Q4 2012 6-K (the "2012 Form 20-F").

229. In the 2012 Form 20-F, the Company stated that it had 10.2 million customers in Uzbekistan through its Unitel subsidiary as of December 31, 2012.

230. The statement in the preceding paragraph was false and misleading as the 10.2 million customers in Uzbekistan through the Company's Unitel subsidiary was made possible by the bribery described above. Because VimpelCom put the topic of the cause of its financial success at issue, then it was obligated to disclose information concerning the source of its success, since reasonable investors would find that such information would materially alter the mix of available information.

231. With respect to regulation of the telecommunications industry in Uzbekistan, the Company stated:

> ***The government authorities responsible for supervising the telecommunications industry in the Republic of Uzbekistan are the Republic of Uzbekistan Cabinet and a specially authorized telecommunications agency.***

232. The statements in the preceding paragraph was false and misleading as the government authorities responsible for supervising the telecommunications industry in the Republic

of Uzbekistan were not the Republic of Uzbekistan Cabinet and a specially authorized telecommunications agency but rather the President of Uzbekistan's eldest daughter Karimova. According to the DOJ's Criminal Complaint, VimpelCom management explained that it was "more important to follow the political requirements suggested for entry into the [Uzbek] market versus [the] questionable risk of acquisition of Unitel as [a] standalone" and VimpelCom would be "in opposition to a very powerful opponent and bring [the] threat of revocation of licenses after the acquisition of Unitel [as a] stand-alone."

233. The Company continued:

> In accordance with the Law on Telecommunications, dated August 20, 1999, businesses offering communications services in the Republic of Uzbekistan may be privately or publicly held by Uzbek or foreign national individuals or legal entities. ***All owners of telecommunications networks have equal rights and enjoy equal protection guaranteed by the law*** and ***the legislation imposes no restrictions on foreign investors.***

234. The statements in the preceding paragraph were false and misleading as the Company admitted in the Deferred Prosecution Agreement that to enter the Uzbek telecommunications market they had to engage in bribery and continue to bribe to remain in the market.

235. In the 2012 Form 20-F, the Company stated that its internal controls were effective and in place. The Company's 2012 Form 20-F states in relevant part:

> Our management has assessed the effectiveness of our company's internal control over financial reporting as of December 31, 2012. In making its assessment, our management has utilized the criteria set forth by the Committee of Sponsoring Organizations, or "COSO," of the Treadway Commission in Internal Control—Integrated Framework, and Securities and Exchange Commission's Guidance Regarding Management's Report on Internal Control Over Financial Reporting Under Section 13(a) or 15(d) of the Exchange Act. ***Based on the assessment, our management believes our company maintained effective internal control over financial reporting as of December 31, 2012.***

236. The statements in the preceding paragraph regarding the Company's internal controls were false and misleading as the Company admitted in the Deferred Prosecution Agreement that it (a) failed to implement adequate internal accounting controls; (b) failed to enforce the internal accounting controls it did have in place, which permitted the above-referenced bribe payments to occur without detection or remediation; (c) failed to implement a system for conducting, recording, and verifying due diligence on third parties, including joint venture partners, consultants, reseller companies, and suppliers to uncover their true nature, beneficial ownership, and possible corruption risks; and (d) failed to require that all consulting agreements be for bona fide services, that agreed-upon payments were commensurate with the services to be performed, and that services paid for were, in fact, performed. Further, the Company admits that it knowingly failed to conduct meaningful auditing or testing of its consultant agreements, invoices, and payments, including those with Takilant and failed to conduct adequate investigations of corruption complaints. The Company admits that it also had no policy regarding payments to bank accounts located in places where the contractual partner neither performed work nor had operations.

237. The 2012 Form 20-F contained SOX certifications signed by Lunder and van Dalen, stating that the financial information contained in the 2012 20-F was accurate and disclosed any material changes to the Company's internal control over financial reporting. The SOX certifications were false because the 2012 Form 20-F was not accurate and VimpelCom's internal controls were not adequate.

238. On May 15, 2013, the Company filed a report on Form 6-K with the SEC announcing the Company's financial and operating results for the quarter ended March 31, 2013 (the "Q1 2013 6-K"). The Q1 2013 6-K stated in relevant part: "Revenue was up 100% YoY, driven by a 40% YoY increase in the subscriber base and a 43% YoY increase in ARPU due to growth of high value subscribers and increasing mobile data revenues. EBITDA grew 192% YoY and EBITDA margin

was 65.2%, a strong increase from 44.6% in 1Q12."

239. The statement in the preceding paragraph was false and misleading as the 100% increase in revenue, the 40% increase in subscriber base, 43% increase in ARPU in Uzbekistan, and 192% EBITDA growth was made possible by the bribery described above. Because VimpelCom put the topic of the cause of its financial success at issue, then it was obligated to disclose information concerning the source of its success, since reasonable investors would find that such information would materially alter the mix of available information.

240. On August 7, 2013, the Company filed a report on Form 6-K with the SEC announcing the Company's financial and operating results for the quarter ended June 30, 2013 (the "Q2 2013 6-K"). The Q2 2013 6-K states in relevant part: "Revenue increased 86% YoY, driven by 45% YoY growth in the subscriber base and a 31% YoY improvement in ARPU due to growth in high value subscribers and increasing mobile data revenues. EBITDA grew 140% YoY and EBITDA margin was 64.7%, a strong increase from 50.6% in 2Q12."

241. The statement in the preceding paragraph was false and misleading as the 86% increase in revenue, the 45% increase in subscriber base, 31% increase in ARPU, and the 140% EBITDA growth in Uzbekistan was made possible by the bribery described above. Because VimpelCom put the topic of the cause of its financial success at issue, then it was obligated to disclose information concerning the source of its success, since reasonable investors would find that such information would materially alter the mix of available information.

242. On November 6, 2013, the Company filed a report on Form 6-K with the SEC announcing the Company's financial and operating results for the quarter ended September 30, 2013 (the "Q3 2013 6-K"). The Q3 2013 6-K stated in relevant part: "In Uzbekistan, VimpelCom continued to deliver strong YoY results in 3Q13. Revenue increased 29% YoY, driven by 12% YoY growth in the subscriber base and a 12% YoY improvement in ARPU due to growth in high value

subscribers and increasing mobile data revenues. EBITDA grew 51% YoY and EBITDA margin was 66.0%, a strong increase from 56.2% in 3Q12."

243. The statement in the preceding paragraph was false and misleading as the 29% increase in revenue, the 12% increase in subscriber base, 12% increase in ARPU, and the 51% EBITDA growth in Uzbekistan was made possible by the bribery described above. Because VimpelCom put the topic of the cause of its financial success at issue, then it was obligated to disclose information concerning the source of its success, since reasonable investors would find that such information would materially alter the mix of available information.

244. On March 6, 2014, the Company filed a report on Form 6-K with the SEC announcing the Company's financial and operating results for the quarter and fiscal year ended December 31, 2013 (the "Q4 2013 6-K"). The Q4 2013 6-K stated in relevant part: "Service revenue increased 11% YoY to USD 175 million driven by a 3% YoY growth in the customer base to 10.5 million, a 3% YoY improvement in ARPU to USD due to growth in high value customers and a 61% YoY increase in mobile data revenue to USD 27 million. EBITDA grew 18% YoY to USD 112 as a result of growing revenue and EBITDA margin was 63.8%, a 3.5 percentage points YoY increase, supported by increased on-net traffic and cost control."

245. The statement in the preceding paragraph was false and misleading as the 11% increase in service revenue, the 3% growth in customer base, 3% increase in ARPU, and an increase of 18% in EBITDA in Uzbekistan was made possible by the bribery described above. Because VimpelCom put the topic of the cause of its financial success at issue, then VimpelCom was obligated to disclose information concerning the source of its success, since reasonable investors would find that such information would materially alter the mix of available information.

246. On May 15, 2014, the Company filed an annual report on Form 20-F with the SEC reiterating the financial and operating results previously announced in the Company's Q4 2013 6-

K (the "2013 Form 20-F").

247. In the 2013 Form 20-F, the Company stated in part:

> **We are subject to investigations by the SEC, DOJ and the Dutch public prosecutor, and are conducting an internal investigation, and we are unable to predict the duration, scope or results of these investigations or their impact on us.**
>
> As we previously disclosed, the SEC, DOJ and Dutch public prosecutor's office are conducting investigations related to VimpelCom; these investigations appear to be concerned with our operations in Uzbekistan, including relations with Takilant Ltd. ("Takilant"). In June 2007, Takilant purchased from us a 7% interest in our business in Uzbekistan for US$20.0 million and entered into a shareholders agreement with us. In September 2009, Takilant exercised its option to put its 7% interest to us for US$57.5 million, an amount specified in the shareholders agreement. In addition, we had agreements with Takilant relating to the acquisition of frequency spectrum (including with respect to 3G and LTE) and channels in Uzbekistan pursuant to which we paid Takilant an aggregate of US$57.0 million.
>
> It has been reported in the press that Takilant is currently being investigated in Sweden and Switzerland on allegations that it and certain persons associated with it have committed acts of bribery and money-laundering connected with their activities in Uzbekistan, and also that Takilant is being investigated in the Netherlands and perhaps other jurisdictions. These investigations may, in part, involve us.
>
> As a result of concerns arising from press reports regarding Takilant, we commenced a review with respect to our operations in Uzbekistan, including our relations with Takilant, and in 2013 we retained external counsel with expertise relating to the U.S. Foreign Corrupt Practices Act ("FCPA") and other anticorruption laws and regulations to conduct such review.
>
> Following notice of the investigations by the SEC, the DOJ and the Dutch public prosecutor's office, we established a special committee of the supervisory board in March 2014, consisting of all outside directors, to oversee the internal investigation being conducted by the Company's external counsel and our response to the inquiries by various authorities. While the initial focus of the investigation being conducted by the Company's external counsel has been related to our Uzbek operations, including our relations with Takilant, and whether there was any conduct in our operations in Uzbekistan that

> may have violated the anti-bribery provisions of the FCPA, the FCPA's books and records and internal controls provisions, applicable local laws and/or our own internal policies, the investigation is also reviewing our operations in additional countries.
>
> We expect to incur costs in responding to requests for information, testimony and other information in connection with the investigations and in conducting the internal investigation, and we cannot predict at this time the ultimate amount of all such costs.
>
> These matters may require the involvement of certain members of our senior management that could impinge on the time they have available to devote to other matters relating to the business. We may also see ongoing media and governmental interest in these matters that could impact the perception of us.
>
> ***The SEC, DOJ and Dutch investigations, as well as our own investigations, are continuing, and we are presently unable to predict the duration, scope or results of these investigations or how the results of these investigations may impact our internal controls, business, and the results of operations or financial condition.***
>
> Further, there can be no assurance that such investigations will not be broader in scope than they currently appear, or that new investigations will not be commenced in these or other jurisdictions, or that there will not be litigation commenced against us.
>
> One or more enforcement actions could be instituted in respect of the matters that are the subject of some or all of the investigations.
>
> The DOJ and SEC have a broad range of civil and criminal sanctions under the FCPA and other laws and regulations including, but not limited to, judgments, settlements, injunctive relief, debarment or other relief, disgorgement, fines, penalties, modifications to business practices, including the termination or modification of existing business relationships, the imposition of compliance programs and the retention of a monitor to oversee compliance with the FCPA, and criminal convictions and/or penalties. The Dutch public prosecutor's office and enforcement authorities in other jurisdictions also have a range of sanctions under the relevant laws and regulations. There can be no assurance that any investigation will not conclude that a violation of applicable law has occurred.
>
> The imposition of any of these sanctions or remedial measures could have a material adverse effect on our business or financial condition.

248. On August 6, 2014, the Company filed a report on Form 6-K with the SEC

announcing the Company's financial and operating results for the quarter ended June 30, 2014 (the "Q2 2014 6-K"). The Q2 2014 6-K also stated in relevant part:

> UZBEKISTAN
> . . . ***Mobile service revenue increased 7% YoYto USD 176 million driven by a 2% YoY growth in the customer base to 10.4 million and a 6% YoY improvement in ARPU to USD 6.*** [.]

249. The emphasized statements in the two preceding paragraphs were false and misleading as the mobile service revenue increase of 7%, the 2% year over year growth in the customer base to 10.4 million and the 6% improvement in ARPU was made possible by the bribery described above. Because VimpelCom put the topic of the cause of its financial success at issue, then it was obligated to disclose information concerning the source of its success, since reasonable investors would find that such information would materially alter the mix of available information.

250. The 2013 Form 20-F contained SOX certifications signed by Lunder and Davies, stating that the financial information contained in the 2013 Form 20-F was accurate and disclosed any material changes to the Company's internal control over financial reporting. The SOX certifications were false because the 2012 Form 20-F was not accurate and VimpelCom's internal controls were not adequate. The SOX certifications were false because the 2012 Form 20-F was not accurate and VimpelCom's internal controls were not adequate. The SOX certifications were false because the 2012 Form 20-F was not accurate and VimpelCom's internal controls were not adequate.

251. On November 12, 2014, the Company filed a report on Form 6-K with the SEC announcing the Company's financial and operating results for the quarter ended September 30, 2014 (the "Q3 2014 6-K"). The Q3 2014 6-K also stated in relevant part:

> UZBEKISTAN
> . . . ***Mobile service revenue increased 8% YoY to USD 189 million driven by a 7% YoY improvement in ARPU to USD 6 and a 2% YoY increase in the customer base to 10.5 million.*** . . . .

252. The emphasized statement in the preceding paragraph was false and misleading as the mobile service revenue increase of 8%, the 2% year over year growth in the customer base to 10.5 million and the 7% improvement in ARPU was made possible by the bribery described above. Because VimpelCom put the topic of the cause of its financial success at issue, then it was obligated to disclose information concerning the source of its success, since reasonable investors would find that such information would materially alter the mix of available information.

253. On February 26, 2015, the Company filed a report on Form 6-K with the SEC announcing the Company's financial and operating results for the quarter and year ended December 31, 2014 (the "Q4 2014 6-K"). The Q4 2014 6-K also stated in relevant part:

> UZBEKISTAN
> . . . ***Mobile service revenue increased 8% YoY to USD 184 million driven by a 6% YoY improvement in ARPU to USD 6 and a 1% YoY increase in the customer base to 10.6 million. The ARPU increase was mainly driven by a strong 31% YoY increase in mobile data revenue to USD 36 million. EBITDA in 4Q14 stood at USD 115 million, leading to an EBITDA margin of 61.6%.*** [.]

254. The emphasized statement in the preceding paragraph was false and misleading as the mobile service revenue increase of 8%, the 1% year over year growth in the customer base to 10.6 million and the 6% improvement in ARPU was made possible by the bribery described above. Because VimpelCom put the topic of the cause of its financial success at issue, then it was obligated to disclose information concerning the source of its success, since reasonable investors would find that such information would materially alter the mix of available information.

255. On March 24, 2015, the Company filed an annual report on Form 20-F with the SEC reiterating the financial and operating results previously announced in the Company's Q4 2014 6-K (the "2014 Form 20-F"). In the 2014 Form 20-F, the Company stated in part:

> **We are subject to investigations by the SEC, DOJ and OM, and are conducting an internal investigation. We are unable to predict the duration, scope or results of these investigations or**

**their impact on us**.

As previously disclosed, the SEC, DOJ and OM are conducting investigations related to VimpelCom, which have been focused primarily on our prior dealings with Takilant Ltd. (“Takilant”).

In June 2007, Takilant purchased from us a 7% interest in our business in Uzbekistan for US$20.0 million and entered into a shareholders agreement with us. In September 2009, Takilant exercised its option to put its 7% interest to us for US$57.5 million, an amount specified in the shareholders agreement. In addition, we had agreements with Takilant relating to the acquisition of frequency spectrum (including with respect to 3G and LTE) and channels in Uzbekistan pursuant to which we paid Takilant an aggregate of US$57.0 million.

It has also been reported in the press that Takilant is currently being investigated in Sweden and Switzerland on allegations that it and certain persons associated with it have committed acts of bribery and money-laundering connected with their activities in Uzbekistan, and also that Takilant is being investigated in the Netherlands and perhaps other jurisdictions. These investigations may, in part, involve us.

As a result of concerns arising from press reports regarding Takilant, we commenced a review with respect to our operations in Uzbekistan, including our relations with Takilant, and in 2013 we retained external counsel with expertise relating to the U.S. Foreign Corrupt Practices Act (“FCPA”) and other anticorruption laws and regulations to conduct such review.

Following notice of the investigations by the SEC, DOJ and OM, we established a Special Committee of the Supervisory Board in March 2014 to oversee the internal investigation being conducted by the company’s external counsel and our response to the inquiries by various authorities. The Special Committee consists of directors who qualify as independent for purposes of Rule 10A-3 under the Exchange Act. The investigation being conducted by the company’s external counsel has been focused primarily on our Uzbekistan operations, including our relations with Takilant, and whether there was any conduct in our operations in Uzbekistan that may have violated the anti-bribery provisions of the FCPA, the FCPA’s books and records and internal controls provisions, applicable local laws and/or our own internal policies. The investigation is also reviewing our operations in additional countries.

We expect to continue incurring costs related to the investigations,

primarily professional fees and expenses, which may be significant. These costs relate to responding to requests for information, testimony and other information in connection with the investigations and in conducting the internal investigation, and we cannot predict at this time the ultimate amount of all such costs. These matters may require the involvement of certain members of our senior management that could impinge on the time they have available to devote to other matters relating to the business. We may also see ongoing media and governmental interest in these matters that could impact the perception of us and result in reputational harm to our company. The investigations have received media attention in a number of jurisdictions, and parliamentary hearings held by the Norwegian Government have addressed the investigations.

***The SEC, DOJ and Dutch investigations, as well as our own investigations, are continuing, and we have cooperated, and continue to cooperate, with the authorities in these investigations. We are also exploring the prospect of resolving the company's potential liabilities arising from the facts established in the investigations. We are unable to predict the duration, scope or results of the ongoing investigations or how the results of these investigations or any resolutions may impact our business, results of operations, financial condition, or the assessment of our internal controls. Further, there can be no assurance that such investigations will not be broader in scope than they currently appear, or that new investigations will not be commenced in these or other jurisdictions, or that there will not be litigation commenced against us.***

One or more enforcement actions could be instituted in respect of the matters that are the subject of some or all of the investigations. The DOJ and SEC have a broad range of civil and criminal sanctions under the FCPA and other laws and regulations including, but not limited to, judgments, settlements, injunctive relief, debarment or other relief, disgorgement, fines, penalties, modifications to business practices, including the termination or modification of existing business relationships, the imposition of compliance programs and the retention of a monitor to oversee compliance with the FCPA, and criminal convictions and/or penalties. The OM and enforcement authorities in other jurisdictions also have a range of sanctions under the relevant laws and regulations. There can be no assurance that any investigation will not conclude that a violation of applicable law has occurred. The imposition of any of these sanctions or remedial measures could have a material adverse effect on our business or financial condition.

256. The 2014 Form 20-F also sated in relevant part:

**(b) Management's Annual Report on Internal Control Over Financial Reporting**

Our management is responsible for establishing and maintaining adequate internal control over financial reporting as defined in Rules 13a- 15(f) and 15d-15(f) under the Exchange Act. Our internal control system was designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation and fair presentation of our company's published consolidated financial statements under generally accepted accounting principles.

There are inherent limitations to the effectiveness of any system of controls and procedures, including the possibility of human error and the circumvention or overriding of the controls and procedures. Because of its inherent limitations, internal control over financial reporting may not prevent or detect misstatements. Also, projections of any evaluation of effectiveness to future periods are subject to risk that controls may become inadequate because of changes in conditions, or that the degree of compliance with the company's policies and procedures may deteriorate.

Our management has assessed the effectiveness of our company's internal control over financial reporting as of December 31, 2014. In making its assessment, our management has utilized the criteria set forth in the Internal Control - Integrated Framework (2013) issued by the Committee of Sponsoring Organizations of the Treadway Commission and the Securities and Exchange Commission's Guidance Regarding Management's Report on Internal Control Over Financial Reporting Under Section 13(a) or 15(d) of the Exchange Act.

***As a result of management's assessment of our internal control over financial reporting as of December 31, 2014, management concluded that our internal control over financial reporting was effective.***

257. The emphasized statements in the two preceding paragraphs regarding the Company's internal controls were false and misleading as the Company admitted in the Deferred Prosecution Agreement that it (a) failed to implement adequate internal accounting controls; (b) failed to enforce the internal accounting controls it did have in place, which permitted the above-referenced bribe payments to occur without detection or remediation; (c) failed to implement a system for conducting, recording, and verifying due diligence on third parties, including joint

venture partners, consultants, reseller companies, and suppliers to uncover their true nature, beneficial ownership, and possible corruption risks; and (d) failed to require that all consulting agreements be for bona fide services, that agreed-upon payments were commensurate with the services to be performed, and that services paid for were, in fact, performed. Further, the Company admits that it knowingly failed to conduct meaningful auditing or testing of its consultant agreements, invoices, and payments, including those with Takilant and failed to conduct adequate investigations of corruption complaints. The Company admits that it also had no policy regarding payments to bank accounts located in places where the contractual partner neither performed work nor had operations.

258. The 2014 Form 20-F contained SOX certifications signed by Lunder and Davies, stating that the financial information contained in the 2014 20-F was accurate and disclosed any material changes to the Company's internal control over financial reporting. The SOX certifications were false because the 2014 Form 20-F was not accurate and VimpelCom's internal controls were not adequate.

259. On May 14, 2015, the Company filed a report on Form 6-K with the SEC announcing the Company's financial and operating results for the quarter ended March 31, 2015 (the "Q1 2015 6-K"). The Q1 2015 6-K also stated in relevant part:

> UZBEKISTAN
> . . . ***Mobile service revenue increased by 13% YoY to UZS 405.5 billion driven by a 14% YoY improvement in ARPU to UZS 12,819, while the customer base decreased by 1% YoY to 10.4 million.*** [.]

260. The emphasized statement in the preceding paragraph was false and misleading as the mobile service revenue increase of 13%, the 1% year over year growth in the customer base to 10.4 million and the 14% improvement in ARPU was made possible by the bribery described above. Because VimpelCom put the topic of the cause of its financial success at issue, then it was obligated

to disclose information concerning the source of the Company's success, since reasonable investors would find that such information would materially alter the mix of available information.

261. On August 6, 2015, the Company filed a report on Form 6-K with the SEC announcing the Company's financial and operating results for the quarter ended June 30, 2015 (the "Q2 2015 6-K"). The Q2 2015 6-K also stated in relevant part:

> UZBEKISTAN
> . . . ***Mobile service revenue increased by 9% YoY to UZS 439 billion as a result of a 10% YoY increase in ARPU, driven by 19% YoY growth in mobile data revenue.*** . . . .

262. The emphasized statement in the preceding paragraph was false and misleading as the mobile service revenue increase of 9%, the 10% improvement in ARPU, and the 19% year over year growth in mobile data revenue was made possible by the bribery described above. Because VimpelCom put the topic of the cause of its financial success at issue, then it was obligated to disclose information concerning the source of its success, since reasonable investors would find that such information would materially alter the mix of available information.

263. On the Company's website, anti-bribery and anti-corruption are discussed:

> In 2014, ***we continued to strengthen our system of governance, policies and procedures focused on anti-bribery and anti-corruption, with a particular emphasis on extensive training across all of the Company's businesses.***
>
> We recognize that a strong and comprehensive approach to compliance is needed to protect our business, and our stakeholders. We have put in place a risk management, compliance, and governance structure that includes a focus on anti-bribery and anti-corruption risks and issues. We have continued to make progress in establishing a more coordinated and strengthened framework, adding resources, training and awareness initiatives to the program. This will remain a key focus as we regard it as a critical part of our future development and a particular focus of our senior management team.
>
> Our comprehensive Group Compliance Charter sets out the organization, operation and governance of compliance management

for the Group, including the role and responsibilities of our global Risk Assurance Committee, the Group Compliance Program and Group Compliance Function.

In August 2013, the company appointed a new senior Group Chief Compliance Officer with the responsibility to update and enhance the Compliance program and to continue to develop a strong ethical culture globally. The Group Compliance Officer reports to the Audit Committee of the Supervisory Board of Directors to which he has direct access, as well as directly to the Group Chief Executive Officer. Our Group Compliance Officer is a member of VimpelCom's Management Board. In recent years, we have enhanced our compliance team at our headquarters in Amsterdam and throughout the group. We have compliance officers and coordinators at all of our business units and covering all our operations.

Our compliance roadmap covers: risk analysis; policies and procedures related to key risk areas; organization and commitment; training and awareness; screening; record-keeping and controls; reporting; internal audit and monitoring; remedial and corrective actions; and program leadership.

***In December 2012, we launched an updated Code of Conduct for the group that provides group-wide standards designed primarily to deter wrongdoing and promote honest and ethical conduct, compliance with applicable governmental laws, rules and regulations, prompt internal reporting of violations and accountability for adherence to the Code. The Code of Conduct reinforces the company's requirements for compliance with all applicable laws, including the US Foreign Corrupt Practices Act (FCPA) and other anti-corruption laws and regulations, as well as adherence to all company accounting policies and controls. This Code states that, in addition to applying to its employees, officers and directors, VimpelCom expects 'anyone doing business on the company's behalf'—a category that includes agents and other third parties—to also comply with anti-bribery and anti-corruption laws.***

***In early 2013, we adopted a new Group Anti-Bribery and Anti-Corruption Policy, which is supported by a range of policies and procedures, in place or under development, which address issues such as third-party due diligence, conflicts of interest, gifts and hospitality, and incident management and investigation.***

In June 2013, we introduced our new Group Incident Management Policy relating to whistleblower processes that allows employees to

> contact a third-party service provider to raise concerns, anonymously if desired. All cases reported are duly assessed and, if appropriate, investigated by internal or external teams. We continue to take measures to ensure these policies are adhered to and the procedures are followed in each of the countries in which we operate.
>
> During 2014, we placed a great deal of emphasis on compliance training programs both at our headquarters and throughout the Business Units. For instance, during 2014, more than 7,300 employees worldwide have attended face to face Code of Conduct training sessions, or completed e-learning modules. Furthermore, in 2014, the company conducted an anti-corruption train-the-trainer session in Amsterdam where all compliance officers throughout the Group received additional training on FCPA and other applicable anti-bribery regulations, including advice on best practices for training other employees on these issues. Since that time, more than 800 employees (almost all of them managers) have received additional training on the FCPA and other applicable anti-bribery regulations as well as updated company policies. The Supervisory Board also received tailored compliance training.

264. The emphasized statements in the preceding paragraph regarding anti-bribery and anti-corruption on the Company's website were false and misleading as the Company admitted in the Deferred Prosecution Agreement that it (a) failed to implement adequate internal accounting controls; (b) failed to enforce the internal accounting controls it did have in place, which permitted the above-referenced bribe payments to occur without detection or remediation; (c) failed to implement a system for conducting, recording, and verifying due diligence on third parties, including joint venture partners, consultants, reseller companies, and suppliers to uncover their true nature, beneficial ownership, and possible corruption risks; and (d) failed to require that all consulting agreements be for bona fide services, that agreed-upon payments were commensurate with the services to be performed, and that services paid for were, in fact, performed. Further, the Company admits that it knowingly failed to conduct meaningful auditing or testing of its consultant agreements, invoices, and payments, including those with Takilant and failed to conduct adequate investigations of corruption complaints. The Company admits that it also had no policy regarding

payments to bank accounts located in places where the contractual partner neither performed work nor had operations.

**RESPONDEAT SUPERIOR**

265. VimpelCom is liable for the acts of Executive 1, Executive 2, members of its Board, and other VimpelCom employees and agents under the doctrine of *respondeat superior* and common law principles of agency as all of the wrongful acts complained of herein were carried out within the scope of their employment with authorization.

266. The scienter of Executive 1, Executive 2, members of its Board, and other VimpelCom employees and agents of VimpelCom is similarly imputed to VimpelCom under *respondeat superior* and agency principles.

**PLAINTIFF'S CLASS ACTION ALLEGATIONS**

267. Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired VimpelCom securities between December 2, 2010 and November 3, 2015, inclusive, seeking to pursue remedies under the Securities Act and the Exchange Act.

268. The members of the Class are so numerous that joinder of all members is impracticable. While the exact number of Class members is unknown to Plaintiff and can only be ascertained through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by VimpelCom or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice that customarily used in securities class actions.

269. Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by VimpelCom's wrongful conduct in violation of federal law that is complained of herein.

270. Plaintiff will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation.

271. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a) whether the federal securities laws were violated by VimpelCom's acts as alleged herein;

(b) whether statements made by VimpelCom to the investing public during the Class Period misrepresented material facts about the business, operations and management of the Company; and

(c) whether the members of the Class have sustained damages and, if so, the proper measure of damages.

272. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

**APPLICABILITY OF PRESUMPTION OF RELIANCE:**

**FRAUD-ON-THE-MARKET DOCTRINE**

273. At all relevant times, the market for VimpelCom ADRs was an efficient market for the following reasons, among others:

(a) The Company's ADSs met the requirements for listing, and was listed and actively traded on the NASDAQ, a highly efficient and automated market;

(b) During the Class Period, on average, over several hundreds of thousands of

shares of VimpelCom ADRs were traded on a weekly basis, demonstrating a very active and broad market for the Company's stock and permitting a very strong presumption of an efficient market;

(c) VimpelCom regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services;

(d) VimpelCom was followed by several securities analysts who wrote reports that were distributed to the sales force and certain customers of their respective brokerage firms during the Class Period. Each of these reports was publicly available and entered the public marketplace; and

(e) Unexpected material news about VimpelCom was rapidly reflected and incorporated into the Company's stock price during the Class Period.

274. As a result of the foregoing, the market for the Company's common stock promptly digested current information regarding VimpelCom from all publicly available sources and reflected such information in VimpelCom's ADS price. Under these circumstances, all purchasers of the Company's common stock during the Class Period suffered similar injury through their purchase of VimpelCom's ADSs at artificially inflated prices, and a presumption of reliance applies.

## COUNT I
## (Against VimpelCom For Violations of Section 10(b) And Rule 10b-5 Promulgated Thereunder)

275. Plaintiff incorporates the above referenced paragraphs.

276. During the Class Period, VimpelCom disseminated or approved the false statements specified above, which it knew or deliberately disregarded were misleading in that they contained

misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

277. VimpelCom violated § 10(b) of the 1934 Act and Rule 10b-5 in that it:

(a) employed devices, schemes and artifices to defraud;

(b) made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

(c) engaged in acts, practices, and a course of business that operated as a fraud or deceit upon Plaintiff and others similarly situated in connection with their purchases of VimpelCom securities during the Class Period.

278. Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for VimpelCom securities. Plaintiff and the Class would not have purchased VimpelCom securities at the prices they paid, or at all, if they had been aware that the market price had been artificially and falsely inflated by defendants' misleading statements.

**WHEREFORE**, Plaintiff prays for relief and judgment, as follows:

(A) Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

(B) Awarding damages in favor of Plaintiff and the other Class members against all Defendants for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(C) Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(D) Such other and further relief as the Court may deem just and proper.

**JURY TRIAL DEMANDED**

Plaintiff hereby demands a trial by jury.

Dated: February 22, 2023[10]

Respectfully submitted,

**THE ROSEN LAW FIRM, P.A.**

/s/Jonathan Horne
Jonathan Horne, Esq. (JH 7258)
Phillip Kim, Esq. (PK 9384)
Laurence M. Rosen, Esq. (LR 5733)
275 Madison Avenue, 40th Floor
New York, New York 10016
Telephone: (212) 686-1060
Fax: (212) 202-3827
Email: pkim@rosenlegal.com
Email: lrosen@rosenlegal.com

*Lead Counsel for Lead Plaintiff and Class*

[10] Refiled March 1, 2023

**THE SCHALL LAW FIRM**

Brian Schall, Esq.
1880 Century Park East, Suite 404
Los Angeles, CA 90067
Telephone: (424) 303-1964
Email: brian@schallfirm.com

*Additional Counsel for Movant*

**CERTIFICATE OF SERVICE**

I hereby certify that on February 22, 2023, a true and correct copy of the foregoing document was served by CM/ECF to the parties registered to the Court's CM/ECF system and that the document was refiled on March 1, 2023.

/s Jonathan Horne