UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------- x
:
IN RE VEON LTD. SECURITIES      :      1:15-cv-08672 (ALC) (OTW)
LITIGATION                                  :
:      <u>OPINION & ORDER</u>
:
------------------------------------------------- x

**ANDREW L. CARTER, JR., United States District Judge:**

Lead Plaintiff Boris Lvov ("Plaintiff" or "Lvov") brings this securities class action against Defendant Veon Ltd., f/k/a VimpelCom Ltd. (referred to herein as "VimpelCom"), alleging violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder on behalf of himself and a class of all persons who purchased VimpelCom American Depositary Shares ("ADSs") between December 4, 2010, and November 3, 2015, inclusive ("Class Period") and who held such ADSs through at least one corrective disclosure.

On September 29, 2024, the Court granted in part and denied in part Defendant's motion to dismiss ("2024 Order"). ECF No. 247. In that opinion, the Court requested counsel submit supplemental briefing on whether the newly alleged corrective disclosures ("New Corrective Disclosures") relate only to newly alleged false statements in the amended complaint, which would prevent Lead Plaintiff from proceeding with those disclosures, or whether they also relate to the false statements that the Court previously found actionable in 2017 ("2017 Statements"). ECF No. 247 at 14. Drawing all reasonable inferences in the Plaintiff's favor, the Court finds three of the six New Corrective Disclosures relate to the 2017 Statements and may proceed, while the other three may not.

**BACKGROUND**

**I. Factual Background**

1

The Court assumes the Parties' familiarity with the facts at issue. For a full recitation of the facts underlying this action, the Court refers to the Court's September 19, 2017 Opinion and Order. ECF No. 63, reported at *In re VEON Ltd. Sec. Litig.*, 2017 WL 4162342 (S.D.N.Y. Sept. 19, 2017) ("2017 Order").

## II. Procedural Background

The 2024 Order laid out the procedural history in detail. ECF No. 247. The Court assumes the Parties are familiar with this background but will highlight the portions relevant to today's decision.

In the 2017 Order, the Court permitted Plaintiff to proceed with three categories of alleged false statements ("2017 Statements"). ECF No. 63. These were:

- *2017 Statement 1*: VimpelCom's statements that, with respect to regulation of the telecommunications industry in Uzbekistan, "[a]ll owners of telecommunications networks have equal rights and enjoy equal protection guaranteed by the law." ECF No. 63 at 14.

- *2017 Statement 2*: VimpelCom's statements putting its reasons for financial success in Uzbekistan at issue. ECF No. 63 at 12.

- *2017 Statement 3*: VimpelCom's statements that the company maintained "effective internal control" over financial reporting. ECF No. 63 at 15-19.

The Court also allowed Plaintiff to proceed with six corrective disclosures:

- *March 12, 2014*: VimpelCom announced that it had been informed by the Securities and Exchange Commission and Dutch authorities that it was under investigation. AC ¶ 149.

- *March 18, 2014*: VimpelCom announced that it was being investigated by the Department of Justice. AC ¶ 151.

- *May 15, 2014*: In its 2013 Form 20-F, VimpelCom disclosed it was being investigated by the SEC, DOJ, and Dutch public prosecutor. AC ¶¶ 153-154.

- *December 8, 2014*: Telenor's President resigned from VimpelCom's supervisory board, citing bribery allegations. AC ¶ 160.

- *August 14, 2015*: It was reported that US prosecutors were seeking to freeze $1 billion in assets related to a wide-ranging criminal probe of alleged corruption by VimpelCom and others. AC ¶¶ 171-172.

- *November 3, 2015*: VimpelCom announced that it was recognizing an accounting reserve of $900M in connection with investigations over bribes paid in Uzbekistan. AC ¶ 173.

On March 1, 2023, the Lead Plaintiff, Mr. Lvov, filed the Third Amended Complaint ("TAC"). ECF No. 221. Mr. Lvov augmented the pleading by alleging three new purported false statements and six new corrective disclosures. Relevant to this Order are the New Corrective Disclosures, which are:

- *January 8, 2013*: Mr. Lvov alleges that on January 8, 2013 TeliaSonera, supposedly a competitor of VimpelCom, denied that it (TeliaSonera) had paid bribes but admitted that "the only Takilant beneficial owner it was able to find was a friend of Karimova." TAC ¶ 15. Mr. Lvov alleges that "the news was concerning to VimpelCom investors because it had been publicly reported that VimpelCom itself had done business with Takilant in Uzbekistan." *Id.* Mr. Lvov goes on to allege that on January 8, 2013, the

3

price of VimpelCom's American Depository Shares or ADSs fell 3.7%. *Id.*; *see also id.* ¶¶ 127-29.

- *March 24, 2014*: Mr. Lvov pleads that following reporting that Swedish prosecutors found a concrete basis to suspect that Gulnara Karimova "was the one who orchestrated, controlled, and also was the one who primarily benefited from" Takilant's bribery scheme "the price of VimpelCom's ADSs fell 3.6%, damaging investors." *Id.* ¶ 16; *see also id.* ¶¶ 134-137.

- *December 4, 2014*: Mr. Lvov pleads that "[o]n December 4, 2014, a Norwegian Member of Parliament announced that the Parliament would haul Telenor and VimpelCom in for a public hearing on the allegations that VimpelCom had paid bribes." *Id.* ¶ 17. Mr. Lvov goes on to plead that the "news revealed the risk that the Norwegian state might force Telenor to sell its VimpelCom shares." He also alleges that the same day, "the price of VimpelCom's ADSs fell 6.3%, damaging investors." *Id.* ¶ 17; *see also id.* ¶¶ 145-147.

- *August 20, 2015*: According to Mr. Lvov, "[o]n August 14 and 20, respectively, it was revealed that U.S. prosecutors were seeking to freeze $1 billion of Takilant's money and that Swiss prosecutors had seized $828 million and even expanded their probe against Karimova." *Id.* ¶ 19. Mr. Lvov alleges that "[t]hese disclosures caused the price of VimpelCom's ADSs to fall from $5.56 on August 13 to $4.51 on August 21, damaging investors." *Id.* ¶ 19; *see also id.* ¶¶ 153-54.

- *October 30 and 31, 2015*: Mr. Lvov alleges that before trading opened on October 30, 2015, a Norwegian Minister announced that she had received new information causing her to lose confidence in the chairman of Telenor's board, whose resignation was

4

announced contemporaneously. Lvov pleads that on October 31, "Bloomberg published a link to an October 30 Norwegian-language article setting out the information which had caused the Minister to lose confidence." *Id.* ¶ 20. Mr. Lvov alleges that the information suggested that high-level Telenor directors and executives knew of the bribes, which in turn suggested that high-level VimpelCom directors and executives likewise knew. *Id.* According to Mr. Lvov, the price of VimpelCom's ADSs fell a combined 4.9% over October 30 and the next trading day, November 2, 2015. *See id.* ¶¶ 156-63.

On May 12, 2024, VimpelCom filed a motion to dismiss these new allegations, arguing that the new false statements and New Corrective Disclosures were time barred by the statute of repose and that the new corrective disclosures could not support Lead Plaintiff's loss causation. ECF 240. On September 29, 2024, the Court granted with prejudice Defendant's motion as to the new false statements and denied without prejudice Defendant's motion as to the New Corrective Disclosures. ECF No. 247 at 14. In addition, the Court ordered briefing on whether the New Corrective Disclosures related to the newly or previously alleged misstatements. *Id.* at 13; *see also* ECF No. 249. Parties submitted briefing on this issue on October 7 and October 14, 2024. ECF No. 250 ("Plaintiff's Letter"); ECF No. 251 ("Defendant's Letter"). Plaintiff contends that all the New Corrective Disclosures relate to the 2017 Statements. ECF No. 250. Defendant argues that five or six New Corrective Disclosures relate only to the newly alleged, and time barred, false statements. ECF No. 251.

This Court did not request Parties brief on the 2024 Order's conclusion that Plaintiff sufficiently pleaded that the disclosures "reveal specific, concrete facts about VimpelCom that

5

contributed to its declining stock price" and this Order will not consider that issue again. ECF No. 247 at 13.

## STANDARD OF REVIEW

I. **Federal Rule of Civil Procedure 12(b)(6)**

When deciding a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), the Court must "accept as true all factual statements alleged in the complaint and draw all reasonable inferences in favor of the non-moving party." *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 191 (2d Cir. 2007). However, the Court need not credit "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). Claims should be dismissed when a plaintiff has not pleaded enough facts that "plausibly give rise to an entitlement for relief." *Id.* at 679. A claim is plausible "when the plaintiff pleads factual content that allows the Court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 678 (citing *Twombly*, 550 U.S. at 556). While not akin to a "probability requirement," the plaintiff must allege sufficient facts to show "more than a sheer possibility that a defendant has acted unlawfully." *Id.* (citing Twombly, 550 U.S. at 556). Accordingly, where a plaintiff alleges facts that are "'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of entitlement to relief.'" *Id.* (quoting *Twombly*, 550 U.S. at 557). The Court's function on a motion to dismiss is "not to weigh the evidence that might be presented at a trial but merely to determine whether the complaint itself is legally sufficient." *Goldman v. Belden*, 754 F.2d 1059, 1067 (2d Cir. 1985).

In deciding a motion to dismiss a securities class action, the Court may consider "any written instrument attached to the complaint, statements or documents incorporated into the

complaint by reference, legally required public disclosure documents filed with the SEC, and documents possessed by or known to the plaintiff and upon which it relied in bringing the suit" of which a court may take judicial notice. *Sgalambo v. McKenzie*, 739 F.Supp.2d 453, 470 (S.D.N.Y. 2010) (quoting *ATSI Commc'ns,* 493 F.3d at 98); *Rothman v. Gregor*, 220 F.3d 81, 88 (2d Cir. 2000)).

### II. Section 10(b) and Rule 10b-5

To plead a claim under Section 10(b) and Rule 10b-5, a plaintiff must adequately allege: "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation; (5) economic loss; and (6) loss causation." *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 267, (2014); *see Waggoner v. Barclays PLC*, 875 F.3d 79, 93 n.23 (2d Cir. 2017).

Regarding loss causation specifically, "to plead loss causation, plaintiffs must allege 'that the subject of the fraudulent statement or omission was the cause of the actual loss suffered.'" *Carpenters Pension Tr. Fund of St. Louis v. Barclays PLC*, 750 F.3d 227, 232 (2d Cir. 2014) (quoting *Suez Equity Investors, L.P. v. Toronto-Dominion Bank*, 250 F.3d 87, 95 (2d Cir. 2001)). That is, Plaintiff must allege "that the misstatement or omission concealed something from the market that, when disclosed, negatively affected the value of the security." *Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 173 (2d Cir. 2005). A plaintiff may plead loss causation "*either* by alleging (a) 'the existence of cause-in-fact on the ground that the market reacted negatively to a corrective disclosure of the fraud;' or (b) 'that the loss was foreseeable and caused by the materialization of the risk concealed by the fraudulent statement.'" *Barclays*, 750 F.3d at 232 (citing *In re Omnicom Grp., Inc. Sec. Litig.*, 597 F.3d 501, 511 (2d Cir. 2010)). "Under either

7

theory, Plaintiffs must show that the disclosure of information 'concealed ... from the market ... negatively affected the value of the security.'" *DoubleLine Cap. LP v. Odebrecht Fin., Ltd.*, 323 F. Supp. 3d 393, 456 (S.D.N.Y. 2018) (quoting *Lentell*, 396 F.3d at 173). That is, when a complaint alleges that misstatements and omissions were exposed by a corrective disclosure, "a plaintiff must point to a statement that, because it corrected a prior falsehood, precipitated a change in the security's price causing his loss." *DoubleLine*, 323 F. Supp. 3d at 456.

To plead loss causation by materialization of risk, a plaintiff must plead facts to show that "the loss was foreseeable and caused by the materialization of the risk concealed by the fraudulent statement." *In re Omnicom*, 597 F.3d at 513 (quoting *ATSI*, 493 F.3d at 107). "[I]f the connection is attenuated, or if the plaintiff fails to 'demonstrate a causal connection between the content of the alleged misstatements or omissions and the harm actually suffered' … a fraud claim will not lie." *Lentell*, 396 F.3d at 174 (quoting *Emergent Cap. Inv. Mgmt., LLC v. Stonepath Grp., Inc.*, 343 F.3d 189, 199 (2d Cir. 2003)).

## DISCUSSION

In determining whether the New Corrective Disclosures relate to the 2017 Statements it is instructive to review this Court's ruling on the previously alleged false statements and the previously alleged corrective disclosures. In 2017, this Court evaluated the corrective disclosures under the risk materialization theory and held that "the concealed risk that VEON's position in Uzbekistan was tenuous (or at least not as strong as presented) given the company's reliance on bribes, for example, materialized when the company began to disclose that government agencies were investigating the entities related to those bribes and, ultimately, VEON itself." *In re VEON Ltd. Sec. Litig.*, No. 15-CV-08672 (ALC), 2017 WL 4162342, at *12 (S.D.N.Y. Sept. 19, 2017). Therefore, to decide whether these New Corrective Disclosures relate to the 2017 Statements, it is

8

prudent to decide whether they materialized the risk that VimpelCom's position in Uzbekistan was tenuous given the company's reliance of bribes. The Court finds that three of six New Corrective Disclosures can be used to relate back to the 2017 Statements.

### a. January 8, 2013, Corrective Disclosure

The new corrective disclosure, dated January 8, 2013, alleges that VimpelCom's competitor, TeliaSonera, was publicly accused of paying bribes through Takilant, the company VimpelCom allegedly used to pay bribes to Gulnara Karimova. Following the announcement of the investigation, TeliaSonera denied the accusations and identified Gayane Avakyan, a close associate of Karimova, as the one beneficial owner of Takilant. *See* TAC ¶ 15. Plaintiff argues that the investigation, TeliaSonera's denial, and its identification of Gayane Avakyan materialized the concealed risk that VimpelCom's position was tenuous, given the knowledge that VimpelCom had worked with Takilant in the past. Plaintiff's Letter at 2.

Reading the complaint in the light most favorable to the Plaintiff, this disclosure created an inference that a company VimpelCom worked with in Uzbekistan was owned by an associate of Karimova and that this created a risk of investigation for VimpelCom as well. The argument that this materialized the concealed risk that VimpelCom was itself reliant on bribes is not sufficiently direct, as required by *Lentell*. 396 F.3d at 174. In *Emergent Capital Investment Management LLC v. Stonepath Group, Inc.*, a case cited in the *Lentell* opinion, the Second Circuit found that declining prices for shares in other companies controlled by the defendants, along with additional allegations as to those defendants' behavior and operation of the corporation at issue, was adequate to plead loss causation. 343 F.3d at 197–98. This is distinct from the case at hand as TeliaSonera was not operated by the same individuals or in the same way as VimpelCom. In fact, TeliaSonera was a competitor of VimpelCom's. Because the investigation was targeting

TeliaSonera, VimpelCom's competitor, not Takilant, the actual partner of VimpelCom, the inference that an investigation against TeliaSonera regarding connections to Takilant materialized the risk of a similar investigation against VimpelCom is too attenuated to support loss causation. *Lentell*, 396 F.3d at 174 ("[I]f the connection is attenuated, or if the plaintiff fails to 'demonstrate a causal connection between the content of the alleged misstatements or omissions and the harm actually suffered' … a fraud claim will not lie." (quoting *Emergent Cap. Inv. Mgmt., LLC v. Stonepath Grp., Inc.*, 343 F.3d 189, 199 (2d Cir. 2003)).

This disclosure does not relate back to the previously alleged false statements.

### b. March 24, 2014, Corrective Disclosure

The new corrective disclosure, dated March 24, 2014, alleges that Swedish prosecutors found a concrete basis to conclude Karimova orchestrated, controlled, and primarily benefited from the bribery scheme between Takilant and TeliaSonera. *See* TAC ¶ 16. Reading the complaint in the light most favorable to the Plaintiff, this disclosure created an inference that Avakyan was solely a straw for Karimova and therefore that VimpelCom had partnered with a company structured to benefit Karimova. This disclosure that Takilant was controlled by Karimova and operated primarily for her benefit then materialized risk of VimpelCom's alleged bribery. This is more direct than the previous disclosure because this disclosure exposed that the investigation implicated Takilant and Karimova directly, rather than just VimpelCom's competitor, and that the investigation had uncovered concrete information about Takilant's operations. *See Lentell*, 396 F.3d at 174. Therefore, as in the 2017 Order, this disclosure conveys that "government agencies were investigating the entities related to [VimpelCom's] bribes," which the Court found materialized VimpelCom's concealed risk. 2017 Order at *12.

Defendant argues that a disclosure about another company cannot materialize a concealed risk for VimpelCom. Defendant's Letter at 2. The Court agrees in principle but finds that this disclosure did not solely implicate TeliaSonera. In drawing all reasonable inferences in favor of the Plaintiff, this disclosure allegedly exposed that VimpelCom itself engaged in business transactions to benefit Karimova through Takilant and therefore called into question all three 2017 Statements. *Id.* Whether VimpelCom was reliant on bribes to maintain its operation in Uzbekistan creates doubt as to the cause of the company's growth in Uzbekistan, the strength of its internal controls, and the basis of its legal protection. *Id.*; *supra* 2017 Statement 1, 2, 3.

This conclusion is not impacted by the case Defendant offered to support its position. Memorandum of Law in Support of Motion to Dismiss the Third Amended Complaint, ECF No. 242 at 18 (citing *Ontario Publ. Serv. Emps. Union Pension Trust Fund v. Nortel Networks Corp.*, 369 F.3d 27 (2d Cir. 2004)). In *Ontario Public Services*, a different company than the defendant made the false statement at issue. 369 F.3d at 34. Here the alleged false statements are still that of VimpelCom, even though the disclosure may implicate third parties in addition to the Defendant. This disclosure therefore relates back to the previously alleged false statements.

    c. *December 4, 2014, Corrective Disclosure*

As the Parties do not dispute that this disclosure is connected to the 2017 Statements, the Court need not consider whether it does. Defendant's Letter at 1. This disclosure relates back to the previously alleged false statements.

    d. *August 20, 2015, Corrective Disclosure*

The new corrective disclosure, dated August 20, 2015, alleges that "U.S. prosecutors were seeking to freeze $1 billion of Takilant's money and that Swiss prosecutors had seized $828 million and even expanded their probe against Karimova." TAC ¶ 19. This is again a disclosure

that "government agencies were investigating the entities related to [VimpelCom's] bribes," which this Court found materialized VimpelCom's risk. 2017 Order at *12. Additionally, this risk is not attenuated as it directly implicates VimpelCom's partner, Takilant, and the disclosure infers that the investigations against it were ramping up. *See Lentell*, 396 F.3d at 174. The disclosure then conveys the dubious nature of the 2017 Statements as to VimpelCom's management, success, and protection in Uzbekistan. 2017 Order at 12-17; *see supra* 2017 Statements 1, 2, 3.

But, as stated before, when pleading under the materialization of a risk theory, Plaintiff still must show that the disclosure related to concealed information and "negatively affected the value of the security." *DoubleLine*, 323 F. Supp. 3d at 456 (citing *Lentell*, 396 F.3d at 173). When additional disclosures do not reveal additional falsity of actionable misstatements then they are not corrective disclosures. *DoubleLine*, 323 F. Supp. 3d at 458-59.

In *DoubleLine*, plaintiffs argued that news articles which disclosed details about a company's bribery scheme in Brazil were corrective disclosures. *See id.* at 458. The court accepted some of those statements as corrective disclosures and rejected others for revealing information that had already been disclosed. *See id.* Even when corrective disclosures offered additional details about the defendant's bribery scheme, those details had to "reveal the falsity" of an actionable misstatement to establish loss causation. *Id.*

Plaintiff's August 20, 2015 corrective disclosure suffers from the same issue. This disclosure, regarding the investigations and financial assets of Takilant and Karimova, does not reveal information that the other disclosures fail to expose. Plaintiff argues that these investigation developments reveal that Takilant was a front for bribery and an entity related to the bribes. Plaintiff's Letter at 3. But Plaintiff argues the disclosures from January 8, 2013, and March 24, 2014, did the same. Even if this disclosure exposes additional details about the extent of the

financial risk—given the monetary penalties suffered by Takilant—it does not expose new concealed information. *DoubleLine*, 323 F. Supp. 3d at 458. Therefore, it does not relate back to the previously alleged false statements.

### e. October 30 and 31, 2015, Corrective Disclosures

The last new corrective disclosures allege that a Norwegian-language article dated October 30, 2015, which was linked in a *Bloomberg* article discussing the Swiss investigation dated the October 31, 2025, reported that high level Telenor directors and executives knew of the bribes, which in turn suggested that high-level VimpelCom directors and executives likewise knew of them. TAC ¶ 20. This is again a disclosure that "government agencies were investigating the entities related to [VimpelCom's] bribes," which materialize VimpelCom's risk. 2017 Order at *12. These disclosures are sufficiently direct since they implicate the awareness VimpelCom and its major stockholder, Telenor, had of the alleged bribery scheme. *See Lentell*, 396 F.3d at 174. This knowledge would in turn expose the falsity of VimpelCom's 2017 Statements as to its management, success, and treatment in Uzbekistan. 2017 Order at 12-17; *see supra* 2017 Statement 1, 2, 3. Additionally, the disclosure in the Norwegian-language article does reveal new concealed information: that executives were aware of the bribery. *DoubleLine*, 323 F. Supp. 3d at 458. The Bloomberg article, on the other hand, only "reported that the previous day, [a] Norwegian-language newspaper … had published a Norwegian-language article providing more details on the incident." TAC ¶ 157. The Bloomberg article did not contain new information but rather conveyed the reporting of the Norwegian-language article. *DoubleLine*, 323 F. Supp. 3d at 458. With no new information, the October 31 disclosure in the *Bloomberg* article cannot support loss causation. Therefore, the October 30, 2015 disclosure relates back to the previously alleged false statements, but the disclosure from the October 31, 2015 does not.

## CONCLUSION

The Court finds that the newly alleged corrective disclosures from March 24, 2014, December 4, 2014, and October 30, 2015 relate back to the previous misstatements this Court found actionable in 2017. Further, the newly alleged corrective disclosures from January 8, 2013, August 20, 2015, and October 31, 2015 do not relate back to the actionable false statements and Plaintiff may not proceed with them.

The parties are hereby **ORDERED** to contact Magistrate Judge Ona T. Wang to proceed with general pre-trial matters.

SO ORDERED.

**Dated: January 10, 2025**
     **New York, New York**

_____
**ANDREW L. CARTER, JR.**
**United States District Judge**